# EXHIBIT I

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN D. COLLINS, Individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | JURY TRIAL DEMANDED |
| DOCUSIGN, INC., DANIEL D. SPRINGER, MICHAEL J. SHERIDAN, and CYNTHIA GAYLOR, | CLASS ACTION |
| Defendants. | |

Plaintiff Brian D. Collins, ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DocuSign, Inc. ("DocuSign" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

1

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities who purchased the publicly traded securities of DocuSign between March 27, 2020 and December 2, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased DocuSign's securities during the Class Period and was economically damaged thereby.

7.      Defendant DocuSign purportedly offers the Agreement Cloud, a broad cloud-based software suite that enables users to automate the agreement process and provide legally binding e-signatures from nearly any device. The Company is incorporated in Delaware with its principal executive offices located at 221 Main St., Suite 1550, San Francisco, CA 94105. The Company's securities are traded on NASDAQ under the ticker symbol "DOCU."

8.      Defendant Daniel D. Springer ("Springer") has served as DocuSign's Chief Executive Officer throughout the Class Period.

9.      Defendant Michael J. Sheridan ("Sheridan") has served as DocuSign's Chief Financial Officer from at least the start of the Class Period to September 2020.

10.     Defendant Cynthia Gaylor ("Gaylor") has served as DocuSign's Chief Financial Officer from September 2020 and at all relevant times thereafter.

11.     Defendants Springer, Sheridan, and Gaylor are sometimes referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

3

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

13.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**
**Materially False and Misleading Statements**

16.     On March 27, 2020, DocuSign filed a Form 10-K for the fiscal year ended January 31, 2020 (the "2020 10-K"). Attached to the 2020 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Springer and Sheridan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

17.     The 2020 10-K listed among its Risk Factors the potential harm the then-new Covid-19 pandemic could have on the Company's business. In pertinent part, the 2020 10-K stated:

"*The recent coronavirus outbreak could harm our business and results of operations.*

The World Health Organization declared in March 2020 that the recent outbreak of the coronavirus disease named COVID-19 constitutes a pandemic. We have undertaken measures to protect our employees, partners and customers, including by adopting a virtual meeting in lieu of our annual North American DocuSign Momentum conference and by requiring almost all employees to work remotely until at least March 31, 2020. There can be no assurance that these measures will be effective, however, or that we can adopt them without adversely affecting our business operations. *In addition, the coronavirus outbreak has created and may continue to create significant uncertainty in global financial markets, which may decrease technology spending, depress demand for our solutions, and harm our business and results of operations.*

*       *       *

*Unfavorable conditions in our industry or the global economy or reductions in information technology spending could limit our ability to grow our business and negatively affect our operating results.*

Our operating results may vary based on the impact of changes in our industry or the global economy on us and our existing and prospective customers. The revenue growth and potential profitability of our business depend on demand for our products and solutions. *Current or future economic uncertainties or downturns could adversely affect our business and operating results.* Negative conditions in the general economy both in the United States and abroad, including conditions resulting from changes in gross domestic product growth, financial and credit market fluctuations, political turmoil, natural catastrophes, warfare and terrorist attacks on the United States, Europe, the Asia Pacific region or elsewhere, could cause a decrease in business investments, including spending on information technology, and negatively affect the growth of our business. In addition, the recent outbreak of the coronavirus has created significant additional uncertainty in the global economy. *If the coronavirus outbreak worsens, especially in regions in which we have material operations or sales, such as the United States, Canada, the United Kingdom, France, Germany, Ireland Israel, Australia, Singapore, Japan or Brazil, our business activities originating from affected areas, including sales-related activities, could be adversely affected.*

*       *       *

*Our current operations are international in scope and we plan further geographic expansion, creating a variety of operational challenges.*

[. . .]

5

Our current international operations and future initiatives involve a variety of risks, including:

[. . .]

exposure to regional public health issues, such as the recent outbreak of coronavirus, and to travel restrictions and other measures undertaken by governments in response to such issues;

\* \* \*

**Our stock price may be volatile, and the value of our common stock may decline.**

The market price of our common stock may be highly volatile and ***may fluctuate or decline substantially*** as a result of a variety of factors, some of which are beyond our control or are related in complex ways, including:

[. . .]

terrorist attacks, natural disasters, public health crises (such as the recent coronavirus outbreak) or other such events impacting countries where we have operations[.]"

