Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY CHENG, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>ACTIVISION BLIZZARD, INC., ROBERT A. KOTICK, DENNIS DURKIN, SPENCER NEUMANN, ARMIN ZERZA, and BRIAN KELLY,<br><br>    Defendants. | Case No. 2:21-cv-06240-PA-JEM<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br><u>CLASS ACTION</u><br><br>JUDGE:   Hon. Percy Anderson<br>HEARING: February 28, 2022<br>TIME:     1:30 p.m.<br>CTRM:    9A |

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND .................................................................................2

    A.   Activision and the Individual Defendants......................................................2

    B.   The DFEH and EEOC Investigations and Pervasive Misconduct................3

    C.   Defendants Mislead Investors.......................................................................5

    D.   The Truth Comes Out Causing Chaos at Activision......................................6

ARGUMENT .........................................................................................................8

    I.   THE AC ALLEGES ACTIONABLE MISSTATEMENTS........................8

        A.   Defendants' Legal Proceedings Statements are False and Misleading.....................................................................................8

        B.   The PSLRA's Safe Harbor Does Not Apply. ........................................13

        C.   Item 103 Required Disclosure of the Investigations. ...........................15

        D.   The Code of Conduct Statements Are Actionable................................16

        E.   The ESG Report Statement is Actionable. ...........................................19

    II.   THE AC ADEQUATELY ALLEGES SCIENTER. ................................20

        A.   Defendants Made Misstatements Knowingly or Recklessly. ...............20

        B.   The AC's Motive Allegations Support the Inference of Scienter. ........24

        C.   The AC Alleges Corporate Scienter. ....................................................25

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp.3d 189 (E.D. Pa. 2021) ....................................................................16

*Ansell v. Laikin*,
2011 WL 3274019 (C.D. Cal. Aug. 1, 2011)........................................................18

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................8, 21

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ...............................................................................17

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ...............................................................14

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) ..................................................................24

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)..................................................................18

*Hollinger v. Titan Cap. Corp.*,
914 F.2d 1564 (9th Cir. 1990) ..............................................................................25

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 174119 (C.D. Cal. Jan. 16, 2013) .........................................................19

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................23

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) ....................................................................22

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008)..................................................................13

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................................19

*In re Finisar Corp. Sec. Litig.*,
No, 2017 WL 1549485 (N.D. Cal. May 1, 2017)....................................................22

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019) .....................................................................17

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ..........................................................22

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ...............................................................15, 25

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................................................................19

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................................14

*In re Quantumscape Sec. Litig.*,
2022 WL 137729 (N.D. Cal. Jan. 14, 2022)............................................................13

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)..........................................................17

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ...................................................................................12

*In re Sunrun, Inc. Sec. Litig.*,
2018 WL 10323335 (N.D. Cal. July 19, 2018) ........................................................23

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .............................................................................18, 22

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ...................................................................................14

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)..................................................................................................19

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ........................................................24

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) .............................................................................14

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)...............................................................................25

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
2018 WL 1230570 (C.D. Cal. Jan. 8, 2018) ..................................................10, 11

*Maiman v. Talbott*,
2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) .....................................................20

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
164 F.Supp.3d 568 (S.D.N.Y. 2016) ..................................................11, 12, 15, 22

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................20

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...............................................................8, 13, 20, 25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)..........................................................................................9, 10

*Reese v. BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) .................................................................................8

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ...............................................................................20

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ........................................................................16, 17

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ...............................................................................21

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009) .............................................................................15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................................................20, 24

**Statutes**

15 U.S.C § 78u-5(b)(2)(A) ..................................................................................13

**Rules**

Fed. R. Civ. P. 15 ................................................................................................25

**Regulations**

17 C.F.R. §229.103 ...............................................................................................15

17 C.F.R. § 229.406 ..............................................................................................16

## **INTRODUCTION**

In fall of 2018, in the wake of the #MeToo movement, the U.S. Equal Employment Opportunity Commission (the "EEOC") and the California Department of Fair Employment and Housing (the "DFEH") opened investigations into Activision Blizzard, Inc.'s ("Activision" or the "Company") systemic culture of sexual harassment, discrimination, and retaliation against its female employees (the "Investigations"). Defendants then lied to shareholders for more than two years by stating in all the Company's 10-Ks and 10-Qs that any undisclosed investigations were "routine," "in the ordinary course of business," "not significant," and were not expected "to have a material adverse effect." When the DFEH filed its public complaint on July 20, 2021, revealing the depraved pattern of behavior towards women at Activision and management's utter indifference towards it, it destabilized the Company. The uproar among Activision's employees and the public led to the firing or resignation of numerous key employees, including the President of the Blizzard Entertainment ("Blizzard") segment where the misconduct was concentrated. These departures delayed Blizzard's two most important new video game releases, causing a huge drop in the Company's stock price. At the end of the Class Period, its stock price was $66.14, a more than $25 drop from the price prior to when the DFEH publicly filed its complaint. The U.S. Securities and Exchange Commission ("SEC") also opened an investigation into the Company, further undermining Defendants' claim that this is not a securities case.

*First*, the Complaint pleads falsity for the statements concerning undisclosed legal proceedings and investigations. Defendants try to confuse things by lumping together two sentences and claiming both are opinions. The first sentence, however, is clearly a statement of fact that all undisclosed investigations were "routine" and "in the ordinary course of business." Two government agencies initiating investigations into systemic sexual harassment, discrimination, and retaliation do not come anywhere close to fitting that description. The second sentence says that

MEM. OF PTS. AND AUTH. IN OPP. TO MTD                    2:21-cv-06240-PA-JEM

in the "opinion of management" the undisclosed investigations were "not significant" and  were not expected "to have a material adverse effect on our business." Despite being an opinion, this statement is also actionable because the omission of facts going to the basis of the opinion — the existence of the Investigations — made it misleading to a reasonable person reading the statement.

