Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY CHENG, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ACTIVISION BLIZZARD, INC., ROBERT A. KOTICK, DENNIS DURKIN, SPENCER NEUMANN, ARMIN ZERZA, and BRIAN KELLY,<br><br>Defendants. | Case No. 2:21-cv-06240-PA-JEM<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

# <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ................................................................. 1

JURISDICTION AND VENUE ........................................................... 13

PARTIES ............................................................................................ 13

ALLEGATIONS OF MISCONDUCT ................................................ 16

  A.   Background of Activision Blizzard. .............................................. 16

  B.   Relevant Non-Parties ................................................................... 18

  C.   The EEOC and DFEH Open Investigations Into Activision Blizzard for Systemic Sexual Harassment and Gender Discrimination Against Female Employees by Commissioner's Charge and Director Complaint, Respectively. ................................................................................ 22

    1)   The EEOC Initiates an Investigation of Activision Blizzard with a Commissioner's Charge on September 26, 2018 ..................................... 22

    2)   The DFEH Begins Requesting Information From Activision Blizzard in 2017 and Initiates a Formal Investigation Into Systemic Misconduct by Serving the Company with a Director's Complaint on October 12, 2018. .... ............................................................................................................. 23

  D.   Defendants Did Not Disclose the EEOC and DFEH Investigations, and Instead Stated Repeatedly During the Class Period that the Company was Party to Only "Routine…Investigations" that Arose in "the Ordinary Course of Business," Were "Not Significant," and Not Expected "to Have a Material Adverse Effect" on Activision Blizzard's Business. ................................... 24

  E.   The EEOC and DFEH Investigations Were Not "Routine" and in the "Ordinary Course of Business;" The EEOC and DFEH Investigations Were "Significant" and Likely "to Have a Material Adverse Effect" on Activision Blizzard's Business. ................................................................................... 25

i

1) EEOC Commissioner's Charges and DFEH Director's Complaints Are Rarely Used Mechanisms That Those Agencies Use for Investigations into Systemic Harassment and Discrimination. ..................................26

   a. The EEOC's Commissioner's Charge against Activision Blizzard was one of only 11 filed in 2018. ..........................................26

   b. The DFEH Filed Only 4 Director's Complaints in 2019 and 3 Director's Complaints in 2020 and in Each of Those Years the Director's Complaint Against Activision Blizzard was Only One of 10 Additional Director's Complaints Under Investigation. ..........................................27

2) In Response to the Investigations, Activision Blizzard Made Significant Changes to its Human Resources Procedures, Which Included Instituting a Formal Process for Investigating Sexual Harassment Complaints For the First Time and Instituting Regular Meetings Between Human Resources and its Legal Team. ..........................................27

3) The EEOC and DFEH Investigations Caused Activision Blizzard to Fire Important Employees Before the Investigations Became Public. ..............29

4) Activision Blizzard's Board of Directors was Informed About the EEOC and DFEH Investigations. ..........................................33

5) The EEOC and DFEH Investigations Were Both Very Extensive — Both Interviewed More Than 100 Witnesses — and the DFEH Served Activision Blizzard With a Broad Subpoena Duces Tecum After it Had Already Been Investigating For More Than Two Years ...........................34

6) Endemic Sexual Harassment and Discrimination at Activision Blizzard and The Inevitable Fact that the  that the EEOC and DFEH Would Discover It Rendered the Investigations Non-Routine and Significant, and Precluded the Possibility that they Would Not Have a Material Effect on the Company. ..........................................36

   a. Sexual Harassment Was Pervasive at Blizzard, Including Among High-Level Employees. ..........................................37

---

ii

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

b. Activision Blizzard Employees Who Complained About Sexual Harassment to Human Resources or their Supervisors Suffered Retaliation. ..........................................................................49

c. Defendant Kotick Knew for Years About Sexual-Misconduct at Blizzard and Other Parts of the Company. ...........................................56

d. J. Allen Brack and Michael Morhaime — Who Served as Blizzard's Presidents During and Right Before the Class Period, Were Each Aware of the Pervasive Harassment. ...................................................59

e. The DFEH, EEOC, and *Bloomberg* also Found that Activision Blizzard Discriminated Against its Female Employees, Especially Those Who Were Pregnant, Mothers, or of Color, by Giving Them Fewer Opportunities and Lower Pay. ..............................................63

f. As With Sexual Harassment, President Brack and Human Resources Were Aware of the Discrimination and Women Who Complained Were Either Ignored or Suffered Retaliation....................................67

7) Activision Blizzard Repeatedly Stated That the Company's Reputation as a Good Place to Work and its Commitment to Diversity and Inclusion was Important to the Success of the Company During the Class Period. .........69

8) Starting in October 2017, the #MeToo Movement Led to the Firing of Numerous High Profile Executives at Other Companies, Making it Clear that the Company Could Not Handle the DFEH and EEOC Investigations as Routine Matters and that They Were Significant and Could Have a Material Effect on the Company. ..............................................70

9) Defendants Admitted That the Investigations Were Material, Not Routine and Significant by Stating in its Public Filings Two Weeks After the DFEH Complaint Was Filed That its Business Could be Adversely Impacted.................................................................71

F. On July 20, 2021, the DFEH Publicly filed its Complaint Against Activision Blizzard, Revealing the Pervasive Misconduct at the Company, and Leading to Enormous Reputational Damage, Employee Walkouts, and the Decline of the Company's Share Price. ........................................72

iii

G.   The Fallout From the DFEH Lawsuit Continues, Including the Resignations of Blizzard's President and Head of Human Resources and the Firing of the Director of Diablo IV. ...................................................................79

H.   The DFEH Amends Its Complaint to Add Claims that Activision Blizzard Obstructed its Investigation.........................................................81

I.   The SEC Opens an Investigation into Sexual Harassment and Workplace Discrimination at Activision Blizzard and Subpoenas Defendant Kotick; Blizzard's Chief Legal Officer and Executive Producer of Overwatch Leave the Company..................................................................83

J.   On September 27, 2021, the EEOC Files a Sexual Harassment, Sex Discrimination, and Retaliation Complaint under Title VII Against Activision Blizzard, and the Company Enters Into a Consent Decree as a Condition of Settlement. ...............................................................85

K.   Due to the Ongoing Scandal, Activision Blizzard Fires 20 Employees; Cancels its Yearly Showcase; Institutes a "New Zero-Tolerance Harassment Policy"; Waives Required Arbitration of Sexual Harassment and Discrimination Claims; and Defendant Kotick Cuts his Own Base Salary to $62,500. ......................................................................87

L.   Activision Blizzard Admits That Leadership Changes to Their Diablo and Overwatch Franchises, Forced by the Ongoing Sexual Harassment Scandal, Would Cause the Latest Installments of Those Games to be Delayed and that Jennifer Oneal was Departing from her Position as Co-leader of Blizzard, Leading to a Huge Drop in the Company's Stock. ......................................88

M.   The November 16 *Wall Street Journal* Article is Published Revealing That Defendant Kotick Knew About Sexual-Misconduct Allegations at Activision Blizzard for Years, the Company had Received More Than 500 Harassment and Discrimination Reports From Current and Former Employees Since the DFEH Complaint was Filed, and That Jennifer Oneal Sent an Internal Email Saying She Was "Tokenized, Marginalized, and Discriminated Against" Prior to Her Resignation.............................................................92

N.   The SEC Widens its Investigation of Activision Blizzard and the DFEH Subpoenas the Police Departments in the Los Angeles Area for Records

iv

About Defendant Kotick and 18 Other Current and Former Activision Employees. ............................................................................... 93

FALSE AND MATERIALLY MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ......................................................................... 94

A.   Activision Blizzard's SEC Filings Repeatedly Misstated That The Company Was Only "party to routine…investigations" that arose in the "ordinary course of business" and were "not significant" or expected to have "a material adverse effect." ............................................................. 94

LOSS CAUSATION ............................................................................ 103

ADDITIONAL SCIENTER ALLEGATIONS .................................................. 104

A.   The Defendants Acted Intentionally or Recklessly .................................... 104

1)   The Individual Defendants Were Aware of the DFEH and EEOC Investigations and That the Board of Directors Had Been Informed  About Them. ....................................................................................... 104

2)   The Significant Changes to the Procedures of Human Resources and Firing of Senior Employees Due to the Investigations Rendered the Individual Defendants' Statements, at Minimum, Reckless. ...................................... 105

3)   The Individual Defendants Were Aware of or Recklessly Disregarded the Pervasive Sexual Harassment and Discrimination at Activision Blizzard and, Therefore, Knew or Should Have Known That Their Statements Were False and Misleading. .......................................................................... 107

4)   Defendants' Obstruction of the DFEH's Investigation Supports a Strong Inference of Scienter. ....................................................................... 109

5)   Given the #MeToo Movement and Activision Blizzard's Lip Service to Diversity, Equity, and Inclusion, Defendants Cannot Reasonably Argue that They Did Not or Should Not Have Realized the Importance of the DFEH and EEOC Investigations. ................................................................. 110

v

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

6)    Defendants Admitted that the Investigations Were Material and Not "Routine" by Stating in the Company's 2Q 2021 10-Q, Filed on August 3, 2021, That its Business Could be Adversely Impacted. ........................... 110

B.    The Individual Defendants Were Motivated to Make the Misstatements. ....... ....................................................................................................................... 111

1)    Defendant Kotick Was Motivated to Make Misstatements by Shareholder Value Creation Incentives in His Employment Agreement. ................... 111

2)    Defendants Sold Millions of Dollars in Activision Blizzard Stock in 2020 and 2021, Before the DFEH and EEOC Filed their Public Complaints. . 112

C.    The Individual Defendants Acted Intentionally or Recklessly When They Approved and Failed to Correct the Aforementioned Misstatements. ....... 113

D.    There is a Strong Inference That Activision Blizzard Acted with Scienter. ....................................................................................................................... 113

NO SAFE HARBOR ........................................................................................... 114

PLAINTIFFS' CLASS ACTION ALLEGATIONS ............................................. 116

COUNT I ............................................................................................................. 118

COUNT II ............................................................................................................ 121

PRAYER FOR RELIEF ...................................................................................... 122

JURY TRIAL DEMANDED ................................................................................ 122

vi

Lead Plaintiff Jeff Ross ("Ross") and named Plaintiffs Gary Cheng ("Cheng"), Micah Ernst ("Ernst"), Michael Noon ("Noon"), Nick Baldwin ("Baldwin"), Chris Martin ("Martin"), and Alejandro Toiber ("Toiber") (collectively, "Plaintiffs" or "Investors"), individually and on behalf of all other persons similarly situated, allege the following based on personal knowledge as to Investors' own acts and upon information and belief as to all other matters based on the investigations conducted by and through Investors' own attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Activision Blizzard, Inc. ("Activision Blizzard" or the "Company"); Activision Blizzard's press releases and earnings call transcripts; public information regarding Activision Blizzard, including information on Activision Blizzard's website; analyst reports and media reports about Activision Blizzard; interviews with former employees of Activision Blizzard and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Investors bring this securities class action on behalf of persons or entities who purchased publicly traded Activision Blizzard common stock on the NASDAQ between November 8, 2018 and November 16, 2021, inclusive (the "Class Period"), and who held such shares on July 27, 2021, and/or September 20, 2021, and/or November 3, 2021, and/or November 16, 2021, and suffered compensable damages thereby (the "Class").[1]

---

[1]  Excluded from the Class are: Defendants and their immediate families; the officers and directors of Activision Blizzard at all relevant times; their subsidiaries, affiliates, legal representatives, heirs, successors, or assigns; and any entity in which Defendants or any excluded persons have or had a controlling interest.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2.       Activision Blizzard is one the largest developers and publishers of video games for video game consoles, personal computers, and mobile devices. The Company also operates Esports leagues, which are competitive leagues for video game players.

3.       Unbeknownst to investors, on September 26, 2018 and October 12, 2018, respectively, the U.S. Equal Employment Opportunity Commission (the "EEOC") and the California Department of Fair Employment and Housing (the "DFEH") informed the Company they each had opened investigations into the Company (the "Investigations"). In 2017, prior to formally opening its investigation, the DFEH began requesting information from Activision Blizzard.

4.       The Investigations concerned sexual harassment, sexual assault and various forms of gender-based discrimination. The peril this posed to Activision Blizzard would have been readily apparent to Defendants since the EEOC and DFEH opened these Investigations in the wake of the #MeToo Movement, which intensified in late 2017.

5.       The commencement of the Investigations posed grave risks to Activision Blizzard given the disturbing reality that sexual harassment and gender-based employment discrimination *were* endemic at Activision Blizzard — especially at Blizzard Entertainment ("Blizzard"), one of the Company's three segments. Defendants' knowledge of the existence of the Investigations, coupled with Defendants' knowledge that the Company's *modus operandi* was one in which pervasive sexual harassment, sexual abuse and gender discrimination was not only tolerated but was celebrated, (as described herein) apprised Defendants of the fact that the Investigations posed grave risks to Activision Blizzard at the time they began.

6.       Notwithstanding the above, during the more than two years between the initiation of the DFEH and EEOC Investigations and when the DFEH publicly filed a complaint against the Company, Activision Blizzard's 10-Ks and 10-Qs

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

stated only that the Company was subject to "***routine….investigations***" that arose "***from the ordinary course of business,***" were "***not significant,***" and not expected "***to have a material adverse effect***."

7.    These statements were highly misleading because the EEOC and DFEH Investigations were not "routine" and in the "ordinary course of business" and were "significant" and likely to have a "material adverse effect" for numerous reasons.

8.    *First*, the EEOC and DFEH, respectively, initiated the Investigations with unusual, non-routine mechanisms — an EEOC Commissioner's Charge and a DFEH Director's Complaint. The EEOC and the DFEH employ these mechanisms only in investigations of serious systemic misconduct. The EEOC only filed 11 Commissioner's Charges in 2018, which decreased further to 9 in 2019 and 3 in both 2020 and 2021. The DFEH only filed 4 Director's Complaints in 2019 and 3 in 2020. Furthermore, during 2019 and 2020, the DFEH's investigation of Activision Blizzard was one of only 10 additional ongoing investigations based on a Director's Complaint.

9.    *Second*, according to a confidential witness who was serving as an Activision Blizzard Human Resources Senior Manager/Human Resources Business Partner at the time, the Investigations led to immediate and significant changes in how the Company's Human Resources Department conducted business. The confidential witness stated that in the fall of 2018, *right after the Investigations began*, the Company's Human Resources department began holding regular meetings with the Company's legal team and that the Company's executives instructed Human Resources that because of the EEOC Investigation they must document all sexual harassment complaints. Prior to the commencement of the EEOC Investigation, regular meetings between the human resources department and the legal department did not take place, and the human resources department did not have a formal process for investigating complaints.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

10.    The above-described confidential witness further stated that Defendant Robert Kotick — the Chief Executive Officer ("CEO") of Activision Blizzard would have certainly known about these changes given that he had regular one-on-one meetings with the Company's Chief People Officer, Claudine Naughton, who was head of Human Resources for all of Activision Blizzard.

11.    The Company also conducted an internal investigation of Human Resources' practices and policies in 2018 and changed the reporting structure of Human Resources in 2019 by having it report directly to the corporate office. An Activision Blizzard spokeswoman admitted to the *Wall Street Journal* that the Company changed the reporting structure of Human Resources because the prior setup 'occasionally allowed some employees to conduct themselves in truly regrettable ways."

12.    *Third*, the Investigations caused the Company to abruptly fire three Blizzard senior leaders: 1) Ben Kilgore, Blizzard's Chief Technology Officer and heir apparent to then Blizzard President Mike Morhaime, in August 2018; 2) Tyler Rosen, Senior Manager of Global Business Strategy & Operations, in October 2018; and 3) Alex Afrasiabi, Senior Creative Director of World of Warcraft (Blizzard's most profitable asset), in May 2020. Prior to their sudden firings those three men had sexually harassed women for years with few repercussions due to their importance to the Company. The *Wall Street Journal* reported, based on conversations with people familiar with Defendant Kotick's leadership, that he was typically aware of high profile hirings and firings and had personally approved Kilgore's termination.

13.    *Fourth*, Activision Blizzard's Board of Directors gave a statement to the *Wall Street Journal* that they were informed about the Investigations at all relevant times. Given that at a company the size of Activision Blizzard management would only inform the board of a small percentage of legal matters — the most significant legal matters with potential for material effects on the

Company, this is another strong indication that the Investigations were not "routine," in the "ordinary course of business" and were "significant" and likely to have a "material adverse effect."

14. *Fifth*, the Investigations were both extensive. The EEOC and DFEH both interviewed more than 100 witnesses and the EEOC sent a survey to all of Activision Blizzard's employees. The EEOC also interviewed 10 of Activision Blizzard's current and former managers and executives and the DFEH took 7 depositions.

15. Additionally, Activision Blizzard admitted in its First Amended Answer to Plaintiff DFEH's First Amended Complaint, filed on May 9, 2022, *see DFEH v. Activision Blizzard, Inc., et al.,* 21 ST CV 26571 (Cal. Supr. Ct.) ("Answer to the DFEH Amended Complaint"), that the DFEH served an extremely broad Subpoena Duces Tecum on the Company on May 4, 2021, after the DFEH had already been officially investigating for more than two years. The DFEH then ignored Activision Blizzard's requests to meet and confer about the subpoena. Despite this, Activision Blizzard filed a 10-Q a month later that continued to represent that the Investigations were "routine" and in the "ordinary course of business" and were "not significant" or expected to have a "material adverse effect."

16. *Sixth,* the pervasive sexual harassment and discrimination at Activision Blizzard and especially at Blizzard meant that the Investigations were not routine because they were certain to uncover significant illegal conduct, the discovery of which posed grave risks to the Company both qualitatively and quantitatively.  In other words, at the very moment Defendants learned that law enforcement was on the Company's trail, Defendants knew that the Investigations posed grave risks to the Company and were thus extraordinary. Indeed, the DFEH found that ***"[f]emale employees are subjected to constant sexual harassment***, including having to continually fend off unwanted sexual comments and advances

5

by their male co-workers and supervisors" and ***"[h]igh-ranking executives and creators engaged in blatant sexual harassment without repercussions.*"** (emphasis added).  In "a particularly tragic example," the DFEH confirmed that a female employee committed suicide during a business trip after male co-workers passed around a picture of the deceased employee's genitalia at a Company holiday party.

17.    The DFEH specifically highlighted Afrasiabi as a "blatant example of Defendants' refusal to deal with a harasser because of his seniority/position." The DFEH found that "Afrasiabi was so known to engage in harassment of females that his suite was nicknamed the 'Crosby Suite' [sic] after alleged rapist Bill Crosby [sic]." Afrasiabi was allowed to operate with impunity at Blizzard for more than a decade until his firing in 2020.

18.    After the DFEH filed a public complaint against Activision Blizzard, on July 20, 2021, the *Washington Post* and *Bloomberg* both produced investigative reports that confirmed a culture of sexual abuse at Blizzard that reached the highest levels, highlighting the misconduct of Afrasiabi, Kilgore, and Rosen.

19.    A lawsuit filed by an employee in Kilgore's technology department and multiple witnesses Plaintiffs' investigator interviewed further confirm that harassment and humiliation at Blizzard were common.

20.    The women who were brave enough to report misconduct to the Company's Human Resources department were frequently retaliated against by their supervisors. The DFEH found that numerous women complained to Human Resources about harassment and discrimination, but that their complaints were either ignored or retaliated against. The DFEH noted that Human Resources' lack of effectiveness was unsurprising given that "Defendants' own internal investigation into their human resources unit noted that there was a 'big lack of trust' and that 'HR was not held in high regard.'"

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

21.    The *Washington Post* and *Bloomberg* also concluded that Human Resources was ineffective and enabled retaliation against victims of sexual harassment and discrimination. A former male Blizzard senior leader told the *Washington Post*: "I know for a fact that HR was aware" of harassment complaints. A long-time female Blizzard employee told *The Washington Post* that **"[HR was] almost like a gang that would ruin your career if you reported certain individuals."**

22.    The Company's top leadership was fully aware of the endemic sexual harassment and discrimination at Activision Blizzard. In its November 16, 2021 Article entitled "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at [Activision Blizzard]," *The Wall Street Journal* reported based on an extensive review of documents that included memos, emails and regulatory requests, and interviews with former employees and others familiar with the Company that Defendant Kotick "**knew about allegations of employee misconduct in many parts of the company**," including Blizzard and other Activision Blizzard studios. *The Wall Street Journal* also found that Defendant Kotick himself has a disturbing history of mistreating women.

23.    The two men who served as President of Blizzard during and right before the Class Period, J. Allen Brack and Michael Morhaime, were also aware of the pervasive sexual harassment and discrimination and did little to prevent it.

24.    The DFEH found that "[n]umerous complaints about unlawful harassment, discrimination, and retaliation were made to Defendants' human resources personnel and executives, including to Blizzard Entertainment's President J. Allen Brack." The DFEH further found that Brack, who was Blizzard President from October 2018 to August 3, 2021, was aware of Afrasiabi's behavior and did not stop it. Additionally, three different women who worked for Blizzard informed Brack about sexual harassment and retaliation at Blizzard in early 2019.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

25.     In its Answer to the DFEH Amended Complaint, Activision Blizzard admitted that "complaints about harassment, discrimination, and retaliation have been raised with [Activision Blizzard's] respective human resources personnel and to some executives, including to Blizzard Entertainment Inc.'s then-President J. Allen Brack" and that he spoke with Afrasiabi about his inappropriate behavior.

26.     Michael Morhaime, who co-founded Blizzard prior to its merger with Activision and served as its President until October 3, 2018, was also aware of the pervasive misconduct. As *Bloomberg* reported and a Blizzard employee Plaintiffs' investigator interviewed confirmed, Morhaime's former assistant said in a private Facebook post that she had informed Morhaime of rampant misconduct at Blizzard and that leadership on all levels knew what was happening. Another former Blizzard employee, Kristin Wood Page, posted on Twitter that she had written a letter to Morhaime while he was still President of Blizzard concerning male employees behaving in a predatory fashion towards women at Blizzard.

27.     *Seventh*, Activision Blizzard stated repeatedly in its Class Period proxy statements that its commitment to diversity and inclusion was critical to the success of the Company, which would lead any reasonable investor to believe that Activision Blizzard's management would not consider the Investigations routine and not significant.

28.     *Eighth,* Given the rampant harassment and discrimination at the Company and the ongoing #MeToo movement, it was obvious to Defendants that the DFEH and EEOC Investigations had the potential to severely damage the Company's reputation, cause it to lose key personnel, and negatively impact its business.

29.     *Ninth*, two weeks after the DFEH filed its public complaint the Company admitted in a 10-Q that its business would likely be adversely impacted by the negative publicity generated by the DFEH's findings.  Defendants were aware from the outset of the DFEH Investigation that given the pervasive

misconduct at the Company the DFEH would doubtlessly file a Complaint which would adversely impact the Company. Defendants' belated acknowledgement that the Investigations were likely to have a material adverse effect on Activision Blizzard when the Company's public filings had previously stated the opposite evidences that their prior statements were materially misleading when made.

30.     Defendant Kotick was strongly motivated to conceal the DFEH and EEOC Investigations and the toxic culture of harassment and discrimination at Activision Blizzard because his employment agreement provided that if the price of the Company's common stock closed at or above $79.96 for at least 90 consecutive trading days, all outstanding equity awards granted under the agreement from October 2016 all the way through December 2021 would accelerate vesting at the maximum payout level. ***Defendant Kotick did not achieve this incentive until the first half of 2021*** and he almost certainly would not have achieved had Activision Blizzard disclosed the Investigations. Because Defendant Kotick reached this incentive, ***he was paid almost $155 million in the year 2020, including almost $150 million in stock awards.***

31.     Insiders at Activision Blizzard also sold tens of millions of dollars of stock in 2020 and 2021 at prices artificially inflated by Defendants' misstatements and omissions, including $56 million in sales by Defendant Brian Kelly, who was the Chairman of Activision Blizzard's Board of Directors.

