Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY CHENG, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>ACTIVISION BLIZZARD, INC., ROBERT A. KOTICK, DENNIS DURKIN, SPENCER NEUMANN, ARMIN ZERZA, and BRIAN KELLY,<br><br>     Defendants. | Case No. 2:21-cv-06240-PA-JEM<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><u>CLASS ACTION</u><br><br>JUDGE:  Hon. Percy Anderson<br>HEARING: August 15, 2022<br>TIME:     1:30 p.m.<br>CTRM:    9A |

---

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                               2:21-cv-06240-PA-JEM

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND AND SUMMARY OF NEW ALLEGATIONS .......3

    A.   Defendants' Misstatements About the Investigations. ...........................3

    B.   The Court's Order on the FAC. ...............................................................3

    C.   The SAC's Allegations. ...........................................................................3

    D.   The Investigations Become Public, Causing Chaos at Activision. .........8

ARGUMENT ......................................................................................................9

    I.     THE SAC ALLEGES ACTIONABLE MISSTATEMENTS. .....................9

    A.   The Statements That the Investigations Were "Routine" and in the "Ordinary Course of Business" Were Not Opinion Statements. ...........11

    B.   The Statements That the Investigations Were "Routine" and in the "Ordinary Course of Business" Were False and Misleading. ...............12

    C.   The Statements That the Investigations Were "Not Significant " or Expected to Have "a Material Adverse Effect" Were Misleading ........18

    II.   THE SAC ALLEGES SCIENTER. .........................................................19

    A.   Defendants Made Misstatements Knowingly or Recklessly. ................19

    B.   The SAC's Motive Allegations Support the Inference of Scienter. ......22

    C.   The SAC Alleges Corporate Scienter. ..................................................23

    III.  THE SAC ALLEGES LOSS CAUSATION. ...........................................24

CONCLUSION ................................................................................................25

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC              2:21-cv-06240-PA-JEM

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Ansell v. Laikin*,
   2011 WL 3274019 (C.D. Cal. Aug. 1, 2011) .................................................... 16, 24

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ...................................................................... 10

*Bond v. Clover Health Invs.*, Corp.,
   2022 WL 602432 (M.D. Tenn. Feb. 28, 2022) ............................................ 12, 15

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020) ....................................................... 24

*Erickson v. Corinthian Colleges*, Inc.,
   2015 WL 12732435 (C.D. Cal. Apr. 22, 2015) ......................................... 24

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ...................................................... 16

*Hollinger v. Titan Cap. Corp.*,
   914 F.2d 1564 (9th Cir. 1990) ................................................................. 23

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ........................................... 25

*In re Finisar Corp. Sec. Litig.*,
   2017 WL 1549485 (N.D. Cal. May 1, 2017) ............................................. 21

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ................................................................. 24

*In re Herbalife, Ltd.,*
   2015 WL 7566616 (C.D. Cal. Nov. 23, 2015) ........................................... 17

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) .......................................................... 12

*In re MannKind Sec. Actions*,
 835 F. Supp. 2d 797 (C.D. Cal. 2011) ....................................................................... 23

*In re Quantumscape Sec. Litig.*,
 2022 WL 137729 (N.D. Cal. Jan. 14, 2022) .............................................................. 11

*In re Skechers USA, Inc. Sec. Litig.*,
 444 F. Supp. 3d 498 (S.D.N.Y. 2020) ...................................................................... 12

*In re Stac Elecs. Sec. Litig.*,
 89 F.3d 1399 (9th Cir. 1996) .................................................................................... 17

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012) .............................................................................. 16, 21

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .................................................................. 24

*Karinski v. Stamps.com, Inc.*,
 2020 WL 281716 (C.D. Cal. Jan. 17, 2020) .............................................................. 24

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
 2018 WL 1230570 (C.D. Cal. Jan. 8, 2018) .............................................................. 18

*Maiman v. Talbott*,
 2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ........................................................... 19

*Mandalevy v. Bofi Holding, Inc.*,
 2021 WL 794275 (S.D. Cal. Mar. 2, 2021) ............................................................... 23

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
 164 F.Supp.3d 568 (S.D.N.Y. 2016) ............................................................. 10, 18, 21

*Mineworkers' Pension Scheme v. First Solar Inc.*,
 881 F.3d 750 (9th Cir. 2018) ............................................................................. 24, 25

*Mulderrig v. Amyris, Inc.*,
 492 F. Supp. 3d 999 (N.D. Cal. 2020) ............................................................... 19, 21

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
 320 F.3d 920 (9th Cir. 2003) ......................................................................... 9, 19, 23

- iii -

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ..................................................................................... 11, 18

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) .................................................................................. 9

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ................................................................................ 19

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ..................................................... 20

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ......................................................................... 10, 20

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) ............................................................... 12

*Smith v. NetApp, Inc.*,
    2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) ....................................................... 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..................................................................................... 19, 23

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ..................................................... 18

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ................................................................................ 12

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................... 20

**Rules**

Fed. R. Civ. P. 15 .......................................................................................................... 25

### <u>INTRODUCTION</u>

Activision Blizzard, Inc. ("Activision" or the "Company")  is one the largest developers and publishers of video games, and operates esports leagues, which are competitive video game playing leagues. ¶65.[1] The SAC alleges that Defendants[2] misled investors during the Class Period[3] by representing that any existing investigations that the Company had not disclosed were "routine," in the "ordinary course of business," "not significant," and that they did not "expect them to have a material adverse effect."

The Court dismissed the First Amended Complaint ("FAC") finding it did not plead contemporaneous facts showing that undisclosed U.S. Equal Employment Opportunity Commission (the "EEOC") and California Department of Fair Employment and Housing (the "DFEH") investigations into Activision (the "Investigations") were (1) not "routine" and in the "ordinary course of business," (2) "significant," or (3) expected "to have a material adverse effect" on the Company.

The Second Amended Complaint (the "SAC") pleads five *new* reasons why Defendants' statements were false and misleading at the time they were made. *First*, the EEOC Commissioner's Charge and DFEH Director's Complaint initiating the Investigations are rarely used mechanisms reserved for investigations into serious systemic misconduct. *Second*, according to a confidential witness who worked in the

---

[1] All paragraph references are to the Second Amended Complaint ("SAC", ECF No. 78) unless otherwise specified.