(Emphasis added.)

18.     On June 4, 2020, DocuSign held an earnings conference call for its first quarter fiscal 2021 ("1Q 2021 Earnings Call"). During the 1Q 2021 Earnings Call, Defendant Springer said, in relevant part:

"The COVID-19 pandemic has fundamentally shifted the global macroeconomic environment and impacted countless lives around the world.

\* \* \*

***Much of the strong Q1 performance was driven by increased demand for eSignature from organizations that suddenly needed a way to sign and manage agreements from wherever they were.*** Typically, eSignature is the first step that many customers take on their broader digital transformation journey with us. So ***from a financial point of view, we believe this surge in eSignature adoption bodes well for future Agreement Cloud expansion.***

\* \* \*

Let me speak briefly about where we see things going from here. ***While no one is 100% sure what the world will look like, it's clear that the ways of doing business are changing. Remote work is here to stay.*** Core business processes will only become more digital and agreements will need to be completed from anywhere, at any time on almost any device. As a result, for organizations that hadn't already embraced DocuSign for eSignature, that were only using us for a few select use cases, the pandemic has been a catalyst for the greater digital transformation of their end-to-end agreement processes. We always believed this transformation will happen and that a unifying platform for agreements will be needed. COVID-19 is just happening faster.

That said, ***even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes. Once they take their first digital transformation steps with us and they realize the time, cost and customer experience benefits, they rarely go back. So, in short, we expect the adoption of our core eSignature offering by new customers and the expansion of use cases by existing ones to continue.*** This also acts as the on-ramp for the adoption of other Agreement Cloud products, sometimes at the same time, sometimes as follow on's.

\*       \*       \*

Yeah, ***I don't think we've seen anything particularly from COVID that would accelerate that move where we work with one or two divisions and now we get more of an enterprise solution*** other than the same macro piece we talked about, which is, ***as companies are increasingly seeing the need to drive the digital transformation, that's accelerating. It probably, at the same rate, would accelerate those expansions from divisional projects to broader enterprisewide solutions.*** But I think, at this point, we'd say, that phenomenon is occurring. It's always been a big growth opportunity for us and I think it's ***the same big growth opportunity for us going forward, but I don't think COVID acceleration of digital transformation is going to change that phenomenon or that rate at which we see that going, other than just making everything go a little bit faster.***"

(Emphasis added.)

19.    On September 3, 2021, DocuSign held an earnings conference call for its second quarter fiscal 2021 ("2Q 2021 Earnings Call"). During the 2Q 2021 Earnings Call, Defendant Springer said, in pertinent part:

"The interest in transforming other parts of the agreement process is growing, too. And that, in turn, creates a pipeline for the rest of the Agreement Cloud suite. Now let me give you some examples of recent customer wins and expansion. One of our largest retail customers runs a network of healthcare clinics within its source.

7

When COVID-19 hit, the company accelerated plans to provide telehealth services using DocuSign eSignature to handle consent and other paperwork remotely. ***This is a great example of COVID-accelerated demand that we see as durable. Now telehealth will remain after COVID-19, but the paperless processes that came with it will likely end up getting implemented for in-person clinic visits too because the electronic way is more efficient and a better experience than paper and clipboards.*** Another example is from a large financial institution that's a longtime DocuSign customer.

The company already uses eSignature widely. But when COVID-19 hit, it accelerated plans for further rollouts. And together we helped activate 11 new lines of business. ***This illustrates a pattern we're seeing where established customers are now bringing eSignature to new divisions, departments, and regions.***

\*     \*     \*

Not just on sales capacity, of course, marketing capacity as well and customer success capacity. And so ***we are endeavoring to stay ahead of the trends that we're seeing. We're looking at the demand data very carefully to try to forecast the trends and get ahead of that with capacity across the business.*** In terms of what will we anticipate post-COVID, I don't know that anybody has a great answer for that.

It is our view that as we work through these difficult times, though, ***there's a greater awareness of need to digitize the business. And we believe that that's going to be sustained even after things return to whatever normal looks like in the future. So we do believe that we're entering into a period of a "new normal."*** It doesn't necessarily mean that the highs of any particular quarter are going to be sustained forever. But at the same time, ***we don't see trends that things are going to return to the way they looked and trended pre-COVID.***

So we're designing the business, we're designing our marketing activities and our sales activities to stay on top of that as possible.