*Second*, the Private Securities Litigation Reform Act's (the "PSLRA") safe harbor does not apply to the legal proceedings statements for multiple reasons: (1) there is a statutory exception for statements appearing in a financial statement prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (2) the Ninth Circuit has held that similar legal disclosures are not forward looking; (3) even if the portion of each statement after the term "expect" is forward-looking, that does not render the rest each statement forward-looking; (4) Defendants' "cautionary" language is too general; and (5) Defendants had actual knowledge their statements were false because they were aware of the Investigations.

*Third*, Defendants' code of conduct and Environmental, Social, and Governance Report ("ESG Report") statements are actionable because they are specific and objectively verifiable, and the allegations that sexual harassment and retaliation were pervasive and tolerated at Activision is overwhelming.

*Fourth*, Plaintiffs plead scienter because ***Defendants do not dispute they knew about the Investigations***. Accordingly, when they made their misstatements they knew or recklessly disregarded that they were misleading. There are also specific allegations that Defendant Kotick knew about pervasive sexual harassment at the Company and was motived to suppress the Investigations so he could receive a $150 million bonus based on maintaining the Company's stock price.

The Court should deny Defendants' Motion to dismiss in its entirety.

## FACTUAL BACKGROUND

**A. Activision and the Individual Defendants.**

Activision is one the largest developers and publishers of video games and

also operates esports leagues, which are competitive video game playing leagues. ¶54.[1] The Company has three reportable segments, Blizzard, Activision Publishing, Inc., and King Digital Entertainment. ¶57. Between 2016 and 2020, Blizzard generated between 24% and 34% of Activision's net revenue every year. ¶62.

Defendant Kotick has served as Chief Executive Officer ("CEO") and a director since 1991. ¶43. Defendant Durkin served as Chief Financial Officer ("CFO") from March 2012 to May 2017 and from January 2019 to April 2021 and served as Chief Corporate Officer in between. ¶44. Defendant Neumann served as the CFO from May 2017 to January 2019. ¶45. Defendant Zerza has served as CFO from April 2021 to present and served as Chief Operating Officer ("COO") of Blizzard from October 2017 to April 2021 and CFO of Blizzard from August 2015 to September 2017. ¶46. Defendant Kelly has served as Chairman of the Board since 2013, Co-Chairman of the Board from October 1998 to 2013, and as a director since 1995. ¶47. Collectively, they are the "Individual Defendants."

During the Class Period, the Company emphasized in its proxy statements that its "inclusive culture" was "mission critical" and a reason it was in the *Fortune* 100 best companies to work for five years running and earned a 100 on the Human Rights Campaign's Equity Index. ¶¶65-66. In 2021, Activision stated that executive bonuses would be tied to diversity, equity, and inclusion metrics. ¶67.

**B. The DFEH and EEOC Investigations and Pervasive Misconduct.**

The EEOC and DFEH began the Investigations, concerning systemic sexual harassment, discrimination, and retaliation at Activision on September 26, 2018 and October 12, 2018, respectively. ¶¶87-90. The peril this posed should have been apparent to Defendants because the MeToo# movement had led to numerous firings of high profile executives starting in late 2017, and was still going strong. ¶183.

The Investigations were also perilous for Activision because as the DFEH and EEOC would document, sexual harassment, discrimination, and retaliation

---

[1] All paragraph references are to the Amended Complaint ("AC") (ECF No. 39).

were endemic at Activision — especially at Blizzard. The DFEH found that "[f]emale employees are subjected to constant sexual harassment," including at alcohol drenched "cube crawls" organized by the Company. ¶96. The DFEH further found that "[h]igh-ranking executives and creators engaged in blatant sexual harassment without repercussions," and cited Senior Creative Director Alex Afrasabi as someone who operated with impunity because of his position — during Blizzard's annual convention, known as BlizzCon, high-level managers nicknamed his suite the "Cosby suite" after alleged rapist Bill Cosby. ¶¶98-100, 102-104. The DFEH also found that Activision engaged in discriminatory practices regarding pay, assignment, and promotion of female employees. ¶¶165-181. After the DFEH filed its public complaint, *The Washington Post* and *Bloomberg* produced investigative reports that confirmed a culture of sexual abuse at Blizzard that reached the highest levels. ¶¶106-114, 143, 151-154. The perpetrators included former Blizzard Chief Technology Officer ("CTO") Ben Kilgore, who was allowed to harass women for years until he was finally fired in 2018. Plaintiffs' investigator also spoke with six Confidential Witnesses ("CWs") who had their own stories of sexual assault and harassment at Blizzard and confirmed their experiences were representative — CW6 said a friend telling her she was sexually assaulted was like hearing "I washed my car today" because it was so common. ¶¶115-129.

All of these sources found that retaliation against women for reporting mistreatment to Human Resources ("HR") was pervasive. ¶¶149-164, 178-180. *The Washington Post* quoted a female longtime Blizzard employee as stating "[HR was] almost like a gang that would ruin your career if you reported certain individuals." ¶151. Four CWs described their experiences of sexual assault and other harassment followed by retaliation or indifference from HR — CW6 was fired due to her reports to HR and CW2 was threatened with firing. ¶¶155-164. Activision admitted to *The Wall Street Journal* ("*WSJ*") that HR began reporting to the Company's corporate office in 2019 due to it previously allowing "some employees to conduct

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD                                            2:21-cv-06240-PA-JEM

themselves in truly regrettable ways." ¶154.

The same *WSJ* report, entitled "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant," found that Defendant Kotick knew about "allegations of employee misconduct in many parts of the company" based on "memos, emails and regulatory requests, and interviews with former employees and others familiar with the company." ¶¶ 130-131. The *WSJ* reported that Kotick "approves high-profile hiring decisions" and is "typically aware of major problems" at all three business units and personally approved Kilgore's firing. ¶132. Kotick knew about a 2020 email that 30 female employees in the Esports' division wrote to their unit leaders complaining of "unwanted touching, demeaning comments, [and] exclusion from important meetings." ¶133. The report also documented that Kotick was aware of sexual assaults in two of the Company's other studios and had engaged in harassment himself. ¶¶134-138.