32.     The DFEH filed its public complaint against Activision Blizzard on July 20, 2021 in the Superior Court of the State of California for the County of Los Angeles (the "DFEH Complaint," attached as **Exhibit 1**, *see DFEH v. Activision Blizzard, Inc., et al.,* 21 ST CV 26571).

33.     The Company quickly issued a denial, claiming that "[t]he DFEH includes distorted, and in many cases false, descriptions of Blizzard's past." This, however, only fanned the flames, causing numerous employees to speak out about the abuse and discrimination that they suffered. Senior employees reported that

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

virtually no work was getting done on important blockbuster product World of Warcraft due to employee anger, and on July 26, 2021, more than 2,000 current and former Activision Blizzard employees signed and published an open letter attacking the Company's response to the DFEH lawsuit.

34.    Once it became clear that Activision Blizzard's denial was false, based upon the above-referenced open letter flatly refuting it, the Company's stock dropped 6.75% on July 27, 2021.

35.    The mounting anger forced Defendant Kotick to issue an apology about how the Company had handled the allegations.  Kotick's obligatory apology did not stop hundreds of employees from walking out on July 28, 2021.

36.    The fallout continued on August 3 and 4, 2021 with the resignations of Blizzard President Brack and Senior VP of Human Resources Jesse Meschuk. Brack was replaced by two co-heads, Mike Ybarra, who previously worked on World of Warcraft, and Jennifer Oneal, a longtime employee of Activision Blizzard. Oneal was the first woman ever to head a business unit of Activision Blizzard.

37.    The Game Director of highly anticipated, forthcoming Blizzard game Diablo IV was fired shortly thereafter and later, on September 21, 2021, the Executive Producer of Blizzard's popular franchise Overwatch also left the Company, both due to the ongoing sexual harassment and discrimination scandal. Diablo IV and Overwatch 2 were Blizzard's two most important upcoming releases.

38.    On August 23, 2021, the DFEH amended its Complaint (the ("Amended DFEH Complaint," attached as **Exhibit 2**). The Amended DFEH Complaint accused Activision Blizzard of obstructing the DFEH's investigation by:  1) claiming employee complaints were privileged; 2) retaining law firm WilmerHale to conduct a confidential investigation that interfered with the DFEH Investigation; 3) soliciting waivers of employee rights without providing any

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

notice of the DFEH Investigation; and 4) shredding documents in violation of a document retention notice DFEH sent.

39. On September 20, 2021, the *Wall Street Journal* reported that the U.S. Securities and Exchange Commission had opened an investigation of Blizzard's disclosures concerning workplace misconduct and discrimination. Over September 20 and 21, 2021, the Company's stock dropped by more than 8%, further damaging investors.

40. On September 27, 2021, the EEOC filed a complaint against Blizzard in U.S. District Court for the Central District of California, which, like the DFEH Complaint, reported that the EEOC found that Activision Blizzard's employees were subjected to sexual harassment and discrimination, that the Company knew about it, but did not prevent it, and that employees who complained were retaliated against (the "EEOC Complaint," attached as **Exhibit 3**, *see EEOC vs. Activision Blizzard, Inc, et al.*, Case No. 2:21-cv-07682-DSF-JEM (C.D. Cal.)). Simultaneously with the filing of the EEOC Complaint, the EEOC announced that it and Activision Blizzard had entered into an onerous 3-year Consent Decree that also included an $18 million monetary settlement. U.S. District Judge Dale S. Fischer entered the final version of the Consent Decree on March 29, 2022 (the "Consent Decree," **Exhibit 4**).

41. The carnage continued into October 2021 when, as the *Financial Times* reported, Blizzard "fired 20 employees in an attempt to clean up its culture following allegations of widespread gender-based discrimination and harassment," and Blizzard cancelled its annual fan convention BlizzCon.

42. On a November 2, 2021 earnings call, Activision Blizzard admitted for the first time that the launch date for its new titles Diablo IV and Overwatch 2 would be postponed. They directly attributed the delay to the games having changes in "leadership" after the Company "in recent months, [took] actions that resulted in the departure of a number of individuals across the company." The

11

Company also announced that Oneal was departing from her position as co-leader of Blizzard at the end of the year.

43.     On the news that Blizzard's forthcoming games were delayed due to departures caused by the Company's ongoing sexual harassment and discrimination scandal, Activision Blizzard's stock plunged more than 14% on November 3, 2021.

44.     On November 16, 2021, *The Wall Street Journal* published its article revealing that Defendant Kotick had known about the sexual misconduct allegations for years. *The Wall Street Journal* further reported that Activision Blizzard had received more than 500 reports from current and former employees alleging harassment, sexual assault, bullying, pay disparities and other misconduct since the filing of the DFEH suit. The article also revealed the true circumstances surrounding Oneal's departure. It revealed that she had sent an internal email concerning her resignation the month after her appointment as Blizzard co-leader in which Oneal, who is Asian-American and gay, said "I have been tokenized, marginalized, and discriminated against…"  It also revealed that despite being appointed as Co-Heads of Blizzard, with ostensibly equal status and responsibilities, Oneal was paid less than her male counterpart, Mike Ybarra.

45.     On this news, the Company's stock plunged 8.3%, again harming investors.

46.     As a result of Defendants' knowing and/or reckless false and misleading statements and omissions concerning the DFEH and EEOC Investigations, the value and price of Activision Blizzard's common stock during the Class Period was artificially inflated. When the truth was revealed and the risk of the DFEH and EEOC Investigations materialized, Activision Blizzard's share price declined and Plaintiffs and other Class members suffered significant losses and damages.

12

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

**JURISDICTION AND VENUE**

47.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

48.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

49.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Activision Blizzard's headquarters is located in this district. Additionally, substantial acts in furtherance of the alleged fraud have occurred in this district, including the dissemination of materially false and/or misleading information.

50.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

51.     Lead Plaintiff Ross, as set forth in the certification submitted in connection with his lead plaintiff motion (ECF No. 23-2), incorporated by reference herein, purchased Activision Blizzard Common Stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

52.     Named Plaintiffs Cheng, Ernst, Noon, Baldwin, Martin, and Toiber, as set forth in their certifications, purchased Activision Blizzard Common Stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.  Plaintiff Cheng's

13

certification was filed with the Initial Complaint (ECF No. 1) and is incorporated by reference herein. Plaintiffs Ernst, Noon, Baldwin, Martin, and Toiber's certifications were filed with the Amended Complaint (ECF No. 39-5).

53.     Defendant Activision Blizzard purports to be one of the world's largest video game publishers. Activision Blizzard is incorporated in Delaware with its principal office located in Santa Monica, California. Activision Blizzard's common stock trades on the NASDAQ under the ticker symbol "ATVI."

54.     Defendant Robert A. Kotick ("Kotick") has served as the Company's Chief Executive Officer ("CEO") and a director of the Company since 1991.

55.     Defendant Dennis Durkin ("Durkin") served as the Company's Chief Financial Officer ("CFO") from March 2012 to May 2017 and from January 2019 until April 2021. He served as the Company's Chief Corporate Officer from May 2017 to January 2019.

56.     Defendant Spencer Neumann ("Neumann") served as the Company's CFO from May 2017 to January 2019.

57.     Defendant Armin Zerza has served as CFO of the Company from April 2021 to present. He also served as Chief Commercial Officer of the Company from February 2019 to April 2021, Chief Operating Officer of Blizzard from October 2017 to April 2021, and CFO of Blizzard from August 2015 to September 2017.

58.     Defendant Brian Kelly ("Kelly") has served as Chairman of the Board of the Company since 2013, Co-Chairman of the Board from October 1998 to 2013, and as a director since 1995.

59.     Defendants Kotick, Durkin, Neumann, Zerza, and Kelly are collectively referred to herein as the "Individual Defendants."

60.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

14

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

61.     Additionally, Defendants Kotick, Durkin, Neumann, and Zerza certified, pursuant to the Sarbanes-Oxley Act of 2002, the Company's compliance with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the Company's quarterly and annual reports filed with the Securities and Exchange Commission during the Class Period that they signed did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that they had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" ("SOX Certifications").

62.     Activision Blizzard is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

carried out within the scope of their employment.

63.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Activision Blizzard under *respondeat superior* and agency principles.

64.    Defendant Activision Blizzard and the Individual Defendants are collectively referred to herein as "Defendants."

## ALLEGATIONS OF MISCONDUCT

### A. Background of Activision Blizzard.

65.    Activision Blizzard describes itself as a leading global developer and publisher of interactive entertainment content and services. The Company develops and distributes content and services on video game consoles, personal computers, and mobile devices and also operates Esports leagues. An Esports league is a competitive league for video game players, some of whom compete in video game competitions professionally.

66.    Activision Blizzard was formed in 2008 when Activision, Inc. merged with Vivendi Games, the parent company of Blizzard Entertainment. Activision, Inc. was interested in merging with Vivendi Games because of Blizzard Entertainment's "World of Warcraft" game, which was then — and remains today — one of the most successful video game franchises of all time. Because of the success of World of Warcraft, when the two companies merged, shareholders of Vivendi Games received 52% of the combined company, which traded as ATVI on the Nasdaq.

67.    In February 2016, Activision acquired the Swedish video game company King.com Limited for $5.9 billion.

68.    Currently and throughout the Class Period, Activision Blizzard has conducted its business through three reportable segments: Blizzard, Activision Publishing, Inc. ("Activision Publishing"), and King Digital Entertainment ("King Digital").

69.     Blizzard delivers content through both premium and free-to-play offerings and primarily generates revenue from full-game and in-game sales, subscriptions, and by licensing software to third-party or related-party companies that distribute Blizzard products. Blizzard also maintains a proprietary online gaming service, Blizzard Battle.net, which allows players around the world to compete against and communicate with each other.

70.     Blizzard's key product franchises include: World of Warcraft, a subscription-based multi-player online role-playing franchise; Hearthstone, an online collectible card franchise based in the World of Warcraft universe; Diablo, an action role-playing franchise; and Overwatch, a team-based first-person action franchise. Blizzard also includes the activities of the Overwatch League, which is a global professional esports league with city-based teams of Overwatch players.

71.     Activision Publishing also delivers content through both premium and free-to-play offerings and primarily generates revenue from full-game and in-game sales, as well as by licensing software to third-party or related-party companies. Activision Publishing's key product franchise is Call of Duty, a first-person action franchise. Activision Publishing also includes the activities of the Call of Duty League, a global professional esports league with city-based teams.

72.     King Digital delivers content primarily through free-to-play offerings and primarily generates revenue from in-game sales and in-game advertising on the mobile platform. King Digital's key product franchise is the game Candy Crush.

73.     Between 2016 and 2020, the Blizzard segment of Activision generated between approximately 24% and 34% of Activision Blizzard's net revenue every year.

74.     On Activision Blizzard's website, the Presidents of the Blizzard, Activision Publishing, and King segments all appear on a webpage entitled "our leadership" along with the top executive officers at Activision Blizzard, including

Defendant CEO Kotick and Activision Blizzard's CFO.

**B. Relevant Non-Parties**

75.     **Alex Afrasiabi** ("Afrasiabi") was employed by Blizzard as a game developer since 2004, most recently as Senior Creative Director on *World of Warcraft*. Activision Blizzard terminated Afrasiabi in May 2020. The DFEH complaint alleges that Afrasiabi "was permitted to engage in blatant sexual harassment with little or no repercussions" and "would hit on female employees, telling [them] he wanted to marry them, attempting to kiss them, and putting his arms around them… in plain view of other male employees, including supervisors, who had to intervene and pull him off female employees. Afrasiabi was so well-known engaging in harassment of females that his suite [at the Company's annual event BlizzCon] was nicknamed the 'Crosby Suite' [sic] after alleged rapist Bill Crosby [sic]. Afrasiabi would call females derogatory names at Company events."

76.     **Luis Barriga** ("Barriga") was a veteran employee of Blizzard since 2006, most recently acting as Game Director for development of forthcoming project *Diablo IV*.  The Company terminated Barriga on or about August 11, 2021 in connection with the investigations of sexual harassment and sex discrimination by the DFEH and EEOC.

77.     **J. Allen Brack** ("Brack") was most recently President of Blizzard. Prior to assuming the role of President in October 2018, Brack was the Executive Producer and Senior Vice President, and the Team Lead for *World of Warcraft*, which he worked on in various capacities since 2006. He resigned as President of Blizzard on or about August 3, 2021, in connection with the fallout from the DFEH and EEOC Investigations.

78.     **Paul Cazarez** ("Cazarez") was a Principal Level Designer working for Blizzard on *World of Warcraft*. Cazarez resigned from Blizzard in 2019. On July 28, 2021, Cazarez was identified in a photograph, posed around a portrait of

18

Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Mosquiera, Kosak, Street, LeCraft, McCree, and others.

79.     **Claire Hart** ("Hart") was Blizzard Entertainment's Chief Legal Officer from July 2018 until she left the Company on September 17, 2021.

80.     **Ben Kilgore** ("Kilgore") was Blizzard's Chief Technology Officer from 2015 until he was fired in August 2018. Kilgore was the Chief Technology Officer referenced in the DFEH Complaint: "Defendant's former Chief Technology Officer was observed by employees groping inebriated female employees at company events and was known for making hiring decisions based on female applicants' looks…."

81.     **Alex Kosak** ("Kosak") was an employee of Activision Blizzard, most recently serving as Lead Quest/Narrative Designer on *World of Warcraft.* On July 28, 2021, Kosak was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Mosquiera, Cazarez, Street, LeCraft, McCree, and others.

82.     **Jonathan LeCraft** ("LeCraft") was a Senior Game Designer on *World of Warcraft.* Blizzard incorporated a number of characters, items, and locations referencing LeCraft in *World of Warcraft.* LeCraft was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Kosak, Mosquiera, Cazarez, Street, McCree, and others. The Company terminated LeCraft on or about August 11, 2021 in connection with the DFEH and EEOC Investigations. Numerous references to LeCraft in *World of Warcraft* were subsequently changed or eliminated.

83.     **Jesse McCree** ("McCree") was a former Lead Game Designer for *World of Warcraft* and *Overwatch,* and most recently acted as Lead Game Designer on forthcoming project *Diablo IV.* He was honored by Blizzard's development team with a playable character that shared his name in *Overwatch.* On July 28, 2021, McCree was identified in a photograph, posed around a portrait

of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Kosak, Street, Mosquiera, Cazarez, LeCraft, and others. The Company terminated McCree on or about August 11, 2021 in connection with the DFEH and EEOC Investigations. Blizzard Entertainment subsequently changed the name of his namesake *Overwatch* character to "Cole Cassidy." Blizzard also removed references to McCree from *World of Warcraft.*

84.   **Josh Mosquiera** ("Mosquiera") was Game Director of *Diablo III*. He left the Company in 2016. On July 28, 2021, Mosquiera was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Kosak,  Street, Cazarez, LeCraft, McCree, and others.

85.   **Jennifer Oneal** ("Oneal") was Studio Head of Vicarious Visions (a wholly owned subsidiary of Activision) until transitioning to Executive Vice President of Development at Blizzard when the Company folded that studio into Blizzard in January 2021. On or about August 3, 2021, Oneal was appointed one of two Co-Heads of Blizzard (together with Mike Ybarra). She was the first female business unit head in Activision Blizzard's history. On November 2, 2021, the Company announced that Oneal was leaving the Company at the end of the year. Before resigning, Oneal, who is Asian and gay, sent an email to a member of Activision's legal team in which she professed a lack of faith in Activision Blizzard's leadership to turn the culture around, saying "it was clear that the company would never prioritize our people the right way," she had been sexually harassed earlier in her career, had been "tokenized, marginalized, and discriminated against." Despite being appointed Co-Lead, with supposedly equal authority and responsibility, Activision Blizzard offered her inferior compensation to her male counterpart, Mike Ybarra.

86.   **Cory Stockton** ("Stockton") is a Lead Game Designer and Lead Content Designer at Blizzard, working on *World of Warcraft.* On July 28, 2021,

20

Stockton was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Street, Mosquiera, Cazarez, LeCraft, McCree, and others. He was placed on leave by the Company on or about August 11, 2021 in connection with the DFEH and EEOC Investigations.

87.    **Jesse Meschuk** ("Meschuk") was the Senior Vice President and Global Head of Human Resources who managed Blizzard's Human Resources. Meschuk left the Company around the same time as Brack, on or about August 3, 2021.

88.    **Michael Morhaime** ("Morhaime") was one of three co-founders and President of Blizzard until October 3, 2018. He then served as an advisor to the Company until April 7, 2019.

89.    **Tyler Rosen** ("Rosen") began working at Blizzard Entertainment in 2013 as Program manager of its Esports division.  Rosen later became Senior Manager of Global Business Strategy & Operations in 2016.  Rosen was abruptly and quietly fired from Blizzard in October 2018.

90.    **Mike Ybarra** ("Ybarra") is currently President and sole leader of Blizzard Entertainment. On or about August 3, 2021, Ybarra was appointed one of two Co-Heads of Blizzard Entertainment (together with Jennifer Oneal).

91.    The **California Department of Fair Employment & Housing** ("DFEH") is, according to its website, an agency of the State of California charged with enforcing "California's civil rights laws, including protecting the people of California from unlawful discrimination in employment, housing, businesses, and state-funded programs, and from bias-motivated violence and human trafficking." DFEH is the largest state civil rights agency in the country. California's various civil rights laws empower DFEH to, among other things, enforce the laws by prosecuting violations in civil court and investigate and bring complaints of individual and systemic discrimination.

92.    The **U.S. Equal Employment Opportunity Commission** ("EEOC"),

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

according to its website, is an agency of the federal government of the United States and "is responsible for enforcing federal laws that make it illegal to discriminate against a job applicant or an employee because of the person's race, color, religion, sex (including pregnancy, transgender status, and sexual orientation), national origin, age (40 or older), disability or genetic information."

**C.** **The EEOC and DFEH Open Investigations Into Activision Blizzard for Systemic Sexual Harassment and Gender Discrimination Against Female Employees by Commissioner's Charge and Director Complaint, Respectively.**

**1)** **The EEOC Initiates an Investigation of Activision Blizzard with a Commissioner's Charge on September 26, 2018**

93.     According to the EEOC Complaint filed against Activision Blizzard on September 27, 2021, on September 26, 2018, "EEOC Commissioner Chai R. Feldblum signed Commissioner's Charge Number 480-2018-05212, initiating the EEOC's investigation into the following allegations, including but not limited to: '1. Subjecting female employees to sex-based discrimination, including harassment, based on their gender. 2. Retaliating against female employees for complaining about sex-based discrimination, based on their gender. 3. Paying female employees less than male employees, based on their gender.'"

94.     The EEOC Complaint further stated that the EEOC "conducted an extensive investigation from September 26, 2018 to June 15, 2021 of the allegations of sexual harassment and related retaliation against Defendants and additional entities beyond the Charge, at their worksites in the United States" and that Defendants provided information, documents, and the testimony of individuals for the investigation.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**2)** **The DFEH Begins Requesting Information From Activision Blizzard in 2017 and Initiates a Formal Investigation Into Systemic Misconduct by Serving the Company with a Director's Complaint on October 12, 2018.**

95.     Confidential Witness 1 ("CW1")[2] worked at Activision Blizzard from 2007 to late 2019. CW1 began his career at the Company as a Senior 3D Artist and became Art Outsource Supervisor in 2016 and Lead Artist in 2018.

96.     CW1 told Plaintiffs' investigator that as Art Outsource Supervisor in 2017, he received an email from Human Resources, which went out to all department heads, telling them not to destroy any of their emails because the DFEH had requested information from the Company.

97.     On October 12, 2018, the DFEH opened a formal investigation by serving a Commissioner's Complaint on Activision Blizzard. According to the DFEH Complaint, "DFEH's director, in his or her discretion, may file a complaint on behalf of a group or class" and "[p]ursuant to this authority, DFEH Director Kevin Kish ('DFEH Director') filed and served a complaint of Group or Systemic Investigation and Director's Complaint for Group/Class Relief against Blizzard Entertainment, Inc. on October 12, 2018, (DFEH Case No. 201810-03875512). On October 29, 2018, an Amended Director's Complaint was filed and served to add Activision Blizzard, Inc. On December 7, 2018, a Second Amended Director's Complaint was filed and served to add Activision Publishing, Inc. (collectively, referred to as 'Director's Complaints'.)"

98.     The DFEH Director's Complaints against Activision Blizzard alleged that "Defendants engaged in discrimination against their employees on the basis

---

[2] All references to confidential witnesses refer to witnesses interviewed by Plaintiffs' investigator. The Second Amended Complaint contains additional confidential witnesses.  Accordingly, the confidential witnesses have been re-numbered.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of sex-gender, including failing to hire, select, or employ persons because of their sex, as well as discriminating in compensation or in the terms, conditions, [and] privileges of employment due to their sex." The Director's Complaints further alleged that "Defendants failed to take all reasonable steps to prevent unlawful discrimination, harassment, or retaliation."

**D. Defendants Did Not Disclose the EEOC and DFEH Investigations, and Instead Stated Repeatedly During the Class Period that the Company was Party to Only "Routine…Investigations" that Arose in "the Ordinary Course of Business," Were "Not Significant," and Not Expected "to Have a Material Adverse Effect" on Activision Blizzard's Business.**

99.    Although Defendants spoke specifically on the topic of ongoing investigations under the heading  "legal proceedings" in each of the Company's 10-Ks and 10-Qs filed between November 2018 and May 2021, they did not disclose the EEOC or DFEH Investigations. Instead, each of the Company's public filings stated that the Company was subject to "*routine….investigations*" that arose from "*the ordinary course of business*," were "*not significant*," and *not expected "to have a material adverse effect"* on Activision Blizzard's business. (emphasis added).

100.    Notably, Activision Blizzard's Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K") (filed February 28, 2019), Form 10-Q for the quarterly period ended June 30, 2019 ("2Q 2019 10-Q") (filed August 8, 2019), and Form 10-K for the fiscal year ended December 31, 2019 ("2019 10-K") (filed February 27, 2020) enumerated certain legal proceedings followed by the blanket statement:

> *In addition, we are party to routine* claims, suits, *investigations*, audits, and other proceedings *arising from the ordinary course of business*, including with respect to intellectual property rights, contractual claims, *labor and employment matters*,…. In the opinion

of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

101.    By using this construction, Defendants were clearly stating that all legal proceedings — including "investigations" — that were not enumerated were "routine," arose in "the ordinary course of business," were "not significant" and were not expected to have a "material adverse effect" on Activision Blizzard's business.

**E.    The EEOC and DFEH Investigations Were Not "Routine" and in the "Ordinary Course of Business;" The EEOC and DFEH Investigations Were "Significant" and Likely "to  Have a Material Adverse Effect" on Activision Blizzard's Business.**

102.    Defendants' two statements (both made repeatedly during the Class Period) that the Company was party only to "routine…investigations….arising from the ordinary course of business" and that those routine investigations "are not significant and we do not expect them to have a material adverse effect on our business" were false and materially misleading because: (1) the Investigations were initiated by an EEOC Commissioner Charge and DFEH Director's Complaint, which those government agencies rarely use and reserve for serious systemic misconduct; (2) the Investigations led the Company to immediately alter its Human Resources practices; (3) the Investigations caused the firing of key employees Ben Kilgore, Alex Afrasiabi, and Tyler Rosen; (4) Activision Blizzard's management informed the board of directors about the Investigations; (5) the Investigations were very extensive and the DFEH served the April 2, 2021 Subpoena Duces Tecum on Activision Blizzard; (6) the pervasive sexual harassment and discrimination at Activision Blizzard and the inevitable fact that the EEOC and DFEH would discover it rendered the Investigations non-routine,

highly significant and precluded the possibility that they would not have a materially adverse effect on the Company; (7) the Company made repeated statements about the importance of diversity and inclusion; (8) the #MeToo Movement made the Investigations especially dangerous for the Company; (9) the Defendants admitted shortly after the DFEH filed its public Complaint that reputational damage from the allegations in the DFEH Complaint would likely impact its business.