[2] Defendants are Activision, Robert Kotick ("Kotick"), Activision's CEO and a director since 1991; Dennis Durkin ("Durkin") Activision's CFO from March 2012 to May 2017 and from January 2019 to April 2021 and Chief Corporate Officer in between; Spencer Neumann ("Neumann") Activision's CFO from May 2017 to January 2019; Armin Zerza ("Zerza"), Activision's CFO from April 2021 to present and served as Chief Operating Officer ("COO") of Blizzard from October 2017 to April 2021 and CFO of Blizzard from August 2015 to September 2017; Brian Kelly ("Kelly"), Activision's Chairman of the Board since 2013, Co-Chairman of the Board from October 1998 to 2013, and director since 1995. ¶¶54-58.

[3] The Class Period in the case is November 8, 2018 to November 16, 2021. ¶1

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                2:21-cv-06240-PA-JEM

Activision Human Resources ("HR") Department, executives at the Company told HR to make significant changes to the investigation and documentation of sexual harassment and other complaints specifically due to the EEOC Investigation. *Third*, Activision fired senior leaders Ben Kilgore, Tyler Rosen, and Alex Afrasiabi due to the Investigations. *Fourth*, Activision's Board of Directors was immediately informed of the Investigations. *Fifth*, the Investigations were each very extensive, including*, inter alia*, more than 100 interviews each, longer interviews and depositions with Activision executives and managers, and, in the case of the EEOC, the sending of a survey to all Activision employees. The DFEH also dramatically escalated its investigation near the end of the Class Period by serving a broad subpoena on Activision about which it refused to meet and confer. The subpoena would have been especially worrisome for Activision because it showed that the DFEH was dissatisfied with Activision's cooperation at a critical time where Activision was negotiating with the DFEH about how the DFEH would provide notice of reasonable cause for its allegations.

Additionally, the SAC alleges that Defendants' statements were misleading because it was inevitable that the Investigations would uncover wrongdoing because of the pervasive sexual harassment at Activision. In support of that, the SAC newly alleges that Activision admitted in its Amended Answer to the DFEH's Amended Complaint (the "DFEH Answer", *see* SAC ¶15) that complaints about harassment were raised with Activision HR and certain executives, including with J. Allen Brack, the President of the Blizzard Entertainment ("Blizzard") segment where the misconduct was concentrated and that Brack also spoke with high-level Blizzard employee Afrasiabi about his sexual harassment of employees in 2015 and 2016.

The SAC also newly alleges that Defendant Kotick made the misstatements with scienter because he knew that the Company was making major changes to its HR processes in response to the EEOC investigation, based on his regular one-on-one meetings with Chief People Officer, Claudine Naughton. New confidential

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                                      2:21-cv-06240-PA-JEM

witness allegations also show that Defendant Zerza, who held high level positions at Blizzard from August 2015 to April 2021, knew of the pervasive misconduct there.

Finally, Defendants new argument that the SAC does not plead loss causation is meritless. Questions of loss causation are typically not resolved at the pleading stage and a complaint need only show a causal connection between the fraud and the loss. The loss causation allegations in the SAC clearly meet that standard.

## FACTUAL BACKGROUND AND SUMMARY OF NEW ALLEGATIONS

### A. Defendants' Misstatements About the Investigations.

The DFEH began requesting information from Activision in 2017. ¶95-96. The EEOC and DFEH began the Investigations, which concerned systemic sexual harassment, discrimination, and retaliation at Activision by Commissioner's charge on September 26, 2018 and Director's Complaint on October 12, 2018, respectively. ¶¶93-98. Defendants did not disclose either Investigation and instead misled investors for more than two years by stating in Activision's 10-Ks and 10-Qs from November 8, 2018 through May 4, 2021 that all undisclosed investigations were "routine," in "the ordinary course of business," "not significant," and that they did not "expect them to have a material adverse effect." ¶¶328-346.

### B. The Court's Order on the FAC.

On April 18, 2022, the Court granted Defendants' Motion to Dismiss the FAC with leave to amend ("MTD Order"). ECF No. 75. The Court held that Plaintiffs had not established falsity for the statements concerning the investigations because the allegations constituted "fraud-by-hindsight" and "absent particularized, temporal facts, are insufficient to support a claim of securities fraud." *Id* at 13. The Court further held that the FAC's allegations of scienter were insufficient since they arose largely from the same facts as the allegations of falsity. *Id.* at 16.

### C. The SAC's Allegations.

The SAC contains additional detailed allegations showing falsity and scienter. *Commissioner's Charge and Director's Complaint.* The SAC pleads facts

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                    2:21-cv-06240-PA-JEM

demonstrating that the EEOC and DFEH utilized mechanisms reserved for investigations into serious systemic misconduct when they commenced their respective Investigations into Activision's misconduct. ¶¶103-108. In 2018, the Commissioner's charge against Activision was only one of 11 the EEOC brought in the entire country and that number decreased further to 9 in 2019 and 3 in both 2020 and 2021. ¶106. The DFEH only brought 4 Director's Complaints in 2019 and 3 in 2020 and in each of those years the DFEH had only 10 additional ongoing Director's Complaint based investigations. ¶108.

*Changes to HR.* The SAC also pleads for the first time that the Investigations prompted Activision to make significant changes to its HR procedures. According to CW2, who held multiple high level positions in Activision HR between 2015 and 2020, including HR Business Partner, all of the Activision HR Business Partners began having regular meetings with the Company's legal team in fall of 2018 — right after the Investigations started. ¶¶109, 112. At those meetings, Activision's executives told the HR Business Partners, including CW2, that HR must start documenting all sexual harassment and other internal complaints **specifically because the EEOC was investigating the Company**. ¶112. Prior to this, Activision's HR did not have a formal process for investigating or consistently documenting complaints. *Id.* There were also no regular meetings between all of HR and the legal department. *Id.* Defendant Kotick knew about these changes to HR because he had regular one-on-one meetings with Activision's Chief People Officer, Claudine Naugton. ¶¶111, 113. Activision admitted in its DFEH Answer that it conducted an internal investigation of practices and policies of HR in 2018. ¶114.