\*     \*     \*

One thing that's always hard in answering a question around sort of more tectonic shifts like that is what's behind it? Is it a maturation of our business? Is it related to COVID, etc.? ***My view is from a COVID standpoint***, was the nature of your question, is ***we went through a period of time where people just got very focused 6 months ago on we just need to get things up and going quickly. We need to work in a remote environment.***

[. . .]

8

*And I think the number of people that are rushing to us saying, "I need to make a quick adjustment to be able to deal with it like that," if they haven't got it done by now, I think they missed that window. What we are seeing now is people saying, "Wow, this is fantastic. There are more places where I could leverage this in my business."* And we're looking at expansion, as we talked about, of use cases within our base to more and more places that as I said before, we think they would have gotten there eventually. *It just accelerated those, and we're continuing to see that acceleration of those workflows into DocuSign because they realize how beneficial they are to their business.*

From a standpoint of that more platform thinking, I don't know that I would say I've seen that increase. *And I don't know if I'd say this increase would be due to COVID. The natural maturation for a lot of folks with us around the Agreement Cloud opportunity is as they start hearing us describe the future, they say, "You know what, I could see you as a more strategic part of my sort of IT infrastructure and my business process infrastructure." And so I think that's occurring more and more, but I think that's more to do with the fact that we're just getting bigger and having larger relationships with companies as we scale.* You look at that number of customers above $300,000, it's just sort of, one minute, that keeps growing, right, substantially.

And so I think *that's driving it more than a COVID reaction.* But again, it's hard to sort of separate out each of those components, but that would be my view."

(Emphasis added.)

20.     On December 3, 2020, DocuSign held an earnings conference call for its third quarter fiscal 2021 ("3Q 2021 Earnings Call"). During the 3Q 2021 Earnings Call, Defendant Springer, in relevant part, said:

"As COVID-19 has accelerated the digital transformation of key business and agreement processes, *DocuSign has become an increasingly essential cloud software platform. The last few quarters of heightened demand have offered a glimpse into the long-term growth opportunity we have.*

\*      \*      \*

As part of the response to COVID-19, the company expanded into several new eSignature use cases, which drove nearly 100,000 additional transactions over just the past seven months. As I alluded to earlier, the insurer believes this will become business as usual from here on in. This last point reinforces something that history has taught us at DocuSign.

9

*When customers go from paper-based processes to digital agreement processes, they do not go back.* We believe that trend will hold when the pandemic subsides, and the *DocuSign's value will persist no matter how the future of work unfolds.* We're not waiting for the future, though, as we continue to innovate across the entire Agreement Cloud suite."

(Emphasis added.)

21.     On March 11, 2021, DocuSign held an earnings conference call for its fourth quarter fiscal 2021 ("4Q 2021 Earnings Call"). During the 4Q 2021 Earnings Call, Defendant Springer, in pertinent part, said:

"As a team, DocuSign was honored to play a role supporting people all over the world as they responded to the pandemic. *We gained new customers, we expanded our relationship with others and we saw a surge in adoption of our products as accelerating a trend already under way, the digital transformation of agreements.* This transformation not only allows agreements to be prepared, signed, act on and managed from anywhere. It also allows greater speed and efficiency than manual paper-based processes.

As a result, *we don't believe our new or expanded customers will be going back to paper even after the pandemic recedes.* We also don't believe life will go back to the way it was before. Of course, many in-person activities will be welcomed back. *But when people found better ways during the pandemic, we believe those will continue and flourish, whether it's total or partial work from home, virtual visits to medical professionals or getting a document notarized remotely.*

                              *       *       *

Our view, though, coming out of fiscal-year '21, particularly coming out of Q4 here, is we're seeing that -- the build, the pipeline build again. *And so we're quite optimistic that we're gonna see sort of that reacceleration that we saw a little over a year ago* with CLM in particular. And then -- and the sense we're seeing that is it's going to be not so much in our smallest or largest customers, but it's going to go most quickly in those mid-market or commercial businesses, where it tends to be a little bit more fast-moving than the largest enterprises, but having a little bit more scale and need for a full CLM-like solution than our SMB customers. So that's where we see that developing.