J. Allen Brack, Blizzard President starting in October 2018, and his predecessor, Michael Morhaime, were aware of the endemic culture of sexual harassment and discrimination. The DFEH found that Brack was aware of Afrasabi's misconduct, but did not stop it, and that an employee complained to Brack of employees quitting due to sexual harassment and sexism. ¶¶ 139-140. CW5 sent Brack an email, which Brack forwarded to the head of HR, documenting ongoing harassment and discrimination. ¶¶141-142, 181. A former assistant to Morhaime wrote in a private Facebook post that she informed him and other executives of rampant misconduct and another former Blizzard employee stated publicly that she wrote a letter to Morhaime about the misconduct. ¶¶143-148.

**C. Defendants Mislead Investors.**

Defendants misled investors for more than two years by stating in their 10-Ks and 10-Qs that all undisclosed investigations were "routine," "in the ordinary course of business," "not significant," and  did not "expect them to have a material adverse effect." ¶¶185, 249, 251, 253, 262. Two weeks after the DFEH publicly

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD                                    2:21-cv-06240-PA-JEM

filed its Complaint, the Company admitted in its 10-Q for the quarterly period ended June 30, 2021 that it was already addressing "adverse consequences to our business" and if the Company experienced "prolonged periods of adverse publicity, significantly reduced productivity or other negative consequences relating to this matter, our business likely would be adversely impacted." ¶187.

During the Class Period, the Company code of conduct falsely stated that the Company does not "tolerate" "sexual harassment" and "retaliation"; that the rules "apply to all employees"; and that the Company "doesn't tolerate discrimination or make employment-related decisions on the basis of a protected characteristic." ¶¶276-286. Activision's ESG Report stated "we do not tolerate retaliation against any employee who makes a good faith report…." ¶288.

**D.  The Truth Comes Out Causing Chaos at Activision.**

After an investigation of more than two years, on July 20, 2021, DFEH publicly filed its Complaint bringing causes of action alleging, *inter alia*, that Activision had illegally allowed sexual harassment, discrimination, and retaliation. ¶¶192-193. The next day, the Company issued an angry denial, stating that the DFEH included "distorted" and "false descriptions of Blizzard's past" and that the Company had been "extremely cooperative" with the DFEH's investigation. ¶194. This denial caused explosive anger across social media, as current and former Activision employees shared their stories of abuse and discrimination and led to more than 2,000 of the company's employees signing an open letter calling the Company's response to the DFEH Complaint "abhorrent and insulting" and planning a walkout. ¶¶195-198. Since it was clear that the Company's denial rang hallow, the Company's stock fell 6.75% to close at $84.05 on July 27, 2021. ¶ 200

With his workforce in revolt, Kotick was forced to apologize, but this did not stop hundreds of his employees from walking out in protest. ¶¶ 201-202. The fallout continued with resignations of Blizzard President Brack and the head of Blizzard HR in early August. ¶205. Brack was replaced by co-heads, one of whom was

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD                                      2:21-cv-06240-PA-JEM

longtime Activision employee Jennifer Oneal, the first woman to head one of Activision's three segments. *Id.* The Game Director for Blizzard's upcoming game, Diablo IV, was fired soon thereafter and, in September, the Executive Producer of Blizzard's Overwatch game left, both due to the scandal. ¶¶209, 221.

On August 23, 2021, the DFEH added claims alleging that the Company had obstructed its investigation by, *inter alia*, shredding documents, claiming harassment and discrimination complaints were privileged, and trying to get employees to waive their rights without informing them of the DFEH investigation. ¶¶210-215. On September 20, 2021 the *WSJ* reported the SEC had opened an investigation and subpoenaed Defendant Kotick. ¶217. Blizzard's Chief Legal Officer left the same day. ¶220. On September 20 and 21, 2021, the Company's stock dropped more than 8% to $73.03. ¶219. On September 27, the EEOC filed its own suit against the Company in federal court, alleging pervasive harassment, discrimination, and relation. The Company settled with the EEOC by agreeing to an onerous three-year consent decree and an $18 million monetary penalty. ¶¶222-229.

The Company has been unable to shake the scandal — it announced it fired 20 people for patterns of misconduct; cancelled BlizzCon; and Kotick reduced his salary to $62,500 in an effort to appear sorry. ¶¶230-233. During its November 2, 2021 earnings call, Activision admitted the departures of Overwatch and Diablo's leadership would cause the next installment of, and consequently revenues tied to, those games to be delayed and that Oneal was departing as co-head of Blizzard. ¶¶234-238. The Company's stock went into free fall, dropping 14% to $66.75. ¶¶239-243. On November 16, 2021, the *WSJ* published its investigation showing that Defendant Kotick knew about this misconduct for years. ¶244. The same article revealed that Oneal had resigned because she had been sexually harassed and discriminated against and that the Company had received 500 harassment and discrimination complaints since DFEH filed its Complaint. ¶245-246. The Company's stock declined 8.3% from its daily high to close at $66.14. ¶247.

## <u>ARGUMENT</u>

On a Rule 12(b)(6) motion, "[a]ll allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff" and "[a] complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts...that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003) ("*America West*").

### I. THE AC ALLEGES ACTIONABLE MISSTATEMENTS.

"A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011).

### A. Defendants' Legal Proceedings Statements are False and Misleading.

Even if Defendants did not otherwise have a duty to disclose the Investigations, once Defendants spoke about Activision's ongoing investigations, they were bound to do so in a way that would not mislead investors. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (holding that while the failure to mention backlog at all might not have been misleading, "once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of").

When Defendants spoke on the topic of ongoing legal proceedings and investigations in each 10-K and 10-Q filed between November 2018 and May 2021, they made multiple misstatements. In its 2018 and 2019 10-Ks, Activision enumerated certain legal proceedings followed by the blanket statement:

> "***In addition, we are party to routine claims, suits investigations…and other proceedings arising in the ordinary course of business***, including with respect to…employment matters…. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits***

- 8 -

***are not significant and we do not expect them to have a material adverse effect on our business***."

¶¶249, 251 (emphasis added).[2] These paragraphs falsely represented to investors that: (i) all claims and investigations not listed were routine and ordinary course, (ii) all such "routine" claims are "not significant," and (iii) management does not expect any of the "routine" claims will have a material effect on the Company.