**1)   EEOC Commissioner's Charges and DFEH Director's Complaints Are Rarely Used Mechanisms That Those Agencies Use for Investigations into Systemic Harassment and Discrimination.**

103.   The EEOC and DFEH investigations were not routine and in the ordinary course of business because the Commissioner's Charge and Director's Complaint used to initiate them, respectively, are rarely used mechanisms reserved for investigations into systemic misconduct.

a.   The EEOC's Commissioner's Charge against Activision Blizzard was one of only 11 filed in 2018.

104.   In addition to investigating discrimination charges filed by individuals, Congress also authorized the EEOC to investigate discrimination by using Commissioner's charges.

105.   Most Commissioner's charges, such as the one brought against Activision Blizzard, address claims of systemic or companywide discrimination and they must be personally authorized by one of the EEOC's five commissioners.

106.   Accordingly, in contrast to the tens of thousands of charges filed by individuals that the EEOC investigates every year,[3] Commissioner's charges are very rare. The EEOC only brought 11 Commissioner's charges, including the one

---

[3] Individuals filed 76,418, 72,675, and 67,448 charges with the EEOC in 2018, 2019, and 2020, respectively.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

against Activision Blizzard, in 2018. Since then the number of Commissioner's charges the EEOC filed has decreased further to 9 in 2019 and 3 in both 2020 and 2021.

        b.   <u>The DFEH Filed Only 4 Director's Complaints in 2019 and 3 Director's Complaints in 2020 and in Each of Those Years the Director's Complaint Against Activision Blizzard was Only One of 10 Additional Director's Complaints Under Investigation.</u>

    107.  As with the EEOC, the DFEH primarily investigates discrimination cases filed with it by individuals.[4] The DFEH's director may, however, file a Director's Complaint on behalf of a group or a class and conduct a systemic investigation against an employer.

    108.  DFEH Director's Complaints are exceedingly rare. The DFEH only filed 3 Director's Complaints in 2020 and 4 in 2019. Furthermore, in each of those years, the DFEH's investigation of Activision Blizzard was one of only 10 additional ongoing investigations based on a Director's Complaint.

**2)    In Response to the Investigations, Activision Blizzard Made Significant Changes to its Human Resources Procedures, Which Included Instituting a Formal Process for Investigating Sexual Harassment Complaints For the First Time and Instituting Regular Meetings Between Human Resources and its Legal Team.**

    109.  Confidential Witness 2 ("CW2")  held the position of Organizational Development Manager from 2015 to 2017, Human Resources Senior Manager/Human Resources Business Partner from 2017 to 2020, and Chief of Staff, People until late 2020. A Human Resources Business Partner is an experienced human resource professional who works directly with an

---

[4] In 2019 and 2020 the DFEH accepted 6,636 and 5,784 individual complaints for investigation, respectively.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

organization's senior leadership to develop and direct a Human Resources agenda that closely supports organizational goals. CW2's responsibilities included getting Activision Blizzard on the "Great Place to Work List" at *greatplacetowork.com*, which partners with the Fortune 100 Best Companies to Work For list.

110.   As Chief of Staff, People, CW2 served as Chief of Staff to Senior Vice President of Human Resources and Senior People Officer Jesse Meschuk's Chief of Staff. CW2 noted that despite the fact that Meschuk was managing Blizzard's Human Resources, he had a lot of functions that were not specific to Blizzard because the Company was centralizing a lot of Human Resources functions at the time.

111.   CW2 stated that Meschuk reported directly to Activision Blizzard Chief People Officer, Claudine Naughton, who was head of Human Resources for all of Activision Blizzard. Naughton reported directly to Defendant Kotick and had regular one-on-one meetings with him.

112.   According to CW2, in the fall of 2018, shortly after the EEOC and DFEH Investigations officially began, all of the Activision Blizzard Human Resources Business Partners began having  regular meetings with the Company's legal team where the Company's executives told them to start documenting all sexual harassment and other internal complaints because the EEOC was investigating the Company. Prior to that, Activision Blizzard Human Resources did not have a formal process for investigating complaints and there was no consistent documentation of them. There were also no regular meetings between all of Human Resources and the legal department previously.

113.   CW2 further stated that there was no way that Defendant Kotick did not know about these changes because he had regular one-on-one meetings with Naughton.

114.   Additionally, in Activision Blizzard's Answer to the DFEH Amended Complaint, the Company admitted it also conducted an internal investigation of

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

practices and policies of its Human Resources department in 2018. Notably, the Company had begun to receive information requests from the DFEH in 2017.

115.   Then, in 2019, Activision Blizzard changed the reporting structure of Human Resources so that it reported directly to the Company's corporate office. As reported in a *Wall Street Journal* Article published on November 16, 2021 entitled "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant" by Kirsten Grind, Ben Fritz, and Sarah Needleman (the "November 16 *Wall Street Journal* Article"), a spokeswoman for Activision Blizzard admitted to *The Wall Street Journal* that the Company made this change because the prior setup 'occasionally allowed some employees to conduct themselves in truly regrettable ways.'"

116.   Investigations that lead to significant structural changes in how a company's  Human Resources department operates are by definition not routine or in the ordinary course of business. Furthermore, these changes show that Defendants regarded the Investigations as significant and there was risk that they would have a materially adverse effect on the Company.

**3)     The EEOC and DFEH Investigations Caused Activision Blizzard to Fire Important Employees Before the Investigations Became Public.**

117.   Activision Blizzard fired Ben Kilgore, Blizzard's CTO and heir apparent to Blizzard President Mike Morhaime, in August 2018 — right before the EEOC and DFEH formally started their Investigations, and after the Company had already received requests for information from the DFEH. The Company then fired Tyler Rosen, Senior Manager of Global Business Strategy & Operations, in October 2018, and Alex Afrasiabi, the Senior Creative Director of World of Warcraft, in May 2020.

118.   CW2 told Plaintiffs' investigator that those firings could only be explained as resulting from the Investigations since multiple sexual harassment complaints had been pending against each of those senior leaders for years before

the Company fired them. CW2 believed that the Company protected them for so long because they were critical talent that the Company needed. As discussed below, Kilgore and Afrasiabi's behavior was so egregious that the DFEH Complaint referred to them as longtime and repeat sexual harassers (Paragraphs 148-150, *infra*). Additionally, *The Washington Post* documented Afrasiabi, Kilgore, and Rosen's serial harassment, referring to them as "three senior leaders" in its investigative report published on August 6, 2021, entitled "At Blizzard, groping, free-flowing booze and fear of retaliation tainted 'magical' workplace" and authored by Shannon Liao (the "August 6 *Washington Post* Article") (Paragraphs 160-164, *infra*). Furthermore, the August 6 *Washington Post* Article reported that Activision Blizzard made a concerted effort to keep their firings quiet — they never announced a reason for Kilgore, Afrasiabi, and Rosen's departures and "[o]nly through whisper networks did many learn of what happened, and only after the lawsuit was filed on July 20 of this year did Blizzard offer official public statements."

119.   Despite being a known serial harasser whose behavior went back to at least 2012 (*see* Paragraphs 148-149, 152-155, 161, 185-186, *infra*), Afrasiabi was a fixture at Blizzard. He was hired as game developer for *World of Warcraft*, Blizzard's most important game, in 2004 and served as the Creative Director for two important expansions of that game: 2016's Legion and 2018's Battle for Azeroth and was ultimately elevated to Senior Creative Director of the entire game before he was fired. Afrasiabi was so entrenched that there were characters and quests in the game named after him.

120.   Confidential Witness 3 ("CW3") described Afrasiabi's departure from the Company as unexpected and abrupt. CW3 worked for Blizzard from late 2017 to late 2021, first as the Editor for Overwatch Global Publishing and then as Editor of World of Warcraft Global. CW3's duties were like being an internal journalist at the Company.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

121.   CW3 believed that the EEOC and DFEH Investigations were the only plausible explanation for Afrasiabi's sudden firing. CW3 said that Afrasiabi was in the midst of developing a game that the Company had spent millions on and "when he was removed, his project wasn't given to someone else." CW3 further stated that "it was a very costly financial decision for them to let people of that level go. [Afrasiabi] was working on a game under an NDA and he just all of a sudden disappeared for no reason." CW3 was shocked that the Company cancelled Afrasiabi's new game, stating that "they spent millions of dollars developing it and they just shelved it." CW3 further stated that it "just seemed sudden" since "we knew he was a sleazebag, but we [knew] that for ten years before so why now?"

122.   Regarding Kilgore, the November 16 *Wall Street Journal* Article reported "Kilgore faced multiple allegations of sexually harassing female staffers over the course of several years." Additionally former Activision Blizzard employee Cher Scarlett, who worked at the Company as software engineer for its Battle.net in 2015 and 2016, wrote on Twitter on July 24, 2021 that Kilgore was "promoted after incidents that I was privy to in 2015 and 2016 were reported by a mutual friend." Another former Activision Blizzard employee, Terra Field, who was a UNIX Systems Engineer and Senior Systems Engineer at Blizzard from January 2015 to February 2018 and February 2018 to January 2019, respectively, wrote on Twitter, also on July 24, 2021, that "Kilgore was being investigated for inappropriate conduct with female employees as early as 2016" and "[t]he Women's council knew about the allegations."

123.   Confidential Witness 4 ("CW4") worked at Blizzard as an Associate Program Management from June 2016 to January 2019. CW4 stated that Kilgore repeatedly did things that were inappropriate to secretaries and other employees for years. These employees quit or were let go and were given handsome severance packages  and, in at least one instance, signed an NDA.

31

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

124.    Despite this record, Activision Blizzard did not fire Kilgore until after the DFEH began requesting information from the Company and  just prior to the official start of the DFEH and EEOC Investigations.

125.    Regarding Rosen, the August 6 *Washington Post* Article documented a sexual harassment incident as early as 2014, where a female Activision Blizzard esports employee accused him of putting his hand on her backside.

126.    Confidential Witness 5 ("CW5") worked for Blizzard from September 2013 to May 2018. CW5 started out as a Technical Quality Assurance Analyst II and then in September 2014 became a Production Assistant for the Vault team. In December 2015 she became an Associate Game Art Producer for StarCraft II and in December 2016, she became an Art Outsourcing/Art Producer for Classic Games, which is where she stayed until she resigned in May 2018.

127.    CW5 confirmed that Rosen was a serial harasser, stating that people called him "Touchy Tyler" because he would give people back rubs without their consent. He was also known for drinking at work (*see* Paragraph 178, *infra*) Despite this, Rosen was not fired until October 2018, around when the Investigations began.

128.    Based on discussions with people familiar with Defendant Kotick's leadership, the November 16 *Wall Street Journal* Article found that "Mr. Kotick approves high-profile hiring decisions and the exit and pay packages of star developers, and he is typically aware of any major problems in each of Activision's 12 development studios and three major business units."

129.    In line with that, *The Wall Street Journal* reported, based on conversations with people familiar with the matter, that Defendant Kotick had personally approved the 2018 firing of Blizzard CTO Kilgore. The *Wall Street Journal* also confirmed that, despite this, Morhaime, who was then the President of Blizzard, sent an email thanking Kilgore for his contributions over the last four and a half years when he left the Company. *The Wall Street Journal* reported that

32

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

"[s]ome employees said they were taken aback by the praise, particularly given that they had been told not to discuss the circumstances of Mr. Kilgore's departure."

130.   Given these facts about Kotick's involvement with hiring and firing, Kotick certainly also knew about and likely also approved the firings of Afrasiabi and Rosen.

131.   The fact that they led to the firing of important Activision Blizzard employees is further evidence that the EEOC and DFEH Investigations were not routine or in the ordinary course of business. Furthermore, these firings show that the Investigations were already significant and having a material adverse effect on the Company while Defendants were stating the opposite in the Company's public filings.

### 4)   Activision Blizzard's Board of Directors was Informed About the EEOC and DFEH Investigations.

132.   The November 16 *Wall Street Journal* Article reported that Activision Blizzard's board of directors sent *The Wall Street Journal* a statement disclosing that it had been "informed at all times with respect to the status of regulatory matters," referring to the EEOC and DFEH Investigations.

133.   Given the size of Activision Blizzard, only a small percentage of legal matters concerning the Company — the most significant and those with the potential to materially impact the Company — would have been brought to the board of directors' attention by management. Routine or insignificant legal matters would not be brought to the Board's attention. That management specifically informed the board of directors about the EEOC and DFEH Investigations is yet another indication that the Investigations were not routine and in the ordinary course of business and that Defendants believed they were significant and likely to have a material effect on the Company.

134.   The existence of the EEOC and DFEH Investigations was also

33

widely known at the Company. Confidential Witness 6 ("CW6") worked as a Software Engineer in the Blizzard segment of Activision Blizzard from June 2015 through December 2020. During that period she held the title of Associate Software Engineer and Software Engineer. CW6 stated that the DFEH and EEOC Investigations were common knowledge at the Company as far back as 2018 and that employees discussed the Investigations on the Company's internal Slack[5] channels. In particular, CW6 stated that employees began discussing the Investigations after an article appeared on the website *Kotaku.com* about sexism at video game developer Riot Games on August 7, 2018.[6] CW6 further stated that she got an email from Blizzard's legal department during the summer of 2020 telling her not to delete anything on her computer due to the ongoing Investigations. CW6 also specifically recalled asking an Associate Director of Human Resources (Individual A[7]) about the Investigations after she received the email. Individual A told CW6 that she knew about the Investigations.

**5)   The EEOC and DFEH Investigations Were Both Very Extensive — Both Interviewed More Than 100 Witnesses — and the DFEH Served Activision Blizzard With a Broad Subpoena Duces Tecum After it Had Already Been Investigating For more than Two Years.**

135.   The extensiveness of the EEOC and DFEH's Investigations and the DFEH's decision to escalate its investigation after it had been going on for more than two years by serving an extremely broad Subpoena Duces Tecum strongly

---

[5] Slack is an application that many workplaces use to make it easier for employees to communicate with each other. Employees can message each other both in group chats (or "channels") or person-to-person.

[6] Riot Games settled lawsuits alleging sexual harassment and gender discrimination in 2019.

[7] All people denoted as "Individual [Letter]" are people whom Plaintiffs know the identities of, but are not disclosing them due to the possibility they could be retaliated against.

indicated the Investigations were not routine or in the ordinary course of business and that they were significant and likely to have a material adverse effect on Activision Blizzard.

136.   During its Investigation, the EEOC conducted over 100 interviews of Activision Blizzard's current and former employees and third parties, sent an electronic survey to all of Activision Blizzard's employees, conducted "lengthy interviews" with 10 of Activision Blizzard's current and former managers and executives, and reviewed thousands of pages of Activision Blizzard's documents, including policies, trainings, complaints, investigations, and personnel records.[8]

137.   The DFEH stated that, as of September 27, 2021, it had interviewed hundreds of victims and employee/contractor witnesses, taken 7 depositions, and received 18,000 pages of documents and 7 years of employment data.[9]

138.   Additionally, in its Answer to the DFEH Amended Complaint, Activision Blizzard admitted that on April 2, 2021, more than two years after the DFEH had initiated its formal investigation, the DFEH "served a Subpoena Duces Tecum on Activision Blizzard, Inc., which contained 40 requests with numerous subparts" and "reached far beyond the scope of the Director's Complaint, seeking broad categories of documents far beyond those alleged employment practices noticed in the DFEH's Director's Complaint." The DFEH then "did not respond to [Activision Blizzard's] request to meet and confer."

139.   The DFEH served that Subpoena Duces Tecum more than a month before Activision Blizzard filed its Form 10-Q for the quarterly period ended March 31, 2021 on May 4, 2021 ("1Q 2021 10-Q"). In the 1Q 2021 10-Q,

---

[8] *See* Declaration of Ella Hushagen in Opposition to *Amicus* DFEH's Motion to Stay, *EEOC vs. Activision Blizzard, Inc, et al.*, Case No. 2:21-cv-07682-DSF-JEM (C.D. Cal.), ECF No. 62-9.

[9] *See* Declaration of Janette Wipper in Support of Department of Fair Employment and Housing's Motion to Intervene, *EEOC vs. Activision Blizzard, Inc, et al.*, Case No. 2:21-cv-07682-DSF-JEM (C.D. Cal.), ECF No. 24-10.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Defendants continued to state that all investigations that Activision Blizzard were subject to were "routine," in "the ordinary course of business," "not significant," and not expected to have a "material adverse effect" despite the fact that the DFEH's decision to escalate its investigation by serving the April 2, 2021 Subpoena Duces Tecum strongly indicated it was dissatisfied with Activision Blizzard's cooperation and likely to file a public complaint.

**6)   Endemic Sexual Harassment and Discrimination at Activision Blizzard and The Inevitable Fact that the that the EEOC and DFEH Would Discover It Rendered the Investigations Non-Routine and Significant, and Precluded the Possibility that they Would Not Have a Material Effect on the Company.**

140.  On June 15, 2021, the EEOC issued Defendants a Letter of Determination finding reasonable cause on the allegations of systemic sexual harassment and discrimination and retaliation in the EEOC Commissioner's Charge.

141.  Nine days later, on June 24, 2021, the DFEH issued its own finding of cause for its Director's Complaints against the Company. The DFEH's Complaint states that the "DFEH found evidence that Defendants discriminated against female-employees in terms and conditions of employment, including compensation, assignment, promotion, termination, constructive discharge, and retaliation. The DFEH's investigation also found that female employees were subject to sexual harassment. DFEH's investigation found that Defendants failed to take all reasonable steps to prevent unlawful discrimination, harassment, or retaliation. Lastly, DFEH's investigation further found that Defendants had committed violations of Labor Code section 1197.5 in paying female employee less than their male counterparts for substantially similar work."

142.  The EEOC and the DFEH's findings of cause were inevitable given the pervasive and ongoing sexual harassment, discrimination, and retaliation at

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Activision Blizzard. Furthermore, Defendant Kotick, the Presidents of Blizzard during and right before the class period, J. Allen Brack and Michael Morhaime, and other high-level employees were aware of the widespread problems.

        a.    <u>Sexual Harassment Was Pervasive at Blizzard, Including Among High-Level Employees.</u>

143. The DFEH and EEOC Investigations, in-depth investigative reports by the *Washington Post, Bloomberg*, *The Wall Street Journal*, a lawsuit by an employee who worked in Blizzard's Technology Department (headed by Kilgore), and Plaintiffs' investigator's interviews of victims and witnesses who are former employees of Activision Blizzard show that harassment was pervasive at Blizzard before and during the Class Period, including among high level employees, and that the Company actively worked to conceal it.

*<u>The DFEH Investigation.</u>*

144. According to the DFEH Complaint, the Company "fostered a pervasive 'frat boy' workplace culture that continues to thrive." The DFEH found that "Defendants' 'frat boy' culture is a breeding ground for harassment and discrimination against women" and that "Female employees are subjected to constant sexual harassment, including having to continually fend off unwanted sexual comments and advances by their male co-workers and supervisors and being groped at the 'cube crawls' and other company events." During "Cube Crawls" male employees would "drink copious amounts of alcohol as they 'crawl' their way through various cubicles in the office and often engage in inappropriate behavior toward female employees."

145. A female employee noted to DFEH "that random male employees would approach her on Defendants' work site and comment on her breasts" and "[f]emale employees working for the World of Warcraft team noted that male employees and supervisors would hit on them, make derogatory comments about rape, and otherwise engage in demeaning behavior." "This behavior was known to

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

supervisors and indeed encouraged by them, including a male supervisor openly encouraging a male subordinate to 'buy' a prostitute to cure his bad mood."

146.   DFEH's investigation further showed that "***High-ranking executives and creators engaged in blatant sexual harassment without repercussions***" and cited "a particularly tragic example, [where] a female employee committed suicide during a business trip with a male supervisor who had brought butt plugs and lubricant with him on the trip." (emphasis added). Another Blizzard employee confirmed to the DFEH that at a Company holiday party before the female employee's death "male co-workers were alleged to be passing around a picture of the deceased's [genitalia]."

147.   The female Activision Blizzard employee who committed suicide was identified as Kerri Moynihan, when her parents filed a wrongful death suit in the Superior Court of the State of California, County of Los Angeles, on March 3, 2022. *See Paul Moynihan, et al v. Activision Publishing, et al.*, 22 ST CV 07890. Moynihan was a 32-year-old Certified Public Accountant and Finance Manager at Activision Blizzard when she died by suicide on April 27, 2017 while attending an Activision Blizzard work retreat at Disney's Grand Californian Hotel & Spa in Anaheim. She had worked for the Company since January 2011.

148.   The DFEH specifically named Alex Afrasiabi in its Complaint and cited him as a "blatant example of Defendants' refusal to deal with a harasser because of his seniority/position." The DFEH found that "[d]uring a company event (an annual convention called 'Blizz Con') Afrasiabi would hit on female employees, telling them he wanted to marry them, attempting to kiss them, and putting his arms around them. This was in plain view of other male employees, including supervisors, who had to intervene and pull him off female employees." The DFEH further found that "Afrasiabi was so known to engage in harassment of females [and] that his suite was nicknamed the 'Crosby Suite' [sic] after alleged rapist Bill Crosby [sic]."

38

149.   In Activision Blizzard's Answer to the DFEH Amended Complaint it did not deny the incident at BlizzCon and admitted "Afrasiabi received a written warning after an investigation substantiated a 2018 allegation that, at the 2013 BlizzCon, he had grabbed a female employee's hands, would not let go, and implied that they should go up to his hotel room." It further admitted that "Afrasiabi was terminated effective May 28, 2020, for misconduct in the treatment of employees."

150.   The DFEH also found that Ben Kilgore, who it referred to by his position (Blizzard's Chief Technology Officer), routinely engaged in sexual harassment, stating in its Complaint that he "was observed by employees groping inebriated female employees at company events and was known for making hiring decisions based on female applicants' looks."

### EEOC Investigation

151.   Like the DFEH, the EEOC Investigation found that "[e]mployees were subjected to sexual harassment that was severe or pervasive to alter the conditions of employment" and "[t]he conduct was unwelcome and adversely affected the employees." The EEOC further found that Defendants' misconduct had been ongoing since at least September 2016 and that "[Activision Blizzard, Blizzard, and Activision Publishing] knew or should have known of the sexual harassment of the adversely affected employees."

### Investigations by the Washington Post, Bloomberg, and Kotaku.com

152.   Spurred by the filing of the DFEH Complaint on July 20, 2021, on July 28, 2021, the website *Kotaku.com*, which specializes in news about video games, published an article with more details about Afrasiabi's infamous "Cosby Suite." The article was entitled "Inside Blizzard Developers' Infamous Bill 'Cosby Suite': Booze, sexual remarks, and a giant portrait of Cosby are all at the center of Activision lawsuit" and authored by Ethan Gach.

153.   *Kotaku.com* obtained and published a 2013 photo of Afrasiabi and

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

seven other current and former high-level Blizzard developers posing with a portrait of Bill Cosby in a hotel room at BlizzCon. One of the other people in the picture was Jesse McCree, the Lead Game Designer for Diablo IV and former Lead Game Designer for World of Warcraft. The picture also included the Game Director for Diablo III (Josh Mosquiera) and the Lead Systems Designer (Greg Street), the Lead Content Designer (Cory Stockton), the Lead Quest/Narrative Designer (David Kosak), a Level Designer (Paul Cazarez), and a Senior Game Designer for World of Warcraft (John LeCraft).

154. The *Kotaku* article further stated that "[b]ased on photographs and screenshots of Facebook posts obtained by *Kotaku,* it's clear that people beyond Alex Afrasiabi…were aware of the 'Cosby Suite' mentioned in the lawsuit." *Kotaku* obtained a Facebook photo album from 2013 BlizzCon that repeatedly referred to the "Cosby Suite." Another image from the same Facebook album showed a screenshot of a group chat called the "BlizzCon Cosby Crew."