In 2019, clearly building on the decision to formalize and standardize the complaint process throughout the Company, Activision changed the reporting structure of HR, so that it reported directly to the Company's corporate office. ¶115. A spokeswoman for Activision admitted it made this change because the more decentralized prior setup had "occasionally allowed some employees to conduct

themselves in truly regrettable ways." *Id.*

*Firing of Senior Employees.* The SAC also pleads for the first time that Ben Kilgore, Blizzard's CTO, Tyler Rosen, Senior Manager of Global Business Strategy & Operations, and Alex Afrasiabi, the Senior Creative Director of World of Warcraft (Blizzard's most profitable game), were fired due to the Investigations. Those senior leaders were longtime sexual harassers, who were considered untouchable due to their importance to the Company, but then abruptly fired in August 2018, October 2018, and May 2020, respectively, for sexual misconduct. ¶117-127. CW2 stated that the Investigations were the only possible explanation for their firings given that there had been sexual harassment complaints pending against each for years before the Company fired them. ¶118. CW2 believed that the Company protected Kilgore, Rosen, and Afrasiabi for so long because they were critical talent that the Company needed. *Id.* CW3, who served as Editor of World of Warcraft Global – an Activision publication that covered the game that Afrasiabi worked on – stated that the Investigations were the only plausible explanation for Afrasiabi's firing because Afrasiabi was in the midst of developing a game that the Company had spent millions on and then "he just all of a sudden disappeared for no reason," costing the Company millions of dollars ¶¶120-121. According to *The Wall Street Journal ("WSJ")*, Defendant Kotick personally approved Kilgore's firing. ¶129. The *WSJ* also found that Kotick generally "approves high-profile hiring decisions and the exit and pay packages of star developers." ¶128. Thus, Kotick also was certainly aware of and likely also approved Rosen and Afrasiabi's firings. ¶130.

*Informed the Board of Directors.* Activision's Board of Directors sent the *WSJ* a statement disclosing that it had been "informed at all times with respect to the status of [the EEOC and DFEH Investigations]" – *i.e.* since at least the service of the Commissioner's Charge and Director's Complaint. ¶132. The SAC pleads for the first time that, given that Activision is a large Company of 9,500 employees, management's decision to specifically inform the Board about the Investigations is

yet another indication that the Investigations were not routine. ¶¶133, 322.

*The Extensiveness of the Investigations and the Escalation of the DFEH Investigation*. The SAC contains additional allegations concerning the extensiveness of the Investigations and their escalation prior to the end of the Class Period. The EEOC conducted over 100 interviews, including "lengthy interviews" with 10 of Activision's managers and executives, sent an electronic survey to all of Activision's employees, and reviewed thousands of pages of Activision's documents. ¶136. Similarly, the DFEH conducted hundreds of interviews, took 7 depositions, and received 18,000 pages of documents and 7 years of employment data. ¶137.

Additionally, prior to the end of the Class Period, the DFEH escalated its Investigation. In its DFEH Answer, Activision admitted that on April 2, 2021, the DFEH "served a Subpoena Duces Tecum on Activision…which contained 40 requests with numerous subparts" and "reached far beyond the scope of the Director's Complaint." The DFEH then "did not respond to [Activision's] request to meet and confer." ¶¶15, 138. Further, the context of the DFEH's broad subpoena was that Defendants were already preparing for the DFEH to find cause for its allegations. In their DFEH Answer, Defendants also stated that in early 2021, DFEH and Activision discussed extending their tolling agreement (which expired in July 2021) and that they "agreed that, if there was a 'cause' finding, the complexity of the issues warranted the use of a private mediator" instead of a DFEH mediation panel. Rosen Decl. Ex. A. ¶178.[4] At that time, Activision also proposed a pre-mediation meeting "as the channel for DFEH to give notice of the claims on which it had found 'cause'" and "DFEH agreed that such a pre-mediation meeting would be helpful." *Id.*

*Endemic Sexual Harassment and Discrimination.* The SAC adds allegations that Activision made significant admissions about workplace discrimination in its DFEH Answer. Activision admitted that (1) "complaints about harassment, discrimination, and retaliation have been raised with [Activision's] respective HR

---

[4] The Declaration of Laurence M. Rosen ("Rosen Decl."), filed with this opposition.

personnel and to some executives, including to [Blizzard President] J. Allen Brack"; (2) Brack spoke with Afrasiabi about his sexual harassment of women in 2015 and 2016, and (3) Afrasiabi was not fired for sexual misconduct until May 2020. ¶¶149, 226. Those admissions support the DFEH and EEOC's finding that there was pervasive sexual harassment during the Class Period. ¶¶ 140-151; 188-191.

These admissions bolster the other particularized allegations that Brack and Michael Morhaime (Blizzard President prior to October 2018) were specifically informed of pervasive sexual harassment at Blizzard. In addition to Activision's admission of Brack's knowledge, the SAC alleges that (1) the DFEH Complaint stated that an employee on the Battle.net team informed Brack in early 2019 that employees were leaving due to sexual harassment; (2) a Senior Administrative Assistant in Blizzard's Technology Department, who filed a Doe sexual harassment and retaliation lawsuit against Activision, Kilgore, and others, informed Brack in writing on March 14, 2019, about the sexual harassment and retaliation she suffered (new in the SAC); and (3) in January 2019, CW10 emailed Brack that HR was not properly handling sexual harassment complaints. ¶¶180, 227-231. Likewise, a former assistant to Morhaime wrote in a detailed private Facebook post that she informed him and other executives of rampant misconduct and another former Blizzard employee, Kristin Wood Page, stated publicly that she wrote a 2018 letter to Morhaime about the misconduct. ¶¶232-236.

Activision's admission that "harassment, discrimination, and retaliation" was raised with "executives" also reinforces the allegations against Defendant Kotick. The *WSJ* found that Defendant Kotick knew about "allegations of employee misconduct in many parts of the company" for years based on "memos, emails and regulatory requests, and interviews with former employees and others familiar with the company," knew about and approved of Kilgore's firing for sexual harassment in August 2018, and knew about a 2020 email that 30 female employees in the Esports division wrote to their unit leaders complaining of "unwanted touching, demeaning

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                                    2:21-cv-06240-PA-JEM

comments, [and] exclusion from important meetings." ¶¶216-218.

The SAC also newly alleges, based on the personal knowledge of CW12, that Zerza would have known about the misconduct at Blizzard because when he held high-level positions there from August 2015 to April 2021, he worked closely with Brack, Morhaime, and Senior VP of HR Jesse Meschuk. ¶367.

### D. The Investigations Become Public, Causing Chaos at Activision.

On July 20, 2021, DFEH publicly filed its Complaint (the "DFEH Complaint") bringing causes of action alleging, *inter alia*, that Activision had illegally allowed sexual harassment, discrimination, and retaliation and revealing the existence of its investigation. ¶¶267-268. The next day, in an attempt to blunt reaction to the DFEH Complaint, the Company issued an angry denial, stating that the DFEH included "distorted" and "false descriptions of Blizzard's past" and that the Company had been "extremely cooperative" with the DFEH's investigation. ¶269. This denial caused explosive anger across social media — current and former Activision employees shared their stories of abuse and more than 2,000 of the Company's employees signed an open letter calling its response to the DFEH Complaint "abhorrent and insulting" and planned a walkout. ¶¶270-273. When it became clear that the Company's denial rang hallow, the Company's stock fell 6.75% to close at $84.05 on July 27, 2021. ¶275. *Bloomberg Intelligence* attributed the stock drop to "[t]he increasing threat of an exodus of key talent from Activision in the wake of [the DFEH suit]." ¶274.