                              *       *       *

We haven't seen anything. I don't know whether we would be a leading or a lagging indicator, Pat. *But we haven't seen anything in our business that suggests that that will change. Now if you recall, we've said this about -- starting about three*

10

*quarters ago, that our forecast on this is that the people that have come with new customers or new use cases to DocuSign that are COVID-19-centric, they're not going back.*

*People aren't going back to paper. They're not going back to manual processing. So the real question, I think, is interesting in your question is, will that rate of new people coming to us change with -- as we start to move into some sort of return to "normalcy". We haven't seen any change yet.*

And maybe that the change isn't enough and there's not enough new activity to have driven the change in the demand environment. But at this point, yes, we haven't seen a change yet."

(Emphasis added.)

22.    On June 3, 2021, DocuSign held an earnings conference call for its first quarter fiscal 2022 ("1Q 2022 Earnings Call"). During the 1Q 2022 Earnings Call, Defendant Springer stated, in relevant part:

"Since the start of the pandemic, DocuSign has helped accelerate access to healthcare, government, education, small business lending, and many other services around the world. *What began as an urgent need has now transformed into a strategic priority. And as a result, DocuSign has become an indispensable part of many organizations' business processes. Put another way, once businesses digitally transform their agreement processes, they simply don't go back.*

*We believe this trend will only accelerate as the anywhere economy continues to emerge.* In fact, just a few weeks ago, we were excited to welcome DocuSign's 1 millionth customer in this platform. *And this move to digital has manifested itself in a great start to the year with Docusign. We saw strong performance on all fronts, delivering a balance of growth and profitability at scale* [Audio gap].

\*      \*      \*

We're seeing that the phenomenon of that strong customer growth is why you see the net retention rate so high.

It's why you see to the last question from Karl is he was able to talk about such a strong guide that at rates we had not achieved previously, you know, *for COVID from a billings standpoint and revenue standpoint because we are seeing that underlying demand is so strong from the customers, and I really think the key to it is it's what we talked about in the beginning of the call. So the phenomenon that people, once they see the benefits of the digital transformation, and particularly around the Agreement Cloud from having opportunity to grow their*

11

*business with us, they don't go back. In fact, they look for additional opportunities to expand.* So I don't think -- we don't talk about the Q1 pull forward like it was some fixed amount to pull forward that pays Peter and takes in Paul.

We look at it as just an increasing demand. And it really goes back, and you and I have talked about in the past, to the TAM. We are still in the early days, even of just the eSignature business. Our penetration is so low that it's a very, very large ocean from which we're pulling forward that continued strong customer demand.

So that's how we look at it. I think it's fairly straightforward.

\*          \*          \*

And quite frankly, if you think about during COVID, we didn't see the nature of the signature transactions different. They just were faster, right? And so we saw again that acceleration occurred. And as Cynthia pointed out, you know, as we're kind of rounding those quarters, and in many ways, *I think starting to move into whatever the new normal will be, we're still seeing sort of an accelerated rate of that customer demand.* But I wouldn't say it's the size of the transactions are bigger."

(Emphasis added.)

23.     On September 2, 2021, DocuSign held an earnings conference call for its second quarter fiscal 2022 ("2Q 2022 Earnings Call"). During the 2Q 2022 Earnings Call, Defendant Springer stated, in relevant part:

> "Overall, I am proud of how our team has continued to stay in front of the evolving COVID business environment. We are helping organizations of all sizes leverage the power of the Agreement Cloud to digitize the foundation of doing business, the agreement process. *Not only do customers see DocuSign as a vital part of their response to COVID.*
>
> *Many have also seen a better way of doing business from anywhere. And we believe that will become their new normal.*
>
> \*          \*          \*
>
> I think it's a pretty strong guide. If you look at the historical rates the company has grown, we feel pretty good about it, considering that the last time we were giving guidance before the pandemic, our company was half the size. So we've doubled, and we're still looking at what I think are really strong guide, particularly on revenue, but as well on billing. So I'll let Cynthia give you her view on that.

12

In terms of your question about what's happened in the marketplace, I mean, we feel good. We feel like we're seeing a lot of demand. We're happy with the new customer adds. We're happy with the revenue growth.

Again, if you asked me a couple of years ago, how I feel about five numbers in front of our growth rates and revenue, I feel pretty good. So I don't think there's a perspective we have that the business has some significant slowdown. I do think what Cynthia said, and I would reiterate, that the peak of COVID, that was a big tailwind for us. And so for us to do the work to try to create growth that would look like that, long run, I think it would be very, very difficult to be able to deliver that.