"Routine" and "Ordinary Course of Business". As an initial matter, to the extent that Defendants assert the statement: "we are party to routine… investigations …and other proceedings arising in the ordinary course of business" is an opinion, they are incorrect. The statement contains no language modifying "routine" or "ordinary course of business" indicating they are opinions. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (explaining that opinions are prefaced with modifiers like "I believe" or "I think," such as "I think the coffee is hot"). The "opinion of management" does not begin until the next sentence. Also, even where a statement incorporates opinion words, "embedded statement of facts" are still treated as factual statements. *Id.* at 185 (explaining that "we use a patented technology to which our competitors do not have access" would be a statement of fact even prefaced by "I believe our TVs have the highest resolution available because…").

A reasonable investor would not have considered the DFEH and EEOC Investigations as "routine" and "in the ordinary course of business." The definition of "routine" is "of a commonplace or repetitious character" and the definition of "ordinary" is "of a kind to be expected in the normal order of events."[3] Given Activision's size, it might be commonplace for the Company to be subject to a modicum of sexual harassment complaints and lawsuits. But it is certainly not

---

[2] The 2nd Quarter 2019 10-Q is the same (*see* Pls.' Ex. 6, defined *infra*). The 2020 10-K and other 10-Qs during the time period each contained the same language starting from "we are party to routine…." ¶¶253, 262.

[3] *See* https://www.merriam-webster.com/dictionary/routine and https://www.merriam-webster.com/dictionary/ordinary.

"commonplace" for two government agencies to initiate independent investigations alleging that a company engages in systemic sexual harassment, discrimination, and retaliation. ¶¶87-90. Furthermore, Activision actively promoted the idea that such investigations were not routine by crediting its "inclusive culture" with making it a great place to work and by stating that having an "inclusive culture where employees feel valued and heard" was "mission critical." ¶¶ 65-67.

The media's reaction to the Investigations belies any notion that the Investigations were ordinary or routine. The truth about how women were treated at Activision was so shocking, and *extraordinary* that *The Washington Post* and *Bloomberg* began to work on long form investigative reports immediately after the DFEH Complaint was filed. ¶¶105-107. *The Washington Post* Article expressed shock with the title: "At Blizzard, groping, free-flowing booze and fear of retaliation tainted 'magical' workplace." ¶107. Additionally, the immediate and strident denial that Activision issued in response to the DFEH Complaint is not what one would expect with a routine and ordinary matter. ¶194.

Given these allegations, and because all inferences must be drawn in Plaintiffs' favor, the Court cannot hold as a matter of law that Defendants' description of the Company's undisclosed investigations as "routine" and in the "ordinary course of business" was not false and misleading.

<u>"Not Significant" and "Material Adverse Effect"</u>. Defendants' statements that "in the opinion of management… such routine claims are not significant and we do not expect them to have a material adverse effect on our business…" were also misleading. These are two separate misleading statements strung together by the conjunction "and." Thus, the Court should evaluate each statement separately. Opinion statements are actionable where a plaintiff identifies "particular (and material) facts going to the basis for the…opinion…whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare,* 575 U.S. at 194; *see also M & M Hart Living Tr.*

*v. Glob. Eagle Ent., Inc.*, 2018 WL 1230570, at *3 (C.D. Cal. Jan. 8, 2018).[4] Here, Defendants omitted to disclose the DFEH and EEOC Investigations concerning serious allegations of sexual harassment and discrimination. Accordingly, Defendants had no basis for their opinion that all undisclosed investigations were "not significant" and not expected to have a material adverse effect.

In *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F.Supp.3d 568, 583-584 (S.D.N.Y. 2016) ("*Och-Ziff*") (emphasis added), the court held actionable Och-Ziff's statement: "We are not currently subject to any pending regulatory, administrative or arbitration proceedings ***that we expect to have*** a material impact on our results of operations or financial condition" where Och-Ziff did not disclose an SEC-DOJ investigation. After the *WSJ* exposed the investigation, Och-Ziff amended its most recent 10-K to state that "an adverse outcome [of the SEC-DOJ Investigation] could have a material effect on our business, financial condition or results of our operations." *Id.* at 584-585. The court held that "[g]iven Och-Ziff's explicit acknowledgement that the Investigation 'could have a material effect….', Plaintiffs have plausibly pleaded that, in its earlier SEC filings, Och-Ziff opted to speak on the subject of investigations, but did not speak in an accurate and complete manner." *Id.* at 584. The statements were misleading opinions because "Plaintiffs have plausibly alleged that Och-Ziff's projections about the likely impact of regulatory proceedings were based on omitted facts that, if disclosed, would have conflicted with what a reasonable investor would have taken from Och-Ziff's statements themselves." *Id.*

In this case, as in *Och-Ziff*, ***two weeks*** after the DFEH filed its Complaint, Activision admitted in its 10-Q that it was addressing "adverse consequences to our

---

[4] In *M & M Hart*, 2018 WL 1230570, at *4, this Court held an opinion statement was non-actionable because plaintiffs did not "identify facts going to the basis of the [preliminary purchase price allocation] that rendered it misleading to a reasonable person." In contrast, here the undisclosed fact was that the DFEH and EEOC were investigating serious allegations of pervasive sexual harassment and discrimination. Accordingly, there was no basis for the opinion that any undisclosed ongoing investigations of Activision were "not significant" and not expected to have a material adverse effect.

MEM. OF PTS. AND AUTH. IN OPP. TO MTD                    2:21-cv-06240-PA-JEM

business" and warned that if the Company experienced "prolonged periods of adverse publicity, significantly reduced productivity or other negative consequences relating to this matter, ***our business likely would be adversely impacted***." ¶187 (emphasis added). Defendants argue that Plaintiffs point to what the DFEH eventually alleged to assail an opinion expressed over the prior two-and-a half years, but the last misstatement was in Activision's first quarter 2021 10-Q, filed on May 4, 2021, less than three months before the filing of the DFEH Complaint.