155. In the "chat," former Blizzard designer David Kosak wrote: "I am gathering the hot chixx for the Coz." Afrasiabi responded, "Bring em" and Kosak wrote back "You can't marry ALL of them Alex." (emphasis in original). Afrasiabi responded "I can, I'm middle eastern." Jesse McCree then wrote, "You misspelled f\*\*k." In another image *Kotaku* procured, "a group of women are sitting on a bed in the room with the Cosby portrait. One of the women appears to have a hand on another's breast, which is cheered on by the men in the comments." Additionally, *Kotaku* spoke to two former Blizzard developers who had heard about the Cosby Suite through whisper networks and understood it to be a reference to the sexual misconduct allegations against Bill Cosby.

156. Also prompted by the DFEH Complaint, the *Washington Post* and *Bloomberg* both published lengthy investigative reports about sexual harassment and discrimination at Activision Blizzard on August 6, 2021.

157. The August 6 *Washington Post* article, entitled "At Blizzard, groping,

free-flowing booze and fear of retaliation tainted 'magical' workplace" relied on interviews with 17 current and former Blizzard employees.

158.   The *Bloomberg* article, entitled "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed: Managers set the tone by hiring mostly men, stoking their egos and dating women in the company, current and former employees said" was authored by Jason Schreier and relied on interviews with more than 50 current and former Blizzard employees (the "August 6 *Bloomberg* Article").

159.   Like the DFEH Complaint, both August 6 Articles described pervasive sexual harassment at Blizzard. *Bloomberg* stated that the women interviewed were "getting accosted for dates at the office, being subjected to alcohol-fueled hazing rituals and watching male colleagues use company events as a venue to solicit sex." The August 6 *Washington Post* article quoted Jennifer Klasing, a former World of Warcraft quest designer who left the Company in October 2020 as stating "***almost every woman I know of at Blizzard has a story of either actual, literal sexual assault***…or a man with power over her, undermining her and taking credit for her work, dismissing her, talking over her, being the last person to get promoted, despite being eminently capable…Almost every single woman I know that's been there longer than a year has at least one of these stories." (emphasis added).

160.   The August 6 *Washington Post* Article discussed the departures of Afrasiabi, Kilgore, and Rosen, stating that "[f]rom 2018 to 2020, three senior leaders were removed from Blizzard after being reported to human resources and company leadership multiple times for harassment or other toxic behavior."

161.   The *Washington Post* confirmed DFEH's finding that Afrasiabi had been harassing women with impunity for years before he was finally let go. The August 6 *Washington Post* Article stated that interviews with "[m]ultiple current and former Blizzard employees [who] told The Post they witnessed or were

41

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

involved with incidents like those alleged against Afrasiabi in the lawsuit." *The Washington Post* spoke with Anne Armstrong who had posted on social media about an encounter with Afrasiabi that was similar to what the DFEH Complaint described. Armstrong, a former manager at FXOpen Esports (a company that worked with Blizzard), recounted an incident at Blizzard's 2012 holiday party at the Disneyland Hotel "in which she says Afrasiabi kissed her in front of a group of Blizzard employees, including then Blizzard CEO and President Mike Morhaime." Afrasiabi later groped Armstrong's breast at the party "and when Afrasiabi's sister offered to give Armstrong a ride to her car after the party, a drunken [Afrasiabi] followed her into the back seat and stuck his hand under her dress."

162.   The *Washington Post* stated that Kilgore was quietly let go after years of misconduct, including for groping inebriated women at company events. Likewise, the August 6 *Bloomberg* Article stated that two former Blizzard employees said they saw Kilgore touch female colleagues inappropriately at work functions. Furthermore, "Technology staff sometimes got drunk during work hours or showed up hungover; they vomited in trash cans and held after-work hazing rituals where new recruits were expected to take shots of liquor every half hour, former employees recalled."

163.   The August 6 *Bloomberg* Article describes Blizzard employees being informed in a brusque email from Blizzard President Morhaime in summer 2018 that Kilgore — who was believed to be Morhaime's heir apparent — was leaving the Company. The email did not give a reason, but employees immediately began to gossip given that "Kilgore presided over the most notorious group of sexist drinkers." The closest thing to an explanation for Kilgore's departure was when Derek Ingalls, the new head of the technology department, was asked why Kilgore left during a large staff meeting. Ingalls told a brief story and concluded by saying "Don't sleep with your assistant. But if you're going to sleep with your assistant,

don't stop." A representative from human resources at Blizzard stood silently by during the meeting.

164.   The August 6 *Washington Post* Article described Tyler Rosen as another high-level employee who was quietly pushed out after years of misconduct. Rosen admitted in an email to *The Washington Post* that he was "part of the problem that plagues Blizzard and the wider gaming industry." Rosen further stated that "Blizzard could not talk about my termination as a matter of policy, so I exited quietly which helped me avoid public accountability, ***perpetuated the culture of silence***, and downplayed the experiences of survivors." (emphasis added).

*Lawsuit Against Activision Blizzard, Kilgore, Ingalls, and Others in Blizzard's Technology Department.*

165.   On March 23, 2022, a Senior Administrative Assistant in Blizzard's Technology Department filed a *Jane Doe* sexual harassment and retaliation lawsuit against Activision Blizzard, Kilgore, Ingalls, and her immediate supervisor, Director of IT, Mark Skorupa in The Superior Court of the State of California, County of Los Angeles, *see Jane Doe v. Activision Blizzard*, *et al.*, 22 ST CV 10064. Doe's compliant corroborates the DFEH*, Washington Post,* and *Bloomberg's* finding that the Technology Department, which Kilgore and then Ingalls led, was a very hostile place for women before and during the EEOC and DFEH investigations.

166.   Doe started working at the Company on October 23, 2017 and was immediately harassed. On her first day, she was taken out for an "initiation lunch" with Skrupa, Ingalls, and others. There she was pressured to drink many shots of tequila and Skorupa forced his hand into her lap.

167.   On November 3, 2017, at BlizzCon, Doe was instructed to meet a leadership group in the hotel bar where Skorupa pressured her to drink alcohol. After Doe became intoxicated, Skorupa gave her the keys to his hotel room,

saying that he was not using it that night. Doe does not remember much else from that night other than waking up in the middle of the night completely naked in a state of shock and then driving home.

168. In 2017 and 2018, Doe was also repeatedly subjected to crude comments about her body and unwanted touching from Skorupa, including at a dinner party Ingalls held on July 18, 2018. At that same dinner party, Skorupa told Doe that Kilgore wanted to "come take care of you after [her] Lasik [surgery]." Kilgore later came up behind Doe, put his arms around her waist and hugged her tightly from behind — when she turned around, he handed her his phone number and said to call him if she needed to be "taken care of."

169. On August 16, 2018, a meeting was held concerning Kilgore's recent termination. At that meeting, the leadership of the Technology Department took a photo of all the men flipping off the camera in response to the firing.

170. Doe was also at the staff meeting, which took place on October 3, 2018, where Ingalls was asked why Kilgore left and told a story that ended with him giving the advice not to sleep with your assistant and if you do, not to stop and confirmed that a member of human resources silently stood by.

*Victims of Harassment Interviewed by Plaintiffs' Investigator.*

171. Witnesses that Plaintiffs' investigator interviewed personally experienced sexual harassment in addition to observing others being harassed before and during the Class Period.

172. CW6 (a former Blizzard Software Engineer from June 2015 through December 2020) told Plaintiffs' investigator that the articles about Blizzard that have come out since the state and federal lawsuits were filed last summer are "100 percent accurate." Two months after CW6 was hired in 2015, Individual B, who is now a Senior Software Engineer, sexually assaulted her at a cube crawl. CW6 stated that Individual B "started touching [her] butt" and she "would keep moving his hand and he'd just keep putting it back."

173.   Confidential Witness 7 ("CW7"), worked at various jobs at Blizzard from the summer of 2011 until April 2019. From 2011 to May 2014 she worked as a Test Analyst. Following that, she worked in Business Intelligence as an Assistant Project Manager and Associate Project Manager until early 2016. Starting in 2016, CW7 was an Associate Project Manager and the Project Manager in Esports. Finally, CW7  worked as a Program Manager for BlizzCon in 2019.

174.   CW7 stated that she was in in her early 20s when she began her job at Blizzard, and that the inappropriate behavior directed at her started immediately. During her job interview with Individual C, her Platform Services/Quality Assurances Supervisor, Individual C asked CW7 if she was OK with "locker-room banter and talk." CW7 stated that she said "yes" because she felt like she had no choice. CW7 further stated that Individual C, who became her supervisor after hiring her, would take her to fancy restaurants to conduct her performance reviews and tell her "this is the only way we do these reviews." When CW7 asked others about the unusual practice of conducting performance reviews at lavish restaurants, they said "What are you talking about? We have our meetings in a meeting room." Additionally, CW7 reported that when she wore shorts to work in September 2012, the co-worker sitting next to her told her: "your ass looks great in those shorts." CW7 reported that the incident so bothered her that she never wore shorts to work at Blizzard again.

175.   When CW7 moved to Esports in 2016, the situation grew even worse. One of her superiors — Individual D, who is now Blizzard's Global Director of Esports — "would complain about his fiancée not sucking his dick in front of coworkers" and "gave people back rubs and massages without asking first." CW7 described a particularly frightening incident with Individual D that took place in August 2017. While they were having a disagreement, Individual D put his hands on either side of CW7's chair and stood over her so that she could not get up or

reach her phone or purse. Several people tried to intervene, but Individual D yelled at them and said this was between him and CW7. "He was very intimidating. I had to sit there for hours with him standing over me, berating me, saying, 'You need to be on the same page with me.'" Each time she tried to get up to reach toward her phone or her purse, he'd put his arms back on either side of her chair, holding her there, she said.

176.   Individual D held CW7 there for two to three hours and only allowed her to leave after her husband, who worked in another department at Blizzard, came looking for her at 8 or 9 pm because he was worried as he could not reach her.

177.   Plaintiffs' investigator also interviewed two additional former Activision Blizzard Employees who reported to Individual D, Confidential Witness 8 ("CW8") and Confidential Witness 9 ("CW9"). CW8 and CW9 worked as Esports commentators for Blizzard from 2017 to 2018 and 2016 to 2019, respectively. CW8 stated that Individual D told her that he didn't know why she wasn't getting as much work as another woman on the team because I was just as hot or hotter than her and then turned to CW9, who is a man, for confirmation. CW9 confirmed this account to Plaintiffs' investigator and further stated that despite his behavior, Individual D "got promoted quickly and often."

178.   CW7 also discussed Blizzard's infamous cube crawls. She stated that they were held regularly during her time at Blizzard and "were as bad as you've heard – people getting really drunk, throwing up in bathrooms and hallways. You couldn't even sit at your desk and work." "It was crazy. People just wouldn't come into work that day if they didn't want to drink or be part of it." CW7 further stated that the cube crawls were a huge event at the Company and that "[h]undreds of people came to them" and they "usually started around 1 or 2 pm in the afternoon." It was typical for heads of departments to attend the cube crawls and to compete over who had the best cube crawls. CW7 further noted that Tyler

Rosen was "a big part" of the cube crawls and would also drink in the office even when there was not an event.

179.   In 2017, not long after CW7 joined the Esports team, the leaders of the Esports Team, *i.e.*, the Global Product Director, Individual E, and Vice President of Esports Amy Morhaime asked CW7 to plan "a really epic cube crawl for Esports." CW7 stated: "It was kind of a mandate from leadership. We were a newer team." Amy Morhaime is the spouse of Michael Morhaime, who was President of Blizzard at that time.

180.   Confidential Witness 10 ("CW10") worked as a Quality Assurance Tester at Activision Publishing between June 2006 and June 2010 and as a Test Analyst at Blizzard from September 2011 to 2019. She mostly worked on World of Warcraft and Overwatch, but worked on other games, such as Diablo.

181.   CW10, like CW7, reported that she was both the victim of harassment and witnessed fellow employees being harassed throughout the course of her employment at the Company. CW10 stated that when she was at Activision Publishing from June 2006 to 2010, co-workers hit on her and other women while they were working, followed them to their cars, and actively pursued them at work.  Male co-workers made disgusting comments about a skirt she wore to work twice and reported that people used drugs, including cocaine, at work. CW10 stated that she quit in 2009, but when she came back to work at Blizzard in September 2011, there were "a lot of the same issues."

182.    CW10 joined the Women's Council for the Diversity Group at Blizzard in approximately late 2017 or early 2018. Because of her position on the Women's Council, fellow female employees came to her with complaints, including men stalking them in the parking lot and showing up at their homes begging them to go on dates. One woman was driving people home from a work party when another Blizzard employee, who worked in Quality Assurance, Individual F, got into her car. When she said "OK. I guess I'll take you home too,'"

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

he responded: "You're such a stupid bitch. Why won't you date me?"

183. Confidential Witness 11 ("CW11") worked as a Global Esports Events Producer/Coordinator for Live Experiences for Blizzard from October 2017 to February 2019.

184. As with the other news reports and confidential witnesses, CW11 described sexual harassment as omnipresent. She told Plaintiffs' investigator that she would get hit on by higher ups, some of whom were married or in relationships, including times when they asked her to come back to their hotel rooms. She said: "I never knew who was going to get too drunk and say something or do something" and "I [did] not want to end up in somebody's hotel room or having to worry, 'is someone going to slip something in my drink.'" When her friends at the Company told her about sexual assaults, it was like they were telling her "I washed my car today" because it was so common. CW11 also observed that there had been so many "complaints and issues" with the cube crawls — especially the Esports one — that she was surprised that the Company continued them.

185. CW11 witnessed Tyler Rosen sexually assault a friend of hers in the summer of 2018. When Rosen was drunk after a cube crawl, "he had his hands all over a bunch of people," including CW11, and he put his hands up the skirt of CW11's friend. Another one of CW11's friends, Individual G, was sexually assaulted by Alex Afrasiabi and had to keep working with him after the assault occurred.

186. Although CW6, CW7, and CW10 did not work directly with Afrasiabi, they all heard about his harassment while they worked for the Company. CW6 said Afrasiabi was notorious for his misbehavior internally and that "[i]n 2016 he was a jerk to some women who didn't work at Blizzard" — "he said something really sexist and it blew up and there was an article about it." CW7 said "All I know is when I joined the company as a young woman I was told,

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

'Don't be around [Afrasiabi]. Don't go into a meeting room alone with this person. If you see him at a company event, avoid him.'" CW7 further stated that "[t]here was basically a list of men you were recommended to avoid at the company" and "almost every time I joined a new team people would give me a heads up – whether or not someone was creepy or would make a pass at you; this person is liable to scream at you, etc." CW10 said that during her time at Blizzard she heard many stories about Afrasiabi's inappropriate behavior, but that "he was one of the untouchables," so nothing was done. She further noted that [w]hen we worked at BlizzCon, people would get crazy drunk" and "[t]hat whole Cosby suite thing is obviously true."

        b.   <u>Activision Blizzard Employees Who Complained About Sexual Harassment to Human Resources or their Supervisors Suffered Retaliation.</u>

187. The pervasive sexual harassment at Activision Blizzard persisted because when employees reported misconduct to Human Resources or their supervisors, they were retaliated against.

188. The DFEH found that "female employees… complained of the harassment they suffered, including that male co-workers groped them, that male supervisors asked them on dates, and of other unwanted harassment. Defendants failed to take reasonable action in response to these complaints. ***Such lack of effective remedial measures was not surprising given Defendants' own internal investigation into their human resources unit noted that there was a 'big lack of trust' and that 'HR not held in high regard.'"*** Additionally, "multiple employees noted that their complaints were not kept confidential." (emphasis added).

189. Activision Blizzard admitted in its Answer to the DFEH Amended Complaint that during an interview conducted for the Company's 2018 internal investigation of its Human Resources department's policies and practices, an employee in its Human Resources department stated that there was a "big lack of

trust" concerning a particular member of Human Resources due to her closeness to certain business leaders and that "HR was not held in high regard."

190.   The DFEH further found that "in retaliation for complaints they made regarding harassment and discrimination, female employees experienced retaliation by Defendants that included involuntary transfers, selection for layoffs, and denial of projects and other opportunities" and that "Defendants' flawed policies and practices effectively allowed and continue to allow discrimination to occur in Defendants' workplace. Employees have suffered and will continue to suffer harm from Defendants' ongoing unlawful policies and practices unless they are enjoined by this Court."

191.   The EEOC found that "some employees complained about the sexual harassment, but Defendants failed to take corrective and preventative measures. Once Defendants knew or should have known of the sexual harassment of the adversely affected employees, Defendants failed to take prompt and effective remedial action reasonably calculated to end the harassment." It further found that "Defendants retaliated against employees who engaged in activity protected by Title VII including, but not limited to, rejecting and/or complaining about sexual harassment" and "[a]s a result of engaging in such protected activity, employees were subjected to adverse employment actions including discharge or constructive discharge."

192.   The *Washington Post* and *Bloomberg* investigations came to the same conclusion that the DFEH and EEOC did about Blizzard's Human Resources Department — that it was aware of what was going on, but did nothing to stop it and instead enabled retaliation against women. The August 6 *Washington Post* Article quotes a long time female Blizzard employee as stating ***"[HR was] almost like a gang that would ruin your career if you reported certain individuals***." (emphasis added).

193.   A male former Blizzard senior leader told the *Washington Post*: "'I

50

know for a fact HR was aware,'…referencing the harassment complaints leveled by other employees and referenced in the [DFEH] lawsuit. 'I know that each group within Blizzard, whether it's the Battle.net group [which manages Blizzard's online gaming platform], or the marketing group, or each development team, had an HR representative who sat in their area and was assigned to be that person to keep an eye on what was happening and be that advocate for employees.'" The August 6 *Washington Post* Article further noted that Blizzard HR reported directly to the heads of Blizzard, Michael Morhaime and Brack, during the Class Period.

194.   According to the August 6 *Bloomberg* Article, "[s]ix women said they reported incidents to Blizzard's HR department and saw no results." *Bloomberg* also quoted Christina Mikkonen, who worked at the Company from 2013 to 2019 as stating: "It is absolutely a rock-star mentality, **and it touched almost every aspect of Blizzard culture**… These developers were untouchable. Not only could they tell you how to do your job, but they had so much power, they could do whatever they want in line of sight with their other powerful friends." (emphasis added)

195.   Additionally, as discussed above, the November 16 *Wall Street Journal* Article reported that an Activision Blizzard spokeswoman admitted in a statement that the Company had altered its reporting structure by having Human Resources begin reporting directly to the corporate office in 2019 because the prior setup "occasionally allowed some employees to conduct themselves in truly regrettable ways."

196.   Unsurprisingly, given the findings of the DFEH, EEOC, *The Washington Post*, and *Bloomberg*, the Senior Administrative Assistant in the Blizzard Technology Department who filed the *Doe* complaint against Activision Blizzard, Kilgore, Ingalls, and Skorupa (Paragraphs 165-170) suffered extraordinary retaliation from her superiors, Skorupa and Ingalls, when she

reported her harassment to Human Resources.

197.   In August 2018, after Doe said she was going to file a complaint with Human Resources, she was almost immediately moved from an office to a cubicle.

198.   When Doe went to Human Resources on August 30, 2018, her complaints there were dismissed — they told her that her leadership was just being nice and trying to be friends with her. ***They also told her to keep all of her issues, concerns, recordings, or emails to herself because they could be very damaging to Activision Blizzard.***

199.   A few days after Doe made the complaint she overhead Skorupa saying that he "f*cking despise[s] [Ms. Doe]," "it's like I broke up with her and now she's the psycho ex-girlfriend," and "poor [Ms. Doe] isn't getting all the attention and now she's mad." Skorupa then said to Doe: "I wish I could be a total d*ck to [Ms. Doe] but I know I legally can't."

200.   At another meeting in September 2018, when Doe was walking out of the room, Ingalls stated "I hope there are no more pussies in the room."

201.   On October 4, 2018, Doe again went to Human Resources about Skorupa's behavior towards her and also reported Ingalls' comments about sleeping with your assistant and played a recording of them. Human Resources told her that it was Skorupa's "way of complimenting her and that she should stop saying that it is sexual harassment." Human Resources also told her that she should not let Ingalls' comments about Kilgore's firing out because they could be very damaging and he would be taken care of, but nothing was done.

202.   During this time, Ingalls and Skorupa continued to freeze her out by removing her access to Ingalls and Skorupa's calendars. Ingalls and Skorupa also intervened to prevent her from getting a new position in the Classic Games Department. Doe was also rejected from another job in the Story & Franchise Department.

203.   Doe was only finally able to move out of the Technology Department to the Story & Franchise Department by directly appealing to Blizzard President Brack about the sexual harassment and retaliation she suffered in writing on March 14, 2019. The job was, however, a demotion that came with a significant pay decrease. Despite the switch the retaliation has continued — she was given an unwarranted poor performance review after she had previously received positive reviews and, on February 1, 2022, Activision Blizzard hired two new temporary employees to perform the exact duties Doe performed. Given that Activision Blizzard had to hire *two employees* to do her job, it is clear that Doe's poor performance review and demotion were pretextual and retaliation for her complaints.

204.   CW6, CW7, CW10, and CW11 also experienced shocking retaliation and indifference after bringing complaints to Blizzard's HR Department.

205.   After Individual B, who is now a Senior Software Engineer, sexually assaulted CW6 at the cube crawl in August 2015 (*see* Paragraph 172), CW6 reported it to her supervisor, an Engineering Manager, Individual J, but not to HR. Later, after CW6 was slated to attend a meeting with Individual B, she decided to report the assault to an HR representative, Individual K. CW6 said that the HR representative was "comforting," but said that "there was no evidence [Individual B] had done this again or before and it was a one-time thing." CW6 did not know if Individual B was even punished. Years later CW6 had a meeting with Vice President of Human Resources Jesse Meschuk in approximately July 2020, where she discussed the sexual assault. Meschuk set up the meeting with her because she had been discussing the assault on an internal Slack channel.

206.   Similarly, when CW7 reported to a Senior HR Specialist, Individual L, in November or December of 2012 that her manager, Individual C, was making her uncomfortable by asking her out to fancy lunches (*see* Paragraph 174), Individual L's reply was, "You're being a total brat about this. The grass isn't

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

always greener on the other side, and you need to go back to your desk and shut up." After CW7 made that report, the Vice President of Quality Assurance, Individual M, pulled her into his office and told her "our department was like the Army, and that I needed to respect my team and superiors and not cause trouble."

207.   CW7 also reported it to HR when Individual D, who is now Blizzard's Global Director of Esports, physically prevented her from leaving her chair for 2 or 3 hours in August 2017 (*see* Paragraphs 175-176). CW7 was so shaken by the incident that she took two days off and then immediately reported it to Esports' HR representative, Individual N. In response, HR minimized the abuse and threatened to fire CW7. The only question that Individual N asked was "Did [Individual D] ever physically touch you?" When CW7 responded, "No he didn't but I was afraid he would if I stood up," Individual N said, "because he didn't physically touch you, this isn't harassment."

208.   After CW7 made that complaint, the Global Product Director of Esports, Individual E, brought CW7 into her office and said "You need to be careful about how you're acting with your coworkers. You really made [Individual D] feel bad. You need to be more careful about your language." Individual E told CW7 that she wanted to put CW7 on a "performance improvement plan" and even recommended firing her because she was creating a "toxic environment" by disagreeing with Individual D. CW7 was only able to save her job by contacting her immediate supervisor, who was a Lead Project Manager (Individual O), even though Individual O was on paid leave. Individual O convinced Individual E to give CW7 a warning, but she also warned CW7: "Whatever happens, be really careful. I'm going to try to protect you as much as I can but there's only so much I can do. You can't get in a fight with [Individual D] anymore." CW7 told Plaintiffs' investigator that the situation became so stressful that she began having panic attacks at work. She added: "Anybody that tried to report [Individual D] was reprimanded. They talk about no retaliation if you report an incident, but that was

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

not the case here. You would absolutely be retaliated against if you tried to report this individual."

209.   CW7 further stated that she was certain that Amy Morhaime, former Vice President of Esports and wife of President and CEO Mike Morhaime, knew about the harassment going on at Esports because Amy Morhaime told CW7 that she had weekly meetings with HR to review the complaints that employees in the department were reporting.