With his workforce in revolt, Kotick was forced to apologize, but this did not stop hundreds of his employees from walking out in protest. ¶¶276-277. The fallout continued with resignations of Blizzard President Brack and Senior VP of HR Jesse Meschuk in early August. ¶280. The Game Director for Blizzard's upcoming game, Diablo IV, was fired soon thereafter and, in September, the Executive Producer of Blizzard's Overwatch game left, both due to the scandal. ¶¶284, 297.

On September 20, 2021, the *WSJ* reported the SEC had opened an investigation into sexual misconduct and workplace discrimination at Activision and subpoenaed

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                    2:21-cv-06240-PA-JEM

Defendant Kotick. ¶292. A *Bloomberg Intelligence* report issued the same day stated that it could compromise Activision's ability to execute new games, including Diablo IV and Overwatch 2. ¶293. On September 20 and 21, 2021, the Company's stock dropped more than 8% to $73.03. ¶294. On September 27, 2021, the EEOC filed suit against the Company in federal court, alleging pervasive harassment, discrimination, and relation. The Company settled with the EEOC by agreeing to an onerous three-year consent decree and an $18 million monetary penalty. ¶¶298-304.

During its November 2, 2021 earnings call, Activision admitted the departures of Overwatch and Diablo's leadership, which were caused by the fallout from the Investigations, would cause the next installments of, and consequently revenues tied to, those games to be delayed. ¶¶311-315. The Company's stock went into free fall, dropping 14% to $66.75 ¶320. Contemporary analyst reports confirmed that this drop was due to the game delays and traced that directly back to the scandal caused by the Investigations. ¶¶316-319. On November 16, 2021, the *WSJ* published its report that Defendant Kotick knew about sexual misconduct for years. ¶321. The Company's stock declined 8.3% from its daily high to close at $66.14. ¶324.

## ARGUMENT

On a Rule 12(b)(6) motion, "[a]ll allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff" and "[a] complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts...that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003) ("*America West*").

### I. THE SAC ALLEGES ACTIONABLE MISSTATEMENTS.

"A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011).

MEM. OF PTS. AND AUTH. IN OPP. TO MTD SAC                    2:21-cv-06240-PA-JEM

In each 10-K and 10-Q filed between November 2018 and May 2021, Defendants made multiple misstatements. In its 2018 and 2019 10-Ks, Activision enumerated certain legal proceedings followed by the blanket statement:

> "***In addition, we are party to routine claims, suits, investigations…and other proceedings arising in the ordinary course of business***, including with respect to…***employment matters****…*. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business****…*."

¶¶329, 331 (emphasis added).[5] These paragraphs falsely represented that: (i) all claims and investigations not listed were "routine" and "ordinary course," (ii) all such "routine" claims are "not significant," and (iii) management does not expect any of the "routine" claims will have a material adverse effect on the Company. Defendants stated explicitly that this applied to all investigations about "employment matters."

Defendants were not required to speak about what ongoing investigations Activision was facing, but once Defendants spoke about them, they were bound to do so in a way that was not misleading. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (general statement about work backlog triggered requirement to disclose that some of the backlog was subject to stop work orders); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 702, 707-708 (9th Cir. 2016) (mention of requirement to conduct preclinical animal studies in SEC filing put their results at issue); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F.Supp.3d 568, 574-575, 584 (S.D.N.Y. 2016) ("*Och-Ziff*") (by stating that "the Company is currently not subject to any pending judicial, administrative or arbitration proceedings that are expected to have a material impact on the Company's consolidated financial statements," "Och-Ziff opted to speak on the subject of investigations").

---

[5] The 2nd Quarter 2019 10-Q is functionally the same. ¶339. The 2020 10-K and other 10-Qs each have similar language starting from "we are party to routine…." ¶¶337, 345.

| MEM. OF PTS. AND AUTH. IN OPP. TO MTD SAC | 2:21-cv-06240-PA-JEM |
|---|---|

### A. The Statements That the Investigations Were "Routine" and in the "Ordinary Course of Business" Were Not Opinion Statements.

Defendants attempt to argue the sentence "we are party to routine claims, suits investigations…and other proceedings arising in the ordinary course of business, including with respect to…employment matters" is an opinion, but the statement contains no language modifying "routine" or "ordinary course of business" indicating they are opinions. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (explaining that opinions are prefaced with modifiers like "I believe" or "I think," such as "I think the coffee is hot"). Defendants' sole basis for this point that because *the next sentence* is an opinion statement, "context" makes the first sentence — the "routine" statement — an opinion statement. Defendants' Motion to Dismiss SAC ("Mot.") at 14-15. This argument is unavailing, however, since the context supports the opposite. When addressing whether the statement was forward-looking in its Order on the FAC, the Court held that the "routine" statement is "a statement of ***present fact***" (emphasis added). Order at 13. That affirmative statement of fact is followed by a sentence that is clearly demarcated as an opinion since it starts with "[I]n the opinion of management." It would have been easy for Defendants to similarly indicate that "routine" and "ordinary course" were also opinions instead of present facts, but Defendants, who reviewed and signed statements, elected not to do that — the Court should not allow them to make *post hoc* changes to their statements.

Furthermore, this issue is not even a close call since "embedded statement of facts" within an opinion are still treated as factual statements. *See Omnicare*, 575 U.S. at 185 (explaining that "we use a patented technology to which our competitors do not have access" would be a statement of fact even if prefaced by "I believe our TVs have the highest resolution available because…"); *In re Quantumscape Sec. Litig.*, 2022 WL 137729, at *16 (N.D. Cal. Jan. 14, 2022) (holding that facts contained in statements that started with "we believe" were actionable). Based on

*Omnicare*, even if Defendants had said in the opinion of management, the investigations were not significant and did not expect them to have a material adverse effect *because* they were routine, the "routine" portion of the statement would still be an embedded statement of present fact. In the actual statements, however, fact and opinion are much more clearly separated, so this is a much easier case.[6]

### B. The Statements That the Investigations Were "Routine" and in the "Ordinary Course of Business" Were False and Misleading.