But I do think we're going to continue to have strong growth rates. I'll let Cynthia talk specifically to the guide. But from a standpoint of in the marketplace, *we're not seeing any differences in churn rates in any meaningful way. We're not seeing -- customers very rarely leave us.*"

24.     The statements referenced in ¶¶16-23 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the impact of the Covid-19 pandemic on DocuSign's business was positive, not negative; (2) DocuSign misrepresented the role that the Covid-19 pandemic had on its growth; (3) DocuSign downplayed the impact that a 'return to normal' would have on the Company's growth and business; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

## The Truth Emerges

25.     On December 2, 2021, after market hours, DocuSign held an earnings conference call for its third quarter fiscal year 2022 ("3Q 2022 Earnings Call"). During the 3Q 2022 Earnings Call, the Company revealed that its anticipated growth for the fourth quarter of 2022 would be lower than expected. Defendant Springer discussed this slowdown, alleging that the growth boost

from the Covid-19 pandemic had deteriorated earlier than expected – a growth boost that the

Company did not acknowledge until this point. Defendant springer stated, in pertinent part:

> "Revenue grew 42% year over year to $545 million and operating margin reached 22%, exceeding our guidance. International was again a bright spot at 68% year-over-year growth and now 23% of total revenue. However, ***we fell short of our billings guidance, coming in at 28% year-over-year growth.*** We expanded our customer base to 1.11 million and we continue to see strong dollar net retention of 121%.
>
> The market dynamics that we saw in the third quarter were markedly different from what we experienced in the first half of this year. ***With the boost from COVID-19 over the past year and a half, we experienced exceptionally high growth rates at scale as we captured customer demand at an unprecedented pace.*** As we move through Q3 and into the second half of the year, ***we saw demand slow and the urgency of customers' buying patterns temper. While we had expected an eventual step-down from the peak levels of growth achieved during the height of the pandemic, the environment shifted more quickly than we anticipated, and these were the primary contributors to our billing results in Q3 and our outlook for Q4.***
>
> \*   \*   \*
>
> So I don't think we're going to be providing guidance for next year, as you would probably expect, Sterling. But let me talk a little bit about sort of the sources of the change and hopefully, that will be able to give you some perspective on how we think about it. As we talked about in the comments upfront, first half of this year, ***we actually expected to see more of that impact coming out of the kind of the COVID extra demand we had experienced.*** And we didn't, right? And so, we ended up outperforming in the first half by probably more than we expected.
>
> But in the second half, ***we saw this now come in much more dramatically in terms of that impact of the removal of that tailwind, if you will. And I think there's sort of two components to it. One, that there is just sort of a change in the buying urgency we've seen from customers.*** And throughout the COVID era, we had a lot of folks who really needed to get things in place, particularly if they had a large part of their employee base working from home and needed to leverage the benefits of the work-from-anywhere solutions that we have at DocuSign.
>
> \*   \*   \*
>
> If you want to think about the three different factors, Stan, that we talked about in terms of the change from first half to second half, ***we always expected there to be a reduction of that really heightened COVID buying, which drove our growth***

*rates dramatically higher than they had ever been* even as we got bigger. So we expected that."

(Emphasis added.)

26. Also on December 2, 2021, DocuSign published a press release announcing its third-quarter fiscal year 2022 financial results and guidance for the fourth-quarter fiscal year 2022. The guidance provided, in pertinent part, midpoint revenue guidance of $560 million, missing analysts' consensus estimates of $573.8 million. The guidance also provided a billing guidance of $653 million, missing consensus estimates of $705.4 million.

27. On this news, DocuSign's stock price plummeted $98.73 per share, or over 42%, to close at $135.09 per share on December 3, 2021, damaging investors.

28. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the publicly traded securities of DocuSign during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

15

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

16

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the

17

Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

36. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

38. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

40. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

18

41.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

42.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

43.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

19

44.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

45.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

46.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

47.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

48.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

20

49.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

50.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

51.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

52.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

53.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 22, 2021   Respectfully submitted,

          **THE ROSEN LAW FIRM, P.A.**

          By: /s/ Phillip Kim
          Phillip Kim, Esq. (PK 9384)
          Laurence M. Rosen, Esq. (LR 5733)
          275 Madison Ave., 40th Floor
          New York, NY 10016
          Tel: (212) 686-1060
          Fax: (212) 202-3827
          Email: pkim@rosenlegal.com
          Email: lrosen@rosenlegal.com

          *Counsel for Plaintiff*