The statements here are even more misleading than those in *Och-Ziff* because Defendants also stated that all undisclosed investigations were "not significant." "Significant" means "large enough to be noticed or to have an effect."[5] Since the #MeToo movement had been in full force for a year when the Investigations began in fall of 2018, it is absurd for Defendants to argue that they were not large enough to be noticed or have an effect. ¶¶182-183. The reputational danger for Activision was also magnified by the Company actively touting the importance of its inclusive culture. ¶¶65-67. And, as Defendants point out, Activision lists retaining and attracting skilled personnel as a risk factor for the Company in its SEC filings — a risk that a MeToo# scandal would certainly exacerbate. Defendants' Motion ("Mot.") at 8. These facts, combined with Activision's culture of rampant harassment and discrimination, made the Investigations a timebomb. Accordingly, Defendants had no basis for their statements that all undisclosed investigations were "not significant" and would not "have a material adverse effect."

Although they do not state it explicitly, the core of Defendants' argument is that the omitted facts — the Investigations — were not sufficiently material to make their opinion statements misleading to a reasonable investor. Materiality is, however, "fact-specific" and courts should not grant a motion to dismiss on that ground unless the lack of materiality is "obvious." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996); *see also Och-Ziff*, 164 F.Supp.3d at 585 (denying

---

[5] https://www.merriam-webster.com/dictionary/significant.

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD                    2:21-cv-06240-PA-JEM

motion to dismiss because whether failure to disclose investigations is material is "at base, a question of materiality on which 'reasonable minds' could disagree").

**B. The PSLRA's Safe Harbor Does Not Apply.**

The PSLRA Safe Harbor does not apply to the legal proceedings statements.

*First*, as an initial matter, the safe harbor does not to apply statements "included in a financial statement prepared in accordance with [GAAP]." 15 U.S.C § 78u-5(b)(2)(A); *see also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1007 (N.D. Cal. 2008). Each of the legal proceedings statements were repeated verbatim in the Company's consolidated financial statements, which were prepared according to GAAP, in each of its 10-Ks and 10-Qs at issue. *See* Pls.' Exs. 1-11.[6] Accordingly, the PSLRA's safe harbor does not apply. This point is dispositive.

*Second*, the Ninth Circuit has held that a statement making a legal disclosure followed by a statement of expectation about its effect is not forward looking. *See America West*, 320 F. 3d at 936-937 (holding statements "the settlement agreement's provisions will not have a material adverse affect on the Company's operations or financial results" and "[w]e are not anticipating any major increase in maintenance costs or the cost of oversights going forward as a result of [the settlement agreement]" were not forward looking because "[e]ach is a disclosure of…past violations…and a description of the present effects of their imposition on the company); *see also In re Quantumscape Sec. Litig.*, 2022 WL 137729, at *5, 14 (N.D. Cal. Jan. 14, 2022) (holding statement "given we believe our separator will be in the same order of magnitude and cost as conventional separators, we expect that the quantitative approach, should be lower cost than conventional ion cells at any given manufacturing scale" was not forward-looking). The second sentence of the legal proceedings statements — the only portion that could possibly be forward-

---

[6] Plaintiffs' exhibits ("Pls.' Exs.") are attached to the Declaration of Laurence Rosen, filed concurrently with this opposition. The exhibits are all excerpts from 10-Ks and 10-Q that Defendants included in their Request for Judicial Notice in Support of Defendants' Motion to Dismiss Amended Complaint, which Plaintiffs do not oppose.

MEM. OF PTS. AND AUTH. IN OPP. TO MTD                    2:21-cv-06240-PA-JEM

looking — is structured almost exactly like these statements. *See* ¶¶249, 251, 253, 262 ("such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business…").

*Third*, even if the Court were to hold that the second clause of the second sentence of the legal proceedings statements was forward-looking ("we do not expect them to have a material adverse effect"), that does not render the rest of each statement forward-looking. "The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events" — not "to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017); *see also City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1040, n. 6 (N.D. Cal. 2018) (holding that the portion of "expect[s] to end the year with inventory growth that is higher than our sales growth, given the inventory investments in RH Modern" referring to present-tense inventory was not forward-looking). Accordingly, even if the Court were to hold that the "material adverse effect" portion of the statements was forward looking, that does not change the fact that the statements that all undisclosed investigations were "routine," "in the ordinary course of business," and "not significant" were statements of present fact.

*Fourth*, the cautionary language in Activision's SEC filings does not trigger the safe harbor. For the safe harbor to apply, there must be sufficient cautionary language that "reasonable minds could not disagree that the challenged statements were not misleading" and it must "'affect[ ] the reasonableness of reliance on and the materiality of those projections.'" *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994); other citations omitted). Here the cautionary language is not nearly specific enough to render Defendants' legal proceedings

misstatements not misleading or immaterial —  it consisted of general statements about hypothetical legal risk and the importance of retaining and recruiting skilled personnel without reference to any specific claims or proceedings. Mot. at 8. The risk disclosures are themselves misleading and exacerbate the misleading nature of the legal proceedings statements because they represent as hypothetical risks actual events that had already transpired. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (disclosure of hypothetical risks of product liability claims, with no indication that the risk may already have come to fruition was misleading); *Och-Ziff*, 164 F.Supp.3d at 574-575 (misleading legal proceedings statement contained the phase "[Extensive scrutiny by the regulatory agencies] has resulted or may in the future result in regulatory agency investigations, litigation and subpoenas"); *see also In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 817 (C.D. Cal. 2011) (general language about risks inherent in the FDA approval process was not sufficient cautionary language).

*Finally*, the safe harbor also does not apply because, as discussed further in the scienter section, Defendants had actual knowledge that their statements were false when made because Defendants were aware of the Investigations.