210.   CW10 helped the woman who was harassed by Individual F — he got into her car and said to her "You're such a stupid bitch. Why won't you date me?" (*see* Paragraph 182) — make a complaint to HR. CW10 and the victim of Individual F's harassment spoke with an HR representative, Individual P, who told them that since the incident happened offsite, HR couldn't do anything about it, even though it was at a work party where the Company paid for everything.

211.   CW11 similarly found that HR was not a useful recourse for the harassment that she and her co-workers endured. She told Plaintiffs' investigator that when she asked her friends at the Company if they had reported being sexually assaulted their responses would generally be that they had reported the assaults, but the Company did not punish their assailants and they still had to work with their assailants.

212.   Additionally, CW11 went to HR three or four times herself, including about being propositioned at events by co-workers and about Tyler Rosen's sexual assault of her friend (*see* Paragraphs 184-185), but it "just felt like nothing was being done." Instead, projects were taken away from her. She was punished instead of "the guys with the key cards and hotel rooms" who propositioned her. According to CW11, those men all still work at the Company and one got promoted. When CW11 inquired as to why the Company did not take action against these assailants, a member of the HR Department, Individual Q, told her that her "hands were tied" on CW11's complaints because, although HR could

make recommendations, it was up to the person above her direct supervisor, the Event Director (Individual R), to act on them and HR had no power to remedy his failure to do so.

213. CW11 also stated that at one point during her time at Activision Blizzard (between October 2017 to February 2019), the Company tried to get her and other employees to sign new contracts that mandated arbitration for complaints within the Company. This is notable given that the DFEH and EEOC Investigations started in the fall of 2018 and Activision Blizzard's leadership was certainly aware that trouble was brewing even earlier.

214. Activision Blizzard laid off CW11 in February of 2019. CW11 believes the Company laid her off because of her reports to HR. She wrote a "strongly worded email about all of the things we had discussed," to Individual Q in the HR Department after she was fired. CW11 said in the email: "I don't understand how all of these people have multiple complaints about them of abuse and are still with the company."

          c.   <u>Defendant Kotick Knew for Years About Sexual-Misconduct at Blizzard and Other Parts of the Company.</u>

215. The November 16 *Wall Street Journal* Article, entitled "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant," reported that Defendant Kotick had known about the pervasive sexual harassment at Activision Blizzard for years.

216. According to the *Wall Street Journal's* reporting, after the DFEH filed suit on July 20, 2021, Defendant Kotick lied to Activision Blizzard's directors and other executives about how much he knew about the endemic sexual harassment at his company: "Mr. Kotick…told directors and other executives he wasn't aware of many of the allegations of misconduct, and he has played down others, according to people familiar with the matter and internal documents." *The Wall Street Journal* obtained documents showing, however, that "[Defendant

56

Kotick] knew about allegations of employee misconduct in many parts of the company": "*Those documents, which include memos, emails and regulatory requests, and interviews with former employees and others familiar with the company, however, cast Mr. Kotick's response in a different light. They show that he knew about allegations of employee misconduct in many parts of the company*." (emphasis added). Additionally, "[s]ome departing employees who were accused of misconduct were praised on the way out, while their co-workers were asked to remain silent about the matters."

217.   As discussed above in Paragraphs 128 to 129, *The Wall Street Journal* also learned based on discussions with people familiar with Defendant Kotick's leadership that "Mr. Kotick approves high-profile hiring decisions and the exit and pay packages of star developers, and he is typically aware of any major problems in each of Activision's 12 development studios and three major business units," and that Defendant Kotick was aware of the circumstances of and personally approved Kilgore's firing.

218.   *The Wall Street Journal* also found that, according to people familiar with the matter, Defendant Kotick was aware of a 2020 email that 30 female employees working in Activision Blizzard's Esports division wrote to their unit's leaders "saying that female employees had been subject to unwanted touching, demeaning comments, exclusion from important meetings, and unsolicited comments on their appearance."

219.   Defendant Kotick also knew about sexual assaults and harassment in other parts of Activision Blizzard and did little to stop it, showing that he had a pattern of minimizing sexual misconduct.

220.   The November 16 *Wall Street Journal* Article reported that a lawyer for a former employee at Sledgehammer Games, an Activision Blizzard-owned studio, alleged in an email, in which she threatened to file a lawsuit, that "her client had been raped in 2016 and 2017 by her male supervisor after she had been

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

pressured to consume too much alcohol in the office and at work events." Furthermore, according to the email, "[t]he female employee reported the incidents to Sledgehammer's human-resources department and other supervisors, but nothing happened." The woman had also reported one of the incidents to the police. According to the *Wall Street Journal's* interviews with people familiar with the situation, Activision Blizzard reached an out-of-court settlement with the woman within months of receiving the email. Activision Blizzard did ultimately fire that supervisor, Javier Panameno, who was also accused by another female employee of Sledgehammer of harassment. The email from the woman's attorney also stated that another Sledgehammer employee, Eduard Roehrich, had had been accused of sexual harassment by a different woman who worked for Sledgehammer. That employee, Ashley Mark, told *The Wall Street Journal* "that she complained to supervisors and human resources in 2017 about harassment by Mr. Roehrich, including at a company party at which there was heavy drinking." Roehrich confirmed to *The Wall Street Journal* that he was investigated and said he was given a two-week paid leave and allowed to remain at Activision Blizzard at a different position. Roehrich shared an email with *The Wall Street Journal* in which Activision Blizzard asked him to "keep this matter confidential."

221. *The Wall Street Journal* uncovered another sexual harassment incident at the Company that Defendant Kotick was directly involved in. Dan Bunting, co-head of Activision Blizzard's Treyarch studio, was accused by a female employee of sexually harassing her in 2017 after a night of drinking. Activision's human resources department and other supervisors launched an internal investigation in 2019 and recommended that Bunting be fired, **but Mr. Kotick intervened to keep him**. Instead, Bunting was given counseling. Bunting left Activision Blizzard in response to *The Wall Street Journal* asking the Company about the incident.

222. The November 16 *Wall Street Journal Article* also discovered that

58

"*[o]ver the years, Mr. Kotick himself has been accused by several women of mistreatment both inside and outside the workplace*, and in some instances has worked to settle the complaints quickly and quietly, according to people familiar with the incidents and documents reviewed by the Journal." (emphasis added).

223. "In 2006, one of [Defendant Kotick's] assistants complained that he had harassed her, *including by threatening in a voice mail to have her killed*, according to people familiar with the matter." (emphasis added).

224. *The Wall Street Journal* also found that in 2007 a flight attendant on a private jet he co-owned sued him. The flight attendant claimed the plane's pilot had sexually harassed her and, after she complained to the other owner, Mr. Kotick fired her. Kotick and the co-owner of the jet settled with the flight attendant for $200,000 in 2008. In a separate action related to legal fees in the case, an arbitrator, citing what he said was sworn testimony, wrote that Defendant Kotick told the flight attendant and her attorneys, "*I'm going to destroy you*." (emphasis added).

> d. J. Allen Brack and Michael Morhaime — Who Served as Blizzard's Presidents During and Right Before the Class Period, Were Each Aware of the Pervasive Harassment.

225. The DFEH's investigation showed that "*[n]umerous complaints about unlawful harassment, discrimination*, and retaliation were made to Defendants' human resources personnel and executives, *including to Blizzard Entertainment's President J. Allen Brack*." (emphasis added). It further found that "*Afrasiabi's conduct was known to Blizzard Entertainment's executives, who took no effective remedial measures. J. Allen Brack, President of Blizzard Entertainment, allegedly had multiple conversations with Afrasiabi* about his drinking and that he had been 'too friendly' towards female employees at company events but gave Afrasiabi a slap on the wrist (*i.e.* verbal counseling) in response to these incidents. *Subsequently, Afrasiabi continued to make*

*unwanted advances towards female employees*, including grabbing a female employee's hand and inviting her to his hotel room and groping another woman." (emphasis added).

226.   Activision Blizzard admitted in its Answer to the DFEH Amended Complaint "that complaints about harassment, discrimination, and retaliation have been raised with [Activision Blizzard's] respective human resources personnel and to some executives, *including to Blizzard Entertainment Inc.'s then-President J. Allen Brack*." (emphasis added). It further admitted concerning Afrasiabi that "J. Allen Brack counseled Afrasiabi in 2015, when he told Mr. Afrasiabi he was drinking too much and had been 'too friendly' toward some female employees at a Blizzard Entertainment event, and in 2016 after Mr. Afrasiabi used a derogatory term toward a woman at an industry event (not sponsored by [Activision Blizzard]) at which he had been drinking heavily."

227.   Blizzard President Brack was also personally informed of sexual harassment and retaliation at Blizzard by three different employees in early 2019.

228.   *First,* the DFEH Complaint stated that "*[a]n employee complained to Blizzard Entertainment President J. Allen Brack in early 2019 that employees were leaving due to sexual harassment and sexism.* Specifically, this employee noted that women on the Battle.net team were subjected to disparaging comments, the environment was akin to working in a frat house, and that women who were not 'huge gamers' or 'core gamers' and not into the party scene were excluded and treated as outsiders."

229.   *Second*, as discussed in Paragraph 203, the Senior Administrative Assistant in Blizzard's Technology Department, who filed a Doe sexual harassment and retaliation lawsuit against Activision Blizzard, Kilgore, Ingalls, and Skorupa, informed Blizzard President Brack in writing on March 14, 2019, about the sexual harassment and retaliation she suffered.

60

230.  *Third*, in January 2019, CW10 sent Blizzard President Brack an email, in which she discussed the ongoing sexual harassment problems at Blizzard. CW10 provided Plaintiffs' investigator with the text of the email. The email stated, among other things: "I believe we need to be more transparent as a company when it comes to talking about sexual harassment and racial discrimination with our fans and employees. We also need to bring in more third party consultants on handling investigations with harassment and discrimination as I do not believe our current HR team (at least in QA and ESports) cannot [sic] handle these cases effectively at this point in time. Zero tolerance should mean zero tolerance with no exceptions."

231.  Brack responded to CW10's email with an email in which he thanked her for her email and stated that he would forward it to Jesse Meschuk, Senior Vice President of Global HR. Meschuk then set up a meeting with CW10 and Chief Legal Officer and Senior Vice President Claire Hart, which took place sometime between February and April 2019, where CW10 talked about everything in her email. In response, CW10 states that Hart and Meschuk agreed to open an "official" investigation. However, the investigation essentially consisted of an investigator asking people if they had personally harassed or discriminated against CW10, and when they responded in the negative, taking their word for it without investigating further.  Given this, CW10 told Hart and Meschuk "I was really hoping you'd do something for me but it looks like I'm going to have to quit."  CW10 gave her notice later that week.

232.  Michael Morhaime, who co-founded Blizzard Entertainment and served as CEO and later President of Blizzard until October 3, 2018 was also well aware of the ubiquitous sexual harassment at the Company. The August 6 *Bloomberg* Article stated that in a private Facebook post *Bloomberg* reviewed, "a former assistant to [Michael] Morhaime wrote that she had informed him and other executives about rampant misconduct." CW6 read a portion of the post by

Michael Morhaime's assistant, Individual H, to Plaintiffs' investigator. The post stated in part, "[l]eadership at all levels knew this was happening" and "[i]t was on leadership's watch…Not only that, they [harassers] were given more opportunities and some even thrived. Your emails went to them and I told them personally." CW6 said Individual H was "someone who was incredibly active and vocal when it came to internal stuff. She was always fighting for change."

233.   Another former Blizzard employee, Kristin Wood Page ("Wood Page"), corroborated the pervasive culture of harassment and discrimination and the fact that the Company's senior management was keenly aware of it. Wood Page worked for Blizzard from 2010 to 2018. From 2010 to 2016, she worked for *Battle.net* as a Technical Writer and a Content Strategist. Wood Page then worked for Blizzard's Global Public Relations team from 2016 to 2018. Wood Page posted on Twitter on July 23, 2021 stating that she "wrote a letter to Mike Morhaime back in 2018, after I left Blizzard, and while he was still President and CEO." The letter stated, in part: "[a]s long as men in power are behaving in a predatory fashion towards women in the company, it will be impossible for women to truly feel comfortable, valued, or safe. As long as women don't feel comfortable, valued, or safe, it will be harder and harder for the Company to draw in and keep talented women who love games. This means women will continue to be a smaller portion of Blizzard's audience than men, it means fewer women will work at Blizzard and it means, over time, Blizzard will be added to the list of Companies That Are Bad For Women….We care about the quality in our games; why not our people?"

234.   CW11 also confirmed that Michael Morhaime knew about the pervasive sexual harassment at Blizzard. CW11 told Plaintiffs' investigator that "of course [Mike Morhaime and his wife, Amy] knew." She said: "How could they not? They were friends with the people that were doing this. And my friends have said, ***My reports have gone all the way up to Mike [Morhaime] and***

*nothing happened*.'" (emphasis added).

235.   CW5 (*see* Paragraph 126) provided Plaintiffs' investigator with additional confirmation that Michael Morhaime and Brack knew Afrasiabi well and were in constant contact with him while he worked at Blizzard. CW5 heard from a colleague, Individual I, that a small group of "C-suite executives" met for weekly dinners at each other's houses. Individual I attended these gatherings.  The "C-suite executives" called themselves "The Old Guard" because they had been at Blizzard the longest. Three of the members of the group were Brack, Michael Morhaime, and Afrasiabi. CW5 further noted that the dinners were mostly at the Morhaimes' house. This further shows the close relationship that Brack and Michael Morhaime had with Afrasiabi while he was a serial sexual harasser at Blizzard.

236.   Additionally, as discussed above, Michael Morhaime was present when Afrasiabi harassed Anne Armstrong at Blizzard's 2012 holiday party.

e.   The DFEH, EEOC, and *Bloomberg* also Found that Activision Blizzard Discriminated Against its Female Employees, Especially Those Who Were Pregnant, Mothers, or of Color, by Giving Them Fewer Opportunities and Lower Pay.

237.   In addition to endemic sexual harassment, the DFEH Investigation found that "Defendants have engaged in and continue to perpetuate discriminatory practices regarding pay, assignment, promotion and other terms and conditions of employment which negatively affect and impact female employees."

238.   "These discriminatory practices began at hire when women were offered lower compensation and less lucrative job assignments and opportunities than their male counterparts" and "the pay disparity continued throughout employment for female employees" since "Defendants paid female employees significantly less than their male counterparts after hire." The DFEH further found that women received less stock and incentive compensation than male employees.

239.   The DFEH provided multiple examples of how "[w]omen were steered into the lower levels of Defendants' hierarchy and often had to work harder and longer to earn equal promotional and other opportunities as their male counterparts." For example, "one female employee [at Blizzard] sought a promotion because she had been carrying out duties exceeding her job description," but was "repeatedly told it was not her turn and others deserved a promotion ahead of her." She was ultimately "promoted after three years while her male counterpart was promoted within a year of his hire despite having started several months after her" and "he was also assigned leadership responsibilities which she was not afforded."

240.   Another female employee at Blizzard "was assigned to a lower level, denied equal pay, and passed over for a promotion despite multiple factors that suggested she earned it: (1) highly rated performance reviews; (2) she generated significantly more revenue in her marketing campaigns than her male counterpart; and (3) she ran almost twice as many campaigns as her male counterpart." Despite this, her "male counterpart was invited to have monthly or weekly one-on-one meetings with the Vice President," an opportunity that she was not afforded, and he was promoted ahead of her.

241.   The DFEH also found that the male head of a unit at Blizzard promoted his friends over more qualified women. Other male supervisors would refuse to communicate with female employees, going to their male counterparts for information.

242.   The DFEH documented the same problems in the Activision Publishing segment, where women were similarly "denied equal pay, and delayed or passed over for promotions of their male counterparts." "As an example, a female human resources employee at Activision Publishing was delayed and passed over for a promotion despite receiving positive performance reviews, doing substantially more work than her male counterpart, and taking over the

64

actual responsibilities of the departing person. Female accounting employees at Activision Publishing, likewise, note that male counterparts were paid significantly more than them despite doing the same or less work and having less responsibilities."

243.   Pregnant women, mothers, and women of color were accorded some of the worst treatment.

244.   DFEH found that "[a] female employee working on one game team had assumed some of the responsibilities of a manager but when she asked her male supervisor about being fairly paid for the work she was actually doing and promoted into that position, the manager commented that they could not risk promoting her as she might get pregnant and like being a mom too much." Supervisors also ignored medical restrictions, gave negative evaluations while women were out on maternity leave, and criticized women for leaving to pick up their children from daycare. Female employees were also kicked out of lactation rooms so employees could use the room for meetings.

245.   Similarly, the EEOC found "Defendants discriminated against employees due to their pregnancy that adversely affected the employees."

246.   Regarding women of color, the DFEH found that they "were particularly vulnerable targets of Defendants' discriminatory practices." An African American employee told the DFEH that "it took her two years to be made into a permanent employee while men hired after her were made permanent employees." That employee was also micromanaged by her supervisor in a discriminatory way — "her male coworkers were known to be playing video games without any intervention by her supervisor, but her supervisor would call and check on her if she took a break to go on a walk." Another African American who worked in information technology was similarly micromanaged — "her manager made her write a one-page summary of how she would spend that time off of work when no one else had to do any write-up."

247. The DFEH also found that "as a result of these discriminatory pay, assignment, promotion and other practices Defendants' gender pay gap is significant" and that "female employees were forced to leave their employment with Defendants." "[F]emale employees noted that they accepted less compensation than they were making in their prior employment or offered by other companies to work for Defendants with the hollow promise that they would get promoted or get other forms of compensation to make up the difference. They never made up ground and instead had to watch as male comparators were promoted more quickly and offered more compensation, forcing them to leave the company." Additionally, "Defendants terminated female employees more quickly than their male counterparts."

248. *Bloomberg's* investigation found a similar pay gap to the DFEH's investigation. According to the August 6 *Bloomberg* Article, "[s]even women who worked at Blizzard said they made less than male colleagues with similar experience. Two women said they were told by their manager not to discuss their salaries. One shared screenshots of her boss saying salary information should be kept confidential, an apparent violation of California law." Nazih Fares, who worked for Blizzard from 2018 until 2021, told *Bloomberg* that the gender pay disparity was a point of contention for Blizzard employees around the globe.

249. Additional evidence that there was a well known gender pay gap at the Company is that after the DFEH investigation became public in July 2021 one of CW6's former supervisors, Individual S, a former Lead Software Engineer at Blizzard, sent CW6 a private message on Twitter saying one of the reasons he left the company in April 2020 was due to unequal pay for women.

250. CW5 reported that she was belittled for her gender and race while working at Blizzard. After she was bullied at work, she had a male employee "tell me to calm down because he knows I'm a spicy Latina and he knows how these women get." Her manager on the Quality Assurance Team also ridiculed her for

joining the Women's Council, telling her it was a disruption and should not be given priority over other company policies.

251.   Similarly, when CW7 worked in Blizzard's Esports division from 2016 to 2019, she reported that she was discouraged from joining the Women's Network at the Company and male colleagues often told her to do administrative work because the team did not have an administrative assistant and she was the only woman.

     f.    As With Sexual Harassment, President Brack and Human Resources Were Aware of the Discrimination and Women Who Complained Were Either Ignored or Suffered Retaliation.

252.   The DFEH investigation showed that female employees "raised…complaints to various human resources personnel about the discrimination they faced, including but not limited to complaints about unfair pay and assignments, male co-workers belittling them or minimizing their contributions, and male counterparts being promoted quickly despite their lack of seniority."

253.   Their complaints, however, "fell on deaf ears or were met with an empty promise to investigate the issue. Indeed, despite having retained Paul Hastings LLP from 2015 to 2017 and Miller Law Group in 2018 to allegedly provide analysis related to compensation data, Defendants failed to take effective and reasonable steps to prevent pay discrimination as the pay disparity between male and female employees was not remedied and continued."

254.   As with complaints for sexual harassment, the DFEH found that "female employees experienced retaliation by Defendants that included involuntary transfers, selection for layoffs, and denial of projects and other opportunities." The EEOC also found that the Company retaliated against employees for complaining about pregnancy discrimination.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

255. In CW10's January 2019 email to Blizzard President Brack (referenced in Paragraph 230) that Brack responded to and forwarded to Senior Vice President of Global HR Meschuk, which then led to a meeting between CW10, Meschuk, and Chief Legal Officer Claire Hart, CW10 addressed the discrimination against women at the Company extensively. Among other things, her email stated:

> My current manager has shown misogynistic behaviors towards myself and also towards other women on my team (I have made [the VP of Global Quality Assurance (Individual M), the Senior Director of Quality Assurance (Individual T), and a Human Resources Manager (Individual N)] aware of this). He belittles our insight and experience and never takes us seriously. Examples include him criticizing me for joining the Women's Council and saying that I am not contributing to the company in a bigger way. He thinks that it is a disruption and should not be given priority over other company policies.
>
> I joined the Women's Council last year in order to help make Blizzard a better place. We have made a lot of great progress but I believe that *QA has been a toxic place for so long that we need more serious intervention on the executive levels as women and especially women of color like myself have been kept from reaching our full potential. Through the delayed promotions, inaccurate performance appraisals, blatant sexual and verbal harassment from others, and overlooked achievements women are becoming discouraged here at an alarming rate. After speaking with a lot of the women in QA in different roles, I can see the cost of this and we have been bleeding talent.* I want women to be proud of being in QA and especially being here at Blizzard.

(emphasis added).

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

7) **Activision Blizzard Repeatedly Stated That the Company's Reputation as a Good Place to Work and its Commitment to Diversity and Inclusion was Important to the Success of the Company During the Class Period.**

256.   During the Class Period, in its Proxy Statements, which are specifically addressed to shareholders planning to participate in the Company's annual meeting, Activision Blizzard made repeated statements touting the Company's commitment to diversity and inclusion and stressing its importance to the success of the Company. These statements gave Activision Blizzard's shareholders the impression that management considered diversity and inclusion very important and, accordingly, would not consider investigations into systemic sexual harassment at the Company as routine. Furthermore, the Company's statements clearly indicate that such investigations would be "significant" and would have a "material adverse effect" since they say that an inclusive culture is where "the most innovate work comes from," a "strategic priority," and "mission critical."

257.   Activision Blizzard's 2019 Proxy statement, filed with the SEC on April 23, 2019, stated: "We aspire to have an inclusive culture where diversity is embraced and everyone can thrive. We believe this is one of the reasons why, for five consecutive years, Activision Blizzard has been recognized as one of the '100 Best Companies to Work For' by Fortune magazine. Activision Blizzard also earned a top score of 100 on the 2019 Human Rights Campaign Foundation's Corporate Equality Index and the distinction of being one of the 'Best Places to Work for LGBTQ Equality' in our inaugural year of participation. ***We are proud of these accolades because we believe that the most innovative work comes from a culture in which all employees can be their full selves.***" (emphasis added).

258.   Activision Blizzard's 2020 Proxy statement, filed with the SEC on April 24, 2020, said that ***"[d]iversity and inclusion remain a strategic priority for***

*Activision Blizzard*. We are committed to building and sustaining a culture of belonging, where everyone thrives and diversity drives business value and growth." It further stated that "[a]cross our entire organization, ***fostering an inclusive culture where employees feel valued and heard, and a sense of belonging is mission critical***."  (emphasis added).

259.   In its 2021 Proxy Statement, filed with the SEC on April 30, 2021, Activision Blizzard said it was adding an environmental, social, and governance ("ESG") component to its executives' annual cash bonus program. It stated that 20% of strategic objectives "will be based on measurable ESG initiatives (i.e., human capital management, corporate social responsibility, and sustainability goals*, which may include diversity, equity and inclusion metrics centered around the hiring/promotion of members of underrepresented communities, hiring of veterans and sustainability*)." (emphasis added).