The definition of "routine" is "of a commonplace or repetitious character" and the definition of "ordinary" is "of a kind to be expected in the normal order of events."[7] The recent decision of *Bond v. Clover Health Invs.*, Corp., 2022 WL 602432, at *11, *22 (M.D. Tenn. Feb. 28, 2022), held that statements that company was "subject to routine, regular and special investigations" were misleading because the plaintiff had plausibly pled that a Department of Justice kickback investigation "was not, in context, simply a run-of-the-mill matter that investors had no reason to expect disclosure about." That court noted that "[i]n particular, the plaintiffs have alleged that the ***investigation was well-founded, broad in scope, and likely to uncover wrongdoing***" *Id.* at *22 (emphasis added). That court further held that the defendants would have "ample opportunity to argue that that characterization was false," but it was "required, at this stage, to accept the plaintiffs' particularized, well-pleaded allegations as true for the purposes of the motion to dismiss." *Id.*

The SAC contains numerous new allegations, which when combined with the FAC's allegations, demonstrate that when Defendants issued the statements the

---

[6] Defendants' cases are easily distinguishable. *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15-16 (S.D.N.Y. 2016) (court did not address whether portion of disclosure was not an opinion and noted that portion that could have potentially been construed as a present fact was accurate); *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (off the cuff statement during earnings call was in response to question of what defendant's "expectation" was). *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 (9th Cir. 2022) and *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020) do not concern opinion statements.

[7] *See* https://www.merriam-webster.com/dictionary/routine and https://www.merriam-webster.com/dictionary/ordinary.

MEM. OF PTS. AND AUTH. IN OPP. TO MTD SAC                    2:21-cv-06240-PA-JEM

Investigations were anything but "commonplace" or "run-of-the-mill."

*Commissioner's Charge and Director's Complaint.* EEOC Commissioner's Charges and DFEH Director's Complaints are extremely rare and reserved for accusations of serious systemic misconduct. ¶¶103-108. Defendants' assertion that the regulatory outcome was not "absolutely certain" and that EEOC and DFEH "both reject the notion that a Commissioner's Charge or Director's Complaint means either agency has concluded there has been any violation of law" (Mot. at 10) are irrelevant.[8] The inquiry as to falsity is whether the Investigations were more than "routine" and "ordinary." Given the data demonstrating the objective rarity of the Investigations, Defendants' description of them was patently false. ¶¶106, 108.

*Changes to HR.* CW2, who held multiple high-level positions in Activision's HR department, stated that in fall of 2018, shortly after the Investigations officially began, all of Activision's HR Business Partners began having regular meetings with the Company's legal team where the Company's executives told them to start documenting all sexual harassment and other internal complaint. ¶¶109, 112. The SAC alleges that executives specifically told CW2 and other HR Business Partners that the reason they were making these changes ***was because the EEOC was investigating the Company.*** ¶112. Defendants simply ignore this allegation, asserting that Plaintiffs are asking the Court to "infer" cause and effect. Mot. at 11.[9] The 2019 change in Activision's HR reporting structure was part and parcel of the immediate changes Activision made in response to the EEOC Investigation — centralizing HR's reporting structure by having it report to corporate is a logical next step from formalizing the complaint process throughout the company. ¶115 Furthermore, Activision admitted it changed its HR operations specifically because of problems with sexual harassment and discrimination. *Id.*

---

[8]Also, Defs.' Ex. H is referring to complaints of individuals, not Director's Complaints.

[9] In any event, *Smith v. NetApp, Inc.*, 2021 WL 1233354, at *6 (N.D. Cal. Feb. 1, 2021) is not applicable here since it concerns the temporal proximity between a misstatement and contradictory disclosure.

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                2:21-cv-06240-PA-JEM

Defendants recast the SAC as alleging that the only statements they made is that in the opinion of management, the Investigations were not likely to have a material adverse effect on the Company. In truth, the SAC clearly alleges Defendants repeatedly stated as a matter of present fact that all investigations were "routine" while the Company undertook a dramatic change with respect to its HR practices specifically because of the EEOC Investigation. The SAC's additional allegations concerning the Company's policy changes in response to the Investigations is yet another fact evidencing that the Investigations were not "ordinary" or "routine."

*Firing of Senior Employees.* The SAC establishes that Kilgore, Rosen, and Afrasiabi were all long-time sexual harassers that the Company unexpectedly and abruptly fired — Kilgore and Rosen right around when the Investigations started (August and October 2018, respectively) and Afrasiabi in May 2020. ¶¶117-127. Defendants assert that the Court should disregard these allegations because CW2 and CW3 strongly believe that the Investigations were the only possible explanation for the firings, but did not have personal knowledge of that. CW2 did, however, have personal knowledge that the Company perceived Kilgore, Rosen, and Afrasiabi as too valuable to fire and then abruptly let them go and CW3 had personal knowledge that Afrasiabi was in the midst of developing a game that the Company had spent millions on and then he was suddenly fired, costing the Company millions of dollars. ¶¶118, 121. Given CW2 and CW3's personal knowledge of these strongly suggestive facts and their strong belief that the firings were due to the Investigations, it is reasonable to attribute the firings to the Investigations on a motion to dismiss where all reasonable inferences are construed in favor of the Plaintiffs. The abrupt firing of senior employees after the Company had protected them for so long is circumstantial evidence demonstrating that the Investigations were not routine — indeed, CW2 and CW3's statements show that their firings were shocking.

*Informed the Board of Directors.* Activision's Board of Directors told the *WSJ* that it was informed about the Investigations at all times. ¶132. As Defendants point

out repeatedly, Activision is a large company with 9,500 employees. A company of that size does not inform its board of "ordinary" and "routine" legal matters. Of course, given the rarity and severity of Commissioner's Charges and Director's Complaints it is unsurprising that the Board was apprised of the Investigations.

*The Extensiveness of the Investigations and the Escalation of the DFEH Investigation.* *Bond*, 2022 WL 602432, at *22, held that the broad scope of an Investigation indicates that it is not routine. Here, the EEOC and DFEH each conducted hundreds of interviews and reviewed thousands of pages of documents. The EEOC also conducted "lengthy interviews" with 10 of Activision's managers and executives and sent an electronic survey to *all Activision employees*. DFEH took 7 depositions and collected 7 years of employment data. ¶¶135-137.