**C. Item 103 Required Disclosure of the Investigations.**

Item 103 of Regulation S-K, 17 C.F.R. §229.103 required Activision to disclose "any material pending legal proceedings, other than ordinary routine litigation incidental to the business." Item 103 specifically states that companies must include "information as to any such proceedings known to be contemplated by governmental authorities." *Id.* The filing of multiple Commissioner's complaints by the DFEH and the commissioner's charge issued by the EEOC demonstrates that governmental authorities were contemplating proceedings. ¶¶87-89. These actions were material due to the extensive injunctive relief contemplated (¶¶193, 224) and, as discussed above, the likelihood they would damage Activision's reputation and ability to recruit and retain employees.

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD                    2:21-cv-06240-PA-JEM

**D. The Code of Conduct Statements Are Actionable.**

The statements in Activision's Code are specific, concrete, and objectively verifiable — not aspirational. It stated, *inter alia*, (1) "We do not tolerate [sexual harassment] in any form"; (2) "[o]ur company does not tolerate retaliation against you or your coworkers for asking questions, making a good faith report or taking part in investigations"; (3) "[i]t doesn't matter if you are a studio head or an art intern on your first day – the rules described in this Code apply to all employees"; (4) "[o]ur company doesn't tolerate discrimination or make employment-related decisions on the basis of a protected characteristic…." ¶¶276-286. That distinguishes *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017), which held that Hewlett-Packard's ("HP") code of conduct was not "objectively verifiable."

Defendants also cite *Retail Wholesale* for the proposition that codes of conduct cannot be actionable because they are mandated by the SEC. *See* Item 406 of Regulation S-K, 17 C.F.R. § 229.406. This is untrue, given the multitude of cases that have held actionable statements in a company's code. Indeed, the SEC requires audited financial statements and many other disclosures that give rise to liability under the federal securities laws. As these cases hold, when assessing code of conduct statements "context matters".[7]  Here, Defendants touted the importance of the Company's code of conduct by stating in its ESG report: "[t]he right way to play starts with our Code of Conduct, which is our ethical foundation outlining our guiding principles and key ethics and compliance policies" and "we also require all employees to review and acknowledge the Code of Conduct on an annual basis." ¶189. Defendants also touted to investors that the Company was recognized as one of 100 best companies to work for due to its "inclusive culture" and that "[d]iversity and inclusion" was "mission critical." ¶¶65-66.

---

[7] *See, e.g., Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp.3d 189, 221-223 (E.D. Pa. 2021).

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD                                    2:21-cv-06240-PA-JEM

Indeed, *Retail Wholesale*, 845 F.3d at 1277-1278, explicitly acknowledged that a different context for HP's code of conduct statements could have changed the result. *Retail Wholesale* concerned a single harassment claim involving the CEO — when that misconduct came to light, HP quickly launched an investigation and asked for the CEO's resignation. *Id.* at 1272. In contrast, despite Activision's public emphasis on the importance of its code of conduct and inclusive culture, sexual harassment, discrimination, and retaliation were pervasive at Blizzard and high-level employees acted with impunity. *See Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

This case is analogous to *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018), which held that "statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint." Accordingly, it found the statements "[c]onfidential and anonymous mechanisms for reporting concerns are available," and that "[t]hose who violate the standards in this Code will be subject to disciplinary action" were actionable because the complaint alleged a pervasive culture of retaliation against women who reported sexual harassment. *Id.* at *9, *17. Signet, like Activision, emphasized that it had a good relationship with its employees. *Id.* at *9. Similar to here, *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721–22 (S.D.N.Y. 2019) found code of conduct statements actionable where the company said "it required board members and employees to sign and deliver to human resources an adherence letter, and to renew their acceptance of the code twice a year."

Defendants dutifully intone, despite Activision's horrific record, that "any case of [harassment, discrimination, or retaliation] is unacceptable" and then absurdly dismiss the AC's allegations as a "patchwork." Mot. at 14. The allegations of pervasive sexual harassment, discrimination, and retaliation, which include facts

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD                    2:21-cv-06240-PA-JEM

found by the DFEH and EEOC, in depth investigations conducted by *The Washington Post*, *Bloomberg*, and the *WSJ*, and Plaintiffs' investigator's interviews with seven confidential witnesses, are overwhelming. The above sources did not just identify isolated incidents, but instead rely on interviews with numerous people who stated such behavior was pervasive, practiced or tolerated by leadership, and that management didn't hold high value and senior employees accountable. ¶¶95-181. Each of these sources corroborated that retaliation against women for making reports to HR was pervasive. ¶¶149-162, 180. The DFEH found female employees "experienced retaliation by Defendants that included involuntary transfers, selection for layoffs, and denial of projects and other opportunities" and that "flawed policies and practices effectively allowed…discrimination to occur." ¶¶149-150. *Washington Post* and *Bloomberg* quoted long time employees as stating that "[HR was] almost like a gang that would ruin your career if you reported certain individuals" and that certain "untouchable" developers "had so much power, they could do whatever they want," respectively. ¶¶151, 153. Four CWs also shared their harrowing experiences of sexual assaults and other harassment followed by retaliation or indifference from HR and confirmed that was common. ¶¶155-163.

Plaintiffs' reliance on the DFEH and EEOC Complaints is entirely appropriate. Courts in the Ninth Circuit routinely consider the allegations in government complaints true when considering motions to dismiss in securities cases. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019) (considering Attorney General Complaint "[b]ecause the Ninth Circuit has relied on comparable documents when deciding motions to dismiss Section 10(b)…claims,…it is appropriate to do so here" (citing *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706 (9th Cir. 2012)); *Ansell v. Laikin*, 2011 WL 3274019, at *3-*4 (C.D. Cal. Aug. 1, 2011) (Anderson, J.) (considering SEC Complaint). This is consistent with the rules of pleading where "the relevant inquiry is not whether attorneys personally verify allegations from

such a report, but rather, whether the source is reliable." *In re New Century*, 588 F. Supp. 2d 1206, 1220-1221 (C.D. Cal. 2008). The DFEH and EEOC Complaints were the result of more than two years of investigation by each government entity that included extensive witness interviews and review of documents — certainly sufficiently reliable for a Rule 12(b)(6) Motion. The allegations in the EEOC and DFEH Complaints are further corroborated by the *Washington Post*, *Bloomberg*, and *WSJ* articles and Plaintiffs' seven witnesses' statements detailed in the AC. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (corroboration supports reliability).