**8)    Starting in October 2017, the #MeToo Movement Led to the Firing of Numerous High Profile Executives at Other Companies, Making it Clear that the Company Could Not Handle the DFEH and EEOC Investigations as Routine Matters and that They Were Significant and Could Have a Material Effect on the Company.**

260.   As *The New York Times* documented in an article entitled "#Me Too Brought Down 201 Powerful Men. Nearly Half of Their Replacements Are Women," that was published on October 23, 2018, from October 5, 2017 when the Weinstein Company fired Harvey Weinstein until the *New York Times* published the article about a year later, 201 prominent men were fired or lost major roles due to sexual harassment allegations. Prominent entertainment executives that their respective companies fired, included Roy Price, the Head of Amazon Studios; John Lasseter, Chief Creative Officer of Pixar and Walt Disney Animation; and Leslie Moonves, President, Chairman and Chief Executive of the CBS Corporation.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

261. Notably, Activision Blizzard was especially vulnerable to reputational damage from sexual harassment allegations because of its repeated statements about the importance of diversity and inclusion to the Company.

262. Therefore, it was entirely predictable that the EEOC and DFEH investigations combined with the pervasive sexual harassment and assault at Activision Blizzard they were inevitably going to uncover would lead to firing, resignations, negative publicity, and reputational damage that would catastrophically damage the Company.

263. Accordingly, when the EEOC and DFEH Investigations began in September and October of 2018, respectively, it was objectively unreasonable for Defendants to describe the Investigations as "routine" and "in the ordinary course of business" and there was no basis for Defendants to say that they were "not significant" or expected to have a "material adverse effect" on the Company.

**9)    Defendants Admitted That the Investigations Were Material, Not Routine and Significant by Stating in its Public Filings Two Weeks After the DFEH Complaint Was Filed That its Business Could be Adversely Impacted.**

264. Activision Blizzard did not disclose the DFEH Investigation until after the DFEH publicly filed suit on July 20, 2021. In its 10-Q for the quarterly period ended June 30, 2021 ("2Q 2021 10-Q"), filed on August 3, 2021, the Company stated that "in July 2021 the State of California filed a complaint against the Company alleging violations of the California Fair Employment and Housing Act and the California Equal Pay Act. The complaint was recently filed, and we are taking actions to address the concerns of employees and other key stakeholders and the adverse consequences to our business. *If we experience prolonged periods of adverse publicity, significantly reduced productivity or other negative consequences relating to this matter, our business likely would be adversely impacted.* We are carefully monitoring all aspects of our business for

any such impacts." (emphasis added).

265. Defendants' admission that reputational harm from the DFEH Complaint could materially impact the Company shows that the DFEH and EEOC Investigations were never routine and were significant. Given that the Investigations were into systemic misconduct and given the pervasive misconduct at Activision Blizzard of which Defendants were aware, it was always highly likely the Investigations would lead to public revelations of sexual harassment and reputational harm. Therefore, by admitting that such reputational harm would likely adversely affect Activision Blizzard's business, Defendants admitted that the Investigations were likely to have an adverse impact on the Company's business.

**F. On July 20, 2021, the DFEH Publicly filed its Complaint Against Activision Blizzard, Revealing the Pervasive Misconduct at the Company, and Leading to Enormous Reputational Damage, Employee Walkouts, and the Decline of the Company's Share Price.**

266. According to the DFEH Complaint, after the DFEH issued its finding of cause to Activision Blizzard on June 24, 2021, the DFEH and Activision Blizzard "attempted to resolve this matter without litigation. Prior to filing this civil action, the DFEH required all parties to participate in mandatory dispute resolution in the department's internal dispute resolution division free of charge to the parties in an effort to resolve the dispute without litigation. Specifically, DFEH invited Defendants to participate in a mediation session with the department's internal dispute resolution division on July 1, 2, and 15, 2021, but the parties were unable to resolve the administrative complaints."

267. By operation of a signed agreement between the DFEH and Defendants, the DFEH's deadline to file a civil action was July 21, 2021. The DFEH complied with this by filing the DFEH Complaint on July 20, 2021 in the Superior Court of the State of California in and for the County of Los Angeles.

268.   The DFEH brought causes of action for Employment Discrimination Because of Sex-Compensation; Employment Discrimination Because of Sex-Promotion; Employment Discrimination Because of Sex-Termination; Employment Discrimination Because of Sex-Constructive Discharge; Employment Discrimination Because of Sex–Harassment; Retaliation; Failure to Prevent Discrimination and Harassment; Unequal Pay; Waiver of Rights, Forums, or Procedures and Release of Claims. Each count asked the Superior Court to *enjoin* Activision Blizzard's illegal conduct.

269.   On July 21, 2021, the Company issued a statement, as reported by *Bloomberg Law*, denying the DFEH's allegations:

> "We value diversity and strive to foster a workplace that offers inclusivity for everyone. There is no place in our company or industry, or any industry, for sexual misconduct or harassment of any kind," a spokesperson for Activision Blizzard said in a statement. "We take every allegation seriously and investigate all claims. ***In cases related to misconduct, action was taken to address the issue."***
>
> "***The DFEH includes distorted, and in many cases false, descriptions of Blizzard's past. We have been extremely cooperative with the DFEH throughout their investigation, including providing them with extensive data and ample documentation***, but they refused to inform us what issues they perceived," the statement continued.
>
> "***The picture the DFEH paints is not the Blizzard workplace of today***," the company said.

(emphasis added).

270.   In the few days following the Company's denial, numerous current and former employees of the Company spoke up on Twitter and other social media about the pervasive sexual harassment and discrimination at the Company.

271.   On July 24, 2021, Jeff Hamilton, a Senior Game Designer at Blizzard who was working on World of Warcraft tweeted: "***I find Activision's corporate***

73

***response wholly unacceptable.*** I don't stand by it, any of it. It is evil to usurp a victim's story into a rhetorical bludgeon, and it is abhorrent to reply to these accusations with anything other than a well-thought-out plan to correct these abuses." (emphasis added). He further tweeted: "***I can tell you, almost no work is being done on World of Warcraft right now while this obscenity plays out.*** And that benefits nobody - not the players, not the developers, not the shareholders." (emphasis added). Alex Klontzas, Senior Game Producer II – Systems Design on World of Warcraft then confirmed that the next update for World of Warcraft would "take longer to release."

272.  On July 26, 2021, more than 2,000 of Activision Blizzard's current and former employees signed and released an open letter stating that the Company's response to the lawsuit was "abhorrent and insulting":

> To the leaders at Activision Blizzard,
>
> ***We, the undersigned, agree that the statements from Activision Blizzard, Inc. and their legal counsel regarding the DFEH lawsuit***, as well as the subsequent internal statement from Frances Townsend, ***are abhorrent and insulting to all that we believe our company should stand for.*** To put it clearly and unequivocally, our values as employees are not accurately reflected in the words and actions of our leadership.
>
> We believe these statements have damaged our ongoing quest for equality inside and outside of our industry. ***Categorizing the claims that have been made as "distorted, and in many cases false" creates a company atmosphere that disbelieves victims. It also casts doubt on our organizations' ability to hold abusers accountable for their actions and foster a safe environment for victims to come forward in the future.*** These statements make it clear that our leadership is not putting our values first. Immediate corrections are needed from the highest level of our organization.
>
> Our company executives have claimed that actions will be taken to protect us, but in the face of legal action — and the troubling official

74

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

responses that followed — we no longer trust that our leaders will place employee safety above their own interests. ***To claim this is a "truly meritless and irresponsible lawsuit," while seeing so many current and former employees speak out about their own experiences regarding harassment and abuse, is simply unacceptable.***

We call for official statements that recognize the seriousness of these allegations and demonstrate compassion for victims of harassment and assault. We call on Frances Townsend to stand by her word to step down as Executive Sponsor of the ABK Employee Women's Network as a result of the damaging nature of her statement. We call on the executive leadership team to work with us on new and meaningful efforts that ensure employees — as well as our community — have a safe place to speak out and come forward.

We stand with all our friends, teammates, and colleagues, as well as the members of our dedicated community, who have experienced mistreatment or harassment of any kind. We will not be silenced, we will not stand aside, and we will not give up until the company we love is a workplace we can all feel proud to be a part of again. We will be the change.

(emphasis added.)

273.   On July 27, 2021, Activision Blizzard employees planned a walkout and work stoppage to support the petition against the Company, to be held on July 28, 2021.

274.   In a report published on July 27, 2021, *Bloomberg Intelligence* analysts Matthew Kanterman and Nathan Naidu sounded the alarm on the "***brain-drain threat***" facing Activision Blizzard as a result of the revelations contained in the DFEH lawsuit. "***The increasing threat of an exodus of key talent from Activision Blizzard in the wake of a sexual discrimination lawsuit from the state of California could inhibit the company's ability to deliver on a promising pipeline of new games on time and at the necessary quality***, including Diablo IV, Overwatch 2 and several mobile games, ***hurting their sales potential***. ***In the near***

*term, work stoppages and an employee strike could delay key content updates, hurting live services revenue.*" (emphasis added).

275.  Since it was now clear that Activision Blizzard's denial of the DFEH's allegations rang hollow and the risk to the Company's reputation and employee unrest had begun to materialize, the price of Activision Blizzard's stock fell $6.09/share, or 6.75%, to close at $84.05/share, on July 27, 2021.

276.  Later on July 27, 2021, Defendant CEO Kotick issued a letter to all employees apologizing for the Company's "tone deaf" response to the DFEH lawsuit and promising to fire any managers and leaders across the Company who impeded the integrity of the Company's processes for evaluating harassment and discrimination claims:

> This has been a difficult and upsetting week.
>
> I want to recognize and thank all those who have come forward in the past and in recent days. I so appreciate your courage. Every voice matters - and we will do a better job of listening now, and in the future.
>
> ***Our initial responses to the issues we face together, and to your concerns, were, quite frankly, tone deaf.***
>
> It is imperative that we acknowledge all perspectives and experiences and respect the feelings of those who have been mistreated in any way. I am sorry that we did not provide the right empathy and understanding….
>
> We are taking swift action to be the compassionate, caring company you came to work for and to ensure a safe environment. There is no place anywhere at our Company for discrimination, harassment, or unequal treatment of any kind.
>
> We will do everything possible to make sure that together, we improve and build the kind of inclusive workplace that is essential to foster creativity and inspiration.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*I have asked the law firm WilmerHale to conduct a review of our policies and procedures* to ensure that we have and maintain best practices to promote a respectful and inclusive workplace. This work will begin immediately. The WilmerHale team will be led by Stephanie Avakian, who is a member of the management team at WilmerHale and was most recently the Director of the United States Securities and Exchange Commission's Division of Enforcement.

We encourage anyone with an experience you believe violates our policies or in any way made you uncomfortable in the workplace to use any of our many existing channels for reporting or to reach out to Stephanie….Of course, NO retaliation will be tolerated.

We are committed to long-lasting change. Effective immediately, we will be taking the following actions:

1. Employee Support. We will continue to investigate each and every claim and will not hesitate to take decisive action. To strengthen our capabilities in this area we are adding additional senior staff and other resources to both the Compliance team and the Employee Relations team.

2. Listening Sessions. We know many of you have inspired ideas on how to improve our culture. We will be creating safe spaces, moderated by third parties, for you to speak out and share areas for improvement.

3. *Personnel Changes. We are immediately evaluating managers and leaders across the Company. Anyone found to have impeded the integrity of our processes for evaluating claims and imposing appropriate consequences will be terminated.*

4. Hiring Practices. Earlier this year I sent an email requiring all hiring managers to ensure they have diverse candidate slates for all open positions. We will be adding compliance resources to ensure that our hiring managers are in fact adhering to this directive.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

5. In-game Changes. We have heard the input from employee and player communities that some of our in-game content is inappropriate. We are removing that content.

Your well-being remains my priority and I will spare no company resource ensuring that our company has the most welcoming, comfortable, and safe culture possible. You have my unwavering commitment that we will improve our company together, and we will be the most inspiring, inclusive entertainment company in the world.

Yours sincerely,

Bobby

277.   Despite Defendant Kotick's letter, hundreds of Activision Blizzard employees walked off the job as planned on Wednesday July 28, 2021 to protest the working conditions recently highlighted in the DFEH lawsuit and the Company's response to it.

278.   As discussed in Paragraphs 153 to 155, *Kotaku.com* also released its report that included the "Cosby Suite" photo on July 28, 2021, tying numerous high-profile Blizzard personnel to shockingly inappropriate behavior and lending further credence to the account of Activision Blizzard's toxic workplace environment detailed by the DFEH.

279.   In a report published on July 28, 2021, *Bloomberg Intelligence* analysts Kanterman and Naidu reiterated how much damage the DFEH lawsuit had done to Activision Blizzard:

**Brain Drain Risks Growth**

Activision's Post-Lawsuit Brain Drain Threatens Long-Term Growth

***The growing likelihood that Activision Blizzard may lose key talent over fallout from a workplace culture lawsuit could deliver a stinging blow to its execution prowess***, putting its long-term content pipeline at risk and dragging sales below expectations. ***Work***

***stoppages on key products such as World of Warcraft pose a near-term risk to revenue.***

2. Key Talent Could Walk as Accusations Fly

***The specter of talent flight at Activision Blizzard, spawned by a discrimination lawsuit alleging workplace impropriety, could compromise the company's ability to execute on its pipeline of new games.*** Key Blizzard games in development, including Diablo IV, Overwatch 2 and mobile titles could be at risk if the talent exodus escalates….

3. Near-Term Product Delays Could Hit Sales

Employee work stoppages and a planned strike threaten a near-term blow to Activision's sales, even if management can rectify cultural flaws documented in a California lawsuit. ***Development teams, including for key titles such as World of Warcraft, have halted work since the lawsuit was filed on grounds the company's response was lacking, which may signal delays to key content updates.*** Sales from these games are driven by new content releases, suggesting a near-term revenue hit if content delays spread to a broader array of titles.

(emphasis in first line in original; other emphasis added).

G. **The Fallout From the DFEH Lawsuit Continues, Including the Resignations of Blizzard's President and Head of Human Resources and the Firing of the Director of Diablo IV.**

280.   On August 3, 2021 and August 4, 2021, respectively, Blizzard's President J. Allen Brack and  Senior VP of HR Jesse Meschuk resigned from the Company. Brack was replaced with two co-heads, Jennifer Oneal and Mike Ybarra. Oneal was a long-time employee of Activision Blizzard and studio head of Vicarious Visions  (a wholly owned subsidiary of Activision) until transitioning to Executive Vice President of Development at Blizzard Entertainment in January 2021 when the Company folded that studio into Blizzard. She was the first woman ever to lead one of the Company's business units.

79

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

281. Following President Brack's resignation, on August 3, 2021 *Bloomberg Intelligence* analysts Kanterman and Naidu stated in a report that President Brack's departure "*is just the first step of many Activision Blizzard must take to rectify its endemic culture problems* and avoid a massive talent drain that could inhibit long-term growth. If the situation endures, the risk of losing key game developers jeopardizes Activision's ability to bring new games to market and update existing titles…" (emphasis added). The report further emphasized the importance of upcoming Diablo and Overwatch releases: "Upcoming new releases from the Diablo and Overwatch franchises are big growth opportunities, but recent culture issues could lead to a talent exodus and hurt their development."

282. On August 4, 2021, Cowen analysts Doug Creutz and Stephen Glagoia released on report on Activision Blizzard entitled "A Very Mixed Bag in Q2; Blizzard Situation Remains Overly Dynamic." In a section of the report entitled "**Defenestrations Begin At Blizzard**," the analysts observed that while they agreed with the need for Brack and Meschuk to step down "*it's fair to ask why they* **[sic]** *only happened today, rather than two weeks ago when the DFEH investigation became public, or two years ago when the company first learned of the DFEH investigation.*" (emphasis added).

283. On August 6, 2021, Kellogg's pulled out as sponsor of Overwatch League and Coca-Cola and State Farm paused their advertising through Activision Blizzard's Esports platforms.

284. On August 11, 2021, *Kotaku.com* and Activision Blizzard confirmed that Director of Diablo IV, Luis Barriga, the Lead Game Designer for Diablo IV, Jesse McCree, and World of Warcraft Designer, Jonathon LeCraft, were fired. McCree and LeCraft were, along with others, featured in the "Cosby Suite" photo previously published by *Kotaku.com*.

## H. <u>The DFEH Amends Its Complaint to Add Claims that Activision Blizzard Obstructed its Investigation.</u>

285.   On August 23, 2021, the DFEH Amended its lawsuit to add allegations that Activision Blizzard retaliated against employees for assisting the DFEH's investigation and added a claim that the Company failed to maintain and produce records.

286.   The Company obstructed the DFEH by claiming that receipt of or investigation of discrimination and harassment complaints was privileged: "DFEH requested documents related to employee complaints, communications and records about harassment or discrimination by Defendants. Defendants refused to produce relevant evidence to DFEH, claiming that the company's '***receipt [of complaints] or investigation of discrimination or harassment complaints is privileged,***' and they thereby suppressed evidence and interfered with a government investigation seeking relief for employees who suffered unlawful conduct. In one instance, Defendants' counsel stated: '***[a]s a threshold issue, we note that [the investigator] is an attorney …; her work related to receipt or investigations of discrimination or harassment complaints is privileged.***' Throughout the DFEH two-year investigation, Defendants have taken several adverse actions in response to employee complaints and assistance with the DFEH, including repeatedly cloaking the '***receipt or investigation***' of employee discrimination and harassment complaints in attorney-client 'privilege,' then withholding and suppressing evidence from the governmental department charged with investigating and remedying such complaints, and ultimately interfering with DFEH's statutory duties to prosecute workplace discrimination and harassment violations on behalf of employees and contingent or temporary workers." (emphasis in original).

287.   The DFEH further alleged that the Company retained WilmerHale to conduct a confidential investigation for the purpose of interfering with the

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

DFEH's investigation:

> In response to the filing of this suit, Defendants again took similar actions. Defendants retained a law firm to conduct an attorney-led 'confidential' investigation of unlawful practices raised in employees' complaints and assistance with the government enforcement action. Within a week of filing the action and immediately following employees' public assistance, Defendants issued a public statement that announced it retained the law firm WilmerHale "…to conduct a review of [its] policies and procedures" in the workplace. Defendants publicly stated that: "This work will begin immediately… We encourage anyone with an experience you believe violates our policies or in any way made you uncomfortable in the workplace to use any of our many existing channels for reporting or to reach out to [an attorney who formerly worked at the United States Securities and Exchange Commission]. *[The attorney] team at WilmerHale will be available to speak with you on a confidential basis.... Your outreach will be kept confidential*." And, as previously stated by Defendants' counsel, when *the investigator is "an attorney…; her work related to receipt or investigations of discrimination or harassment complaints is privileged*" and then withheld from the government department charged with investigating and remedying the complaints. This directly interferes with DFEH's statutory mandate to investigate, prosecute, and remedy workplace discrimination and harassment violations on behalf of employees and contingent or temporary workers who engaged in, or were perceived to be engaged in, protective activity.

(emphasis in original).

288.   Activision Blizzard also tried to solicit waivers of employee rights without informing employees of the DFEH's pending government enforcement action: "Also, in response to employees' protected activity, Defendants have also taken adverse actions aimed at curtailing employee rights in this government enforcement action such as soliciting waivers of employee rights and obtaining repressive, if not punitive, secret settlements of sexual harassment claims, non-disclosure agreements, and non-disparagement agreements with severe penalties

82

against employees. *Without any notice of the pending government enforcement action under the California Fair Employment and Housing Act and the California Labor Code*." (emphasis in original).

289.   Such waivers and releases violate California law: "Defendants' waivers and releases that overtly interfere with the DFEH's statutory mandate to investigate and remedy discrimination by imposing conditions to and constraints against their employees' ability to notify DFEH of 'information about unlawful conduct in the workplace' is 'contrary to public policy and shall be unenforceable,' as set forth in Government Code sections 12964.5 and 12953."

290.   DFEH further alleged that Activision Blizzard **shredded documents in violation of a document retention notice sent by DFEH**: "DFEH is also informed and aware that documents and records have not been maintained as required by law or by the DFEH's Document Retention Notice, including but not limited to documents related to investigations and complaints were shredded by human resource personnel and emails are deleted thirty (30) days after an employee's separation."

291.   The Amended DFEH Complaint also added contingent and temporary workers to the class of affected workers.

## I.   The SEC Opens an Investigation into Sexual Harassment and Workplace Discrimination at Activision Blizzard and Subpoenas Defendant Kotick; Blizzard's Chief Legal Officer and Executive Producer of Overwatch Leave the Company.

292.   On September 20, 2021, the *Wall Street Journal* reported that the SEC had opened an investigation into Activision Blizzard and subpoenaed Defendant Kotick:

> Federal securities regulators have launched a wide-ranging investigation into Activision Blizzard Inc., including how the videogame-publishing giant handled employees' allegations of sexual

83

misconduct and workplace discrimination, according to people familiar with the investigation and documents viewed by The Wall Street Journal.

The Securities and Exchange Commission has subpoenaed Activision, known for its Call of Duty, World of Warcraft and Candy Crush franchises, and several of its senior executives, including longtime Chief Executive Bobby Kotick, according to the people and documents.

The agency is asking for documents including minutes from Activision board meetings since 2019, personnel files of six former employees and separation agreements the company has reached this year with staffers, records show. The SEC is asking for Mr. Kotick's communications with other senior executives regarding complaints of sexual harassment or discrimination by Activision employees or contractors, the documents show.

293.   Immediately following the news of the SEC Investigation, *Bloomberg Intelligence* analysts Kanterman and Naidu warned that the Investigation could compromise the Company's ability to execute new games, including Diablo IV and Overwatch 2: "A U.S. Securities and Exchange Commission investigation into disclosures regarding workplace issues at Activision Blizzard, first reported in The Wall Street Journal, ***could compromise the company's ability to execute new games -- including Diablo IV, Overwatch 2 and mobile titles -- and meet consensus' estimated double-digit 2022 sales growth***. Development works including those for World of Warcraft had to stop in the wake of a California state lawsuit and employee defections." (emphasis added).

294.   On September 20 and 21, 2021, following the reporting of the SEC Investigation, the price of Activision Blizzard's stock dropped from $79.56 to $73.03/share or more than 8%.

84

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

295.   The Company confirmed the SEC's investigation in its Form 10-K for the fiscal year ended December 31, 2021, which it filed with the SEC on February 25, 2022 (the "2021 10-K"). The 2021 10-K stated that "[t]he Company is cooperating with an investigation by the U.S. Securities and Exchange Commission (the "SEC") regarding disclosures on employment matters and related issues including responding to subpoenas from the SEC. The SEC has also issued subpoenas to a number of current and former executives and other employees in connection with this matter."

296.   Also on September 20, 2021, Blizzard's Chief Legal Officer, Claire Hart, announced that September 17, 2021 had been her last day.

297.   On September 21, 2021, *Bloomberg* reported that Overwatch Executive Producer Chacko Sonny was leaving Activision Blizzard at the end of the week.

**J.   On September 27, 2021, the EEOC Files a Sexual Harassment, Sex Discrimination, and Retaliation Complaint under Title VII Against Activision Blizzard, and the Company Enters Into a Consent Decree as a Condition of Settlement.**

298.   After the EEOC issued to Defendants a Letter of Determination finding reasonable cause on its claims, "[a]s required by statute, the Commission invited Defendants to engage in conciliation efforts to endeavor to eliminate the discriminatory practices and provide appropriate relief. The conciliation process is statutorily required for the EEOC to address the findings made in the Letter of Determination. The Commission engaged in extensive conciliation discussions with Defendants, but the Commission was unable to secure through informal methods an acceptable conciliation agreement."

299.   Accordingly, the EEOC filed the EEOC Complaint on September 27, 2021. As detailed above, the EEOC, like the DFEH, found that Activision Blizzard's employees were subject to sexual harassment and discrimination, that

Defendants knew about it but did not prevent it, and that employees who complained were retaliated against.

300.    The EEOC asked for, *inter alia*, "a permanent injunction enjoining Defendant, their officers, successors, agents, servants, employees, attorneys, assigns, and all persons in active concert or participation with each of them, from engaging in sexual harassment, retaliation, and any other employment practices which discriminate based on sex, including pregnancy."