At minimum, the DFEH Investigation was no longer routine when, on April 2, 2021 (prior to the May 4, 2021 misstatement), the DFEH served a subpoena on Activision that the Company described as "far beyond the scope of the Director's Complaint" and then did not respond to the Company's meet and confer request. ¶138. Defendants emphasize that the DFEH did not find "cause" prior to June 2021 (Mot. at 9), but, according to its DFEH Answer, Activision was already preparing for a cause finding in early 2021. At that time, Activision and the DFEH discussed extending their tolling agreement, which expired in July 2021, and "agreed that, if there was a 'cause' finding, the complexity of the issues warranted the use of a private mediator." Rosen Decl. Ex. A. ¶178. Furthermore, Activision admitted to proposing a pre-mediation meeting "as the channel for DFEH to give notice of the claims on which it had found 'cause.'" *Id.* That the DFEH served the April 2, 2021 subpoena, indicates that these talks had broken down and that DFEH was likely to file suit.

*Endemic Sexual Harassment and Discrimination.* *Bond*, 2022 WL 602432, at *22, held that if an investigation was "likely to uncover wrongdoing" that was a strong indication it was not routine. That is certainly the case here — both the EEOC and DFEH found that there was pervasive sexual harassment at Activision during the

Class Period. ¶¶140-151. Courts in this circuit routinely consider allegations contained in government agencies' pleadings at the motion to dismiss stage in securities cases. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019) (considering Attorney General Complaint "[b]ecause the Ninth Circuit has relied on comparable documents when deciding motions to dismiss Section 10(b)…claims" (citing *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706 (9th Cir. 2012)); *Ansell v. Laikin*, 2011 WL 3274019, at *3-*4 (C.D. Cal. Aug. 1, 2011) (Anderson, J.) (considering SEC Complaint). Activision has also now admitted in its DFEH Answer that "complaints about harassment, discrimination, and retaliation" were raised with HR and "some executives, including [Blizzard] then—President J. Allen Brack" and that Brack spoke with Afrasiabi about sexual harassment of women in 2015 and 2016. ¶226. Additionally, there are particularized allegations in the SAC that in three separate instances in early 2019, employees informed Brack that sexual harassment was a serious issue at Blizzard and that the previous Blizzard President, Morhaime, was also informed multiple times. ¶¶227-236. As detailed in the scienter section, Defendant CEO Kotick was also aware of serious sexual harassment problems. Thus, knowledge of the pervasive harassment was not cabined to the lower levels of the Company. The DFEH and EEOC's findings of pervasive harassment during the Class Period are further corroborated by the *Washington Post, Bloomberg*, a lawsuit filed by a Jane Doe who worked in Kilgore's Technology department, and the other CWs. ¶¶152-186, 192-214. Accordingly, the Investigations were non-routine because of the inevitable fact that they would uncover wrongdoing because of the pervasive sexual harassment at Activision.

*Other Allegations.* While they may not be sufficient to show falsity by themselves, the allegations that, *during the Class Period*, Activision heavily promoted its "inclusive culture" and the #MeToo movement was constantly in the news, lends support to the position that, in context, the Investigations were objectively not routine. ¶¶256-263. Additionally, Activision's admission, two weeks

- 16 -

after the DFEH filed its complaint, that reputational harm from the DFEH Complaint would likely adversely impact Activision's business shows that —  given the pervasive misconduct at Activision — it was always highly likely the Investigations would lead to reputational harm and therefore unlikely to be routine. ¶¶264-265

*Materiality*. Defendants also claim that their "routine" and "ordinary course of business" misstatements are immaterial, but materiality is "fact-specific" and courts should not grant a motion to dismiss on that ground unless the lack of materiality is "obvious." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996). The Court should reject Defendants' circular argument that the statements are immaterial because they are false only in hindsight. Mot. 15. As discussed above, numerous facts evidence Defendants' awareness that the Investigations were not "routine" long before the DFEH's  July 20, 2021 Complaint: (1) the Investigations were non-routine Commissioner's Charges and Director's Complaints the moment they started and the Board of Directors was informed about them immediately; (2) the HR changes started immediately in fall of 2018 and were followed by a complete HR restructuring in 2019; (3) Activision fired Kilgore and Rosen before the first misstatement and fired Afrasiabi in May 2020; (4) Activision expressed concern about a cause finding by DFEH, and DFEH served its expansive subpoena before the last statement Defendants made; (5) there are a multitude of allegations concerning sexual harassment at Activision during the Class Period.

Defendants also assert their statements were immaterial because Activision's stock did not drop immediately, but, as discussed further in the loss causation section, the SAC pleads that the Investigations caused the stock to drop from $91.51 before the DFEH filed its complaint to $66.14 a share at the end of the Class Period. Activision's stock, which closed at $76.54 on July 12, 2022, has still not recovered. *See* Rosen Decl. Ex. B.[10]

---

[10]*In re Herbalife, Ltd.,* 2015 WL 7566616, at *2 (C.D. Cal. Nov. 23, 2015) is easily distinguishable because the market was already largely aware of what allegedly made the statements misleading, the stock price was climbing less than a week after disclosure and

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                    2:21-cv-06240-PA-JEM

## C. The Statements That the Investigations Were "Not Significant" or Expected to Have "a Material Adverse Effect" Were Misleading.

Defendants' opinion statements "[i]n the opinion of management… such routine claims are not significant and we do not expect them to have a material adverse effect on our business…" are two separate misleading statements strung together by the conjunction "and." Thus, the Court should evaluate each statement separately.  Opinion statements are actionable where a plaintiff identifies "particular (and material) facts going to the basis for the…opinion…whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare,* 575 U.S. at 194; *see also Todd v. STAAR Surgical Co.,* 2016 WL 6699284, at *8-*9 (C.D. Cal. Apr. 12, 2016) (holding that opinion statement "[STAAR] believes it is substantially in compliance with the FDA's [regulations]" was misleading because STAAR failed to disclose FDA violations).[11] Here, Defendants' omission of the Investigations made Defendants' statement that all undisclosed investigations were "not significant" or "expected to have a material adverse effect" is misleading to a reasonable person reading the statement fairly and in context. *See Och-Ziff*, 164 F.Supp.3d at 584 (treating the statements at issue as opinions and holding that "Plaintiffs have plausibly alleged that Och-Ziff's projections about the likely impact of regulatory proceedings were based on omitted facts that, if disclosed, would have conflicted with what a reasonable investor would have taken from Och-Ziff's statements themselves"). Notably, this case is even stronger than *Och Ziff* because Defendants also stated that all undisclosed investigations were "not significant." "Significant" is defined as "having or likely to

---

continued to rise over the next two weeks, and plaintiff bought more shares after the corrective disclosure.