It is hard to imagine what showing of pervasive sexual harassment and retaliation would suffice if the AC's allegations do not — none of Defendants' cases address this volume of information from credible sources. Mot. at 14-15.

**E. The ESG Report Statement is Actionable.**

Activision's ESG Report misleadingly stated: "We do not tolerate retaliation against any employee who makes a good faith report or assists in good faith in an investigation." ¶288. As discussed in the previous section, there is overwhelming evidence that the Company broadly tolerated retaliation. This is a declarative, not an aspirational statement and, unlike the code of conduct statements, Defendants cannot claim that SEC required them to make it. Furthermore, as with the code of conduct statements, when this statement is read in conjunction with the Company's other statements about the importance of diversity and inclusion to Activision's success, it gives a materially misleading impression of the Company.

Defendant Kotick was a maker of this statement under the securities laws, since he signed the opening statement of the ESG Report. *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *25 (C.D. Cal. Jan. 16, 2013) ("an individual defendant's signature on a document containing actionable misrepresentations is a sufficient basis upon which to hold that defendant liable"). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 146-148 (2011),

does not help Defendants: it held that a statement is not attributable to someone just because he assisted in its preparation if he did not have "ultimate control." Defendant Kotick did have ultimate control because he was CEO of the Company.

## II. THE AC ADEQUATELY ALLEGES SCIENTER.

When considering scienter, a court must "first accept all factual allegations in the complaint as true" and "consider the complaint in its entirety." *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014). Scienter may be pled by alleging "knowledge of the falsity as well as 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (quoting *America West*, 320 F.3d at 937). The Supreme Court has held that when the inference of fraud is cogent and at least *equally* as likely as any non-culpable explanation of the alleged conduct scienter is pled. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). "The Supreme Court has now made clear...that a tie goes to the Plaintiff." *Maiman v. Talbott*, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010).

Defendants attack each of Plaintiffs' scienter allegations piecemeal, but it is clear that, when all the allegations are taken together, the AC pleads scienter.

### A. Defendants Made Misstatements Knowingly or Recklessly.

It is undisputed that each Individual Defendant knew contemporaneous facts contradicting his statements. Defendants do not dispute (because they cannot) that each Individual Defendant was aware of the Investigations when they signed the 10-Ks and 10-Qs containing the legal proceedings statements. Mot. at 17; ¶¶295-297. Instead, Defendants assert that the AC does not show that they were aware that the Investigations were not "routine," "in the ordinary course of business," "significant," or would likely have a material adverse effect. But the only plausible inference is that Defendants understood: (1) the import of the Investigations, (2) the literal meanings of "routine," "in the ordinary course of business," and "significant," and (3) that their statements gave a misleading impression of the true nature and significance of the Investigations. The Ninth Circuit has explained that

- 20 -

"[i]n assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter ***viewed with a practical and common-sense perspective***." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (emphasis added); *see Berson,* 527 F.3d at 987-989 (reversing district court and holding complaint pled scienter based entirely on circumstantial evidence). Defendants' assertions defy common sense.

In addition to the obviousness of the fact that the Investigations were not "routine," "ordinary" and were indeed "significant," carrying the real possibility of materially harming the Company, additional circumstances support the inference that Defendants knowingly or recklessly made the legal proceedings statements: (1) the Company touting that it was a top ranked workplace due its inclusive culture and such a culture was "mission critical" (¶¶65-67); (2) the ongoing and high-profile #MeToo movement (¶¶182-184); (3) the Company's SEC filings listing loss of employees as a significant risk factor; (4) the statements concerning harassment, retaliation, and discrimination in the code of conduct and ESG Report; (5) the strident public denial issued immediately after the DFEH Complaint was filed — not something done for a routine, unimportant matter (¶194); and (6) the admission two weeks after the DFEH Complaint was filed that it was material (¶187).

The opening of the Investigations was also of immediate significance because sexual harassment, discrimination, and retaliation were pervasive at Activision. Even if each Individual Defendant was not aware of the extent of the sexual harassment and retaliation, *inter alia,* that pervaded the Company's daily operations the Investigations put them on notice. Defendants were obligated to ensure the SEC filings and Sarbanes-Oxley certifications they signed were accurate by making a careful investigation to assess the Company's potential liability in connection with the Investigations. Given the ease with which each Individual Defendant could have discovered the pervasive misconduct (especially in light of the knowledge of Defendant Kotick, the Presidents of Blizzard, and the HR Department, as discussed

- 21 -

below) it is reasonable to infer that each Individual Defendant knew about it or was severely reckless in not discovering it. Further, Defendants would have known or discovered that in 2019, HR began to report directly to the corporate office because of its inability to stop misconduct. ¶154. This change in the reporting structure was a red flag indicating the scope and gravity of the misconduct. If the Individual Defendants failed to make this basic investigation into whether their statements were correct or if they were simply extremely callous about sexual harassment and discrimination, it would simply mean they were reckless and still had scienter. *See Verifone,* 704 F.3d at 708 ("[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5"); *In re Finisar Corp. Sec. Litig.*, No, 2017 WL 1549485, at \*6-\*7 (N.D. Cal. May 1, 2017) (scienter pled based on access to information and what would have been disclosed to defendants); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at \*13 (E.D. Pa. Mar. 25, 2020) (since recklessness includes "willful blindness" defendants could not avoid scienter by claiming they failed to review important accessible information).

Courts have inferred scienter from a failure to disclose an investigation where defendants knew about it and non-disclosure made a statement misleading. In *Och-Ziff,* 164 F.Supp.3d at 585, scienter was alleged because "Defendants knew about the…Investigation from 2011 onward, but waited to disclose its potential impact, which Och-Ziff later described as material…" and, therefore, had "plausibly alleged that…Defendants were reckless." In *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015), the court inferred scienter where "BioScrip subjectively knew about the [Civil Investigation Demand]" and "was reckless in electing to withhold knowledge of the CID, despite its significant role in formulating a basis of belief that BioScrip was in legal compliance." Thus, Defendants' knowledge of the existence of the Investigations alone is sufficient to plead scienter.