301.    Simultaneously with the filing of the EEOC Complaint, the EEOC announced that Activision Blizzard had entered into an onerous Consent Decree, which had a duration of 3 years and also included a $18 million monetary settlement.

302.    The Consent Decree required that within 30 days of its effective date, "Defendants will retain a third party EEO Consultant, approved by the EEOC, with demonstrated experience in the areas of preventing and combating gender discrimination, harassment, and related retaliation. The EEO Consultant shall have access to documents and employees and shall review Defendants' compliance with the provisions of this Decree."

303.    The Consent Decree also required Defendants to "hire or designate an Internal Equal Employment Opportunity Coordinator…to ensure Defendants' compliance with this Decree."

304.    Activision Blizzard will also be subject to annual audits: "On an annual basis throughout the duration of this Decree, the EEO Consultant shall conduct unannounced audits of current employees, that can occur in person, to assess whether sexual harassment, pregnancy discrimination and/or related retaliation issues are properly being addressed, whether the mechanisms implemented pursuant to this Decree are effective, whether the trainings are effective, and to identify areas to improve."

305.    In a report they released on September 27, 2021, *Bloomberg*

86

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*Intelligence* analysts Kanterman and Naidu stated that Activision Blizzard's settlement with the EEOC "Doesn't Alleviate Talent Risk": "Activision Blizzard's $18 million settlement with the U.S. Equal Employment Opportunity Commission ***doesn't alleviate the likelihood of significant brain drain, with staff defections likely to persist in the wake of workplace culture allegations, jeopardizing the timing and quality of its new-game pipeline and putting sales expectations at risk.*** Activision still faces a lawsuit from California's Department of Fair Employment and Housing and an investigation from the SEC." (emphasis added).

306.   Judge Fischer of the U.S. District Court for the Central District of California entered the final version of the Consent Decree on March 29, 2022.

**K. Due to the Ongoing Scandal, Activision Blizzard Fires 20 Employees; Cancels its Yearly Showcase; Institutes a "New Zero-Tolerance Harassment Policy"; Waives Required Arbitration of Sexual Harassment and Discrimination Claims; and Defendant Kotick Cuts his Own Base Salary to $62,500.**

307.   On October 19, 2021, the Financial Times reported that Activision Blizzard "has fired 20 employees in an attempt to clean up its culture following allegations of widespread gender-based discrimination and harassment" and "has also reprimanded 20 individuals and will expand its ethics and compliance team." Activision Blizzard's Chief Compliance Office, Frances Townsend, said that the 20 people fired had "patterns" of misconduct. Townsend also admitted that the Company's investigation of itself "found misconduct across several parts of the business."

308.   On October 26, 2021, Blizzard announced that it was canceling BlizzCon. In an article by Michael Tobin entitled "Activision's Blizzard Cancels Conference Amid Misconduct Scandal" from that same date, *Bloomberg* describes "BlizzCon as one of the biggest events on the video game industry calendar. In years past, it has drawn more than 20,000 people to Southern California and

87

serves as a venue to unveil new games from Activision's Blizzard Entertainment unit."

309.   As part of the Company's continued effort to placate its employees, Defendant Kotick announced on October 28, 2021, in yet another letter, that the Company was launching a "***new*** zero-tolerance harassment policy company-wide" (bold and italics added; underlining in original). Kotick also stated that "[f]or any Activision Blizzard employee who chooses not to arbitrate an individual claim of sexual harassment, unlawful discrimination, or related retaliation arising in the future, the company will waive any obligation to do so."

310.   In his letter issued October 28, 2021, Defendant Kotick also stated that he had asked Activision Blizzard's Board of Directors "to reduce my total compensation until the Board has determined that we have achieved the transformational gender-related goals and other commitments described above." He specifically "asked the Board to reduce [his] pay to the lowest amount California law will allow for people earning a salary, which this year is $62,500" and that he not be granted any bonuses and equity during this time.

**L.   <u>Activision Blizzard Admits That Leadership Changes to Their Diablo and Overwatch Franchises, Forced by the Ongoing Sexual Harassment Scandal, Would Cause the Latest Installments of Those Games to be Delayed and that Jennifer Oneal was Departing from her Position as Co-leader of Blizzard, Leading to a Huge Drop in the Company's Stock.</u>**

311.   On November 2, 2021 Activision Blizzard held its Earnings Call for the Third Quarter of 2021 (the "Q3 2021 Earnings Call").

312.   During the Q3 2021 Earnings Call, Daniel Alegre, the Company's President and Chief Operating Officer ("COO") admitted that because the Company had "taken actions that resulted in the departure of a number of individuals across the company," resulting in new leadership for the Overwatch and Diablo franchises, the Company was pushing back the launch date for

88

Overwatch 2 and Diablo IV:

> As we grow our teams with new hires, we are keenly aware of the importance and responsibility we have to ensure a safe working environment for our people. This is our number one priority. Specifically, *in recent months, we have taken actions that resulted in the departure of a number of individuals across the company.* Additionally, we have seen increased competition in the market for our talent and higher voluntary turnover that has partly offset our success in hiring.
>
> *As we have worked with new leadership in Blizzard and within the franchises themselves, particularly in certain key creative roles, it's become apparent that some of the Blizzard content planned for next year will benefit from more development time to reach its full potential.* While we are still planning to deliver a substantial amount of content from Blizzard next year, *we are now planning for a later launch for Overwatch 2 and Diablo IV than originally envisaged.*
>
> *These are two of the most eagerly anticipated titles in the industry*, and our teams have made great strides towards completion in recent quarters. But we believe giving the team some extra time to complete production and continue growing their creative resources to support the titles after launch will ensure that these releases delight and engage their communities for many years into the future.
>
> *These decisions will push out the financial uplift that we had expected to see next year*, but we are confident that this is the right course of action for our people, our players, and the long-term success of our franchise.

(emphasis added).

313.   Activision Blizzard's CFO, Defendant Zerza, stated later on the Q3 2021 Earnings Call that due to the delays, "[w]e are therefore currently not planning for material contributions from Overwatch 2 or Diablo IV in 2022."

314.   During the question and answer period of the Q3 2021 Earnings Call, analyst Mike Hickey from The Benchmark Co. LLC asked for more color "on the

reason for the slip in Overwatch 2 and Diablo IV." Blizzard Co-Leader Mike Ybarra responded by confirming that the "slip" was due to the leadership changes on each game:

> Looking at our upcoming releases across all of our teams here at Blizzard, we have a deep bench of veteran development talent, and ***we have new leadership on both Overwatch 2 and Diablo IV.*** Both are seasoned Blizzard developers with over 30 years' experience at the company between them. The teams have made great progress and passed important milestones recently, and we expect these to be fantastic releases. ***But there's obviously been a change in leadership.*** We looked at what was left in the final phases of production with fresh eyes, and we saw that allowing the teams more time would enable both great experiences at launch and also help ensure that everything will be in place to engage the communities for many years to come.

(emphasis added)

315. During the Q3 2021 Earnings Call, Alegre also announced that Jennifer Oneal was departing from her position as co-leader of Blizzard at the end of the year.

316. Analysts believed that the delays of Overwatch 2 and Diablo IV were a disaster for the Company and that the delays had been caused by the fallout from the sexual harassment and discrimination allegations against the Company.

317. Following the Q3 2021 Earnings Call, on November 2, 2021, *Bloomberg Intelligence* analysts Kanterman and Amine Bensaid issued a report entitled "***Culture Turmoil May Slow Activision's 4Q Sales: Earnings Outlook***." It stated that "Activision Blizzard's decision to delay the launches of Overwatch 2 and Diablo IV may be due to the internal culture turmoil the company is experiencing, and we think it may mean more revenue volatility in 4Q, with the potential for a decline in 2022."

318. On November 3, 2021, BMO Capital Markets analyst Gerrick L.

Johnson issued a report entitled "3Q Results OK, but Game Delays Send Shares Lower." The report stated that the game delays were the realization of the "***worst fears regarding the workplace issues at Blizzard***":

> ***The biggest surprise out of the quarter was the news that Overwatch 2 and Diablo IV would not meaningfully contribute to 2022, which was not what investors wanted to hear*** given already heightened concern around game delays in the sector…
>
> ***When the state of California sued the company for sexual harassment and discrimination and these issues came to light, one of the biggest risks we identified was the potential loss of personnel, especially with a lot of growth in the industry and heightened demand for talent. We think our worst fears regarding the workplace issues at Blizzard are being realized.*** It was clear to us, based on management comments, that the company was lacking the human resources needed, not so much to launch a finished game, but also talent needed to support the game after launch with continued in game content drops and live services. ***In retrospect, after the departures of Overwatch 2's executive producer, Chacko Sonny, and its Director, Jeff Kaplan, as well as Diablo 4's Director, Luis Barriga, and Lead Designer, Jesse McCree, these delays are not that big of a surprise.***

(emphasis added).

319.   Also on November 3, 2021, Jefferies issued an analyst report on Activision Blizzard entitled "**Scenario #13, The One We Didn't Want**." (emphasis in original). It stated that the key take away was "**ATVI reported an in-line 3Q and an expected in-line 4Q guide. What came next on the call/slide deck (not the press release) was largely dreadful. First, Overwatch 2 and Diablo IV are delayed. Second, recent promote & diversity champion Jen O'Neal is stepping down from Blizzard leadership after three months. Third, the delays seem related to internal issues, not just 'need more time to make them great'. We think investors' confidence is shaken.**" (emphasis in original).

320.   On November 3, 2021, after Blizzard announced that Overwatch 2

and Diablo IV were delayed due to a change in leadership in both games, the price of Activision Blizzard shares traded at unusually high volumes and plunged $10.92, or more than 14%, to $66.75/share.

**M.** **The November 16 _Wall Street Journal_ Article is Published Revealing That Defendant Kotick Knew About Sexual-Misconduct Allegations at Activision Blizzard for Years, the Company had Received More Than 500 Harassment and Discrimination Reports From Current and Former Employees Since the DFEH Complaint was Filed, and That Jennifer Oneal Sent an Internal Email Saying She Was "Tokenized, Marginalized, and Discriminated Against" Prior to Her Resignation.**

321.   As described in Paragraphs 215 to 224, the November 16 _Wall Street Journal_ Article showed that Defendant Kotick had been aware of sexual misconduct allegations at Blizzard and at other Activision Blizzard studios for years and had engaged in misconduct himself.

322.   The November 16 _Wall Street Journal_ Article also revealed that since the DFEH filed suit on July 20, 2021, Activision Blizzard had received more than 500 reports from current and former employees alleging harassment, sexual assault, bullying, pay disparities and other issues. This number of reports is remarkable given that only 20% of Activision Blizzard's 9,500 employees are women.

323.   Another revelation in the November 16 _Wall Street Journal_ Article was that in September 2021, only a month after she was appointed Blizzard's co-head, Jennifer Oneal "sent an email to a member of Activision's legal team in which she professed a lack of faith in the ability of Activision's leadership to turn the culture around, saying 'it was clear that the company would never prioritize our people the right way.'" Oneal further stated in the email that she had been sexually harassed earlier in her career at Activision Blizzard, that she was paid less than her male counterpart (Mike Ybarra) at the helm of Blizzard, and wanted

to discuss her resignation. Oneal, who is Asian-American and gay, wrote: "I have been tokenized, marginalized, and discriminated against…". Oneal also described a party for an Activision development studio she attended with Defendant Kotick around 2007 in which scantily clad women danced on stripper poles. The *Wall Street Journal* further reported that at the same party, a DJ encouraged female attendees to drink more so the men would have a better time, according to another person who was present.

324.    When the November 16, 2021 *Wall Street Journal* Article was published at 10:59 a.m. Activision's share price began dropping from the day's high of $72.13/share. Then at about 2:30 p.m., *Bloomberg* reported that Activision Blizzard employees had planned a walkout protest to force the resignation of Kotick.  Kotick, being the CEO, was an integral part of the Company and his possible departure created uncertainty and fear among investors. This adverse news caused Activision Blizzard's share price to decline $5.99/share from its high of $72.13/share that day or 8.3% to close at $66.14/share.

**N.**  **The SEC Widens its Investigation of Activision Blizzard and the DFEH Subpoenas the Police Departments in the Los Angeles Area for Records About Defendant Kotick and 18 Other Current and Former Activision Employees.**

325.    On February 17, 2022, *The Wall Street Journal* published a report entitled "Regulators Widen Activision Blizzard Probes Over Workplace Issues: SEC subpoenas more current and former executives: California agency seeks additional information on CEO Bobby Kotick and board's handling of workplace misconduct allegations" by Kirsten Grind.

326.    *The Wall Street Journal* reported that the SEC widened its investigation into Activision Blizzard by serving a subpoena dated January 18, 2022 which requested records and communications from a much longer list of current and former Activision Blizzard executives than it had previously sought.

93

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

The subpoena also requested records dating back to 2016, which was a much longer timeframe than the SEC had previously requested.

327.   The *Wall Street Journal* further reported that shortly thereafter, the DFEH issued subpoenas to police departments in the Los Angeles area for records about Defendant Kotick and 18 other current and former Activision Blizzard employees.

## FALSE AND MATERIALLY MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

A. **Activision Blizzard's SEC Filings Repeatedly Misstated That The Company Was Only "party to routine…investigations" that arose in the "ordinary course of business" and were "not significant" or expected to have "a material adverse effect."**

328.   On February 28, 2019, Activision Blizzard filed a form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K") with the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2018 10-K were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2018 10-K and the 2018 10-K states that the Company prepared them in conformity with Generally Accepted Accounting Principles ("GAAP").

329.   The 2018 10-K stated the following under the heading "legal proceedings" under both Item 3 of Part I and in the notes to the Company's consolidated financial statements:

> In December 2018, we received a decision from the STA informing us of an audit assessment to a Swedish subsidiary of King for the 2016 tax year…
>
> In December 2017, we received a Notice of Reassessment from the FTA related to transfer pricing for intercompany transactions

94

involving one of our French subsidiaries for the 2011 through 2013 tax years….

*In addition, we are party to routine* claims, suits, *investigations*, audits, and other proceedings *arising in the ordinary course of business*, including with respect to intellectual property, competition and antitrust matters, regulatory matters, tax matters, privacy matters, *labor and employment matters*, compliance matters, unclaimed property matters, liability and personal injury claims, product damage claims, collection matters, and/or commercial claims. In the opinion of management, after consultation with legal counsel, *such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business*, financial condition, results of operations, or liquidity.

(Emphasis in title in original; other emphasis added.)

330. On February 27, 2020, Activision Blizzard filed a form 10-K for the fiscal year ended December 31, 2019 ("2019 10-K") with the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2019 10-K were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2019 10-K and the 2019 10-K states that the Company prepared them in conformity with GAAP.

331. The 2019 10-K stated the following under the heading "legal proceedings" under both Item 3 of Part I and in the notes to the Company's consolidated financial statements:

In December 2017, we received a Notice of Reassessment from the French Tax Authority (the "FTA") related to transfer pricing for intercompany transactions involving one of our French subsidiaries for the 2011 through 2013 tax years….

*In addition, we are party to routine* claims, suits, *investigations*, audits, and other proceedings *arising in the ordinary course of business*, including with respect to intellectual property, competition and antitrust matters, regulatory matters, tax matters, privacy matters, *labor and employment matters*, compliance matters,

95

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

unclaimed property matters, liability and personal injury claims, product damage claims, collection matters, and/or commercial claims. In the opinion of management, after consultation with legal counsel, *such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business*, financial condition, results of operations, or liquidity.

(Emphasis in title in original; other emphasis added.)

332.   On February 23, 2021, Activision Blizzard filed a form 10-K for the fiscal year ended December 31, 2020 ("2020 10-K") with the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2020 10-K were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2020 10-K and the 2020 10-K states that the Company prepared them in conformity with GAAP.

333.   The 2020 10-K stated in Part I:

**Item 3.   LEGAL PROCEEDINGS**

Refer to Note 22 of the notes to the consolidated financial statements included in Item 8 of this Annual Report on Form 10-K for disclosures regarding our legal proceedings.

(Emphasis in title in original; other emphasis added.)

334.   The 2020 10-K further stated in the notes to the Company's consolidated financial statements:

***Legal Proceedings***

***We are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising in the ordinary course of business***, including with respect to intellectual property, competition and antitrust matters, regulatory matters, tax matters, privacy matters, ***labor and employment matters***, compliance matters, unclaimed property matters, liability and personal injury claims, product damage claims, collection matters, and/or commercial claims. In the opinion

96

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3

of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

4

(Emphasis in title in original; other emphasis added.)

5
6
7
8
9
10

335.   On November 8, 2018, Activision Blizzard filed a form 10-Q for the quarterly period ended September 30, 2018 ("3Q 2018 10-Q") with the SEC that was signed by Defendant Neumann. Attached to the 3Q 2018 10-Q were SOX Certifications signed by Defendants Kotick and Neumann. The Company's consolidated financial statements form part of the 3Q 2018 10-Q and the 3Q 2018 10-Q states that the Company prepared them in accordance with GAAP.

11
12
13
14
15
16

336.   On May 2, 2019, Activision Blizzard filed a form 10-Q for the quarterly period ended March 31, 2019 ("1Q 2019 10-Q") with the SEC that was signed by Defendant Durkin. Attached to the 1Q 2019 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 1Q 2019 10-Q and the 1Q 2019 10-Q states that the Company prepared them in accordance with GAAP.

17
18
19

337.   The 3Q 2018 10-Q and 1Q 2019 10-Q stated under the heading "legal proceedings" in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

20
21
22
23
24
25
26

***We are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, ***labor and employment matters***, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

27
28

97

(emphasis added).

338.   On August 8, 2019, Activision Blizzard filed a form 10-Q for the quarterly period ended June 30, 2019 ("2Q 2019 10-Q") with the SEC that were signed by Defendant Durkin. Attached to the 2Q 2019 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2Q 2019 10-Q and the 2Q 2019 10-Q states that the Company prepared them in accordance with GAAP.

339.   The 2Q 2019 10-Q stated under the heading "legal proceedings" in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

> In December 2018, we received a decision from the STA informing us of an audit assessment of a Swedish subsidiary of King for the 2016 tax year….
>
> ***In addition, we are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, ***labor and employment matters***, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

340.   On November 7, 2019, Activision Blizzard filed a form 10-Q for the quarterly period ended September 30, 2019 ("3Q 2019 10-Q") with the SEC that was signed by Defendant Durkin. Attached to the 3Q 2019 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 3Q 2019 10-Q and the 3Q 2019 10-Q states that the Company prepared them in accordance with GAAP.

341.   On May 5, 2020, Activision Blizzard filed a form 10-Q for the

98

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

quarterly period ended March 31, 2020 ("1Q 2020 10-Q") with the SEC that was signed by Defendant Durkin. Attached to the 1Q 2020 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 1Q 2020 10-Q and the 1Q 2020 10-Q states that the Company prepared them in accordance with GAAP.

342.  On August 4, 2020, Activision Blizzard filed a form 10-Q for the quarterly period ended June 30, 2020 ("2Q 2020 10-Q") with the SEC that was signed by Defendant Durkin. Attached to the 2Q 2020 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2Q 2020 10-Q and the 2Q 2020 10-Q states that the Company prepared them in accordance with GAAP.

343.  On October 29, 2020, Activision Blizzard filed a form 10-Q for the quarterly period ended September 30, 2020 ("3Q 2020 10-Q") with the SEC that was signed by Defendant Durkin. Attached to the 3Q 2020 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 3Q 2020 10-Q and the 3Q 2020 10-Q states that the Company prepared them in accordance with GAAP.

344.  On May 4, 2021, Activision Blizzard filed a form 10-Q for the quarterly period ended March 31, 2021 ("1Q 2021 10-Q") with the SEC that was signed by Defendant Zerza. Attached to the 1Q 2021 10-Q were SOX Certifications signed by Defendants Kotick and Zerza. The Company's consolidated financial statements form part of the 1Q 2021 10-Q and the 1Q 2021 10-Q states that the Company prepared them in accordance with GAAP.

345.  The 3Q 2019 10-Q, 1Q 2020 10-Q, 2Q 2020 10-Q, 3Q 2020 10-Q, and 1Q 2021 10-Q all state in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*We are party to routine* claims, suits, ***investigations***, audits, and other proceedings ***arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, labor and employment matters, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

346.    The foregoing statements in Activision Blizzard's 10-Ks and 10-Qs set forth in Paragraphs 329, 331, 333-334, 337, 339, 345 were false and materially misleading and omitted to state material facts necessary to make the statements not misleading.

347.    The statements that any undisclosed investigations of Activision Blizzard were "routine" and arose in the "ordinary course of business" are misleading because that did not correctly describe the EEOC and DFEH Investigations. *First,* the Investigations were initiated with an EEOC Commissioner Charge and DFEH Director's Complaint, which those government agencies rarely use and reserve for serious systemic misconduct (Paragraphs 103-108). *Second*, the Investigations led the Company to immediately alter its Human Resources practices — Activision Blizzard instituted formal procedures for sexual harassment complaints for the first time, held regular meetings between all of Human Resources and the legal department, and then changed the Human Resources reporting structure so that it reported directly to the corporate office (Paragraphs 109-116). *Third*, the Investigations caused the Company to fire key senior employees Ben Kilgore, Alex Afrasiabi, and Tyler Rosen (Paragraphs 117-131). *Fourth*, Activision Blizzard's management informed the board of directors about the Investigations, which would not be true of a routine matter at a large company such as Activision (Paragraphs 132-134). *Fifth*, the Investigations were

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

very extensive and, regarding the 1Q 2021 10-Q statement, the DFEH served the extremely broad April 2, 2021 Subpoena Duces Tecum on Activision Blizzard after the DFEH had already been formally investigating for more than two years (Paragraphs 135-139). *Sixth*, the pervasive sexual harassment and discrimination at Activision Blizzard and the inevitable fact that the EEOC and DFEH would discover it rendered the Investigations non-routine and highly significant. (Paragraphs 140-255). *Seventh*, the Company's statements about the importance of diversity and inclusion indicated that the Company did not consider investigations such as the EEOC and DFEH Investigations as routine and in the ordinary course of business (Paragraphs 256-259). *Eighth*, the #MeToo Movement made it extremely unlikely that the Company would be able to handle the Investigations as a routine matter (Paragraphs 260-263). *Ninth*, by admitting that reputational damage from the DFEH Complaint would likely impact its business, the Company admitted that EEOC and DFEH's Investigations into that conduct were not routine (Paragraphs 264-265).

348.    The statements that any undisclosed investigations of Activision Blizzard were "not significant" or expected to have a "material adverse effect" on Activision Blizzard's business had no basis because the omissions of the EEOC and DFEH Investigations made those statements misleading to a reasonable person. If the EEOC and DFEH Investigations had been disclosed, a reasonable investor would have understood that Activision Blizzard, contrary to its statements, was subject to investigations that were significant and/or expected to have a material adverse effect on the Company's business for the following reasons. *First,* the Investigations were initiated with by an EEOC Commissioner Charge and DFEH Director's Complaint, which those government agencies rarely use and reserve for serious systemic misconduct (Paragraphs 103-108). *Second*, the Investigations led the Company to immediately alter its Human Resources practices — Activision Blizzard instituted formal procedures for sexual

harassment complaints for the first time, held regular meetings between all of Human Resources and the legal department, and then changed the Human Resources reporting structure so that it reported directly to the corporate office. Defendants would not have made such drastic changes if they did not consider the Investigations to be significant and if they did not believe that they were likely to have a materially adverse effect on Activision Blizzard's business (Paragraphs 109-116). *Third*, the Investigations caused the Company to fire key senior employees Ben Kilgore, Alex Afrasiabi, and Tyler Rosen which was significant and had the potential to materially affect the Company (Paragraphs 117-131). *Fourth*, Activision Blizzard's management informed the board of directors about the Investigations, which would not be true of a matter that was not significant or not expected to have a material effect (Paragraphs 132-134). *Fifth* the Investigations were very extensive and, regarding the 1Q 2021 10-Q statement, the DFEH served the extremely broad April 2, 2021 Subpoena Duces Tecum on Activision Blizzard after the DFEH had already been formally investigating for more than two years (Paragraphs 135-139). *Sixth*, the pervasive sexual harassment and discrimination at Activision Blizzard and the inevitable fact that the EEOC and DFEH would discover it rendered the Investigations non-routine, highly significant, and precluded the possibility that they would not have a material effect on the Company. (Paragraphs 140-255). *Seventh*, the Company made statements indicating that the public's perception of it as being committed to diversity and inclusion was material to the Company's business (Paragraphs 256-259). *Eighth*, the ongoing #MeToo Movement made it predictable that the Investigations would lead to a significant number of firings and reputational damage (Paragraphs 260-263). *Ninth*, by admitting that reputational damage from the DFEH Complaint would likely impact its business, the Company admitted that EEOC and DFEH's Investigations into that conduct were significant and likely to have a materially adverse effect. (Paragraphs 264-265).