[11] In *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2018 WL 1230570, at *4 (C.D. Cal. Jan. 8, 2018), this Court held an opinion statement was non-actionable because plaintiffs did not "identify facts going to the basis of the [preliminary purchase price allocation] that rendered it misleading to a reasonable person." In contrast, here the undisclosed fact was that the DFEH and EEOC were occurring when Defendant made the misstatements.

MEM. OF PTS. AND AUTH. IN OPP. TO MTD SAC                    2:21-cv-06240-PA-JEM

have influence or effect."[12]

Taking all inferences in Plaintiffs' favor, the SAC has pled that failure to disclose the Investigations rendered the statements misleading because: (1) the significance of the Investigations was evident at their inception given the unusual Commissioner's Charge and Director's Complaint and the fact the Activision Board was informed; (2) only a significant investigation would cause such sweeping changes to HR and prompt the Company to fire key employees that the Company had previously insulated despite their misconduct; (3) of the scope of the Investigations, and if the significance and potential to have a material adverse effect was not clear prior, it was certainly clear when the parties started negotiating over mediation and the DFEH suddenly served an expansive subpoena; and (4) the danger of the Investigations was further evident to Defendants during the Class Period because of the pervasive misconduct at Activision, the ongoing #MeToo Movement, and the emphasis the Company put on its alleged commitment to diversity and inclusion.

## II.  THE SAC ALLEGES SCIENTER.

When considering scienter, a court must "first accept all factual allegations in the complaint as true" and "consider the complaint in its entirety." *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014). Scienter may be pled by alleging "knowledge of the falsity as well as 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (quoting *America West*, 320 F.3d at 937). When the inference of fraud is at least *equally* as likely as any non-culpable explanation, scienter is pled. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). "The Supreme Court has now made clear...that a tie goes to the Plaintiff." *Maiman v. Talbott*, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010).

### A. Defendants Made Misstatements Knowingly or Recklessly.

The SAC pleads that Defendant Kotick made misstatements knowingly or recklessly. Kotick certified that every statement was not misleading pursuant to

---

[12] https://www.merriam-webster.com/dictionary/significant.

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD SAC                    2:21-cv-06240-PA-JEM

Sarbanes Oxley ("SOX") and there is no dispute that he was aware of the Investigations and that, as a member of the Activision Board, he was aware it was informed about them. ¶¶328-345, 354-357. As the SAC pleads (for the first time), CW2 stated that Kotick would have known about HR having regular meetings with the legal department and the new mandate executives gave to HR to start documenting all complaints and instituting a formal process for investigating them *specifically because of the EEOC Investigation* because Kotick had regular one-on-one meetings with Chief People Officer, Claudine Naughton, who reported directly to him. ¶¶111-113. This occurred *at the beginning of the class period* in fall of 2018. For the same reasons, Kotick knew that HR was restructured in 2019 such that it directly reported to corporate and knew that the Company enacted this change because the previous setup allowed employees to commit misconduct. ¶¶115, 359.

Kotick also approved the firing of Kilgore for misconduct right before the Class Period in August 2018. ¶129. Furthermore, because, as the *WSJ* found, "Mr. Kotick approves high-profile hiring decisions and the exit and pay packages of star developers, and he is typically aware of any major problems in each of Activision's 12 development studios and three major business units," he would have also approved or at least known about the firing of Rosen in 2018 and Afrasiabi in 2020. ¶128.

The fact that in immediate response to the Investigations Activision changed its corporate procedures and fired key employees is a strong indicator of scienter. *Schueneman*, 840 F.3d at 708 (that company made internal effort to respond to the FDA, while failing to disclose the FDA's concerns to investors contributed to an inference of scienter). Additionally, the accounts of CW2 and other CWs are specific enough to plead scienter. *See Roberts v. Zuora, Inc.*, 2020 WL 2042244, at \*10–11 (N.D. Cal. Apr. 28, 2020) (CW allegations sufficient despite lack of direct contact with the defendants); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 n.4 (9th Cir. 2009) ("[U]nder the Court's test in *Tellabs*, which explicitly rejected any standard which would 'transpose to the pleading stage the test that is used at the

summary judgment and judgment-as-a-matter-of-law stages…' the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus.").

Further, the *WSJ* found that Kotick was aware of "allegations of employee misconduct in many parts of the company," based on "memos, emails and regulatory requests, and interviews with former employees and others familiar with the company" (¶216), a 2020 email by 30 female employees in Activision's Esports division that said they experienced "unwanted touching" and "demeaning comments" (¶218), sexual assault at Activision's Sledgehammer and Treyarch Studios from 2016-2019 (¶¶219-221), and engaged in harassment himself (¶¶222-224).

Accordingly, the SAC amply alleges that Kotick knew about (1) the Investigations and that they were important enough for the Activision Board to be informed, (2) that they prompted the Company to make significant changes to its HR operations and fire key employees, and (3) that illegal sexual harassment took place regularly at Activision such that the Investigations were likely to uncover wrongdoing. This more than suffices to demonstrate Kotick's awareness that his statements were misleading. Further, even if this were not enough to demonstrate Kotick's actual knowledge, given Kotick's SOX certifications, he was, at minimum, reckless when he made the statements since he could have easily found out more information about the nature and progress of the Investigations. *See Mulderrig*, 492 F. Supp. 3d at 1013, 1026-1027 ("It is not necessary for a complaint to establish a strong inference that defendants actually knew contradicting facts since '[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10(b)-5.'" (quoting *Verifone*, 704 F.3d at 708)); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *6-*7 (N.D. Cal. May 1, 2017) (scienter pled based on access to information and what would have been disclosed to defendants). Additionally, courts have inferred scienter from a failure to disclose an investigation where defendants knew about it and non-disclosure made a statement misleading. *See Och-Ziff,* 164

- 21 -

F.Supp.3d at 585 (recklessness plausibly alleged because "Defendants knew about the…Investigation from 2011 onward, but waited to disclose its potential impact").

The SAC also pleads scienter for the other Defendants. Defendants point out that not all the Individual Defendants signed every misstatement, but that point only has any significant application to Neumann, who only signed the 10-Q filed November 8, 2018. ¶ 335. That was, however, after the EEOC and DFEH served their Commissioner's Charge and Director's Compliant, the Company completely overhauled the HR complaint process and started the HR meetings with legal, and fired Kilgore and Rosen. Durkin and Kelly signed filings that covered most of the Class Period — Durkin signed every filing and SOX certificate from February 28, 2019 through February 23, 2021 and Kelly signed 10-Ks on February 28, 2019, February 27, 2020, February 23, 2021. The only significant event that occurred after all the statements that Durkin and Kelly signed was the DFEH serving its broad subpoena. ¶¶328-345. Zerza signed the last statement and certified it under SOX, on May 4, 2021 – after everything that made the statements misleading occurred. ¶344.

Neumann, Durkin, and Zerza all served as Activision's CFO during the Class Period. ¶¶55-57. Accordingly, it was their job to review the misstatements since they were part of Activision's financial statements, and assess their accuracy. ¶354. Given the major changes to HR, the high-profile firings, and the easy accessibility of information about the nature, scope, and progress of the Investigation, Neuman, Durkin, and Zerza were reckless in executing SOX certificates signing off on those statements. Additionally, Zerza held high-level positions at Blizzard from August 2015 to April 2021, and CW12 had personal knowledge that Zerza worked closely with Brack, Morhaime, and Meschuk and, therefore, would have known about the harassment. ¶367. Accordingly, Zerza would have had additional reason to recognize that the Investigations were not routine and were significant to the Company.

**B. The SAC's Motive Allegations Support the Inference of Scienter.**

Even if a motive standing alone is not sufficient, it can meaningfully contribute

to the inference of scienter. See *Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference").  Plaintiffs allege that Kotick was motivated to keep Activision's stock price above $79.96 — the price that the Company's stock had to stay above for 90 days for Defendant Kotick to get a $150 million bonus. ¶¶375-378. Courts in the Ninth Circuit have held allegations that a defendant had a strong incentive to keep the stock price up is supportive of scienter even where there is only a circumstantial connection between the motive and the misstatements. *See Am. West*, 320 F.3d at 944 (holding that desire to receive stock options were "particularized allegations" of motive even though the only connection between the stock options and the statements was that the stock options were based on financial performance); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011) (holding that need to keep company stock price above a specific amount to maintain access to capital "buttresse[d] a finding of scienter"); *Mandalevy v. Bofi Holding, Inc.,* 2021 WL 794275, at *5 (S.D. Cal. Mar. 2, 2021) (because "Defendants' false statement would ward off a drop in stock prices and prevent the investigation from affecting BofI's value,"  defendants "had something to gain from representing that BofI was not…under investigation…."). The Defendants also complain that the SAC does not allege Kotick sold stock, but neither did the defendants motivated by performance incentives in *America West*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period").

**C. The SAC Alleges Corporate Scienter.**

The scienter of each Individual Defendant is imputed to Activision. The Court should also impute scienter from Blizzard President Brack, who was aware of the pervasive culture of harassment and discrimination. ¶¶225-236. As heads of one of Activision's three segments, his individual scienter is imputed to Activision under *respondeat superior*. *See Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1576–77 (9th Cir. 1990) (*respondent superior* is a basis for vicarious liability in securities cases).

Defendants are also wrong that collective scienter is not a viable argument in the Ninth Circuit. A plaintiff can plead corporate scienter without alleging that a particular person had scienter in "circumstances in which a company's public statements [a]re so important and so dramatically false that they [ ] create a strong inference that at least *some* corporate officials knew of the falsity…." *Erickson v. Corinthian Colleges*, Inc., 2015 WL 12732435, at *10 (C.D. Cal. Apr. 22, 2015) (internal quotation marks omitted); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 66281, at *14-*15 (N.D. Cal. Jan. 4, 2017). The statements concerning the Investigations fit into this category. Because they were part of Activision's financial statements and made repeatedly, they were closely vetted. Since, as described above, the Investigations were far from routine, at least some corporate officer must have been aware of their falsity. The Company's obstruction of the DFEH Investigation, *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 548 (S.D.N.Y. 2020), and false denial of the DFEH's allegations, *see Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020), also supports corporate scienter. ¶¶269-272; 285-290.

## III.   THE SAC ALLEGES LOSS CAUSATION.

"Questions of loss causation are typically not to be resolved at the pleading stage." *Ansell*, 2011 WL 3274019, at *4. Ninth Circuit authority directly contradicts Defendants' assertion the brief gap from July 20, 2021 when the DFEH filed its public complaint and the first large stock drop on July 27, 2021 defeats loss causation. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1053, 1057-1058 (9th Cir. 2008) (finding loss causation despite an almost three month lag between corrective disclosure and stock drop and holding "[a] limited temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss causation per se implausible"). In *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-754 (9th Cir. 2018), the Ninth Circuit explained that "[t]o prove loss causation, plaintiffs need only show a 'causal

- 24 -

connection' between the fraud and the loss" and "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." "That a stock price drop comes immediately after the revelation of fraud can help to rule out alternative causes…..*But that sequence is not a condition of loss causation*." *Id.* at 754 (emphasis added); *see also In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *20, *21 (C.D. Cal. Aug. 4, 2014) ("A plaintiff may also establish loss causation by alleging that the defendant's misrepresentations concealed a risk that materialized and played some part in diminishing the value of the security.").

There is a clear causal connection for each stock drop. Defendants did not disclose the Investigations, concealing a risk; after DFEH filed its complaint, Activision strongly denied the allegations, delaying the reaction. ¶269. The DFEH Complaint, however, directly caused the employee unrest that undermined Activision's efforts to minimize the suit and caused the stock to drop on July 27, 2021. ¶¶270-275, 349. The stock next dropped on September 20 and 21, 2021, when the SEC opened an investigation into harassment and discrimination at Activision — the publicity generated by the DFEH Complaint was the but-for cause of the SEC Investigation. ¶¶292-294, 350. Activision stock next dropped 14% on November 3, 2021 because of delays of the latest installments of its Diablo and Overwatch franchises. Activision admitted in its third quarter 2021 earnings call that leadership changes to those games, which were caused by the disclosure of the DFEH and EEOC Investigations, caused the delay and contemporaneous analyst reports supported that. ¶¶ 311-320, 351. Finally, Activision's stock dropped again on November 16, 2021 after a *WSJ* investigation precipitated by the disclosure of the Investigations revealed that Kotick had long known about misconduct at Activision. ¶¶321-324, 352.

## CONCLUSION

Defendants' Motion should be denied. If the Court grants any portion of it, Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15.

DATED: July  13, 2022

**THE ROSEN LAW FIRM, P.A.**

By: *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Brian B. Alexander, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: balexander@rosenlegal.com

*Lead Counsel for Plaintiffs*

- 26 -