The inference of scienter as to Defendant Kotick is particularly compelling given the *WSJ's* investigation. ¶¶130-138. The *WSJ* found, *inter alia*, that Kotick:

(1) knew about "allegations of employee misconduct in many parts of the company" "[b]ased on memos, emails and regulatory requests, and interviews with former employees and others familiar with the company" (¶131); (2) "approves high-profile hiring decisions" and is "typically aware of major problems" at all three business units and approved Blizzard CTO Ben Kilgore's firing (¶132); (3) was aware of a 2020 email by 30 female employees in Activision's Esports division saying that they "had been subject to unwanted touching, demeaning comments, [and] exclusion from important meetings" (¶133); (4) was aware of sexual assaults at other Activision studios (¶¶134-135); (5) engaged in harassment himself (¶136).

Defendants assert that the Court should not consider the *WSJ's* reporting because it uses unidentified sources, but the case they cite, *In re Sunrun, Inc. Sec. Litig.*, 2018 WL 10323335, at *1 (N.D. Cal. July 19, 2018), concerned the use of a *WSJ* reporter as a *confidential witness*, not an investigative report that had gone through the *WSJ's* fact checking process. Detailed allegations from news reports based on anonymous sources satisfies the PSLRA. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *11 (N.D. Cal. Nov. 4, 2020). Defendants also nitpick Plaintiffs' interpretation of these allegations, but these disputes are more appropriate for the finder of fact. For purposes of this Motion, it is clear that (1) Defendant Kotick would have known that the Investigations were significant because he knew there was plenty for them to find and (2) the code of conduct and ESG statements would give investors a false impression of Activision. Defendant Zerza would also have been aware of the pervasive misconduct at Blizzard because he was Blizzard's CFO and COO for six years until April 2021. ¶46.

Two other indications that Defendants had an intent to deceive are the Company's: (1) July 21, 2021 false exculpatory statement and (2) obstruction of the DFEH's investigation. On July 21, 2021, immediately after the DFEH filed its Complaint, the Company stated "[t]he DFEH includes distorted, and in many cases false, descriptions of Blizzard's past" it had been "extremely cooperative with the

- 23 -

DFEH throughout their investigation." ¶194. The Company's denial of the DFEH's Complaint was such an egregious falsehood that in the next week more than 2,000 current and former Activision Employees signed an open letter calling it "abhorrent and insulting," employees planned walkouts, and Defendant Kotick was forced to apologize. ¶¶194-201. It became clear that Defendants were lying about cooperating with the DFEH when the DFEH amended its Complaint specifically to add a claim that the Company was obstructing its investigation, including by shredding documents in violation of a document retention notice, claiming harassment and discrimination complaints were privileged, and trying to get employees to waive their rights without informing them of the DFEH investigation. ¶¶210-215. False exculpatory statements show fraudulent intent and support scienter. *See Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020). Additionally, obstructing an investigation is "circumstantial evidence of scienter." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 548 (S.D.N.Y. 2020). As discussed in Point I.D., the Court should accept the allegations in the DFEH Complaint as true for the purpose of this Motion. Finally, Defendants' argument that this does not support scienter because *only one of two* government agencies accused them of improperly shredding documents is unavailing.

**B. The AC's Motive Allegations Support the Inference of Scienter.**

Defendants' criticism of Plaintiffs for including motive and opportunity allegations (Mot. at 21) shows a misunderstanding of the scienter standard. Scienter is based on a holistic assessment, so while motive and opportunity allegations may not be, *standing alone*, sufficient to allege scienter, they can meaningfully contribute to the inference of scienter. *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"). Plaintiffs' motive allegations concerning Defendant Kotick's $150 million bonus are not illogical. At the time the Investigations started, Activision's stock was at $81.57 and $77.92 (Defs.' Ex. R), respectively, which was close to $79.96 — the price that the

- 24 -

Company's stock had to stay above for 90 days for Defendant Kotick to get his bonus. ¶309. Accordingly, Kotick would have been highly motived to suppress disclosure of the Investigations to prevent a stock decline — by the end of the Class Period, the fallout from the investigations had caused the stock to decline to $66.14. ¶247. It is well established that Kotick's desire to keep the stock high to receive his enormous bonus contributes to scienter. *See Am. West*, 320 F.3d at 944 (holding that desire to receive stock options were "particularized allegations" of motive); *MannKind*, 835 F. Supp. 2d at 813 (need to keep company stock price above a specific amount to maintain access to capital "buttresse[d] a finding of scienter").

Defendants complain that Kotick did not sell stock, but neither did the defendants motivated by performance incentives in *America West*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."). In any event, the Individual Defendants sold enormous amounts of stock: Kelly sold $56 million and Durkin sold $4 million in 2020, and Zerza sold more than $2 million in 2021. ¶¶312-320.

**C. The AC Alleges Corporate Scienter.**

Scienter from each Individual Defendant is imputed to Activision. The Court should also impute scienter from Blizzard Presidents Morhaime and Brack, who were aware of the pervasive culture of harassment and discrimination. ¶¶139-148, 181. This is not based on "collective scienter." As heads of one of Activision's three segments, their individual scienter is imputed to Activision under *respondeat superior*. *See Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1576–77 (9th Cir. 1990) (*respondent superior* is a basis for vicarious liability in securities cases); *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (scienter imputed from non-defendant managing director of bank).

## CONCLUSION

Defendants' motion should be denied. If the Court grants any portion of it, Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15.

DATED: February  2, 2022

**THE ROSEN LAW FIRM, P.A.**

By: *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Brian B. Alexander, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: balexander@rosenlegal.com

*Lead Counsel for Plaintiffs*

- 26 -

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD                    2:21-cv-06240-PA-JEM