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**LOSS CAUSATION**

349.  On July 27, 2021, after it became clear that Activision Blizzard's denial of the DFEH's allegations was false and the risk of employee unrest, loss of productivity and large scale resignations and terminations had materialized, the price of Activision Blizzard shares traded at unusually high volumes and fell $6.09, or over 6.75%, to close at $84.05/share.

350.  On September 20 and 21, 2021, the price of Activision Blizzard shares fell $6.53, or more than 8%, to close at $73.03/share after *The Wall Street Journal* reported that the SEC had opened an investigation.

351.  On November 2, 2021, after the close of the market, Blizzard announced that Overwatch 2 and Diablo IV were delayed due to the termination of "a number of individuals across the company" and "higher voluntary turnover" as a result of the unfolding scandal, which was the materialization of the risk of the DFEH and EEOC Investigations. On November 3, 2021, the price of Activision Blizzard shares traded at unusually high volumes and fell $10.92, or more than 14%, to $66.75/share.

352.  In the morning on November 16, 2021 at 10:59 a.m., the *Wall Street Journal* published an article detailing how Defendant CEO Robert Kotick had not only known of the endemic sexual harassment, retaliation and discrimination problems at Activision Blizzard for years, but that Kotick was also one of the culprits guilty of such misconduct. Within minutes of *The Wall Street Journal* article's publication, Activision Blizzard's share price began dropping from the day's high of $72.13/share. Then at about 2:30 p.m. *Bloomberg* reported that Activision Blizzard employees had planned a walkout protest to force the resignation of Kotick.  Kotick, being the CEO, was an integral part of the Company and his possible departure created uncertainty and fear among investors. This double shot of adverse news caused Activision Blizzard's share price to decline $5.99/share from its high of $72.13/share that day or 8.3% to close at

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

$66.14/share.

353.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

**A. The Defendants Acted Intentionally or Recklessly.**

**1)   The Individual Defendants Were Aware of the DFEH and EEOC Investigations and That the Board of Directors Had Been Informed About Them.**

354.   The November 16 *Wall Street Journal* Article stated that Defendant Kotick was aware of the DFEH and EEOC Investigations. Additionally, the Article stated that the Company's Board of Directors' sent *The Wall Street Journal* a statement that said it had been "informed at all times with respect to the status of regulatory matters," referring to the DFEH and EEOC Investigations. Accordingly, that indicates Defendant Kelly, Chairman of the Board of Directors, and Defendant Kotick, the Company's CEO and a director, were informed. The other Individual Defendants, Durkin, Neumann, and Zerza, who all served as CFO of the Company after the DFEH and EEOC Investigations commenced, also would have been aware of the Investigations in light of their contact with the Board. Furthermore, Individual Defendants, Durkin, Neumann, and Zerza would have found out about the Investigations as part of their due diligence when they reviewed and approved the legal proceedings disclosures in Activision Blizzard's 10-Ks and 10-Qs. As CFOs of the Company, they would have reviewed and approved the legal proceedings statements both because they were part of Activision Blizzard's consolidated financial statements and because they all signed 10-Ks and/or 10-Qs during the Class Period.

355.   Additionally, CW6 told Plaintiffs' investigator that the DFEH and EEOC Investigations were common knowledge at the Company as far back as

2018 and that employees  discussed the Investigations on the Company's internal Slack channels. CW6 further stated that she got an email from Blizzard's legal department during the summer of 2020 telling her not to delete anything on her computer due to the ongoing Investigations. CW6 further recalled asking an Associate Director of Human Resources (Individual A) about the Investigations and Individual A told CW6 that she knew about them.

356.  Each individual Defendant would also have been aware of the Investigations because of their extensiveness — the EEOC and the DFEH both interviewed more than 100 witnesses and the EEOC sent a survey to every Activision Blizzard employee (*see* Paragraphs 135-139).

357.  Given that: (1) each Individual Defendant was aware of the Investigations, (2) the Investigations were very rare investigations into systemic misconduct initiated by an EEOC Commissioner's Charge and DFEH Director's Complaint (*see* Paragraphs 103-108), (3) the Investigations were important enough to inform Activision's board of directors of (*see* Paragraphs 132-133), and (4) given the extensiveness of each Investigation (*see* Paragraphs 135-139), each Individual Defendant was, at minimum, reckless in stating that all undisclosed investigations were "routine," arising from the "ordinary course of business", "not significant, and not expected "to have a material adverse effect."

**2)   The Significant Changes to the Procedures of Human Resources and Firing of Senior Employees Due to the Investigations Rendered the Individual Defendants' Statements, at Minimum, Reckless.**

358.   The Individual Defendants also were or should have been aware that their statements were misleading because the Investigations caused significant, non-routine, changes at Activision Blizzard long before they became public.

359.   Almost as soon as the Investigations formally began, the Company made  significant changes to the functioning of the Company's Human Resources department — all of Human Resources began having regular meetings with the

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Legal Department and the executives told Human Resources that they had to introduce a formal complaint process specifically because of the EEOC Investigation (*see* Paragraph 112). Further, CW2 was certain that Defendant Kotick would be aware of changes to Human Resources because of his one-on-one meetings with Chief People Officer Naughton. (*see* Paragraphs 111, 113). The Company also conducted an internal investigation of human resources' policies and procedures in 2018 and changed the reporting structure of all of Human Resources so it reported directly to the corporate office in 2019 and admitted that the change was due to the inability to stop sexual harassment (*see* Paragraphs 114-115.)  Defendants Durkin, Neumann, Zerza, and Kelly were also certainly aware or should have been aware of these changes given their positions at the Company.

360.  Furthermore, as discussed in Paragraphs 117 to 131, the Investigations caused the firing of senior Blizzard leaders Kilgore, Rosen and Afrasiabi long before they became public. Their firings were shocking given these individuals value to the Company and their long history of engaging in illegal harassment. Defendant Kotick was, as a matter of course, involved in the hiring and firing of high-level employees and personally approved the firing of Kilgore. Additionally, as described above, Kilgore, Afrasiabi and Rosen were sufficiently prominent employees at the Company that Defendants Durkin, Neumann, Zerza, and Kelly would have been aware that they were fired and that the reason in each case was sexual misconduct.

361.  These major changes occurred contemporaneous with Defendants' issuance of statements to investors reassuring them that all Investigations Activision Blizzard was subject to were "routine," in the "ordinary course of business," "not significant," and not expected to have a "material adverse effect." Accordingly, the Individual Defendants were at minimum reckless when they made those statements.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### 3) The Individual Defendants Were Aware of or Recklessly Disregarded the Pervasive Sexual Harassment and Discrimination at Activision Blizzard and, Therefore, Knew or Should Have Known That Their Statements Were False and Misleading.

362. The pervasive sexual harassment at Activision Blizzard and the inevitable fact that EEOC and the DFEH would discover it rendered the Investigations non-routine, highly significant, and almost certain to have a material adverse effect on the Company. Accordingly, since each Individual Defendant knew or should have known of the pervasive misconduct, their statements about the nature of the Investigations that Activision Blizzard was subject to were, at minimum, reckless.

363. As described in Paragraphs 215 to 224, according to the September 16 *Wall Street Journal Article*, the Wall Street Journal's review of internal documents and interviews with people familiar with the matter, Defendant Kotick "knew about allegations of misconduct in many parts of the Company." This includes sexual misconduct allegations at Blizzard and at other Activision Blizzard studios, Sledgehammer and Treyarch. The *Wall Street Journal* also documented that Defendant Kotick himself was guilty of mistreating and threatening women.

364. Notably, the *Wall Street Journal* also found that since the DFEH publicly filed its case, Defendant Kotick had misled Activision Blizzard's directors and other executives about how much he knew about the endemic sexual harassment at his company, which shows that Defendant Kotick has a pattern of intentional misrepresentation concerning sexual harassment at Activision Blizzard.

365. Defendants Kotick, Durkin, Neumann, Zerza, and Kelly would also have known about or recklessly disregarded the pervasive misconduct because the Presidents of Blizzard during the Class Period, Brack and Michael Morhaime

were informed repeatedly of the misconduct (*see* Paragraphs 225-236, 252-255). As Presidents of one of Activision Blizzard's three segments, Brack and Morhaime reported directly to the top officers of the Company.

366.   Defendants Kotick, Durkin, Neumann, Zerza, and Kelly would also have been aware or recklessly disregarded the misconduct due to the fact that numerous women made complaints to Blizzard Human Resources, including to Jesse Meschuk, Senior Vice President and Global Head of Human Resources. Given that Human Resources began reporting directly to the corporate office in 2019, the Individual Defendants were aware of the pervasive misconduct or, at least, had access to information about it. Furthermore, the fact that the Company altered its reporting chain for human resources because by the Company's own admission the prior setup "occasionally allowed some employees to conduct themselves in truly regrettable ways," shows that the top executives of the Company were aware of the misconduct.

367. Defendant Zerza would also certainly have known about the pervasive harassment at Blizzard since he served as Chief Operating Officer of Blizzard from October 2017 to April 2021, and CFO of Blizzard from August 2015 to September 2017. According to Confidential Witness 12 ("CW12"), who served as Vice President of Business Development & Media at Activision Blizzard from 2016 to June 2020, when Zerza was at Blizzard he worked closely with Brack and Morhaime and Meschuk would have taken direction and sought approval from Zerza. Accordingly, CW12 said that Zerza "had to know what was going on."

368. Additionally, Kilgore, Afrasiabi and Rosen were sufficiently prominent employees at the Company such that Defendants Kotick, Durkin, Neumann, Zerza, and Kelly would have been aware that they were fired and that the reason in each case was sexual misconduct. As *The Wall Street Journal* reported, Defendant Kotick personally approved the firing of Kilgore and it was

108

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

typical for him to be involved in such decisions (Paragraphs 128-129).

369.   Defendants Kotick, Durkin, Neumann, Zerza, and Kelly all were involved in the preparation of and signed Activision Blizzard's 10-Ks and/or 10-Qs during the Class Period. Given that each of the Individual Defendants was aware of the DFEH and EEOC Investigations, they would have had to determine whether it was misleading for the Company not to disclose those Investigations and state only that the Company was subject to "routine….investigations" that arose from "the ordinary course of business" and were "not significant." To make these determinations, each of the Individual Defendants would need to determine whether the DFEH and EEOC Investigations to the Company were "routine," in the "ordinary course of business," "not significant", and not expected to have a "materially adverse effect." Any inquiry into this would, for the reasons in the preceding paragraphs, quickly lead to the discovery of the pervasive sexual harassment and discrimination at the Company and, therefore, knowledge that the statements in Activision Blizzard's 10-Ks and 10-Q were false and misleading.

**4)   Defendants' Obstruction of the DFEH's Investigation Supports a Strong Inference of Scienter.**

370.   As detailed in Paragraphs 285 to 291, the DFEH amended its complaint to add allegations that Activision Blizzard intentionally obstructed its investigation by 1) claiming employee complaints were subject to attorney-client privilege; 2) retaining WilmerHale to conduct a confidential investigation that interfered with the DFEH investigation; 3) soliciting waivers of employee rights without providing any notice of the DFEH investigation; and 4) ***shredding documents*** in violation of a document retention notice sent by DFEH. Defendants' all-out effort to obstruct the DFEH investigation shows that they were aware that it was a serious threat to Activision Blizzard.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**5)     Given the #MeToo Movement and Activision Blizzard's Lip Service to Diversity, Equity, and Inclusion, Defendants Cannot Reasonably Argue that They Did Not or Should Not Have Realized the Importance of the DFEH and EEOC Investigations.**

371.   As the *New York Times* documented (*see* Paragraphs 260-263) more than 201 powerful men lost their jobs from October 2017 to October 2018 based on sexual harassment allegations. The EEOC and DFEH Investigations, which commenced in September and October of 2018, respectively, commenced in the wake of those firings.

372.   Additionally, as described in Paragraphs 256 to 259, the Company repeatedly stated that its reputation as a good place to work and commitment to diversity and inclusion were important to the success of the Company.

373.   In light of the #MeToo Movement and Activision Blizzard's efforts to portray itself as a workplace committed to diversity, equity, and inclusion, the Defendants would have realized or were reckless in failing to realize that the EEOC and DFEH Investigations and the ongoing misconduct were likely to seriously harm the Company's reputation. This is especially true given that Defendants were aware that, *in reality, sexual harassment and discrimination were endemic at the Company*.

**6)     Defendants Admitted that the Investigations Were Material and Not "Routine" by Stating in the Company's 2Q 2021 10-Q, Filed on August 3, 2021, That its Business Could be Adversely Impacted.**

374.   After the DFEH publicly filed its Complaint on July 20, 2021, Defendants disclosed it in Activision Blizzard's 2Q 2021 10-Q, filed on August 3, 2021, stating "in July 2021 the State of California filed a complaint against the Company alleging violations of the California Fair Employment and Housing Act and the California Equal Pay Act. The complaint was recently filed, and we are taking actions to address the concerns of employees and other key stakeholders

and the adverse consequences to our business. *If we experience prolonged periods of adverse publicity, significantly reduced productivity or other negative consequences relating to this matter, our business likely would be adversely impacted. We are carefully monitoring all aspects of our business for any such impacts*." (emphasis added). By stating this, Defendants admitted that the reputational harm from the DFEH Complaint could seriously harm Activision Blizzard's business. Given the pervasive misconduct at Activision Blizzard of which Defendants were aware since the outset of the Investigations, there was a high likelihood the Investigations would lead to reputation-damaging revelations about sexual harassment at Activision Blizzard coming out. Therefore, the statement in 2Q 2021 10-Q was an admission that the Investigations were not routine, were significant, and likely to have a material effect on the Company.

**B.   The Individual Defendants Were Motivated to Make the Misstatements.**

**1)   Defendant Kotick Was Motivated to Make Misstatements by Shareholder Value Creation Incentives in His Employment Agreement.**

375.   On June 7, 2021, the CtW Investment Group ("Ctw"), which works with union-sponsored pension funds to enhance long-term stockholder value, issued a letter to Activision Blizzard Shareholders criticizing Defendant Kotick's compensation and encouraging shareholders to vote against the nonbinding "Say-on-Pay" resolution concerning Defendant Kotick's compensation and re-election of the chair of Activision Blizzard's compensation committee, Robert Morgado.

376.   Ctw explained that under the Shareholder Value Creation Incentive in Defendant Kotick's employment agreement, "if the [Company's] stock price closes at or above $79.96 for at least 90 consecutive trading days, all outstanding equity awards granted under the agreement from October 2016 all the way through December 2021 would accelerate vesting at the maximum payout level."

377.   That stock price condition was not met until the first half of 2021 and

triggered a total pay package of almost $155 million for Defendant Kotick for the year 2020, including almost $150 million in stock awards. This dwarfed Defendant Kotick's already substantial pay packages of approximately $30 million for each of the previous four years.

378. Defendant Kotick only received this massive bonus due to the aforementioned false and misleading statements that inflated Activision Blizzard's share price.

**2)  Defendants Sold Millions of Dollars in Activision Blizzard Stock in 2020 and 2021, Before the DFEH and EEOC Filed their Public Complaints.**

379. On May 14, 15, and 18, 2020, Defendant Kelly, the Chairman of Activision Blizzard's Board, sold $27,271,372.50 of Activision Blizzard common stock. Defendant Kelly sold 250,000 shares for proceeds of $18,105,250 on May 14, 2020. On May 15, he sold 75,000 shares of for $5,502,202.50. Then, on May 18, 2020, Defendant Kelly sold 50,000 shares for $3,663,920.

380. On November 2, 3, and 4, 2020, Defendant Kelly sold another $28,913,822.50 in Activision Blizzard shares. Defendant Kelly sold 200,000 shares for proceeds of $15,329,980 on November 2, 2020. On November 3, 2020 he sold 100,000 shares for $7,665,240. Then, on November 4, 2020, Defendant Kelly sold 75,000 shares for $5,918,602.50.

381. In total, Defendant Kelly sold *more than $56 million in Activision Blizzard Shares in 2020*.

382. On August 27, 2020, while he was still serving as Activision Blizzard's CFO, Defendant Durkin sold 50,000 shares of Activision Blizzard common stock for proceeds of $4,175,500.

383. On May 11, 2021, while he was serving as Activision Blizzard's CFO, Defendant Zerza sold 23,723 shares of Activision Blizzard stock for proceeds of $2,250,263.64.

384.   On March 15, 2021, Activision Blizzard's longtime Chief Legal Officer Christopher Walther sold 45,030 Activision Blizzard shares for proceedings of $4,141,859.40. Walther then retired on June 14, 2021, shortly before the DFEH filed its Complaint.

385.   Activision Blizzard's President and Chief Operating Officer Daniel Alegre sold 18,500 Activision Blizzard shares for proceeds of $1,771,190 on February 24, 2021 and 21,722 Activision Blizzard shares for proceeds of $2,034,916.96 on May 14, 2021, for a total of $3,806,106.96.

386.   Finally, Activision Blizzard directors Robert Morgado and Casey Wasserman also sold significant amounts of stock in 2020. On February 12, 2020, Morgado sold 32,000 Activision shares for proceeds of $1,991,561.60. On August 31, 2020, Wasserman sold 10,000 Activision Blizzard shares for $807,500.

387.   Defendants were motivated to make misstatements and omissions about the DFEH and EEOC Investigations and the endemic harassment and discrimination so that they could sell shares of the Company's common stock at inflated prices.

**C. The Individual Defendants Acted Intentionally or Recklessly When They Approved and Failed to Correct the Aforementioned Misstatements.**

388.   Each of the Individual Defendants was provided with copies of the aforementioned SEC filings that contained the misleading statements alleged herein before their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. They were at minimum reckless when they signed and/or authorized the issuance of those public filing and other public statements and signed SOX Certifications.

**D. There is a Strong Inference That Activision Blizzard Acted with Scienter.**

389.   Activision Blizzard's July 21, 2021, denial of the allegations in the DFEH complaint was a false exculpatory statement evidencing its scienter.

390.   In response to public disclosure of the DFEH Complaint, on July 21,

113

2021, the Company issued a press release denying the allegations of the complaint stating in part:

> The DFEH includes distorted, and in many cases false, descriptions of Blizzard's past. We have been extremely cooperative with the DFEH throughout their investigation, including providing them with extensive data and ample documentation, … .

391.   This denial was a false exculpatory statement and evidences consciousness of guilt that is strong evidence of scienter.

392.   Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Activision Blizzard, including each high-ranking officer or director, is imputable to the Company. The knowledge of each of these individuals should therefore be imputed to Activision Blizzard for the purposes of assessing corporate scienter.

393.   Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Activision Blizzard as an entity. Corporate scienter may be alleged independent of individual defendants where others high-level employees are aware that a statement was false or misleading. Brack and Michael Morhaime were both aware of the EEOC and DFEH Investigations and pervasive misconduct at Blizzard and, as Presidents of one of the Company's three units, their knowledge is imputed to the Company.

## NO SAFE HARBOR

394.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.

395.   *First*, the statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

396.   *Second*, the safe harbor does not to apply statements "included in a

financial statement prepared in accordance with [GAAP]." 15 U.S.C § 78u-5(b)(2)(A). Since all of the misstatements in this Complaint appear in the Company's consolidated financial statements, which were prepared according to GAAP, the safe harbor does not apply to any of them.

397.   *Third*, to the extent that the statements can be characterized as forward-looking, only the second clause of the second sentence of each statement was forward-looking ("we do not expect them to have a material adverse effect"), and that does not render the rest of each statement forward-looking. Accordingly, the statements "we are party to routine…investigations…arising from the ordinary course of business…" and "[i]n the opinion of management, after consultation with legal counsel, such routine claims and lawsuits are not significant" are not forward looking.

398.   *Fourth*, to the extent certain of the statements alleged to be false and misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made.

399.   *Fifth*, to the extent certain of the statements alleged to be false and misleading may be characterized as forward looking, they were not accompanied by meaningful cautionary language. The language "[w]e may be involved in legal proceedings that have a negative impact on our business" that appeared in the risk disclosures in the Company's public filings during the Class Period is not close to sufficient. Since that risk disclosure would apply to virtually any public company, it does not affect the reasonableness of reliance and materiality of the misstatements at issue in the case, and, therefore, does not qualify as meaningful cautionary language. Additionally, the risk disclosures are themselves misleading and exacerbate the misleading nature of the Defendants' misstatements about the Investigations that Activision Blizzard was subject to because they represent as hypothetical risks actual events that had already transpired.

400.   *Sixth*, to the extent certain of the statements alleged to be false and

115

misleading may be characterized as forward looking the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Activision Blizzard who knew that the statement was false when made (*see* Paragraphs 354-374).

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

401. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Activision Blizzard securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Activision Blizzard, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

402. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Activision Blizzard securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

403. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

404. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

405. Common questions of law and fact exist as to all members of the

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Activision Blizzard;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Activision Blizzard to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Activision Blizzard securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

406. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

407. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

117

- Activision Blizzard's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, Activision Blizzard filed periodic public reports;

- Activision Blizzard regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Activision Blizzard's securities were liquid and traded with sufficient volume during the Class Period; and

- Activision Blizzard was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

408.   Based on the foregoing, the market for Activision Blizzard securities promptly digested current information regarding Activision Blizzard from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

409.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## <u>COUNT I</u>
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder <u>Against All Defendants</u>

410.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

411.   This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

412.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

413.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

•    employed devices, schemes and artifices to defraud;

•    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

•    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Activision Blizzard securities during the Class Period.

414.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Activision Blizzard were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Activision Blizzard, their control over, and/or receipt and/or modification of Activision Blizzard's allegedly materially misleading statements, and/or their associations with the Company which made them privy to

119

confidential proprietary information concerning Activision Blizzard, participated in the fraudulent scheme alleged herein.

415.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Activision Blizzard personnel to members of the investing public, including Plaintiff and the Class.

416.   As a result of the foregoing, the market price of Activision Blizzard securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Activision Blizzard securities during the Class Period in purchasing Activision Blizzard securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

417.   Had Plaintiffs and the other members of the Class been aware that the market price of Activision Blizzard securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Activision Blizzard securities at the artificially inflated prices that they did, or at all.

418.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

419.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

suffered in connection with their purchase of Activision Blizzard securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

420.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

421.   During the Class Period, the Individual Defendants participated in the operation and management of Activision Blizzard, and conducted and participated, directly and indirectly, in the conduct of Activision Blizzard's business affairs. Because of their senior positions, they knew the adverse non-public information about Activision Blizzard's misstatement of revenue and profit and false financial statements.

422.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Activision Blizzard's financial condition and results of operations, and to correct promptly any public statements issued by Activision Blizzard which had become materially false or misleading.

423.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Activision Blizzard disseminated in the marketplace during the Class Period concerning Activision Blizzard's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Activision Blizzard to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Activision Blizzard within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Activision Blizzard securities.

121

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

424.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Activision Blizzard.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)   declaring this action to be a proper class action, designating Plaintiff Jeff Ross as Lead Plaintiff and certifying him as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)   awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)   awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: May 18, 2022

**THE ROSEN LAW FIRM, P.A.**

/s/*Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Brian B. Alexander, Esq. (*pro hac vice*)

122

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: balexander@rosenlegal.com

*Lead Counsel for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS