1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

GARY CHENG, Individually and on behalf of all others similarly situated,

Plaintiff,

v.

ACTIVISION BLIZZARD, INC., ROBERT A. KOTICK, DENNIS DURKIN, ARMIN ZERZA, and BRIAN KELLY,

Defendants.

Case No. 2:21-cv-06240-PA-JEM

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

CLASS ACTION

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE .......................................................................... 12

PARTIES ............................................................................................................ 13

ALLEGATIONS OF MISCONDUCT ............................................................... 15

  A.    Background of Activision Blizzard. ............................................................ 15

  B.    Relevant Non-Parties ................................................................................. 17

  C.    In Fall of 2018, The EEOC and DFEH Opened Investigations Into
       Activision Blizzard for Systemic Sexual Harassment and Gender
       Discrimination Against Female Employees by Commissioner's Charge and
       Director Complaint, Respectively; the DFEH had Been Requesting
       Information From Activision Blizzard in 2017 ............................................ 24

    1)    The EEOC Initiates an Investigation of Activision Blizzard with a
          Commissioner's Charge on September 26, 2018 ....................................... 24

    2)    The DFEH Begins Requesting Information From Activision Blizzard in
          2017 and Initiates a Formal Investigation Into Systemic Misconduct by
          Serving the Company with a Director's Complaint on October 12, 2018. ....
          ................................................................................................................. 25

  D.    At the Time the EEOC and DFEH Began Their Investigations, Sexual
       Harassment and Discrimination Had Been Endemic For Years at Activision
       Blizzard, Making Those Agencies' Findings of Illegal Systemic Sex
       Harassment and Discrimination at Blizzard Inevitable ............................... 26

    1)    High-level Activision Blizzard Employees Ben Kilgore, Alex Afrasiabi,
          and Tyler Rosen Were Serial Sexual Harassers Who Acted with Impunity
          Prior to the Beginning of the Investigations. ............................................. 28

      a.    Ben Kilgore. ............................................................................... 29

i

        b.   Alex Afrasiabi. ......................................................................... 31

        c.   Tyler Rosen. ............................................................................. 36

    2)   In 2017, an Activision Blizzard Employee who Had Worked at the
         Company for More Than Six Years Committed Suicide Due to Sexual
         Harassment. .................................................................................... 37

    3)   Victims of Harassment Interviewed by Plaintiffs' Investigator and Media
         Investigations Further Show That Sexual Harassment and Retaliation Was
         Pervasive at Blizzard Leading up to the Investigations and that the DFEH
         and EEOC's Findings Were Inevitable. ........................................... 38

        a.   CW3 Stated that She and Other Female Co-workers Were Repeatedly
             harassed and When She Reported it to Human Resources, She was
             Punished. .................................................................................. 39

        b.   CW4 Was Sexual Assaulted During a Cube Crawl and There Were no
             Repercussions for her Assailant. ............................................. 40

        c.   CW5 Suffered Repeated Harassment between 2011 to 2017 and Was
             Threatened With Termination When She Reported it to HR.................. 41

        d.   CW6 was Harassed Herself and Heard the Complaints of Many Other
             Women as a Member of Blizzard's Woman's Counsel in 2017 and 2018.
             ....................................................................................................... 45

    4)   Michael Morhaime, Who Served as Blizzard's President Until October 3,
         2018 — Around the Time the Investigations Began —  Was Aware of the
         Pervasive Sexual Harassment at Blizzard. .................................... 46

    5)   There Was Also Pervasive Sex Discrimination Against Female Employees,
         Especially Those Who Were Pregnant, Mothers, or of Color, by Giving
         Them Fewer Opportunities and Lower Pay, at Activision Blizzard Leading
         up to the Investigations. ................................................................. 47

    6)   After Tolerating Kilgore's Misconduct For Years, Activision Blizzard
         Abruptly Fires Kilgore in August 2018 — Shortly Before the Formal
         Initiation of the Investigations — With the Personal Approval of
         Defendant Kotick. ........................................................................... 52

ii

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

7)  The Culture of Sexual Harassment and Retaliation in Blizzard's Technology Department Was So Toxic and Ingrained That the Harassment and Retaliation Against *Doe* Become Even Worse After the Company Fired Kilgore. ..................................................................................... 55

8)  In Addition to His Knowledge about Kilgore, Defendant Kotick Also Knew About Other Sexual-Misconduct at Activision Blizzard When the DFEH and EEOC Initiated Their Formal Investigations, Including a Rape at Sledgehammer Games, an Activision Blizzard-Owned Studio ............. 57

E.  Starting in October 2017, the #MeToo Movement Led to the Firing of Numerous High Profile Executives at Other Companies, Putting Defendants on Notice of How Dangerous the DFEH and EEOC Investigations Could be to the Company. ............................................................................ 59

F.  EEOC Commissioner's Charges and DFEH Director's Complaints, Which the EEOC and DFEH Used to Formally Begin their Investigations on September 26, 2018 and October 12, 2018, Respectively, Are Rarely Used Mechanisms That Those Agencies Use for Investigations into Systemic Harassment and Discrimination. ................................................. 60

1)  The EEOC's Commissioner's Charge against Activision Blizzard was one of only 11 filed in 2018. ........................................................... 61

2)  The DFEH Filed Only 4 Director's Complaints in 2019 and 3 Director's Complaints in 2020 and in Each of Those Years the Director's Complaint Against Activision Blizzard was Only One of 10 Additional Director's Complaints Under Investigation. ............................................... 62

G.  In Response to the Investigations, Activision Blizzard Made Significant Changes to its Human Resources Procedures, Which Included Instituting a Formal Process for Investigating Sexual Harassment Complaints For the First Time and Instituting Regular Meetings Between Human Resources and its Legal Team. ........................................................................ 62

H.  Activision Blizzard Opens a Parallel Investigation to the EEOC and DFEH's Investigations and Uses it to Obstruct the DFEH Investigation. ................. 64

iii

I.  Activision Blizzard's Management informed the Board of Directors About
    the EEOC and DFEH Investigations. ........................................................... 65

J.  The Existence of the Investigations Was Widely Known at Activision
    Blizzard and They Made a Significant Impression its Employees Because of
    a Recent News Story About Sexism at Competitor Riot Games. ................ 66

K.  In October of 2018, Activision Blizzard Abruptly Fired Tyler Rosen After
    Tolerating His Conduct for Years. ............................................................... 66

L.  Defendants Did Not Disclose the EEOC and DFEH Investigations, and
    Instead Stated On November 8, 2018 that the Company was Party to Only
    "Routine…Investigations" that Arose in "the Ordinary Course of Business,"
    Were "Not Significant," and Not Expected "to Have a Material Adverse
    Effect" on Activision Blizzard's Business. .................................................. 67

M.  In Early 2019, Multiple Employees Informed New Blizzard President Brack
    About the Pervasive Misconduct at Blizzard. ............................................. 68

N.  In Late 2018 and Early 2019, Doe Spoke to An Investigator Hired by
    Activision Blizzard and CW3 Wrote an Email to HR After She Was Fired in
    Retaliation for Making Harassment Complaints. .......................................... 70

O.  On February 28, 2019, Activision Blizzard Again Stated That All the
    Investigations it Was Subject to Were "Routine," Arose in "the Ordinary
    Course of Business," were "Not Significant," and Not Expected "to Have a
    Material Adverse Effect" ............................................................................. 71

P.  Doe Informs President Brack in Writing About the Sexual Harassment and
    Retaliation She Suffered; CW6 Meets with Meschuck and Blizzard's Chief
    Legal Officer; and the Company Makes Another Similar Legal Proceedings
    Statement. .................................................................................................... 72

Q.  Despite Changing the Reporting Structure of its HR Department Due to its
    Inability to Stop Misconduct, Activision Blizzard Again Makes Similar
    False and Misleading Legal Proceedings Statements. .................................. 74

R.  Defendant Kotick Was Directly Involved in Yet Another Sexual Harassment
    Internal Investigation and the DFEH Intervenes in a Class Action Suit

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Against Riot Games; Activision Blizzard Again Makes Similar False and Misleading Legal Proceeding Statements ......................................................75

S.   Activision Blizzard Suddenly Fires Alex Afrasiabi on May 28, 2020, Despite the Fact that it was a Costly Financial Decision. .............................76

T.   In June 2020, the EEOC and DFEH Investigations Caused Activision Blizzard to Create a New Employee Relations Team That Handled All Internal Investigations of Complaints Throughout the Company.................78

U.   Despite the Investigations Causing Activision Blizzard to Completely Overhaul the Internal Complaint Process and Fire Alex Afrasiabi, the Company Continued to Make Similar False and Misleading Legal Proceedings Statements. ................................................................................79

V.   Thirty Female Employees in Activision Blizzard's Esports Division Send an Email Documenting Harassment and Discrimination to Their Unit Leader With Kotick's Knowledge; the Company Makes Another Similar False and Misleading Legal Proceedings Statement. ......................................................80

W.   After Over Two Years of Extensive Investigation Activision Blizzard Internally Acknowledges Significant Risk of a Cause Finding and Attempts to Negotiate with DFEH; Following DFEH's Issuance of a Broad Subpoena DFEH Ignores the Company's Request to Meet and Confer; the Company Makes Another False and Misleading Legal Proceedings Statement ...........81

X.   The Public Disclosure of the Investigations Leads to an Enormous Scandal that Damages Activision Blizzard's Reputation and Productivity, Leading to a Large Decline In The Company's Share Price. .........................................83

1)   On July 20, 2021, the DFEH Publicly filed its Complaint Against Activision Blizzard, Revealing the Pervasive Misconduct at the Company, and Leading to Enormous Reputational Damage, Employee Walkouts, and the Decline of the Company's Share Price. ................................................83

2)   Defendants Admitted That the Investigations Were Material, Not Routine and Significant by Stating in its Public Filings Two Weeks After the DFEH Complaint Was Filed That its Business Could be Adversely Impacted .................................................................................................91

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3)   The Fallout From the DFEH Lawsuit Continues, Including the Resignations of Blizzard's President and Head of Human Resources and the Firing of the Director of Diablo IV ...................................................... 92

4)   The DFEH Amends Its Complaint to Add Claims that Activision Blizzard Obstructed its Investigation. ...................................................... 93

5)   The SEC Opens an Investigation into Sexual Harassment and Workplace Discrimination at Activision Blizzard and Subpoenas Defendant Kotick; Blizzard's Chief Legal Officer and Executive Producer of Overwatch Leave the Company. ...................................................... 96

6)   On September 27, 2021, the EEOC Files a Sexual Harassment, Sex Discrimination, and Retaliation Complaint under Title VII Against Activision Blizzard, and the Company Enters Into a Consent Decree as a Condition of Settlement. ...................................................... 97

7)   Due to the Ongoing Scandal, Activision Blizzard Fires 20 Employees; Cancels its Yearly Showcase; Institutes a "New Zero-Tolerance Harassment Policy"; Waives Required Arbitration of Sexual Harassment and Discrimination Claims; and Defendant Kotick Cuts his Own Base Salary to $62,500. ...................................................... 99

8)   Activision Blizzard Admits That Leadership Changes to Their Diablo and Overwatch Franchises, Forced by the Ongoing Sexual Harassment Scandal, Would Cause the Latest Installments of Those Games to be Delayed and that Jennifer Oneal was Departing from her Position as Co-leader of Blizzard, Leading to a Huge Drop in the Company's Stock. ..... 101

9)   The November 16 *Wall Street Journal* Article is Published Revealing That Defendant Kotick Knew About Sexual-Misconduct Allegations at Activision Blizzard for Years, the Company had Received More Than 500 Harassment and Discrimination Reports From Current and Former Employees Since the DFEH Complaint was Filed, and That Jennifer Oneal Sent an Internal Email Saying She Was "Tokenized, Marginalized, and Discriminated Against" Prior to Her Resignation. ................................... 104

10)  The SEC Widens its Investigation of Activision Blizzard and the DFEH Subpoenas the Police Departments in the Los Angeles Area for Records

vi

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

About Defendant Kotick and 18 Other Current and Former Activision Employees...................................................................................106

FALSE AND MATERIALLY MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD.........................................................................106

A.  Activision Blizzard's SEC Filings Repeatedly Misstated That The Company Was Only "party to routine…investigations" that arose in the "ordinary course of business" and were "not significant" or expected to have "a material adverse effect."....................................................106

LOSS CAUSATION ...........................................................................118

ADDITIONAL SCIENTER ALLEGATIONS ...................................119

A.  The Defendants Acted Knowingly or Recklessly. ......................119

  1)  Defendant Kotick Acted Knowingly or Recklessly. ...............119

    a.  Kotick was Aware of Pervasive Harassment and Discrimination. ........119

    b.  Kotick was Aware of the Investigations and That the Board Had Been Informed About Them..........................................................121

    c.  Kotick was Aware of Significant Changes to the Company's Human Resources Procedures and the Firing of Senior Employees Due to the Investigations. ...................................................................121

    d.  Defendant Kotick Signed SOX Certifications for Each Misstatement..123

  2)  Defendant Durkin Acted Knowingly or Recklessly.................123

  3)  Defendant Zerza Acted Knowingly or Recklessly. .................124

  4)  Defendant Kelly Acted Knowingly or Recklessly. .................124

  5)  Defendants' Obstruction of the DFEH's Investigation Supports a Strong Inference of Scienter.................................................125

vii

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6)   Given the #MeToo Movement and Activision Blizzard's Lip Service to Diversity, Equity, and Inclusion, Defendants Cannot Reasonably Argue that They Did Not or Should Not Have Realized the Importance of the DFEH and EEOC Investigations. ................................................. 125

7)   Defendants Admitted that the Investigations Were Material and Not "Routine" by Stating in the Company's 2Q 2021 10-Q, Filed on August 3, 2021, That its Business Could be Adversely Impacted. ........................... 126

B.   The Individual Defendants Were Motivated to Make the Misstatements. . 127

1)   Defendant Kotick Was Motivated to Make Misstatements by Shareholder Value Creation Incentives in His Employment Agreement. .................... 127

2)   Defendants Sold Millions of Dollars in Activision Blizzard Stock in 2020 and 2021, Before the DFEH and EEOC Filed their Public Complaints. . 128

C.   The Individual Defendants Acted Intentionally or Recklessly When They Approved and Failed to Correct the Aforementioned Misstatements. ....... 129

D.   There is a Strong Inference That Activision Blizzard Acted with Scienter. ............................................................................................................... 129

NO SAFE HARBOR ........................................................................................... 130

PLAINTIFFS' CLASS ACTION ALLEGATIONS ............................................. 132

COUNT I ............................................................................................................. 134

COUNT II ............................................................................................................. 137

PRAYER FOR RELIEF ....................................................................................... 138

JURY TRIAL DEMANDED ................................................................................. 138

viii

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Lead Plaintiff Jeff Ross ("Ross") and named Plaintiffs Gary Cheng ("Cheng"), Micah Ernst ("Ernst"), Michael Noon ("Noon"), Nick Baldwin ("Baldwin"), Chris Martin ("Martin"), and Alejandro Toiber ("Toiber") (collectively, "Plaintiffs" or "Investors"), individually and on behalf of all other persons similarly situated, allege the following based on personal knowledge as to Investors' own acts and upon information and belief as to all other matters based on the investigations conducted by and through Investors' own attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Activision Blizzard, Inc. ("Activision Blizzard" or the "Company"); Activision Blizzard's press releases and earnings call transcripts; public information regarding Activision Blizzard, including information on Activision Blizzard's website; analyst reports and media reports about Activision Blizzard; interviews with former employees of Activision Blizzard and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Investors bring this securities class action on behalf of persons or entities who purchased publicly traded Activision Blizzard common stock on the NASDAQ between November 8, 2018 and November 16, 2021, inclusive (the "Class Period"), and who held such shares on July 27, 2021, and/or September 20, 2021, and/or November 3, 2021, and/or November 16, 2021, and suffered compensable damages thereby (the "Class").[1]

---

[1] Excluded from the Class are: Defendants and their immediate families; the officers and directors of Activision Blizzard at all relevant times; their subsidiaries, affiliates, legal representatives, heirs, successors, or assigns; and any entity in which Defendants or any excluded persons have or had a controlling interest.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

2.      Activision Blizzard is one of the largest developers and publishers of video games for video game consoles, personal computers, and mobile devices. The Company also operates Esports leagues, which are competitive leagues for video game players.

3.      Unbeknownst to investors, on September 26, 2018 and October 12, 2018, respectively, the U.S. Equal Employment Opportunity Commission (the "EEOC") and the California Department of Fair Employment and Housing (the "DFEH") informed the Company they each had opened investigations into the Company (the "Investigations"). In 2017, prior to formally opening its investigation, the DFEH began requesting information from Activision Blizzard.

4.      The Investigations concerned sexual harassment, sexual assault and various forms of gender-based discrimination. The peril this posed to Activision Blizzard would have been readily apparent to Defendants since the EEOC and DFEH opened these Investigations in the wake of the #MeToo Movement, which intensified in late 2017.

5.      The commencement of the Investigations posed grave risks to Activision Blizzard given the disturbing reality that sexual harassment and gender-based employment discrimination *were* endemic at Activision Blizzard — especially at Blizzard Entertainment ("Blizzard"), one of the Company's three segments. Defendants' knowledge of the existence of the Investigations, coupled with Defendants' knowledge that the Company's *modus operandi* was one in which pervasive sexual harassment, sexual abuse and gender discrimination was not only tolerated but was celebrated, (as described herein) apprised Defendants of the fact that the Investigations posed grave risks to Activision Blizzard at the time they began.

6.      Indeed, the DFEH found that ***"[f]emale employees are subjected to constant sexual harassment***, including having to continually fend off unwanted sexual comments and advances by their male co-workers and supervisors" and

2

***"[h]igh-ranking executives and creators engaged in blatant sexual harassment without repercussions."*** (emphasis added). In "a particularly tragic example," the DFEH confirmed that a female employee committed suicide during a business trip after male co-workers passed around a picture of the deceased employee's genitalia at a Company holiday party.

7.    After the DFEH filed a public complaint against Activision Blizzard, on July 20, 2021 (the "DFEH Complaint," attached as **Exhibit 1**, *see DFEH v. Activision Blizzard, Inc., et al.,* 21 ST CV 26571 (Cal. Supr. Ct.)), the *Washington Post* and *Bloomberg* both produced investigative reports that confirmed a culture of sexual abuse at Blizzard that reached the highest levels. They, in particular, highlighted three Blizzard senior leaders: 1) Ben Kilgore, Blizzard's Chief Technology Officer ("CTO") and heir apparent to then Blizzard President Mike Morhaime, 2) Alex Afrasiabi, Senior Creative Director of World of Warcraft (Blizzard's most profitable asset), and 3) Tyler Rosen, Senior Manager of Global Business Strategy & Operations. Prior to their sudden firings due to pressure from the Investigations, those three men sexually harassed women for years with few repercussions due to their importance to the Company.

8.    The DFEH specifically highlighted Afrasiabi as a "blatant example of Defendants' refusal to deal with a harasser because of his seniority/position." The DFEH found that "Afrasiabi was so known to engage in harassment of females that his suite was nicknamed the 'Crosby Suite' [sic] after alleged rapist Bill Crosby [sic]." Afrasiabi was allowed to operate with impunity at Blizzard for more than a decade until his firing in 2020.

9.    A lawsuit filed by an employee in Kilgore's technology department and multiple witnesses Plaintiffs' investigator interviewed further confirm that harassment and humiliation at Blizzard were common and tolerated.

10.    The women who were brave enough to report misconduct to the Company's Human Resources department were frequently retaliated against by

3

their supervisors. The DFEH found that numerous women complained to Human Resources about harassment and discrimination, but that their complaints were either ignored or retaliated against. The DFEH noted that Human Resources' lack of effectiveness was unsurprising given that "Defendants' own internal investigation into their human resources unit noted that there was a 'big lack of trust' and that 'HR was not held in high regard.'"

11.    The *Washington Post* and *Bloomberg* also concluded that Human Resources was ineffective and enabled retaliation against victims of sexual harassment and discrimination. A former male Blizzard senior leader told the *Washington Post*: "I know for a fact that HR was aware" of harassment complaints. A long-time female Blizzard employee told *The Washington Post* that ***"[HR was] almost like a gang that would ruin your career if you reported certain individuals."***

12.    Michael Morhaime, who co-founded Blizzard prior to its merger with Activision and served as its President until October 3, 2018, was well aware of the pervasive misconduct. As *Bloomberg* reported and a Blizzard employee Plaintiffs' investigator interviewed confirmed, Morhaime's former assistant said in a private Facebook post that she had informed Morhaime of rampant misconduct at Blizzard and that leadership on all levels knew what was happening. Another former Blizzard employee, Kristin Wood Page, posted on Twitter that she had written a letter to Morhaime while he was still President of Blizzard concerning male employees behaving in a predatory fashion towards women at Blizzard.

13.    Activision Blizzard abruptly and unexpectedly fired Kilgore in August 2018, right before the formal start of the Investigations, and after it had already started receiving information requests from the DFEH. According to a confidential witness, given Kilgore's years of misconduct without repercussions, the only possible explanation for the firing was the impending Investigations. The *Wall Street Journal* reported, based on conversations with people familiar with

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Defendant Kotick's leadership as Chief Executive Officer ("CEO") of Activision Blizzard, and confidential witnesses confirmed, that Kotick was typically aware of high profile hirings and firings. The *Wall Street Journal* further reported that Defendant Kotick had personally approved Kilgore's termination.

14.    In its November 16, 2021 Article entitled "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at [Activision Blizzard]," *The Wall Street Journal* further reported based on an extensive review of documents that included memos, emails and regulatory requests, and interviews with former employees and others familiar with the Company that Defendant Kotick "***knew about allegations of employee misconduct in many parts of the company***," including Blizzard and other Activision Blizzard studios. This included Kotick receiving an email about a rape at another Activision Blizzard studio in July 2018. *The Wall Street Journal* also found that Defendant Kotick himself has a disturbing history of mistreating women.

15.    Once the EEOC and DFEH formally began their Investigations on September 26, 2018 and October 12, 2018, several other factors   strongly indicated that the Investigations were not routine and that the Company was treating them as significant.

16.    *First*, the EEOC and DFEH, respectively, initiated the Investigations with unusual, non-routine mechanisms — an EEOC Commissioner's Charge and a DFEH Director's Complaint. The EEOC and the DFEH employ these mechanisms only in investigations of serious systemic misconduct. The EEOC only filed 11 Commissioner's Charges in 2018, which decreased further to 9 in 2019 and 3 in both 2020 and 2021. The DFEH only filed 4 Director's Complaints in 2019 and 3 in 2020. Furthermore, during 2019 and 2020, the DFEH's investigation of Activision Blizzard was one of only 10 additional ongoing investigations based on a Director's Complaint.

17.    *Second*, according to a confidential witness who was serving as an

5

Activision Blizzard Human Resources Senior Manager/Human Resources Business Partner at the time, the Investigations led to immediate and significant changes in how the Company's Human Resources department conducted business. The confidential witness stated that in the fall of 2018, *right after the Investigations began*, Human Resources company-wide began holding regular meetings with the Company's legal team and that the Company's executives instructed Human Resources that because of the EEOC Investigation they must document all sexual harassment complaints. Prior to the commencement of the EEOC Investigation, regular meetings between the Human Resources department and the legal department did not take place, and the Human Resources department did not have a formal process for investigating complaints.

18.     The above-described confidential witness further stated that Activision Blizzard CEO Defendant Kotick would have certainly known about these changes given that he had regular one-on-one meetings with the Company's Chief People Officer, Claudine Naughton, who was head of Human Resources for all of Activision Blizzard.

19.     *Third*, the Company opened a parallel investigation to the DFEH and EEOC Investigations and tried to use it to obstruct the DFEH Investigation.

20.     *Fourth*, Activision Blizzard's Board of Directors gave a statement to *The Wall Street Journal* that they were informed about the Investigations at all relevant times. Given that at a company the size of Activision Blizzard management would only inform the board of a small percentage of legal matters — the most significant legal matters with potential for material effects on the Company, this strongly indicates that the Investigations were not routine.

21.     *Fifth*, similar to Kilgore's firing, Activision Blizzard abruptly fired Tyler Rosen in October 2018, shortly after the Investigations began.

22.     Notwithstanding the above, on November 8, 2018, Activision filed a form 10-Q with the SEC that stated that the Company was subject only to

6

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

"*routine....investigations*" that arose "*from the ordinary course of business*," were "*not significant*," and not expected "*to have a material adverse effect*."

23.   During the more than two years between the initiation of the DFEH and EEOC Investigations and when the DFEH publicly filed a complaint against the Company, Activision Blizzard continued to make similar statements in its 10-Ks and 10-Qs. Those statements were false and misleading because of the above reasons and because of additional events that occurred during the Class Period

24.   In early 2019, multiple female employees separately informed Blizzard President J. Allen Brack (who succeeded Morhaime) about harassment and discrimination at Blizzard. Additionally, in its First Amended Answer to Plaintiff DFEH's First Amended Complaint ("Answer to the DFEH Amended Complaint," attached as **Exhibit 2**, filed on May 9, 2022, *see DFEH v. Activision Blizzard, Inc., et al.,* 21 ST CV 26571 (Cal. Supr. Ct.)[2]). Activision Blizzard admitted that "complaints about harassment, discrimination, and retaliation have been raised with [Activision Blizzard's] respective human resources personnel and to some executives, *including to Blizzard Entertainment Inc.'s then-President J. Allen Brack*" and that he spoke with Afrasiabi about his inappropriate behavior. (emphasis added).

25.   In August 2019, Activision Blizzard significantly restructured its Human Resources Department by having it report directly to the corporate office. An Activision Blizzard spokeswoman admitted to the *Wall Street Journal* that the Company changed the reporting structure of Human Resources because the prior setup "occasionally allowed some employees to conduct themselves in truly regrettable ways."

26.   In 2019, Kotick was directly involved in another internal

---

[2] On August 10, 2022, the California Superior Court denied Activision Blizzard's Motion for Summary Adjudication of the DFEH's claims, rejecting Activision Blizzard's arguments about the adequacy and scope of the DFEH's investigation.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

investigation into sexual misconduct, this time concerning the co-head of Activision affiliated Treyarch studio.

27.    On January 21, 2020, *The Los Angeles Times* reported that the DFEH intervened in a private sexual harassment and discrimination class action against another Los Angeles area video game company, Riot Games, arguing that the $10 million dollar settlement was too small and the women could be entitled to up to $400 million.

28.    On May 28, 2020, Alex Afrasiabi was suddenly fired even though it cost Activision Blizzard millions given that he was working on an important proprietary game.

29.    In June 2020, because of the Investigations, Activision Blizzard created an entirely new Employee Relations Team, which almost completely removed complaint investigations from Human Resources.

30.    In 2020, 30 female employees in Activision Blizzard's Esports division collectively wrote to their unit's leaders about the sexual harassment and discrimination they had suffered and Defendant Kotick was aware of this email.

31.    *Finally*, in its Answer to the DFEH Amended Complaint, Activision Blizzard admitted that its negotiations with the DFEH had broken down in the spring of 2021. Activision Blizzard admitted that as part of negotiations with the DFEH about extending the parties' tolling agreement, which was set to expire in July 2021, it began negotiating with the DFEH about a mediation of claims where the DFEH found cause, including a pre-mediation meeting where the DFEH could "give notice of the claims on which it had found 'cause.'" These negotiations demonstrated Activision Blizzard's concern that  the DFEH would make a cause finding.

32.    With Activision Blizzard already on high-alert for a DFEH cause finding, the DFEH served an extremely broad Subpoena Duces Tecum on the Company on April 2, 2021. The DFEH then ignored Activision Blizzard's

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

requests to meet and confer about the subpoena. The DFEH's combativeness would have been especially alarming to Activision Blizzard because the DFEH had already conducted an extensive investigation of Activision Blizzard spanning two years. Despite this, just a month after receiving the DFEH's broad subpoena, Activision Blizzard filed a 10-Q that continued to represent that the Investigations were "routine" and in the "ordinary course of business" and were "not significant" or expected to have a "material adverse effect."

33.     Defendant Kotick was strongly motivated to conceal the DFEH and EEOC Investigations and the toxic culture of harassment and discrimination at Activision Blizzard because his employment agreement provided that if the price of the Company's common stock closed at or above $79.96 for at least 90 consecutive trading days, all outstanding equity awards granted under the agreement from October 2016 all the way through December 2021 would accelerate vesting at the maximum payout level. ***Defendant Kotick did not achieve this incentive until the first half of 2021*** and he almost certainly would not have achieved it had Activision Blizzard disclosed the Investigations. Because Defendant Kotick reached this incentive, ***he was paid almost $155 million in the year 2020, including almost $150 million in stock awards.***

34.     Insiders at Activision Blizzard also sold tens of millions of dollars of stock in 2020 and 2021 at prices artificially inflated by Defendants' misstatements and omissions, including $56 million in sales by Defendant Brian Kelly, who was the Chairman of Activision Blizzard's Board of Directors.

35.     The DFEH filed the DFEH Complaint, its public complaint against Activision Blizzard on July 20, 2021 in the Superior Court of the State of California for the County of Los Angeles.

36.     The Company quickly issued a denial, claiming that "[t]he DFEH includes distorted, and in many cases false, descriptions of Blizzard's past." This, however, only fanned the flames, causing numerous employees to speak out about

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

the abuse and discrimination that they suffered. Senior employees reported that virtually no work was getting done on important blockbuster product World of Warcraft due to employee anger, and on July 26, 2021, more than 2,000 current and former Activision Blizzard employees signed and published an open letter attacking the Company's response to the DFEH lawsuit.

37.     Once it became clear that Activision Blizzard's denial was false, based upon the above-referenced open letter flatly refuting it, the Company's stock dropped 6.75% on July 27, 2021.

38.     The mounting anger forced Defendant Kotick to issue an apology about how the Company had handled the allegations.  Kotick's obligatory apology did not stop hundreds of employees from walking out on July 28, 2021.

39.     The fallout continued on August 3 and 4, 2021 with the resignations of Blizzard President Brack and Senior VP of Human Resources Jesse Meschuk.

40.     The Game Director of highly anticipated, forthcoming Blizzard game Diablo IV was fired shortly thereafter and later, on September 21, 2021, the Executive Producer of Blizzard's popular franchise Overwatch also left the Company, both due to the ongoing sexual harassment and discrimination scandal. Diablo IV and Overwatch 2 were Blizzard's two most important upcoming releases.

41.     On August 23, 2021, the DFEH amended its Complaint (the ("Amended DFEH Complaint," attached as **Exhibit 3**). The Amended DFEH Complaint accused Activision Blizzard of obstructing the DFEH's investigation by:  1) claiming employee complaints were privileged; 2) retaining law firm WilmerHale to conduct a confidential investigation that interfered with the DFEH Investigation; 3) soliciting waivers of employee rights without providing any notice of the DFEH Investigation; and 4) shredding documents in violation of a document retention notice DFEH sent.

42.     On September 20, 2021, the *Wall Street Journal* reported that the

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

SEC had opened an investigation into Blizzard's disclosures concerning workplace misconduct and discrimination. Over September 20 and 21, 2021, the Company's stock dropped by more than 8%, further damaging investors.

43.    On September 27, 2021, the EEOC filed a complaint against Activision Blizzard in U.S. District Court for the Central District of California, which, like the DFEH Complaint, reported that the EEOC found that Activision Blizzard's employees were subjected to sexual harassment and discrimination, that the Company knew about it, but did not prevent it, and that employees who complained were retaliated against (the "EEOC Complaint," attached as **Exhibit 4**, *see EEOC vs. Activision Blizzard, Inc, et al.*, Case No. 2:21-cv-07682-DSF-JEM (C.D. Cal.)). Simultaneously with the filing of the EEOC Complaint, the EEOC announced that it and Activision Blizzard had entered into an onerous 3-year Consent Decree that also included an $18 million monetary settlement. U.S. District Judge Dale S. Fischer entered the final version of the Consent Decree on March 29, 2022 (the "Consent Decree," **Exhibit 5**).

44.    The carnage continued into October 2021 when, as the *Financial Times* reported, Blizzard "fired 20 employees in an attempt to clean up its culture following allegations of widespread gender-based discrimination and harassment," and Blizzard cancelled its annual fan convention BlizzCon.

45.    On a November 2, 2021 earnings call, Activision Blizzard admitted for the first time that the launch date for its new titles Diablo IV and Overwatch 2 would be postponed. They directly attributed the delay to the games having changes in "leadership" after the Company "in recent months, [took] actions that resulted in the departure of a number of individuals across the company."

46.    On the news that Blizzard's forthcoming games were delayed due to departures caused by the Company's ongoing sexual harassment and discrimination scandal, Activision Blizzard's stock plunged more than 14% on November 3, 2021.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

47.     On November 16, 2021, *The Wall Street Journal* published its article revealing that Defendant Kotick had known about the sexual misconduct allegations for years. *The Wall Street Journal* further reported that Activision Blizzard had received more than 500 reports from current and former employees alleging harassment, sexual assault, bullying, pay disparities and other misconduct since the filing of the DFEH suit.

48.     On this news, the Company's stock plunged 8.3%, again harming investors.

49.     As a result of Defendants' knowing and/or reckless false and misleading statements and omissions concerning the DFEH and EEOC Investigations, the value and price of Activision Blizzard's common stock during the Class Period was artificially inflated. When the truth was revealed and the risk of the DFEH and EEOC Investigations materialized, Activision Blizzard's share price declined and Plaintiffs and other Class members suffered significant losses and damages.

## JURISDICTION AND VENUE

50.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

51.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

52.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Activision Blizzard's headquarters is located in this district. Additionally, substantial acts in furtherance of the alleged fraud have occurred in this district, including the dissemination of materially false and/or misleading information.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

53.   In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

54.   Lead Plaintiff Ross, as set forth in the certification submitted in connection with his lead plaintiff motion (ECF No. 23-2), incorporated by reference herein, purchased Activision Blizzard Common Stock during the Class Period at artificially inflated prices and suffered damages as a  result of the federal securities law violations alleged herein.

55.   Named Plaintiffs Cheng, Ernst, Noon, Baldwin, Martin, and Toiber, as set forth in their certifications, purchased Activision Blizzard Common Stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.  Plaintiff Cheng's certification was filed with the Initial Complaint (ECF No. 1) and is incorporated by reference herein. Plaintiffs Ernst, Noon, Baldwin, Martin, and Toiber's certifications were filed with the Amended Complaint (ECF No. 39-5).

56.   Defendant Activision Blizzard purports to be one of the world's largest video game publishers. Activision Blizzard is incorporated in Delaware with its principal office located in Santa Monica, California. Activision Blizzard's common stock trades on the NASDAQ under the ticker symbol "ATVI."

57.   Defendant Robert A. Kotick ("Kotick") has served as the Company's Chief Executive Officer ("CEO") and a director of the Company since 1991.

58.   Defendant Dennis Durkin ("Durkin") served as the Company's Chief Financial Officer ("CFO") from March 2012 to May 2017 and from January 2019 until April 2021. He served as the Company's Chief Corporate Officer from May 2017 to January 2019.

13

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

59.    Defendant Armin Zerza has served as CFO of the Company from April 2021 to present. He also served as Chief Commercial Officer of the Company from February 2019 to April 2021, Chief Operating Officer of Blizzard from October 2017 to April 2021, and CFO of Blizzard from August 2015 to September 2017.

60.    Defendant Brian Kelly ("Kelly") has served as Chairman of the Board of the Company since 2013, Co-Chairman of the Board from October 1998 to 2013, and as a director since 1995.

61.    Defendants Kotick, Durkin, Zerza, and Kelly are collectively referred to herein as the "Individual Defendants."

62.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

63.    Additionally, Defendants Kotick, Durkin, and Zerza certified, pursuant to the Sarbanes-Oxley Act of 2002, the Company's compliance with the

14

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the Company's quarterly and annual reports filed with the SEC during the Class Period that they signed did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that they had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" ("SOX Certifications").

64.     Activision Blizzard is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

65.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Activision Blizzard under *respondeat superior* and agency principles.

66.     Defendant Activision Blizzard and the Individual Defendants are collectively referred to herein as "Defendants."

## ALLEGATIONS OF MISCONDUCT

### A. Background of Activision Blizzard.

67.     Activision Blizzard describes itself as a leading global developer and publisher of interactive entertainment content and services. The Company develops and distributes content and services on video game consoles, personal computers, and mobile devices and also operates Esports leagues. An Esports league is a competitive league for video game players, some of whom compete in video game competitions professionally.

68.     Activision Blizzard was formed in 2008 when Activision, Inc. merged with Vivendi Games, the parent company of Blizzard Entertainment.

Activision, Inc. was interested in merging with Vivendi Games because of Blizzard Entertainment's "World of Warcraft" game, which was then — and remains today — one of the most successful video game franchises of all time. Because of the success of World of Warcraft, when the two companies merged, shareholders of Vivendi Games received 52% of the combined company, which traded as ATVI on the Nasdaq.

69.    In February 2016, Activision acquired the Swedish video game company King.com Limited for $5.9 billion.

70.    Currently and throughout the Class Period, Activision Blizzard has conducted its business through three reportable segments: Blizzard, Activision Publishing, Inc. ("Activision Publishing"), and King Digital Entertainment ("King Digital").

71.    Blizzard delivers content through both premium and free-to-play offerings and primarily generates revenue from full-game and in-game sales, subscriptions, and by licensing software to third-party or related-party companies that distribute Blizzard products. Blizzard also maintains a proprietary online gaming service, Blizzard Battle.net, which allows players around the world to compete against and communicate with each other.

72.    Blizzard's key product franchises include: World of Warcraft, a subscription-based multi-player online role-playing franchise; Hearthstone, an online collectible card franchise based in the World of Warcraft universe; Diablo, an action role-playing franchise; and Overwatch, a team-based first-person action franchise. Blizzard also includes the activities of the Overwatch League, which is a global professional esports league with city-based teams of Overwatch players.

73.    Activision Publishing also delivers content through both premium and free-to-play offerings and primarily generates revenue from full-game and in-game sales, as well as by licensing software to third-party or related-party companies. Activision Publishing's key product franchise is Call of Duty, a first-

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

person action franchise. Activision Publishing also includes the activities of the Call of Duty League, a global professional esports league with city-based teams.

74.     King Digital delivers content primarily through free-to-play offerings and primarily generates revenue from in-game sales and in-game advertising on the mobile platform. King Digital's key product franchise is the game Candy Crush.

75.     Between 2016 and 2020, the Blizzard segment of Activision generated between approximately 24% and 34% of Activision Blizzard's net revenue every year.

76.     On Activision Blizzard's website, the Presidents of the Blizzard, Activision Publishing, and King segments all appear on a webpage entitled "our leadership" along with the top executive officers at Activision Blizzard, including Defendant CEO Kotick and Activision Blizzard's CFO.

**B.  Relevant Non-Parties**

77.     **Confidential Witness 1** ("CW1") worked at Activision Blizzard from 2007 to late 2019. CW1 began his career at the Company as a Senior 3D Artist and became Art Outsource Supervisor in 2016 and Lead Artist in 2018.

78.     **Confidential Witness 2** ("CW2") worked at Blizzard as an Associate Program Manager from June 2016 to January 2019.

79.     **Confidential Witness 3** ("CW3") worked as a Global Esports Events Producer/Coordinator for Live Experiences for Blizzard from October 2017 to February 2019.

80.     **Confidential Witness 4** ("CW4") worked as a Software Engineer in the Blizzard segment of Activision Blizzard from June 2015 through December 2020.

81.     **Confidential Witness 5** ("CW5"), worked at various jobs at Blizzard from the summer of 2011 until April 2019. From 2011 to May 2014, she worked as a Test Analyst. Following that, she worked in Business Intelligence as an

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Assistant Project Manager and Associate Project Manager until early 2016. Starting in 2016, CW5 was an Associate Project Manager and the Project Manager in Esports. Finally, CW5 worked as a Program Manager for BlizzCon in 2019.

82.     **Confidential Witness 6** ("CW6") worked as a Quality Assurance Tester at Activision Publishing between June 2006 and June 2010 and as a Test Analyst at Blizzard from September 2011 to 2019. She mostly worked on World of Warcraft and Overwatch, but worked on other games, such as Diablo.

83.     **Confidential Witness 7** ("CW7") worked for Blizzard from September 2013 to May 2018. CW7 started out as a Technical Quality Assurance Analyst II and then in September 2014 became a Production Assistant for the Vault team. In December 2015 she became an Associate Game Art Producer for StarCraft II and, in December 2016, she became an Art Outsourcing/Art Producer for Classic Games, which is where she stayed until she resigned in May 2018.

84.     **Confidential Witness 8** ("CW8") worked as an Esports commentator for Blizzard from 2017 to 2018.

85.     **Confidential Witness 9** ("CW9"). Worked as an Esports commentator for Blizzard from 2016 to 2019.

86.     **Confidential Witness 10** ("CW10") worked in various positions in Human Resources at Activision Blizzard from 2007 until December 2020, including Senior Director Human Resources from May 2017 to February 2019 and Vice President of Human Resources for Activision Publishing from February 2019 to December 2020. As VP of Human Resources, she reported to Activision Blizzard Chief People & Diversity Officer Claudine Naughton who reported directly to Kotick.

87.     **Confidential Witness 11** ("CW11") worked as a Human Resources Partner at Blizzard from June 2015 to March 2021.

88.     **Confidential Witness 12** ("CW12") worked for Activision Blizzard

18

as Organizational Development Manager from 2015 to 2017, Human Resources Senior Manager/Human Resources Business Partner from 2017 to 2020, and Chief of Staff, People until late 2020.

89.     **Confidential Witness 13** ("CW13") worked for Blizzard as a Human Resources Generalist from December 2013 to February 2016 and a Human Resources Business Partner from February 2016 to August 2018.

90.     **Confidential Witness 14** ("CW14") worked at the Company as a Lead HR Program Manager from January 2016 to September 2019 and as an HR Manager for Activision Blizzard from September 2011 to January 2016.

91.     **Confidential Witness 15** ("CW15") worked for Blizzard from late 2017 to late 2021, first as the Editor for Overwatch Global Publishing and then as Editor of World of Warcraft Global. CW15's duties were like being an internal journalist at the Company.

92.     **Confidential Witness 16** ("CW16") served as Associate Director, Development Services in Human Resources at Blizzard from June 2020 to February 2022.

93.     **Confidential Witness 17** ("CW17") served as Vice President of Business Development & Media at Activision Blizzard from 2016 to June 2020.

94.     **Alex Afrasiabi** ("Afrasiabi") was employed by Blizzard as a game developer since 2004, most recently as Senior Creative Director on *World of Warcraft.* Activision Blizzard terminated Afrasiabi on May 28, 2020. The DFEH complaint alleges that Afrasiabi "was permitted to engage in blatant sexual harassment with little or no repercussions" and "would hit on female employees, telling [them] he wanted to marry them, attempting to kiss them, and putting his arms around them… in plain view of other male employees, including supervisors, who had to intervene and pull him off female employees. Afrasiabi was so well-known engaging in harassment of females that his suite [at the Company's annual event BlizzCon] was nicknamed the 'Crosby Suite' [sic] after

19

alleged rapist Bill Crosby [sic]. Afrasiabi would call females derogatory names at Company events."

95. **Luis Barriga** ("Barriga") was a veteran employee of Blizzard since 2006, most recently acting as Game Director for development of forthcoming project *Diablo IV*. The Company terminated Barriga on or about August 11, 2021 in connection with the investigations of sexual harassment and sex discrimination by the DFEH and EEOC.

96. **J. Allen Brack** ("Brack") was most recently President of Blizzard. Prior to assuming the role of President in October 2018, Brack was the Executive Producer and Senior Vice President, and the Team Lead for *World of Warcraft*, which he worked on in various capacities since 2006. He resigned as President of Blizzard on or about August 3, 2021, in connection with the fallout from the DFEH and EEOC Investigations.

97. **Paul Cazarez** ("Cazarez") was a Principal Level Designer working for Blizzard on *World of Warcraft*. Cazarez resigned from Blizzard in 2019. On July 28, 2021, Cazarez was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Mosquiera, Kosak, Street, LeCraft, McCree, and others.

98. **Claire Hart** ("Hart") was Blizzard's Chief Legal Officer from July 2018 until she left the Company on September 17, 2021.

99. **Ben Kilgore** ("Kilgore") was Blizzard's Chief Technology Officer from 2015 until he was fired in August 2018. Kilgore was the Chief Technology Officer referenced in the DFEH Complaint: "Defendant's former Chief Technology Officer was observed by employees groping inebriated female employees at company events and was known for making hiring decisions based on female applicants' looks…."

100. **Alex Kosak** ("Kosak") was an employee of Activision Blizzard, most recently serving as Lead Quest/Narrative Designer on *World of Warcraft*. On

20

July 28, 2021, Kosak was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Mosquiera, Cazarez, Street, LeCraft, McCree, and others.

101. **Jonathan LeCraft** ("LeCraft") was a Senior Game Designer on *World of Warcraft.* Blizzard incorporated a number of characters, items, and locations referencing LeCraft in *World of Warcraft.* LeCraft was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Kosak, Mosquiera, Cazarez, Street, McCree, and others. The Company terminated LeCraft on or about August 11, 2021 in connection with the DFEH and EEOC Investigations. Numerous references to LeCraft in *World of Warcraft* were subsequently changed or eliminated.

102. **Jesse McCree** ("McCree") was a former Lead Game Designer for *World of Warcraft* and *Overwatch,* and most recently acted as Lead Game Designer on forthcoming project *Diablo IV.* He was honored by Blizzard's development team with a playable character that shared his name in *Overwatch.* On July 28, 2021, McCree was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Kosak, Street, Mosquiera, Cazarez, LeCraft, and others. The Company terminated McCree on or about August 11, 2021 in connection with the DFEH and EEOC Investigations. Blizzard subsequently changed the name of his namesake *Overwatch* character to "Cole Cassidy." Blizzard also removed references to McCree from *World of Warcraft*.

103. **Josh Mosquiera** ("Mosquiera") was Game Director of *Diablo III*. He left the Company in 2016. On July 28, 2021, Mosquiera was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Stockton, Kosak,  Street, Cazarez, LeCraft, McCree, and others.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

104.   **Jennifer Oneal** ("Oneal") was Studio Head of Vicarious Visions (a wholly owned subsidiary of Activision) until transitioning to Executive Vice President of Development at Blizzard when the Company folded that studio into Blizzard in January 2021. On or about August 3, 2021, Oneal was appointed as one of two Co-Heads of Blizzard (together with Mike Ybarra). She was the first female business unit head in Activision Blizzard's history. On November 2, 2021, the Company announced that Oneal was leaving the Company at the end of the year. Before resigning, Oneal, who is Asian and gay, sent an email to a member of Activision's legal team in which she professed a lack of faith in Activision Blizzard's leadership to turn the culture around, saying "it was clear that the company would never prioritize our people the right way," she had been sexually harassed earlier in her career, had been "tokenized, marginalized, and discriminated against." Despite being appointed Co-Lead, with supposedly equal authority and responsibility, Activision Blizzard offered her inferior compensation to her male counterpart, Mike Ybarra.

105.   **Cory Stockton** ("Stockton") is a Lead Game Designer and Lead Content Designer at Blizzard, working on *World of Warcraft.* On July 28, 2021, Stockton was identified in a photograph, posed around a portrait of Bill Cosby in Afrasiabi's "Cosby Suite", together with Afrasiabi, Street, Mosquiera, Cazarez, LeCraft, McCree, and others. He was placed on leave by the Company on or about August 11, 2021 in connection with the DFEH and EEOC Investigations.

106.   **Jesse Meschuk** ("Meschuk") was the Senior Vice President and Global Head of Human Resources who managed Blizzard's Human Resources. Meschuk left the Company around the same time as Brack, on or about August 3, 2021.

107.   **Michael Morhaime** ("Morhaime") was one of three co-founders and President of Blizzard until October 3, 2018. He then served as an advisor to the Company until April 7, 2019.

108.  **Tyler Rosen** ("Rosen") began working at Blizzard in 2013 as Program manager of its Esports division.  Rosen later became Senior Manager of Global Business Strategy & Operations in 2016.  Rosen was abruptly and quietly fired from  Blizzard in October 2018.

109.  **Mike Ybarra** ("Ybarra") is currently President and sole leader of Blizzard. On or about August 3, 2021, Ybarra was appointed one of two Co-Heads of Blizzard (together with Jennifer Oneal).

110.  The **California Department of Fair Employment & Housing** ("DFEH") is, according to its website, an agency of the State of California charged with enforcing "California's civil rights laws, including protecting the people of California from unlawful discrimination in employment, housing, businesses, and state-funded programs, and from bias-motivated violence and human trafficking." DFEH is the largest state civil rights agency in the country. California's various civil rights laws empower DFEH to, among other things, enforce the laws by prosecuting violations in civil court and investigate and bring complaints of individual and systemic discrimination.

111.  The **U.S. Equal Employment Opportunity Commission** ("EEOC"), according to its website, is an agency of the federal government of the United States and "is responsible for enforcing federal laws that make it illegal to discriminate against a job applicant or an employee because of the person's race, color, religion, sex (including pregnancy, transgender status, and sexual orientation), national origin, age (40 or older), disability or genetic information."

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

C. **In Fall of 2018, The EEOC and DFEH Opened Investigations Into Activision Blizzard for Systemic Sexual Harassment and Gender Discrimination Against Female Employees by Commissioner's Charge and Director Complaint, Respectively; the DFEH had Been Requesting Information From Activision Blizzard in 2017.**

1) **The EEOC Initiates an Investigation of Activision Blizzard with a Commissioner's Charge on September 26, 2018**

112.   According to the EEOC Complaint filed against Activision Blizzard on September 27, 2021, on September 26, 2018, "EEOC Commissioner Chai R. Feldblum signed Commissioner's Charge Number 480-2018-05212, initiating the EEOC's investigation into the following allegations, including but not limited to: '1. Subjecting female employees to sex-based discrimination, including harassment, based on their gender. 2. Retaliating against female employees for complaining about sex-based discrimination, based on their gender. 3. Paying female employees less than male employees, based on their gender.'"

113.   The EEOC Complaint further stated that the EEOC "conducted an extensive investigation from September 26, 2018 to June 15, 2021 of the allegations of sexual harassment and related retaliation against Defendants and additional entities beyond the Charge, at their worksites in the United States" and that Defendants provided information, documents, and the testimony of individuals for the investigation.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4

    **2)**    **The DFEH Begins Requesting Information From Activision Blizzard in 2017 and Initiates a Formal Investigation Into Systemic Misconduct by Serving the Company with a Director's Complaint on October 12, 2018.**

5
6
7

114.   Confidential Witness 1 ("CW1")[3] worked at Activision Blizzard from 2007 to late 2019. CW1 began his career at the Company as a Senior 3D Artist and became Art Outsource Supervisor in 2016 and Lead Artist in 2018.

8
9
10
11

115.   CW1 told Plaintiffs' investigator that as Art Outsource Supervisor in 2017, he received an email from Human Resources, which went out to all department heads, telling them not to destroy any of their emails because the DFEH had requested information from the Company.

12
13
14
15
16
17
18
19
20
21
22

116.   On October 12, 2018, the DFEH opened a formal investigation by serving a Commissioner's Complaint on Activision Blizzard. According to the DFEH Complaint, "DFEH's director, in his or her discretion, may file a complaint on behalf of a group or class" and "[p]ursuant to this authority, DFEH Director Kevin Kish ('DFEH Director') filed and served a complaint of Group or Systemic Investigation and Director's Complaint for Group/Class Relief against Blizzard Entertainment, Inc. on October 12, 2018, (DFEH Case No. 201810-03875512). On October 29, 2018, an Amended Director's Complaint was filed and served to add Activision Blizzard, Inc. On December 7, 2018, a Second Amended Director's Complaint was filed and served to add Activision Publishing, Inc. (collectively, referred to as 'Director's Complaints'.)"

23
24

117.   The DFEH Director's Complaints against Activision Blizzard alleged that "Defendants engaged in discrimination against their employees on the basis

25
26
27
28

---

[3] All references to confidential witnesses refer to witnesses interviewed by Plaintiffs' investigator. The Third Amended Complaint contains additional confidential witnesses. Accordingly, the confidential witnesses have been re-numbered.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of sex-gender, including failing to hire, select, or employ persons because of their sex, as well as discriminating in compensation or in the terms, conditions, [and] privileges of employment due to their sex." The Director's Complaints further alleged that "Defendants failed to take all reasonable steps to prevent unlawful discrimination, harassment, or retaliation."

**D. At the Time the EEOC and DFEH Began Their Investigations, Sexual Harassment and Discrimination Had Been Endemic For Years at Activision Blizzard, Making Those Agencies' Findings of Illegal Systemic Sex Harassment and Discrimination at Blizzard Inevitable.**

118.   On June 15, 2021, the EEOC issued Defendants a Letter of Determination finding reasonable cause on the allegations of systemic sexual harassment and discrimination and retaliation in the EEOC Commissioner's Charge.

119.   As the EEOC stated in its publicly filed EEOC Complaint against Activision Blizzard, the EEOC's Investigation found that "[e]mployees were subjected to sexual harassment that was severe or pervasive to alter the conditions of employment" and "[t]he conduct was unwelcome and adversely affected the employees." The EEOC further found that Defendants' misconduct had been ongoing since at least September 2016 and that "[Activision Blizzard, Blizzard, and Activision Publishing] knew or should have known of the sexual harassment of the adversely affected employees."

120.   The EEOC further found that when Activision Blizzard employees complained about sexual harassment, people at the Company retaliated against them: "[S]ome employees complained about the sexual harassment, but Defendants failed to take corrective and preventative measures. Once Defendants knew or should have known of the sexual harassment of the adversely affected employees, Defendants failed to take prompt and effective remedial action reasonably calculated to end the harassment." It also found that "Defendants

retaliated against employees who engaged in activity protected by Title VII including, but not limited to, rejecting and/or complaining about sexual harassment" and "[a]s a result of engaging in such protected activity, employees were subjected to adverse employment actions including discharge or constructive discharge."

121.   Nine days after the EEOC's cause finding, on June 24, 2021, the DFEH issued its own finding of cause for its Director's Complaints against the Company. Regarding the cause finding, the DFEH's Complaint states that the "DFEH found evidence that Defendants discriminated against female-employees in terms and conditions of employment, including compensation, assignment, promotion, termination, constructive discharge, and retaliation. The DFEH's investigation also found that female employees were subject to sexual harassment. DFEH's investigation found that Defendants failed to take all reasonable steps to prevent unlawful discrimination, harassment, or retaliation. Lastly, DFEH's investigation further found that Defendants had committed violations of Labor Code section 1197.5 in paying female employee less than their male counterpats for substantially similar work."

122.   DFEH further stated in the publicly filed DFEH Complaint, that it found that "***High-ranking executives and creators engaged in blatant sexual harassment without repercussions.***" (emphasis added) The Company "fostered a pervasive 'frat boy' workplace culture that continues to thrive" and that "Defendants' 'frat boy' culture is a breeding ground for harassment and discrimination against women."

123.   The DFEH also found that "Female employees are subjected to constant sexual harassment, including having to continually fend off unwanted sexual comments and advances by their male co-workers and supervisors and being groped at the 'cube crawls' and other company events." During "Cube Crawls" male employees would "drink copious amounts of alcohol as they 'crawl'

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

their way through various cubicles in the office and often engage in inappropriate behavior toward female employees."

124.   The DFEH further found that "in retaliation for complaints they made regarding harassment and discrimination, female employees experienced retaliation by Defendants that included involuntary transfers, selection for layoffs, and denial of projects and other opportunities" and that "Defendants' flawed policies and practices effectively allowed and continue to allow discrimination to occur in Defendants' workplace. Employees have suffered and will continue to suffer harm from Defendants' ongoing unlawful policies and practices unless they are enjoined by this Court."

125.   The EEOC and the DFEH's findings of cause and explosive public allegations against Activision Blizzard were inevitable from the moment that they opened the Investigations given the pervasive and ongoing sexual harassment, discrimination, and retaliation at Activision Blizzard. Furthermore, Defendant Kotick, the Presidents of Blizzard during and right before the class period, J. Allen Brack and Michael Morhaime, and other high-level employees were aware of the widespread problems.

**1)   High-level Activision Blizzard Employees Ben Kilgore, Alex Afrasiabi, and Tyler Rosen Were Serial Sexual Harassers Who Acted with Impunity Prior to the Beginning of the Investigations.**

126.   High-level Activision Blizzard employees Ben Kilgore, Blizzard's CTO and heir apparent to Blizzard President Mike Morhaime, Alex Afrasiabi, the Senior Creative Director of World of Warcraft, and Tyler Rosen, Senior Manager of Global Business Strategy & Operations, engaged in serial sexual harassment of employees for years prior to the beginning of the Investigations with no repercussions.

127.   *The Washington Post* documented Afrasiabi, Kilgore, and Rosen's serial harassment, referring to them as "three senior leaders" that  "were [each]

reported to human resources and company leadership multiple times for harassment or other toxic behavior" in its investigative report published on August 6, 2021, entitled "At Blizzard, groping, free-flowing booze and fear of retaliation tainted 'magical' workplace" and authored by Shannon Liao (the "August 6 *Washington Post* Article"). The August 6 *Washington Post* Article relied on interviews with 17 current and former Blizzard employees.

a.   <u>Ben Kilgore.</u>

128.   After Ben Kilgore started as Blizzard's CTO in 2015, he quickly established a reputation as a repeat sexual harasser. The Company allowed his behavior to continue for years until he was fired in August 2018, right before the Investigations formally commenced. Despite his behavior, he was seen as the heir apparent to Blizzard President Mike Morhaime.

129.   The DFEH also found that Ben Kilgore, (Blizzard's Chief Technology Officer), routinely engaged in sexual harassment, stating in its Complaint that he "was observed by employees groping inebriated female employees at company events and was known for making hiring decisions based on female applicants' looks."

130.   Former Activision Blizzard employee Cher Scarlett, who worked at the Company as software engineer for its Battle.net in 2015 and 2016, wrote on Twitter on July 24, 2021 that Kilgore was "promoted after incidents that I was privy to in 2015 and 2016 were reported by a mutual friend." Another former Activision Blizzard employee, Terra Field, who was a UNIX Systems Engineer and Senior Systems Engineer at Blizzard from January 2015 to February 2018 and February 2018 to January 2019, respectively, wrote on Twitter, also on July 24, 2021, that "Kilgore was being investigated for inappropriate conduct with female employees as early as 2016" and "[t]he Women's council knew about the allegations."

131.   Confidential Witness 2 ("CW2") worked at Blizzard as an Associate

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Program Manager from June 2016 to January 2019. CW2 stated that Kilgore repeatedly did things that were inappropriate to secretaries and other employees for years. These employees quit or were let go and were given handsome severance packages  and, in at least one instance, signed an NDA.

132.   *The Wall Street Journal* further confirmed Kilgore's serial misbehavior in an article published on November 16, 2021 entitled "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant" by Kirsten Grind, Ben Fritz, and Sarah Needleman (the "November 16 *Wall Street Journal* Article"), reporting that "Kilgore faced multiple allegations of sexually harassing female staffers over the course of several years."

133.   The August 6 *Washington Post* Article stated that Kilgore engaged in "a pattern of misconduct, including groping inebriated women at company events."

134.   Another investigation by *Bloomberg* further confirmed Kilgore's behavior while CTO of Blizzard. On August 6, 2021, *Bloomberg* published an article entitled "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed: Managers set the tone by hiring mostly men, stoking their egos and dating women in the company, current and former employees said."  The article, authored by Jason Schreier, relied on interviews with more than 50 current and former Blizzard employees (the "August 6 *Bloomberg* Article"). *Bloomberg* spoke with two former Blizzard employees who said they saw Kilgore touch female colleagues inappropriately at work functions. Additionally, "Technology staff sometimes got drunk during work hours or showed up hungover; they vomited in trash cans and held after-work hazing rituals where new recruits were expected to take shots of liquor every half hour, former employees recalled."

135.   On March 23, 2022, a Senior Administrative Assistant in Blizzard's Technology Department filed a *Jane Doe* sexual harassment and retaliation

lawsuit against, *inter alia*, Activision Blizzard, Kilgore, Derek Ingalls (who became the new head of the Technology Department after Kilgore was fired), and her immediate supervisor, Director of IT, Mark Skorupa in The Superior Court of the State of California, County of Los Angeles, *see Jane Doe v. Activision Blizzard*, *et al.*, 22 ST CV 10064. Doe's complaint corroborates the DFEH*, Washington Post,* and *Bloomberg's* finding that the Technology Department, which Kilgore led, was a very hostile place for women leading up to the EEOC and DFEH Investigations.

136.   Doe started working at the Company on October 23, 2017 and was immediately harassed. On her first day, she was taken out for an "initiation lunch" with Skorupa, Ingalls, and others. There she was pressured to drink many shots of tequila and Skorupa forced his hand into her lap.

137.   On November 3, 2017, at BlizzCon, Doe was instructed to meet a leadership group in the hotel bar where Skorupa pressured her to drink alcohol. After Doe became intoxicated, Skorupa gave her the keys to his hotel room, saying that he was not using it that night. Doe does not remember much else from that night other than waking up in the middle of the night completely naked in a state of shock and then driving home.

138.   During 2017 and the 2018, Doe was also repeatedly subjected to crude comments about her body and unwanted touching from Skorupa, including at a dinner party Ingalls held on July 18, 2018. At that same dinner party, Skorupa told Doe that Kilgore wanted to "come take care of you after [her] Lasik [surgery]." Kilgore later came up behind Doe, put his arms around her waist and hugged her tightly from behind — when she turned around, he handed her his phone number and said to call him if she needed to be "taken care of."

b.   <u>Alex Afrasiabi.</u>

139.   Despite being a known serial harasser whose predatory behavior dated  back to at least 2012, Afrasiabi was a fixture at Blizzard. He was hired as

31

game developer for *World of Warcraft*, Blizzard's most important game, in 2004 and served as the Creative Director for two important expansions of that game: 2016's Legion and 2018's Battle for Azeroth and was ultimately elevated to Senior Creative Director of the entire game. Afrasiabi was so entrenched that there were characters and quests in the game named after him.

140.   The DFEH specifically named Alex Afrasiabi in its Complaint and cited him as a "blatant example of Defendants' refusal to deal with a harasser because of his seniority/position." The DFEH found that "[d]uring a company event (an annual convention called 'Blizz Con') Afrasiabi would hit on female employees, telling them he wanted to marry them, attempting to kiss them, and putting his arms around them. This was in plain view of other male employees, including supervisors, who had to intervene and pull him off female employees." The DFEH further found that "Afrasiabi was so known to engage in harassment of females [and] that his suite was nicknamed the 'Crosby Suite' [sic] after alleged rapist Bill Crosby [sic]."

141.   In Activision Blizzard's Answer to the DFEH Amended Complaint it did not deny the incident at BlizzCon and admitted "Afrasiabi received a written warning after an investigation substantiated a 2018 allegation that, at the 2013 BlizzCon, he had grabbed a female employee's hands, would not let go, and implied that they should go up to his hotel room."

142.   Spurred by the filing of the DFEH Complaint on July 20, 2021, on July 28, 2021, the website *Kotaku.com*, which specializes in news about video games, published an article with more details about Afrasiabi's infamous "Cosby Suite." The article, authored by Ethan Gach, was entitled "Inside Blizzard Developers' Infamous Bill 'Cosby Suite': Booze, sexual remarks, and a giant portrait of Cosby are all at the center of Activision lawsuit".

143.   *Kotaku.com* obtained and published a 2013 photo of Afrasiabi and seven other current and former high-level Blizzard developers posing with a

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

portrait of Bill Cosby in a hotel room at BlizzCon. One of the other people in the picture was Jesse McCree, the Lead Game Designer for Diablo IV and former Lead Game Designer for World of Warcraft. The picture also included the Game Director for Diablo III (Josh Mosquiera) and the Lead Systems Designer (Greg Street), the Lead Content Designer (Cory Stockton), the Lead Quest/Narrative Designer (David Kosak), a Level Designer (Paul Cazarez), and a Senior Game Designer for World of Warcraft (John LeCraft).

144. The *Kotaku* article further stated that "[b]ased on photographs and screenshots of Facebook posts obtained by *Kotaku,* it's clear that people beyond Alex Afrasiabi…were aware of the 'Cosby Suite' mentioned in the lawsuit." *Kotaku* obtained a Facebook photo album from 2013 BlizzCon that repeatedly referred to the "Cosby Suite." Another image from the same Facebook album showed a screenshot of a group chat called the "BlizzCon Cosby Crew."

145. In the "chat," former Blizzard designer David Kosak wrote: "I am gathering the hot chixx for the Coz." Afrasiabi responded, "Bring em" and Kosak wrote back "You can't marry ALL of them Alex." (emphasis in original). Afrasiabi responded "I can, I'm middle eastern." Jesse McCree then wrote, "You misspelled f**k." In another image *Kotaku* procured, "a group of women are sitting on a bed in the room with the Cosby portrait. One of the women appears to have a hand on another's breast, which is cheered on by the men in the comments." Additionally, *Kotaku* spoke to two former Blizzard developers who had heard about the Cosby Suite through whisper networks and understood it to be a reference to the sexual misconduct allegations against Bill Cosby.

146. *The Washington Post's* reporting further confirmed DFEH's finding that Afrasiabi had been harassing women with impunity for years before he was finally let go. The August 6 *Washington Post* Article stated that interviews with "[m]ultiple current and former Blizzard employees [who] told The Post they witnessed or were involved with incidents like those alleged against Afrasiabi in

the lawsuit." *The Washington Post* spoke with Anne Armstrong who had posted on social media about an encounter with Afrasiabi that was similar to what the DFEH Complaint described. Armstrong, a former manager at FXOpen Esports (a company that worked with Blizzard), recounted an incident at Blizzard's 2012 holiday party at the Disneyland Hotel "in which she says Afrasiabi kissed her in front of a group of Blizzard employees, including then Blizzard CEO and President Mike Morhaime." Afrasiabi later groped Armstrong's breast at the party "and when Afrasiabi's sister offered to give Armstrong a ride to her car after the party, a drunken [Afrasiabi] followed her into the back seat and stuck his hand under her dress."

147.   DFEH also found that "***Afrasiabi's conduct was known to Blizzard Entertainment's executives, who took no effective remedial measures***. *J. Allen Brack, President of Blizzard Entertainment, allegedly had multiple conversations with Afrasiabi* about his drinking and that he had been 'too friendly' towards female employees at company events but gave Afrasiabi a slap on the wrist (*i.e.* verbal counseling) in response to these incidents. **Subsequently, Afrasiabi continued to make unwanted advances towards female employees**, including grabbing a female employee's hand and inviting her to his hotel room and groping another woman." (emphasis added).

148.   Activision Blizzard admitted in its Answer to the DFEH Amended Complaint that "J. Allen Brack counseled Afrasiabi in 2015, when he told Mr. Afrasiabi he was drinking too much and had been 'too friendly' toward some female employees at a Blizzard Entertainment event, and in 2016 after Mr. Afrasiabi used a derogatory term toward a woman at an industry event (not sponsored by [Activision Blizzard]) at which he had been drinking heavily."

149.   The DFEH further found that a hostile environment for women extended to the entire World of Warcraft team. A female employee noted to DFEH "that random male employees would approach her on Defendants' work

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

site and comment on her breasts" and "[f]emale employees working for the World of Warcraft team noted that male employees and supervisors would hit on them, make derogatory comments about rape, and otherwise engage in demeaning behavior." "This behavior was known to supervisors and indeed encouraged by them, including a male supervisor openly encouraging a male subordinate to 'buy' a prostitute to cure his bad mood."

150.    Witnesses that Plaintiffs' investigator interviewed also confirmed Afrasiabi's serial misbehavior.

151.    Confidential Witness 3 ("CW3") worked as a Global Esports Events Producer/Coordinator for Live Experiences for Blizzard from October 2017 to February 2019. One of CW3's friends, Individual A[4], was sexually assaulted by Alex Afrasiabi. Individual A had to keep working with Afrasiabi  even after she reported the assault because Activision Blizzard did not do anything about the assault.

152.    Confidential Witness 4 ("CW4") worked as a Software Engineer in the Blizzard segment of Activision Blizzard from June 2015 through December 2020. CW4 said Afrasiabi was notorious for his misbehavior internally and that "[i]n 2016 he was a jerk to some women who didn't work at Blizzard" — "he said something really sexist and it blew up and there was an article about it."

153.     Confidential Witness 5 ("CW5"), worked at various jobs at Blizzard from the summer of 2011 until April 2019. From 2011 to May 2014, she worked as a Test Analyst. Following that, she worked in Business Intelligence as an Assistant Project Manager and Associate Project Manager until early 2016. Starting in 2016, CW5 was an Associate Project Manager and the Project Manager in Esports. Finally, CW5  worked as a Program Manager for BlizzCon in

---

[4] All people denoted as "Individual [Letter]" are people whom Plaintiffs know the identities of, but are not disclosing them due to the possibility they could be retaliated against.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2019.

154.   Concerning Afrasiabi, CW5 said "All I know is when I joined the company as a young woman I was told, 'Don't be around [Afrasiabi]. Don't go into a meeting room alone with this person. If you see him at a company event, avoid him.'" CW5 further stated that "[t]here was basically a list of men you were recommended to avoid at the company" and "almost every time I joined a new team people would give me a heads up – whether or not someone was creepy or would make a pass at you; this person is liable to scream at you, etc."

155.   Confidential Witness 6 ("CW6") worked as a Quality Assurance Tester at Activision Publishing between June 2006 and June 2010 and as a Test Analyst at Blizzard from September 2011 to 2019. She mostly worked on World of Warcraft and Overwatch, but worked on other games, such as Diablo.

156.   CW6 said that during her time at Blizzard she heard many stories about Afrasiabi's inappropriate behavior, but that "he was one of the untouchables," so nothing was done. She further noted that [w]hen we worked at BlizzCon, people would get crazy drunk" and "[t]hat whole Cosby suite thing is obviously true."

       c.   Tyler Rosen.

157.   Tyer Rosen jointed Blizzard as a Program Manager in Esports in October 2013. The August 6 *Washington Post* Article documented a sexual harassment incident as early as 2014, where a female Activision Blizzard Esports employee accused him of putting his hand on her backside.

158.   Confidential Witness 7 ("CW7") worked for Blizzard from September 2013 to May 2018. CW7 started out as a Technical Quality Assurance Analyst II and then in September 2014 became a Production Assistant for the Vault team. In December 2015 she became an Associate Game Art Producer for StarCraft II and, in December 2016, she became an Art Outsourcing/Art Producer for Classic Games, which is where she stayed until she resigned in May 2018.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

159.   CW7 confirmed that Rosen was a serial harasser, stating that people called him "Touchy Tyler" because he would give people back rubs without their consent. He was also known for drinking at work.

160.   CW5 stated that Rosen was "a big part" of the "cube crawls," the alcohol fueled work parties where women were frequently harassed, and would also drink in the office even when there was not an event.

161.   Despite this behavior, Rosen was promoted to Senior Manager, Global Business Strategy & Operations in February 2016.

162.   CW3 witnessed Tyler Rosen sexually assault a friend of hers in the summer of 2018. When Rosen was drunk after a cube crawl, "he had his hands all over a bunch of people," including CW3, and he put his hands up the skirt of CW3's friend.

### 2)    In 2017, an Activision Blizzard Employee who Had Worked at the Company for More Than Six Years Committed Suicide Due to Sexual Harassment.

163.    The DFEH Complaint cited "a particularly tragic example, [where] a female employee committed suicide during a business trip with a male supervisor who had brought butt plugs and lubricant with him on the trip." Another Blizzard employee confirmed to the DFEH that at a Company holiday party before the female employee's death "male co-workers were alleged to be passing around a picture of the deceased's [genitalia]."

164.   The female Activision Blizzard employee who committed suicide was identified as Kerri Moynihan, when her parents filed a wrongful death suit in the Superior Court of the State of California, County of Los Angeles, on March 3, 2022. *See Paul Moynihan, et al v. Activision Publishing, et al.*, 22 ST CV 07890. Moynihan was a 32-year-old Certified Public Accountant and Finance Manager at Activision Blizzard when she died by suicide on April 27, 2017 while attending an Activision Blizzard work retreat at Disney's Grand Californian Hotel & Spa in

Anaheim. She had worked for the Company since January 2011.

**3) Victims of Harassment Interviewed by Plaintiffs' Investigator and Media Investigations Further Show That Sexual Harassment and Retaliation Was Pervasive at Blizzard Leading up to the Investigations and that the DFEH and EEOC's Findings Were Inevitable.**

165.   Like the DFEH Complaint, both The *Washington Post* and *Bloomberg* found that sexual harassment and retaliation had been pervasive at Activision Blizzard for years.

166.   The August 6 *Washington Post* Article quoted Jennifer Klasing, a former World of Warcraft quest designer who left the Company in October 2020 as stating "***almost every woman I know of at Blizzard has a story of either actual, literal sexual assault***…or a man with power over her, undermining her and taking credit for her work, dismissing her, talking over her, being the last person to get promoted, despite being eminently capable…Almost every single woman I know that's been there longer than a year has at least one of these stories." (emphasis added).

167.   The August 6 *Washington Post* Article also quotes a long time female Blizzard employee as stating going to HR did not help because it was "***almost like a gang that would ruin your career if you reported certain individuals***." (emphasis added). A male former Blizzard senior leader told the *Washington Post*: "'***I know for a fact HR was aware***,'…referencing the harassment complaints leveled by other employees and referenced in the [DFEH] lawsuit. 'I know that each group within Blizzard, whether it's the Battle.net group [which manages Blizzard's online gaming platform], or the marketing group, or each development team, had an HR representative who sat in their area and was assigned to be that person to keep an eye on what was happening and be that advocate for employees.'" (emphasis added).

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

168.   Likewise, the August 6 *Bloomberg* Article stated that the more than 50 women Bloomberg interviewed recalled "getting accosted for dates at the office, being subjected to alcohol-fueled hazing rituals and watching male colleagues use company events as a venue to solicit sex." Additionally, "[s]ix women said they reported incidents to Blizzard's HR department and saw no results." *Bloomberg* also quoted Christina Mikkonen, who worked at the Company from 2013 to 2019 as stating: "It is absolutely a rock-star mentality, ***and it touched almost every aspect of Blizzard culture***… These developers were untouchable. Not only could they tell you how to do your job, but they had so much power, they could do whatever they want in line of sight with their other powerful friends." (emphasis added)

169.   Consistent with the DFEH and EEOC's findings, and *The Washington Post* and *Bloomberg* investigations, witnesses that Plaintiffs' investigator interviewed also described pervasive sexual harassment and retaliations at the Company during the time period prior to the formal opening the Investigations.

        a.   <u>CW3 Stated that She and Other Female Co-workers Were Repeatedly harassed and When She Reported it to Human Resources, She was Punished.</u>

170.   CW3 worked as a Global Esports Events Producer/Coordinator for Live Experiences for Blizzard from October 2017 to February 2019.

171.   CW3 described sexual harassment as omnipresent. She told Plaintiffs' investigator that she would get hit on by higher ups, some of whom were married or in relationships, including times when they asked her to come back to their hotel rooms. She said: "I never knew who was going to get too drunk and say something or do something" and "I [did] not want to end up in somebody's hotel room or having to worry, 'is someone going to slip something in my drink.'" When her friends at the Company told her about sexual assaults, it

39

was like they were telling her "I washed my car today" because it was so common. CW3 also observed that there had been so many "complaints and issues" with the cube crawls — especially the Esports one — that she was surprised that the Company continued them.

172.   CW3 found that HR was not a useful recourse for the harassment that she and her co-workers endured. She told Plaintiffs' investigator that when she asked her friends at the Company if they had reported being sexually assaulted their responses would generally be that they had reported the assaults, but the Company did not punish their assailants and they still had to work with their assailants.

173.   Additionally, CW3 went to HR three or four times herself, including about being propositioned at events by co-workers and about Tyler Rosen's sexual assault of her friend, but it "just felt like nothing was being done." Instead, projects were taken away from her. She was punished instead of "the guys with the key cards and hotel rooms" who propositioned her. According to CW3, those men all still work at the Company and one got promoted. When CW3 inquired as to why the Company did not take action against these assailants, a Senior Manager in the HR Department, Individual B, told her that her "hands were tied" on CW3's complaints because, although HR could make recommendations, it was up to the person above her direct supervisor, the Event Director (Individual C), to act on them and HR had no power to remedy his failure to do so.

            b.   <u>CW4 Was Sexual Assaulted During a Cube Crawl and There Were no Repercussions for her Assailant.</u>

174.   CW4 (a former Blizzard Software Engineer from June 2015 through December 2020) told Plaintiffs' investigator that the articles about Blizzard that had come out since the DFEH and EEOC filed their state and federal lawsuits were "100 percent accurate." Two months after CW4 was hired in June 2015, Individual D, who is now a Senior Software Engineer, sexually assaulted her at a

cube crawl. CW4 stated that Individual D "started touching [her] butt" and she "would keep moving his hand and he'd just keep putting it back."

175.   CW4 reported it to her supervisor, an Engineering Manager, Individual E, but nothing was done. In August 2018, after CW4 was slated to attend a meeting with Individual D for the first time since the incident, she decided to report the assault to an HR representative, Individual F. CW4 said that the HR representative was "comforting," but said that "there was no evidence [Individual D] had done this again or before and it was a one-time thing." CW4 did not know if Individual D was even punished.

c.   CW5 Suffered Repeated Harassment between 2011 to 2017 and Was Threatened With Termination When She Reported it to HR.

176.   CW5, worked at various jobs at Blizzard from the summer of 2011 until April 2019. From 2011 to May 2014, she worked as a Test Analyst. Following that, she worked in Business Intelligence as an Assistant Project Manager and Associate Project Manager until early 2016. Starting in 2016, CW5 was an Associate Project Manager and the Project Manager in Esports. Finally, CW5  worked as a Program Manager for BlizzCon in 2019.

177.   CW5 stated that she was in in her early 20s in 2011 when she began her job at Blizzard, and that the inappropriate behavior directed at her started immediately. During her job interview with Individual G, her Platform Services/Quality Assurances Supervisor, Individual G asked CW5 if she was OK with "locker-room banter and talk." CW5 stated that she said "yes" because she felt like she had no choice. CW5 further stated that Individual G, who became her supervisor after hiring her, would take her to fancy restaurants to conduct her performance reviews and tell her "this is the only way we do these reviews." When CW5 asked others about the unusual practice of conducting performance reviews at lavish restaurants, they said "What are you talking about? We have our meetings in a meeting room." Additionally, CW5 reported that when she wore

shorts to work in September 2012, the co-worker sitting next to her told her: "your ass looks great in those shorts." CW5 reported that the incident so bothered her that she never wore shorts to work at Blizzard again.

178.   When CW5 reported to a Senior HR Specialist, Individual H, in November or December of 2012 that her manager, Individual G, was making her uncomfortable by asking her out to fancy lunches, Individual H's reply was, "You're being a total brat about this. The grass isn't always greener on the other side, and you need to go back to your desk and shut up." After CW5 made that report, the Vice President of Quality Assurance, Individual I, pulled her into his office and told her "our department was like the Army, and that I needed to respect my team and superiors and not cause trouble."

179.   When CW5 moved to Esports in early 2016, the situation grew even worse. One of her superiors — Individual J, who is now Blizzard's Global Director of Esports — "would complain about his fiancée not sucking his dick in front of coworkers" and "gave people back rubs and massages without asking first." CW5 described a particularly frightening incident with Individual J that took place in August 2017. While they were having a disagreement, Individual J put his hands on either side of CW5's chair and stood over her so that she could not get up or reach her phone or purse. Several people tried to intervene, but Individual J yelled at them and said this was between him and CW5. "He was very intimidating. I had to sit there for hours with him standing over me, berating me, saying, 'You need to be on the same page with me.'" Each time she tried to get up to reach toward her phone or her purse, he'd put his arms back on either side of her chair, holding her there, she said.

180.   Individual J held CW5 there for two to three hours and only allowed her to leave after her husband, who worked in another department at Blizzard, came looking for her at 8 or 9 pm because he was worried as he could not reach her.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

181.   CW5 was so shaken by the August 2017 incident with Individual J that she took two days off and then immediately reported it to Esports' HR representative, Individual K. In response, HR minimized the abuse and threatened to fire CW5. The only question that Individual K asked was "Did [Individual J] ever physically touch you?" When CW5 responded, "No he didn't but I was afraid he would if I stood up," Individual K said, "because he didn't physically touch you, this isn't harassment."

182.   After CW5 made that complaint, the Global Product Director of Esports, Individual L, brought CW5 into her office and said "You need to be careful about how you're acting with your coworkers. You really made [Individual J] feel bad. You need to be more careful about your language." Individual L told CW5 that she wanted to put CW5 on a "performance improvement plan" and even recommended firing her because she was creating a "toxic environment" by disagreeing with Individual J. CW5 was only able to save her job by contacting her immediate supervisor, who was a Lead Project Manager (Individual M), even though Individual M was on paid leave. Individual M convinced Individual L to give CW5 a warning, but she also warned CW5: "Whatever happens, be really careful. I'm going to try to protect you as much as I can but there's only so much I can do. You can't get in a fight with [Individual J] anymore." CW5 told Plaintiffs' investigator that the situation became so stressful that she began having panic attacks at work. She added: "Anybody that tried to report [Individual J] was reprimanded. They talk about no retaliation if you report an incident, but that was not the case here. You would absolutely be retaliated against if you tried to report this individual."

183.   CW5 further stated that she was certain that Amy Morhaime, former Vice President of Esports and wife of President and CEO Mike Morhaime, knew about the harassment going on at Esports because Amy Morhaime told CW5 that she had weekly meetings with HR to review the complaints that employees in the

43

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

department were reporting.

184.   Plaintiffs' investigator also interviewed two additional former Activision Blizzard Employees who reported to Individual J, Confidential Witness 8 ("CW8") and Confidential Witness 9 ("CW9"). CW8 and CW9 worked as Esports commentators for Blizzard from 2017 to 2018 and 2016 to 2019, respectively. CW8 stated that Individual J told her that he didn't know why she wasn't getting as much work as another woman on the team because she was just as hot or hotter than her and then turned to CW9, who is a man, for confirmation. CW9 confirmed this account to Plaintiffs' investigator and further stated that despite his behavior, Individual J "got promoted quickly and often."

185.   CW5 also discussed Blizzard's infamous cube crawls. She stated that they were held regularly during her time at Blizzard and "were as bad as you've heard – people getting really drunk, throwing up in bathrooms and hallways. You couldn't even sit at your desk and work." "It was crazy. People just wouldn't come into work that day if they didn't want to drink or be part of it." CW5 further stated that the cube crawls were a huge event at the Company and that "[h]undreds of people came to them" and they "usually started around 1 or 2 pm in the afternoon." It was typical for heads of departments to attend the cube crawls and to compete over who had the best cube crawls.

186.   In 2017, not long after CW5 joined the Esports team, the leaders of the Esports Team, *i.e.*, the Global Product Director, Individual L, and Vice President of Esports Amy Morhaime asked CW5 to plan "a really epic cube crawl for Esports." CW5 stated: "It was kind of a mandate from leadership. We were a newer team." Amy Morhaime is the spouse of Michael Morhaime, who was President of Blizzard at that time.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1

2

3

      d.   <u>CW6 was Harassed Herself and Heard the Complaints of Many</u>
<u>Other Women as a Member of Blizzard's Woman's Counsel in</u>
<u>2017 and 2018.</u>

4

5

6

7

187.   CW6 worked as a Quality Assurance Tester at Activision Publishing between June 2006 and June 2010 and as a Test Analyst at Blizzard from September 2011 to 2019. She mostly worked on World of Warcraft and Overwatch, but worked on other games, such as Diablo.

8

9

10

11

12

13

14

15

16

188.   CW6, like CW5, reported that she was both the victim of harassment and witnessed fellow employees being harassed throughout the course of her employment at the Company. CW6 stated that when she was at Activision Publishing from June 2006 to 2010, co-workers hit on her and other women while they were working, followed them to their cars, and actively pursued them at work. Male co-workers made disgusting comments about a skirt she wore to work twice and reported that people used drugs, including cocaine, at work. CW6 stated that she quit in 2009, but when she came back to work at Blizzard in September 2011, there were "a lot of the same issues."

17

18

19

20

21

22

23

24

189.   CW6 joined the Women's Council for the Diversity Group at Blizzard in approximately late 2017 or early 2018. Because of her position on the Women's Council, fellow female employees came to her with complaints, including men stalking them in the parking lot and showing up at their homes begging them to go on dates. One woman was driving people home from a work party when another Blizzard employee, who worked in Quality Assurance, Individual N, got into her car. When she said "OK. I guess I'll take you home too,'" he responded: "You're such a stupid bitch. Why won't you date me?"

25

26

27

28

190.   CW6 and the victim of Individual N's harassment spoke with an HR representative, Individual O, who told them that since the incident happened offsite, HR couldn't do anything about it, even though it was at a work party where the Company paid for everything.

**4)   Michael Morhaime, Who Served as Blizzard's President Until October 3, 2018 — Around the Time the Investigations Began — Was Aware of the Pervasive Sexual Harassment at Blizzard.**

191.   Michael Morhaime, who co-founded Blizzard Entertainment and served as CEO and later President of Blizzard until October 3, 2018, was aware of the ubiquitous sexual harassment at the Company during his time as President.

192.   The August 6 *Bloomberg* Article stated that in a private Facebook post *Bloomberg* reviewed, "a former assistant to [Michael] Morhaime wrote that she had informed him and other executives about rampant misconduct." CW4 read a portion of the post by Michael Morhaime's assistant, Individual P, to Plaintiffs' investigator. The post stated in part, "[l]eadership at all levels knew this was happening" and "[i]t was on leadership's watch…Not only that, they [harassers] were given more opportunities and some even thrived. Your emails went to them and I told them personally." CW4 said Individual P was "someone who was incredibly active and vocal when it came to internal stuff. She was always fighting for change."

193.   Another former Blizzard employee, Kristin Wood Page ("Wood Page"), corroborated the pervasive culture of harassment and discrimination and the fact that Morhaime and others in senior management were keenly aware of it. Wood Page worked for Blizzard from 2010 to 2018. From 2010 to 2016, she worked for *Battle.net* as a Technical Writer and a Content Strategist. Wood Page then worked for Blizzard's Global Public Relations team from 2016 to 2018. Wood Page posted on Twitter on July 23, 2021 stating that she "wrote a letter to Mike Morhaime back in 2018, after I left Blizzard, and while he was still President and CEO." The letter stated, in part: "[a]s long as men in power are behaving in a predatory fashion towards women in the company, it will be impossible for women to truly feel comfortable, valued, or safe. As long as women don't feel comfortable, valued, or safe, it will be harder and harder for the

Company to draw in and keep talented women who love games. This means women will continue to be a smaller portion of Blizzard's audience than men, it means fewer women will work at Blizzard and it means, over time, Blizzard will be added to the list of Companies That Are Bad For Women....We care about the quality in our games; why not our people?"

194.   CW3 also confirmed that Michael Morhaime knew about the pervasive sexual harassment at Blizzard. CW3 told Plaintiffs' investigator that "of course [Mike Morhaime and his wife, Amy] knew." She said: "How could they not? They were friends with the people that were doing this. And my friends have said, *'My reports have gone all the way up to Mike [Morhaime] and nothing happened*.'" (emphasis added).

195.   CW7 provided Plaintiffs' investigator with additional confirmation that Michael Morhaime and Brack knew Afrasiabi well and were in constant contact with him while he worked at Blizzard. CW7 heard from a colleague, Individual Q, that a small group of "C-suite executives" met for weekly dinners at each other's houses. Individual Q attended these gatherings. The "C-suite executives" called themselves "The Old Guard" because they had been at Blizzard the longest. Three of the members of the group were Brack, Michael Morhaime, and Afrasiabi. CW7 further noted that the dinners were mostly at the Morhaimes' house. This further shows the close relationship that Morhaime and his successor Brack had with Afrasiabi while he was a serial sexual harasser at Blizzard.

196.   Additionally, as discussed above, Michael Morhaime was present when Afrasiabi harassed Anne Armstrong at Blizzard's 2012 holiday party.

**5)   There Was Also Pervasive Sex Discrimination Against Female Employees, Especially Those Who Were Pregnant, Mothers, or of Color, by Giving Them Fewer Opportunities and Lower Pay, at Activision Blizzard Leading up to the Investigations.**

197.   In addition to endemic sexual harassment, the DFEH Investigation

found that "Defendants have engaged in and continue to perpetuate discriminatory practices regarding pay, assignment, promotion and other terms and conditions of employment which negatively affect and impact female employees."

198. "These discriminatory practices began at hire when women were offered lower compensation and less lucrative job assignments and opportunities than their male counterparts" and "the pay disparity continued throughout employment for female employees" since "Defendants paid female employees significantly less than their male counterparts after hire." The DFEH further found that women received less stock and incentive compensation than male employees.

199. The DFEH investigation showed that female employees "raised…complaints to various human resources personnel about the discrimination they faced, including but not limited to complaints about unfair pay and assignments, male co-workers belittling them or minimizing their contributions, and male counterparts being promoted quickly despite their lack of seniority."

200. Their complaints, however, "fell on deaf ears or were met with an empty promise to investigate the issue. Indeed, despite having retained Paul Hastings LLP from 2015 to 2017 and Miller Law Group in 2018 to allegedly provide analysis related to compensation data, Defendants failed to take effective and reasonable steps to prevent pay discrimination as the pay disparity between male and female employees was not remedied and continued."

201. As with complaints for sexual harassment, the DFEH found that "female employees experienced retaliation by Defendants that included involuntary transfers, selection for layoffs, and denial of projects and other opportunities." The EEOC also found that the Company retaliated against employees for complaining about pregnancy discrimination.

202. The DFEH provided multiple examples of how "[w]omen were steered into the lower levels of Defendants' hierarchy and often had to work

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

harder and longer to earn equal promotional and other opportunities as their male counterparts." For example, "one female employee [at Blizzard] sought a promotion because she had been carrying out duties exceeding her job description," but was "repeatedly told it was not her turn and others deserved a promotion ahead of her." She was ultimately "promoted after three years while her male counterpart was promoted within a year of his hire despite having started several months after her" and "he was also assigned leadership responsibilities which she was not afforded."

203.   Another female employee at Blizzard "was assigned to a lower level, denied equal pay, and passed over for a promotion despite multiple factors that suggested she earned it: (1) highly rated performance reviews; (2) she generated significantly more revenue in her marketing campaigns than her male counterpart; and (3) she ran almost twice as many campaigns as her male counterpart." Despite this, her "male counterpart was invited to have monthly or weekly one-on-one meetings with the Vice President," an opportunity that she was not afforded, and he was promoted ahead of her.

204.   The DFEH also found that the male head of a unit at Blizzard promoted his friends over more qualified women. Other male supervisors would refuse to communicate with female employees, going to their male counterparts for information.

205.   The DFEH documented the same problems in the Activision Publishing segment, where women were similarly "denied equal pay, and delayed or passed over for promotions of their male counterparts." "As an example, a female human resources employee at Activision Publishing was delayed and passed over for a promotion despite receiving positive performance reviews, doing substantially more work than her male counterpart, and taking over the actual responsibilities of the departing person. Female accounting employees at Activision Publishing, likewise, note that male counterparts were paid

49

significantly more than them despite doing the same or less work and having less responsibilities."

206.   Pregnant women, mothers, and women of color were accorded some of the worst treatment.

207.   DFEH found that "[a] female employee working on one game team had assumed some of the responsibilities of a manager but when she asked her male supervisor about being fairly paid for the work she was actually doing and promoted into that position, the manager commented that they could not risk promoting her as she might get pregnant and like being a mom too much." Supervisors also ignored medical restrictions, gave negative evaluations while women were out on maternity leave, and criticized women for leaving to pick up their children from daycare. Female employees were also kicked out of lactation rooms so employees could use the room for meetings.

208.   Similarly, the EEOC found "Defendants discriminated against employees due to their pregnancy that adversely affected the employees."

209.   Regarding women of color, the DFEH found that they "were particularly vulnerable targets of Defendants' discriminatory practices." An African American employee told the DFEH that "it took her two years to be made into a permanent employee while men hired after her were made permanent employees." That employee was also micromanaged by her supervisor in a discriminatory way — "her male coworkers were known to be playing video games without any intervention by her supervisor, but her supervisor would call and check on her if she took a break to go on a walk." Another African American who worked in information technology was similarly micromanaged — "her manager made her write a one-page summary of how she would spend that time off of work when no one else had to do any write-up."

210.   The DFEH also found that "as a result of these discriminatory pay, assignment, promotion and other practices Defendants' gender pay gap is

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

significant" and that "female employees were forced to leave their employment with Defendants." "[F]emale employees noted that they accepted less compensation than they were making in their prior employment or offered by other companies to work for Defendants with the hollow promise that they would get promoted or get other forms of compensation to make up the difference. They never made up ground and instead had to watch as male comparators were promoted more quickly and offered more compensation, forcing them to leave the company." Additionally, "Defendants terminated female employees more quickly than their male counterparts."

211.  *Bloomberg's* investigation found a similar pay gap to the DFEH's investigation. According to the August 6 *Bloomberg* Article, "[s]even women who worked at Blizzard said they made less than male colleagues with similar experience. Two women said they were told by their manager not to discuss their salaries. One shared screenshots of her boss saying salary information should be kept confidential, an apparent violation of California law." Nazih Fares, who worked for Blizzard from 2018 until 2021, told *Bloomberg* that the gender pay disparity was a point of contention for Blizzard employees around the globe.

212.  Additional evidence that there was a well-known gender pay gap at the Company is that after the DFEH investigation became public in July 2021 one of CW4's former supervisors, Individual R, a former Lead Software Engineer at Blizzard, who had worked for the Company for a long time, sent CW4 a private message on Twitter saying one of the reasons he left the company in April 2020 was due to unequal pay for women.

213.  CW6 reported that she was belittled for her gender and race while working at Blizzard. After she was bullied at work, she had a male employee "tell me to calm down because he knows I'm a spicy Latina and he knows how these women get." Her manager on the Quality Assurance Team also ridiculed her for joining the Women's Council, telling her it was a disruption and should not be

given priority over other company policies.

214.   Similarly, when CW5 worked in Blizzard's Esports division from 2016 to 2019, she reported that she was discouraged from joining the Women's Network at the Company and male colleagues often told her to do administrative work because the team did not have an administrative assistant and she was the only woman.

6)   **After Tolerating Kilgore's Misconduct For Years, Activision Blizzard Abruptly Fires Kilgore in August 2018 — Shortly Before the Formal Initiation of the Investigations — With the Personal Approval of Defendant Kotick.**

215.   After tolerating his misconduct for years (*see* Paragraphs 128-138), Activision Blizzard abruptly fired Ben Kilgore, Blizzard's CTO and heir apparent to Blizzard President Mike Morhaime, in August 2018 — right before the EEOC and DFEH formally started their Investigations, and after the Company had already received requests for information from the DFEH.

216.   The August 6 *Bloomberg* Article describes Blizzard employees being informed in a brusque email from Blizzard President Morhaime in summer 2018 that Kilgore was leaving the Company. The email did not give a reason, but employees immediately began to gossip given that "Kilgore presided over the most notorious group of sexist drinkers."

217.   The closest thing to an explanation for Kilgore's departure was when Derek Ingalls, the new head of the technology department, was asked why Kilgore left during a large staff meeting that took place on October 3, 2018. Ingalls told a brief story and concluded by saying "Don't sleep with your assistant. But if you're going to sleep with your assistant, don't stop." A representative from Human Resources at Blizzard stood silently by during the meeting. The Senior Administrative Assistant in the Blizzard Technology Department who filed the *Doe* complaint against Activision Blizzard, Kilgore, Ingalls, and Skorupa also

attended that meeting and recorded it.

218.   Based on discussions with people familiar with Defendant Kotick's leadership, the November 16 *Wall Street Journal* Article found that "Mr. Kotick approves high-profile hiring decisions and the exit and pay packages of star developers, and he is typically aware of any major problems in each of Activision's 12 development studios and three major business units."

219.   In line with that, *The Wall Street Journal* reported, based on conversations with people familiar with the matter, that Defendant Kotick had personally approved the 2018 firing of Kilgore. The *Wall Street Journal* also confirmed that, despite this, Morhaime, who was then the President of Blizzard, sent an email thanking Kilgore for his contributions over the last four and a half years when he left the Company. *The Wall Street Journal* reported that "[s]ome employees said they were taken aback by the praise, particularly given that they had been told not to discuss the circumstances of Mr. Kilgore's departure."

220.   This level of involvement by Kotick with firing is consistent with what Confidential Witness 10 ("CW10") told Plaintiffs' investigator. CW10 worked in various positions in the Human Resources at Activision Blizzard from 2007 until December 2020, including Senior Director Human Resources from May 2017 to February 2019 and Vice President of Human Resources for Activision Publishing from  February 2019 to December 2020. As VP of Human Resources, she reported to Activision Blizzard Chief People & Diversity Officer Claudine Naughton who reported directly to Kotick.

221.   CW10 said that to terminate anyone at the level of Senior Vice President at Activision Blizzard, you needed Kotick's approval and, therefore, there is no way he could not have known about the harassment.

222.   Confidential Witness 11 ("CW11"), who was a Human Resources Partner at Blizzard from June 2015 to March 2021, also stated that Kotick's approval was required to terminate anyone at the level of Senior Vice President

and up and, therefore, the higher-ups had to know about the harassment.

223.   Confidential Witness 12 ("CW12") worked for Activision Blizzard as Organizational Development Manager from 2015 to 2017, Human Resources Senior Manager/Human Resources Business Partner from 2017 to 2020, and Chief of Staff, People until late 2020. CW12 told Plaintiffs' investigator that Kilgore's firing could only be explained as resulting from the imminent Investigations since multiple sexual harassment complaints had been pending against Kilgore for years before the Company fired him. CW12 believed that the leadership of the Company protected Kilgore for so long because they believed Kilgore was critical talent that the Company needed.

224.   Confidential Witness 13's ("CW13") statements confirmed the fact Kilgore was suddenly fired and that this was surprising and a sudden about-face for the Company. CW13 worked for Blizzard as a Human Resources Generalist from December 2013 to February 2016 and a Human Resources Business Partner from February 2016 to August 2018. As a Human Resources Business Partner CW13 acted as a business partner to coach and guide "people managers" up to the Vice President level on various HR practices, including the investigation of complaints. CW13's  Supervisor was Head of HR, Esports & Leagues, Individual S, who reported to Senior VP of Human Resources Jesse Meschuk.

225.   CW13 told Plaintiffs' investigator that in the first half of 2018 she had a discussion with her supervisor where her supervisor mentioned that Kilgore was "untouchable" and had not been fired after a previous investigation because of his value to the Company. Furthermore, CW13 stated that protecting harassers who were perceived as valuable to the Company was standard practice at Blizzard: "A number of different employee relations issues hit my desk that I was specifically told I could not touch because the person in question being accused of things was too valuable to the company."

226.   Accordingly, it was a dramatic, non-routine, shift of policy when

54

Blizzard, with Defendant Kotick's involvement, suddenly fired Kilgore.

**7)    The Culture of Sexual Harassment and Retaliation in Blizzard's Technology Department Was So Toxic and Ingrained That the Harassment and Retaliation Against *Doe* Become Even Worse After the Company Fired Kilgore.**

227.    Despite the firing of Kilgore, the Senior Administrative Assistant in the Blizzard Technology Department who filed the *Doe* complaint continued to experience continuous harassment and retaliation, which only intensified when she reported it to Human Resources.

228.    On August 16, 2018, a meeting was held concerning Kilgore's recent termination. At that meeting, the leadership of the Technology Department took a photo of all the men flipping off the camera in response to the firing. Ingalls emailed the photo to leadership, including Doe.

229.    In August 2018, after Doe said she was going to file a complaint with Human Resources, she was almost immediately moved from an office to a cubicle.

230.    When Doe went to Human Resources on August 30, 2018, her complaints were dismissed — they told her that her leadership was just being nice and trying to be friends with her. ***They also told her to keep all of her issues, concerns, recordings, or emails to herself because they could be very damaging to Activision Blizzard.***

231.    A few days after Doe made the complaint to Human Resources she overhead Skorupa saying that he "f\*cking despise[s] [Ms. Doe]," "it's like I broke up with her and now she's the psycho ex-girlfriend," and "poor [Ms. Doe] isn't getting all the attention and now she's mad." Skorupa then said to Doe: "I wish I could be a total d\*ck to [Ms. Doe] but I know I legally can't."

232.    On September 7, 2018, Doe met again with HR to beg for another position at Activision Blizzard, such as an open Web & Mobile position she was

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

aware of. HR told Doe that the Company was not going to fill the Web & Mobile position, but then Activision Blizzard hired a new employee for the position on September 24, 2018.

233.   At another meeting in September 2018, when Doe was walking out of the room, Ingalls stated "I hope there are no more pussies in the room."

234.   On October 4, 2018, Doe again went to Human Resources about Skorupa's behavior towards her and also reported Ingalls' comments about sleeping with your assistant and played a recording of them. Human Resources told her that it was Skorupa's "way of complimenting her and that she should stop saying that it is sexual harassment." Human Resources also told her that she should not let Ingalls' comments about Kilgore's firing out because they could be very damaging and he would be taken care of, but nothing was done.

235.   On October 8, 2018, Ingalls and Skorupa continued to freeze Doe out by removing her access to their calendars.

236.   In October 2018, Ingalls and Skorupa intervened to prevent Doe from getting a new position in the Classic Games Department. After Doe interviewed for the Classic Games position, HR told her that the feedback from the interview was great and she needed to wait a week for final results. However, after Ingalls and Skorupa spoke with Rob Bridenbecker, who was then Executive Producer and Vice President of Classic Games, she was immediately rejected from the job. Activision Blizzard, instead, hired a less qualified receptionist who was soon fired because of her lack of qualifications. Doe reported Ingalls and Skorupa's intervention to HR, but HR just warned her about "jumping to conclusions." Doe was also rejected from another job in the Story & Franchise Department.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

**8)  In Addition to His Knowledge about Kilgore, Defendant Kotick Also Knew About Other Sexual-Misconduct at Activision Blizzard When the DFEH and EEOC Initiated Their Formal Investigations, Including a Rape at Sledgehammer Games, an Activision Blizzard-Owned Studio.**

237.   The November 16 *Wall Street Journal* Article, entitled "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant," reported that that after the DFEH filed suit on July 20, 2021, Defendant Kotick lied to Activision Blizzard's directors and other executives about how much he knew about the endemic sexual harassment at his company: "Mr. Kotick…told directors and other executives he wasn't aware of many of the allegations of misconduct, and he has played down others, according to people familiar with the matter and internal documents." *The Wall Street Journal* obtained documents showing, however, that "[Defendant Kotick] knew about allegations of employee misconduct in many parts of the company": "***Those documents, which include memos, emails and regulatory requests, and interviews with former employees and others familiar with the company, however, cast Mr. Kotick's response in a different light. They show that he knew about allegations of employee misconduct in many parts of the company***." (emphasis added).

238.   The November 16 *Wall Street Journal* Article reported that a lawyer for a former employee at Sledgehammer Games, an Activision Blizzard-owned studio, ***alleged in an July 2018 email to Defendant Kotick***, in which she threatened to file a lawsuit, that "her client had been raped in 2016 and 2017 by her male supervisor after she had been pressured to consume too much alcohol in the office and at work events." Furthermore, according to the email, "[t]he female employee reported the incidents to Sledgehammer's human-resources department and other supervisors, but nothing happened." The woman had also reported one

of the incidents to the police. According to the *Wall Street Journal's* interviews with people familiar with the situation, Activision Blizzard reached an out-of-court settlement with the woman within months of receiving the email. Activision Blizzard fired that supervisor, Javier Panameno, who was also accused by another female employee of Sledgehammer of harassment, two months after receiving the email — right before the formal beginning of the Investigations.

239.   The email from the woman's attorney also stated that another Sledgehammer employee, Eduard Roehrich, had had been accused of sexual harassment by a different woman who worked for Sledgehammer. That employee, Ashley Mark, told *The Wall Street Journal* "that she complained to supervisors and human resources in 2017 about harassment by Mr. Roehrich, including at a company party at which there was heavy drinking." Roehrich confirmed to *The Wall Street Journal* that he was investigated and said he was given a two-week paid leave and allowed to remain at Activision Blizzard at a different position. Roehrich shared an email with *The Wall Street Journal* in which Activision Blizzard asked him to "keep this matter confidential."

240.   The November 16 *Wall Street Journal Article* also discovered that "*[o]ver the years, Mr. Kotick himself has been accused by several women of mistreatment both inside and outside the workplace*, and in some instances has worked to settle the complaints quickly and quietly, according to people familiar with the incidents and documents reviewed by the Journal." (emphasis added).

241.   "In 2006, one of [Defendant Kotick's] assistants complained that he had harassed her, *including by threatening in a voice mail to have her killed*, according to people familiar with the matter." (emphasis added).

242.   *The Wall Street Journal* also found that in 2007 a flight attendant on a private jet Kotick  co-owned sued him. The flight attendant claimed the plane's pilot had sexually harassed her and, after she complained to the other owner, Mr. Kotick fired her. Kotick and the co-owner of the jet settled with the flight

58

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

attendant for $200,000 in 2008. In a separate action related to legal fees in the case, an arbitrator, citing what he said was sworn testimony, wrote that Defendant Kotick told the flight attendant and her attorneys, "***I'm going to destroy you***." (emphasis added).

**E.  Starting in October 2017, the #MeToo Movement Led to the Firing of Numerous High Profile Executives at Other Companies, Putting Defendants on Notice of How Dangerous the DFEH and EEOC Investigations Could be to the Company.**

243.    As *The New York Times* documented in an article entitled "#Me Too Brought Down 201 Powerful Men. Nearly Half of Their Replacements Are Women," that was published on October 23, 2018, from October 5, 2017 when the Weinstein Company fired Harvey Weinstein until the *New York Times* published the article about a year later, 201 prominent men were fired or lost major roles due to sexual harassment allegations. Prominent entertainment executives that their respective companies fired, included Roy Price, the Head of Amazon Studios; John Lasseter, Chief Creative Officer of Pixar and Walt Disney Animation; and Leslie Moonves, President, Chairman and Chief Executive of the CBS Corporation.

244.    Remarkably, a study from the consulting division of PwC found that, for the first time, in 2018 more CEOs left for reasons related to unethical behavior stemming from allegations of sexual misconduct or ethical lapses than poor financial performance.

245.    Further showing the immense danger of public sexual harassment allegations to the value of a company, as reported on January 26, 2018 by *The Wall Street Journal* in an article by Ben Eisen entitled, "Misconduct Report Shaves $2 Billion From Wynn Market Value," the market value of Wynn Resorts Ltd. dropped by $2.1 billion on January 26, 2018 after *The Wall Street Journal*

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

published an article citing a pattern of sexual misconduct by the Company's Chairman and CEO Steve Wynn.

246.   Notably, Activision Blizzard was especially vulnerable to reputational damage from sexual harassment allegations because of its repeated statements about the importance of diversity and inclusion to the Company. For example, Activision Blizzard's 2018 Proxy statement, filed with the SEC on April 30, 2018, stated: "We are invested in creating an environment where everyone can thrive. We believe this is one of the reasons why, for four consecutive years, Activision Blizzard has been recognized as one of the "100 Best Companies to Work For" by Fortune magazine." It further stated: "We see diversity and inclusion as sources of innovation for our Company.....That is why we will continue to prioritize our efforts in creating and sustaining a culture of diversity and inclusion, both in our workplace and in the virtual worlds we create."

247.   Therefore, it was entirely predictable that the EEOC and DFEH investigations combined with the pervasive sexual harassment and assault at Activision Blizzard they were inevitably going to uncover would lead to firing, resignations, negative publicity, and reputational damage that would catastrophically damage the Company.

**F.   EEOC Commissioner's Charges and DFEH Director's Complaints, Which the EEOC and DFEH Used to Formally Begin their Investigations on September 26, 2018 and October 12, 2018, Respectively, Are Rarely Used Mechanisms That Those Agencies Use for Investigations into Systemic Harassment and Discrimination.**

248.   When the EEOC and DFEH formally began their Investigations on September 26, 2018 and October 12, 2018, respectively, (1) sexual harassment was rampant at Blizzard, with the full knowledge of Blizzard President Morhaime (2) Kilgore been abruptly fired with the direct involvement of Defendant Kotick in August 2018, (3) Kotick had been informed by email about a rape at

60

Sledgehammer games in July 2018, and (4) the #MeToo Movement was constantly making the news.

249.   Adding to that already dangerous situation for the Company, the EEOC and DFEH stepped in and filed a Commissioner's Charge and a Director's Complaint, respectively, against Activision Blizzard. Both mechanisms are rarely used by the agencies, and reserved for investigations into the most serious systemic misconduct.

**1)   The EEOC's Commissioner's Charge against Activision Blizzard was one of only 11 filed in 2018.**

250.   In addition to investigating discrimination charges filed by individuals, Congress also authorized the EEOC to investigate discrimination by using Commissioner's charges.

251.   Most Commissioner's charges, such as the one brought against Activision Blizzard, address claims of systemic or companywide discrimination and they must be personally authorized by one of the EEOC's five commissioners.

252.   Accordingly, in contrast to the tens of thousands of charges filed by individuals that the EEOC investigates every year,[5] Commissioner's charges are very rare. The EEOC only brought 11 Commissioner's charges, including the one against Activision Blizzard, in 2018. Since then the number of Commissioner's charges the EEOC filed has decreased further to 9 in 2019 and 3 in both 2020 and 2021.

_____

[5] Individuals filed 76,418, 72,675, and 67,448 charges with the EEOC in 2018, 2019, and 2020, respectively.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**2)     The DFEH Filed Only 4 Director's Complaints in 2019 and 3 Director's Complaints in 2020 and in Each of Those Years the Director's Complaint Against Activision Blizzard was Only One of 10 Additional Director's Complaints Under Investigation.**

253.   As with the EEOC, the DFEH primarily investigates discrimination cases filed with it by individuals.[6] The DFEH's director may, however, file a Director's Complaint on behalf of a group or a class and conduct a systemic investigation against an employer.

254.   DFEH Director's Complaints are exceedingly rare. The DFEH only filed 3 Director's Complaints in 2020 and 4 in 2019. Furthermore, in each of those years, the DFEH's investigation of Activision Blizzard was one of only 10 additional ongoing investigations based on a Director's Complaint.

**G.  <u>In Response to the Investigations, Activision Blizzard Made Significant Changes to its Human Resources Procedures, Which Included Instituting a Formal Process for Investigating Sexual Harassment Complaints For the First Time and Instituting Regular Meetings Between Human Resources and its Legal Team.</u>**

255.  CW12 worked for Activision Blizzard as Organizational Development Manager from 2015 to 2017, Human Resources Senior Manager/Human Resources Business Partner from 2017 to 2020, and Chief of Staff, People until late 2020. A Human Resources Business Partner is an experienced human resource professional who works directly with an organization's senior leadership to develop and direct a Human Resources agenda that closely supports organizational goals. CW12's responsibilities included getting Activision Blizzard on the "Great Place to Work List" at

---

[6] In 2019 and 2020 the DFEH accepted 6,636 and 5,784 individual complaints for investigation, respectively.

*greatplacetowork.com*, which partners with the Fortune 100 Best Companies to Work For list.

256.   As Chief of Staff, People, CW12 served as Chief of Staff to Senior Vice President of Human Resources and Senior People Officer Jesse Meschuk's Chief of Staff. CW12 noted that despite the fact that Meschuk was managing Blizzard's Human Resources, he had a lot of functions that were not specific to Blizzard because the Company was centralizing a lot of Human Resources functions at the time.

257.   CW12 stated that Meschuk reported directly to Activision Blizzard Chief People Officer, Claudine Naughton, who was head of Human Resources for all of Activision Blizzard. Naughton reported directly to Defendant Kotick and had regular one-on-one meetings with him.

258.   According to CW12, in the fall of 2018, shortly after the EEOC and DFEH Investigations officially began, all of the Activision Blizzard Human Resources Business Partners began having regular meetings with the Company's legal team where the Company's executives told them to start documenting all sexual harassment and other internal complaints because the EEOC was investigating the Company. Prior to that, Activision Blizzard Human Resources did not have a formal process for investigating complaints and there was no consistent documentation of them. There were also no regular meetings between company-wide Human Resources and the legal department previously.

259.   CW12 further stated that there was no way that Defendant Kotick did not know about these changes because he had regular one-on-one meetings with Naughton.

260.   Confidential Witness 14's ("CW14") statements also show the incredibly urgent, non-routine, manner in which Activision Blizzard dealt with the beginning of the Investigations. CW14 worked at Activision Blizzard as a Lead HR Program Manager from January 2016 to September 2019 and as an HR

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Manager for Activision Blizzard from September 2011 to January 2016. CW14 reported directly to VP of Human Resources Jesse Meschuk.

261.   CW14 stated that that shortly after the EEOC and DFEH Investigations began, Activision Blizzard's attorneys told her about those Investigations and made an "urgent" request for "huge" data sets on the Company's employees dating back many years. CW14 said there was an enormous amount of urgency around the request — the attorneys asked for them in "three hours" and she told them it would take a day or two. CW14 further stated that she was confident that the higher ups were worried about the Investigations.

**H. Activision Blizzard Opens a Parallel Investigation to the EEOC and DFEH's Investigations and Uses it to Obstruct the DFEH Investigation.**

262.   In Activision Blizzard's Answer to the DFEH Amended Complaint, the Company admitted it opened an internal investigation of practices and policies of its Human Resources department in 2018.

263.   The DFEH found that when "female employees… complained of the harassment they suffered, including that male co-workers groped them, that male supervisors asked them on dates, and of other unwanted harassment. Defendants failed to take reasonable action in response to these complaints. ***Such lack of effective remedial measures was not surprising given Defendants' own internal investigation into their human resources unit noted that there was a 'big lack of trust' and that 'HR not held in high regard.'"*** (emphasis added). Additionally, "multiple employees noted that their complaints were not kept confidential."

264.   Activision Blizzard admitted in its Answer to the DFEH Amended Complaint that during an interview conducted for the Company's 2018 internal investigation of its Human Resources department's policies and practices, an employee in its Human Resources department stated that there was a "big lack of trust" concerning a particular member of Human Resources due to her closeness to certain business leaders and that "HR was not held in high regard."

265.   The fact that Activision Blizzard spent the time and money conducting this parallel investigation shows the significant and non-routine nature of the DFEH and EEOC Investigations and also put Defendants on notice of the endemic misconduct at the Company.

266.   According to the DFEH, Activision Blizzard also used its parallel investigation to obstruct the DFEH's Investigation. The Amended DFEH Complaint stated that Activision Blizzard's outside counsel used the internal investigation to claim that the Company's "'***receipt [of complaints] or investigation of discrimination or harassment complaints is privileged.***'" (emphasis in original) Additionally, Activision Blizzard also "solicited waivers of employee rights and obtain[ed] repressive, if not punitive, secret settlements of sexual harassment claims, non-disclosure agreements, and non-disparagement agreements with severe penalties against employees. ***Without any notice of the pending government enforcement action***…" (emphasis in original). (*See* Paragraphs 347-352, *infra*).

**I.   Activision Blizzard's Management informed the Board of Directors About the EEOC and DFEH Investigations.**

267.   The November 16 *Wall Street Journal* Article reported that Activision Blizzard's board of directors sent *The Wall Street Journal* a statement disclosing that it had been "informed at all times with respect to the status of regulatory matters," referring to the EEOC and DFEH Investigations.

268.   Given the size of Activision Blizzard, only a small percentage of legal matters concerning the Company — the most significant and those with the potential to materially impact the Company — would have been brought to the board of directors' attention by management. Routine or insignificant legal matters would not be brought to the Board's attention. That management specifically informed the board of directors about the EEOC and DFEH Investigations is yet another indication that the Investigations were not routine and

in the ordinary course of business and that Defendants believed they were significant and likely to have a material effect on the Company.

**J. The Existence of the Investigations Was Widely Known at Activision Blizzard and They Made a Significant Impression its Employees Because of a Recent News Story About Sexism at Competitor Riot Games.**

269. The existence of the EEOC and DFEH Investigations was also widely known at the Company. CW4 worked as a Software Engineer in the Blizzard segment of Activision Blizzard from June 2015 through December 2020. During that period she held the title of Associate Software Engineer and Software Engineer. CW4 stated that the DFEH and EEOC Investigations were common knowledge at the Company as far back as 2018 and that employees discussed the Investigations on the Company's internal Slack[7] channels. In particular, CW4 stated that the Investigations made a significant impression on Activision Blizzard's employees because of an August 7, 2018 article that had appeared on the website *Kotaku.com* about sexism at fellow Los Angeles area video game developer, Riot Games. CW4 described the Riot story as "huge news."

**K. In October of 2018, Activision Blizzard Abruptly Fired Tyler Rosen After Tolerating His Conduct for Years.**

270. As alleged in Paragraphs 157 to 162, Tyler Rosen was a serial harasser at Activision Blizzard, who had complaints made about his behavior going back to 2014.

271. Despite this, the Company did not fire Rosen until October 2018, right after the Investigations started.

272. As with Kilgore, CW12 stated that Rosen's firing could only have been explained by the Investigations since sexual harassment complaints had been

---

[7] Slack is an application that many workplaces use to make it easier for employees to communicate with each other. Employees can message each other both in group chats (or "channels") or person-to-person.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

pending against him for years.

273.   The August 6 *Washington Post* Article described Tyler Rosen as a high-level employee who was quietly pushed out after years of misconduct. Rosen admitted in an email to *The Washington Post* that he was "part of the problem that plagues Blizzard and the wider gaming industry." Rosen further stated that "Blizzard could not talk about my termination as a matter of policy, so I exited quietly which helped me avoid public accountability, ***perpetuated the culture of silence***, and downplayed the experiences of survivors." (emphasis added).

274.   Given Kotick's involvement with hiring and firing, Kotick certainly also knew about and likely also approved the firing of Rosen (*See* Paragraphs 218-222).

**L.**   **Defendants Did Not Disclose the EEOC and DFEH Investigations, and Instead Stated On November 8, 2018 that the Company was Party to Only "Routine…Investigations" that Arose in "the Ordinary Course of Business," Were "Not Significant," and Not Expected "to Have a Material Adverse Effect" on Activision Blizzard's Business.**

275.   On November 8, 2018, Activision Blizzard filed a form 10-Q for the quarterly period ended September 30, 2018 ("3Q 2018 10-Q"). Attached to the 3Q 2018 10-Q was a SOX Certification signed by Defendants Kotick.

276.   Although the 3Q 2018 10-Q spoke specifically on the topic of ongoing investigations under the heading  "legal proceedings," it did not disclose the EEOC or DFEH Investigations. Instead, it stated in both the notes to the Company's consolidated financial statements and under Item 1 of Part II that the Company was subject to "***routine….investigations***" that arose from "***the ordinary course of business***," were "***not significant***," and ***not expected "to have a material adverse effect"*** on Activision Blizzard's business:

> ***We are party to routine*** claims, suits, ***investigations***, audits, and other
> proceedings ***arising from the ordinary course of business***, including

67

with respect to intellectual property rights, contractual claims, ***labor and employment matters***, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

277.   The 3Q 2018 10-Q described all ongoing investigations as "routine," "arising in the ordinary course of business," "not significant," and not expected to have a "material adverse effect" despite the fact that: (1) the pervasive sexual harassment and discrimination at Activision Blizzard made it inevitable that the EEOC and DFEH would discover it; (2) the Investigations were initiated by an EEOC Commissioner Charge and DFEH Director's Complaint, which those government agencies rarely use and reserve for serious systemic misconduct; (3) the Investigations led the Company to immediately alter its Human Resources practices and also start a parallel internal investigation; (4) the Investigations caused the Company to abruptly fire of key employees Ben Kilgore and Tyler Rosen; (5) Activision Blizzard's management informed the board of directors about the Investigations; (6) the #MeToo Movement made the Investigations especially dangerous for the Company.

**M.  In Early 2019, Multiple Employees Informed New Blizzard President Brack About the Pervasive Misconduct at Blizzard.**

278.   J. Allen Brack succeeded Morhaime as Blizzard President in October 2018. He was informed of the pervasive harassment at Blizzard both prior to the time he became President and shortly after the beginning of his tenure.

279.   *First*, as discussed in Paragraphs 147 to 148, Activision Blizzard admitted in its Answer to the DFEH Amended Complaint J. Allen Brack, while he was Executive Producer and Vice President for *World of Warcraft*, "counseled" Afrasiabi twice in 2015 and 2016 about his treatment of female Blizzard

68

employees.

280.   *Second*, the DFEH Complaint alleged that "***[n]umerous complaints about unlawful harassment, discrimination***, and retaliation were made to Defendants' human resources personnel and executives, ***including to Blizzard Entertainment's President J. Allen Brack***." (emphasis added). In response, Activision Blizzard admitted in its Answer to the DFEH Amended Complaint "that complaints about harassment, discrimination, and retaliation have been raised with [Activision Blizzard's] respective human resources personnel and to some executives, ***including to Blizzard Entertainment Inc.'s then-President J. Allen Brack***." (emphasis added).

281.   *Third,* the DFEH Complaint stated that the DFEH's investigation found that "***[a]n employee complained to Blizzard Entertainment President J. Allen Brack in early 2019 that employees were leaving due to sexual harassment and sexism.*** Specifically, this employee noted that women on the Battle.net team were subjected to disparaging comments, the environment was akin to working in a frat house, and that women who were not 'huge gamers' or 'core gamers' and not into the party scene were excluded and treated as outsiders."

282.   *Fourth*, in January 2019, CW6 sent Blizzard President Brack an email, in which she discussed the ongoing sexual harassment and discrimination problems at Blizzard. CW6 provided Plaintiffs' investigator with the text of the email. The email stated, among other things:

> My current manager has shown misogynistic behaviors towards myself and also towards other women on my team (I have made [the VP of Global Quality Assurance (Individual I), the Senior Director of Quality Assurance (Individual T), and a Human Resources Manager (Individual K)] aware of this). He belittles our insight and experience and never takes us seriously. Examples include him criticizing me for joining the Women's Council and saying that I am not contributing to

69

the company in a bigger way. He thinks that it is a disruption and should not be given priority over other company policies.

I joined the Women's Council last year in order to help make Blizzard a better place. We have made a lot of great progress but I believe that ***QA has been a toxic place for so long that we need more serious intervention on the executive levels as women and especially women of color like myself have been kept from reaching our full potential. Through the delayed promotions, inaccurate performance appraisals, blatant sexual and verbal harassment from others, and overlooked achievements women are becoming discouraged here at an alarming rate. After speaking with a lot of the women in QA in different roles, I can see the cost of this and we have been bleeding talent.*** I want women to be proud of being in QA and especially being here at Blizzard.

….

In conclusion I believe we need to be more transparent as a company when it comes to talking about sexual harassment and racial discrimination with our fans and employees. ***We also need to bring in more third party consultants on handling investigations with harassment and discrimination as I do not believe our current HR team (at least in QA and ESports) cannot [sic] handle these cases effectively at this point in time.*** Zero tolerance should mean zero tolerance with no exceptions.

(emphasis added).

283.   Brack responded to CW6's email with an email in which he thanked her for her email and stated that he would forward it to Jesse Meschuk, Senior Vice President of Global HR.

**N.** **In Late 2018 and Early 2019, Doe Spoke to An Investigator Hired by Activision Blizzard and CW3 Wrote an Email to HR After She Was Fired in Retaliation for Making Harassment Complaints.**

284.   The Senior Administrative Assistant in the Blizzard Technology Department who filed the *Doe* complaint against Activision Blizzard, Kilgore, Ingalls, and Skorupa complained to HR again in November 12, 2018 because she

70

had been removed from all leadership meetings in retaliation for her harassment complaints. HR acknowledged that leadership was retaliating against her and bullying her, but did not help her in any way.

285.   On December 17, 2018, Doe provided information about her "toxic experiences" at Blizzard to an investigator hired by Activision Blizzard. Accordingly, Activision Blizzard's internal investigation, which ran parallel to the DFEH and EEOC Investigations put the Company on notice of the wrongdoing.

286.   In February of 2019, Activision Blizzard laid off CW3. CW3 believes the Company laid her off because of her reports to HR, including her report of Tyler Rosen. (*See* Paragraph 162). She wrote a "strongly worded email about all of the things we had discussed," to Individual B, a Senior Manager in the HR Department, after she was fired. CW3 said in the email: "I don't understand how all of these people have multiple complaints about them of abuse and are still with the company."

287.   CW3 also stated that during her time at Activision Blizzard (between October 2017 to February 2019), the Company tried to get her and other employees to sign new contracts that mandated arbitration for complaints within the Company. This is notable given Activision Blizzard's attempts to thwart the DFEH's Investigation by claiming that internal complaints were privileged.

**O. On February 28, 2019, Activision Blizzard Again Stated That All the Investigations it Was Subject to Were "Routine," Arose in "the Ordinary Course of Business," were "Not Significant," and Not Expected "to Have a Material Adverse Effect"**

288.   On February 28, 2019, Activision Blizzard filed a form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K") with the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2018 10-K were SOX Certifications signed by Defendants Kotick and Durkin. The 2018 10-K enumerated certain legal proceedings followed by the blanket statement:

71

*In addition, we are party to routine* claims, suits, *investigations*, audits, and other proceedings *arising from the ordinary course of business*, including with respect to intellectual property rights, contractual claims, *labor and employment matters*,…. In the opinion of management, after consultation with legal counsel, *such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business*, financial condition, results of operations, or liquidity.

(emphasis added).

289.    By using this construction, Defendants were clearly stating that all legal proceedings — including "investigations" — that were not enumerated were "routine," arose in "the ordinary course of business," were "not significant" and were not expected to have a "material adverse effect" on Activision Blizzard's business.

**P. <u>Doe Informs President Brack in Writing About the Sexual Harassment and Retaliation She Suffered; CW6 Meets with Meschuk and Blizzard's Chief Legal Officer; and the Company Makes Another Similar Legal Proceedings Statement.</u>**

290.    On March 14, 2019, Doe complained to Blizzard President Brack in writing about the sexual harassment and retaliation she had suffered in Blizzard's Technology Department. Only then was she finally able to move out of the Technology Department because Activision Blizzard offered her the position in the Story & Franchise Department that she was previously rejected from. The job was, however, a demotion that came with a significant pay decrease.

291.    In response to CW6's January 2019 email to President Brack, Senior Vice President of Global HR Meschuk then set up a meeting with CW6 and Blizzard Chief Legal Officer and Senior Vice President Claire Hart, which took place sometime between February and April 2019. CW6 talked about everything in her email. In response, CW6 states that Hart and Meschuk agreed to open an

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"official" investigation. However, the investigation essentially consisted of an investigator asking people if they had personally harassed or discriminated against CW6, and when they responded in the negative, taking their word for it without investigating further. Given this, CW6 told Hart and Meschuk "I was really hoping you'd do something for me but it looks like I'm going to have to quit." CW6 gave her notice later that week

292. At the same time, Activision Blizzard continued to tout the importance of its "inclusive culture" to investors. In its 2019 Proxy statement, filed with the SEC on April 23, 2019, the Company stated: "We aspire to have an inclusive culture where diversity is embraced and everyone can thrive. We believe this is one of the reasons why, for five consecutive years, Activision Blizzard has been recognized as one of the '100 Best Companies to Work For' by Fortune magazine. Activision Blizzard also earned a top score of 100 on the 2019 Human Rights Campaign Foundation's Corporate Equality Index and the distinction of being one of the 'Best Places to Work for LGBTQ Equality' in our inaugural year of participation. We are proud of these accolades because we believe that the most innovative work comes from a culture in which all employees can be their full selves." (emphasis added).

293. On May 2, 2019, Activision Blizzard filed a form 10-Q for the quarterly period ended March 31, 2019 ("1Q 2019 10-Q") with the SEC that was signed by Defendant Durkin. Attached to the 1Q 2019 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The 1Q 2019 10-Q again stated that all investigations that Activision Blizzard was subject to were "routine," arose from "the ordinary course of business," were "not significant," and not expected "to have a material adverse effect."

73

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

**Q. <u>Despite Changing the Reporting Structure of its HR Department Due to its Inability to Stop Misconduct, Activision Blizzard Again Makes Similar False and Misleading Legal Proceedings Statements.</u>**

294.   In August 2019, Activision Blizzard changed the reporting structure of Human Resources so that it reported directly to the Company's corporate office. As reported in the "November 16 *Wall Street Journal* Article", a spokeswoman for Activision Blizzard admitted to *The Wall Street Journal* that the Company made this change because the prior setup 'occasionally allowed some employees to conduct themselves in truly regrettable ways.'" In light of CW12's statements that changes in the complaint investigation process were due to the EEOC Investigation (*see* Paragraphs 255-258) and the statement in the Activision Blizzard's Consent Decree with EEOC that "Defendants represent that they have reorganized and reconstituted the Human Resources functions enterprise wide," it is clear that this significant restructuring of Human Resources was due the ongoing Investigations. Additionally, Kotick was aware of these changes because of his one-on-one meetings with Naughton (*see* Paragraph 259).

295.   On August 8, 2019 and November 7, 2019, Activision Blizzard filed a form 10-Q for the quarterly period ended June 30, 2019 ("2Q 2019 10-Q") and a form 10-Q for the quarterly period ended September 30, 2019 ("3Q 2019 10-Q") with the SEC, respectively. They were both signed by Defendant Durkin and each attached SOX Certifications signed by Defendants Kotick and Durkin. Despite the significant restructuring of the HR department, both again stated that all investigations that Activision Blizzard was subject to were "routine," arose from "the ordinary course of business," were "not significant," and not expected "to have a material adverse effect." The 2Q 2019 10-Q used the same "in addition" language as the 2018 10-K

74

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

**R. Defendant Kotick Was Directly Involved in Yet Another Sexual Harassment Internal Investigation and the DFEH Intervenes in a Class Action Suit Against Riot Games; Activision Blizzard Again Makes Similar False and Misleading Legal Proceeding Statements.**

296.   *The Wall Street Journal* uncovered yet another sexual harassment incident at the Company that Defendant Kotick was directly involved in. The August 6 *Wall Street Journal* Article stated that Dan Bunting, co-head of Activision Blizzard's Treyarch studio, was accused by a female employee of sexually harassing her in 2017 after a night of drinking. Activision Blizzard's human resources department and other supervisors launched an internal investigation in 2019 and recommended that Bunting be fired, but Kotick intervened to keep him. Instead, Bunting was given counseling. Bunting left Activision Blizzard in response to *The Wall Street Journal* asking the Company about the incident.

297.   On January 21, 2020, *The Los Angeles Times* reported that another Los Angeles area video game company, Riot Games, had attracted the DFEH's ire. The DFEH moved to intervene in a sexual harassment and gender discrimination class action filed by women who worked at Riot Games in November 2018, arguing that the agreed settlement of $10 million was too low because the women could be entitled to as much as $400 million.[8]   The DFEH also stated that the non-monetary terms of the potential settlement with Riot Games were inadequate, because "no enforceable changes to employment policies, at a company alleged to be rife with sexism, are part of the settlement." Notably, the DFEH found that the women at Riot Games could be entitled to $400 million despite the fact that Riot Game's workforce was only about one-fourth of

_____

[8] The DFEH successfully prevented the settlement and Riot Games eventually settled for $100 million, ten times as much as it initially agreed to.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the size of Activision Blizzard's.[9]

298.   On February 27, 2020, Activision Blizzard filed a form 10-K for the fiscal year ended December 31, 2019 ("2019 10-K") with the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2019 10-K were SOX Certifications signed by Defendants Kotick and Durkin. The 2019 10-K again stated that all investigations that Activision Blizzard was subject to were "routine," arose from "the ordinary course of business," were "not significant," and not expected "to have a material adverse effect." The 2019 10-K used the same "in addition" language as the 2018 10-K.

299.   Activision Blizzard's 2020 Proxy statement, filed with the SEC on April 24, 2020, continued to tout the importance of diversity and inclusion to the success of the Company. It stated that ***"[d]iversity and inclusion remain a strategic priority for Activision Blizzard***. We are committed to building and sustaining a culture of belonging, where everyone thrives and diversity drives business value and growth." It further stated that "[a]cross our entire organization, *fostering an inclusive culture where employees feel valued and heard, and a sense of belonging is mission critical*." (emphasis added).

300.   On May 5, 2020, Activision Blizzard filed a form 10-Q for the quarterly period ended March 31, 2020 ("1Q 2020 10-Q") with the SEC that was signed by Defendant Durkin. Attached to the 1Q 2020 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The 1Q 2020 10-Q made another similar false and misleading legal proceedings statement.

**S.** **Activision Blizzard Suddenly Fires Alex Afrasiabi on May 28, 2020, Despite the Fact that it was a Costly Financial Decision.**

301.   Despite Afrasiabi, the Senior Creative Director of Blizzard's most

---

[9] The DFEH stated in its motion to intervene in the EEOC's settlement with Activision that it estimated the total damages for Activision Blizzard employees for harassment, retaliation, and discrimination claims was more than $930 million.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

popular game, *World of Warcraft*, being a known serial harasser whose egregious behavior went back to at least 2012 (Paragraphs 139-156), Activision did not fire him until May 28, 2020.

302.   Confidential Witness 15 ("CW15") described Afrasiabi's departure from the Company as unexpected and abrupt. CW15 worked for Blizzard from late 2017 to late 2021, first as the Editor for Overwatch Global Publishing and then as Editor of World of Warcraft Global. CW15's duties were like being an internal journalist at the Company.

303.   CW15 believed that the EEOC and DFEH Investigations were the only plausible explanation for Afrasiabi's sudden firing. CW15's belief is based upon CW15's knowledge that Afrasiabi was in the midst of developing a game that the Company had spent millions of dollars on and "when [Afrasiabi] was removed, his project wasn't given to someone else." CW15 further stated that "it was a very costly financial decision for them to let people of that level go. [Afrasiabi] was working on a game under an NDA and he just all of a sudden disappeared for no reason." CW15 was shocked that the Company cancelled Afrasiabi's new game, stating that "they spent millions of dollars developing it and they just shelved it." CW15 further stated that it "just seemed sudden" since "we knew he was a sleazebag, but we [knew] that for ten years before so why now?"

304.   CW12 concurred with CW15, stating that as with Kilgore and Rosen, Afrasiabi's firing could only have been explained by the Investigations since sexual harassment complaints had been pending against him for years.

305.   Activision Blizzard's Answer to the Amended DFEH Complaint admitted that "Afrasiabi was terminated effective May 28, 2020, for misconduct in the treatment of employees."

306.   Given Kotick's involvement with hiring and firing, Kotick also knew about and likely also approved the firing of Afrasiabi (*See* Paragraphs 218-222)).

77

**T. <u>In June 2020, the EEOC and DFEH Investigations Caused Activision Blizzard to Create a New Employee Relations Team That Handled All Internal Investigations of Complaints Throughout the Company.</u>**

307.   Confidential Witness 16 ("CW16") served as Associate Director, Development Services in Human Resources at Blizzard from June 2020 to February 2022. According to CW16, the EEOC and DFEH Investigations caused Activision Blizzard to revamp how it handled internal investigations of complaints prompted the Company to create the Employee Relations Team for that purpose in June 2020. CW16 said the Employee Relations Team handled all the internal investigations for the entire Company in a standardized way, whereas there had not been a standardized procedure previously (CW12 also discussed the lack of a standard procedure for the investigation of complaints. *See* Paragraph 258).

308.   CW16 further stated that the new Employee Relations Team took a "massive caseload" of internal investigations away from his HR team.

309.   Similarly, CW10, who, *inter alia*, served as Vice President of Human Resources for Activision Publishing from February 2019 to December 2020 and reported to Activision Blizzard Chief People & Diversity Officer Claudine Naughton (who in turn reported directly to Kotick), said that Naughton "began decimating HR in order to begin building up the company's employee relations team."

310.   CW10 further stated she believes most of what Naughton did was at Kotick's direction.

311.   CW11, who was a Human Resources Partner at Blizzard from June 2015 to March 2021, further confirmed that the establishment of the Employee Relations Team represented a dramatic change. CW11 stated that prior to the establishment of that team, different HR people had different methods of investigation and some wouldn't take some complaints seriously "because there was no oversight."  "It was very much up to the individual HR person to follow

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

their own devices." CW11 further stated that she never received any training on how to conduct an investigation until late 2020.

312.   CW10, CW11, and CW16,  also all told Plaintiffs' investigator that by June 2020 the fact that the EEOC and DFEH Investigations were ongoing was widely known within the Company.

313.   Additionally, CW4, who worked as a Software Engineer in the Blizzard segment of Activision Blizzard from June 2015 through December 2020, stated that she got an email from Blizzard's legal department during the summer of 2020 telling her not to delete anything on her computer due to the ongoing Investigations. CW4 also specifically recalled asking an Associate Director of Human Resources (Individual U) about the Investigations after she received the email. Individual U told CW4 that she knew about the Investigations.

314.   Additionally, CW4 had a meeting with Vice President of Human Resources Jesse Meschuk in approximately July 2020, where she discussed the sexual assault she suffered at a cube crawl (*See* Paragraphs 174-175). Meschuk set up the meeting with her because she had been discussing the assault on an internal Slack channel.

**U.** **Despite the Investigations Causing Activision Blizzard to Completely Overhaul the Internal Complaint Process and Fire Alex Afrasiabi, the Company Continued to Make Similar False and Misleading Legal Proceedings Statements.**

315.   Despite the EEOC and DFEH Investigations causing Activision Blizzard to completely overhaul its internal complaint process by forming the Employee Relations Team and to fire Alex Afrasiabi, the Company continued to make similar false and misleading legal proceedings statements.

316.   On August 4, 2020 and October 29, 2020, Activision Blizzard filed a form 10-Q for the quarterly period ended June 30, 2020 ("2Q 2020 10-Q") and a form 10-Q for the quarterly period ended September 30, 2020 ("3Q 2020 10-Q")

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

with the SEC, respectively. They were both signed by Defendant Durkin and each attached SOX Certifications signed by Defendants Kotick and Durkin. Both again stated that all investigations that Activision Blizzard was subject to were "routine," arose from "the ordinary course of business," were "not significant," and not expected "to have a material adverse effect."

**V. Thirty Female Employees in Activision Blizzard's Esports Division Send an Email Documenting Harassment and Discrimination to Their Unit Leader With Kotick's Knowledge; the Company Makes Another Similar False and Misleading Legal Proceedings Statement.**

317.   According to the November 16 *Wall Street Journal* Article, the *Wall Street Journal* also found that, according to people familiar with the matter, Defendant Kotick was aware of a 2020 email that 30 female employees working in Activision Blizzard's Esports division wrote to their unit's leaders "saying that female employees had been subject to unwanted touching, demeaning comments, exclusion from important meetings, and unsolicited comments on their appearance."

318.   On February 23, 2021, Activision Blizzard filed a form 10-K for the fiscal year ended December 31, 2020 ("2020 10-K") with the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2020 10-K were SOX Certifications signed by Defendants Kotick and Durkin. It again stated that all investigations that Activision Blizzard was subject to were "routine," arose from "the ordinary course of business," were "not significant," and not expected "to have a material adverse effect."

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### W. After Over Two Years of Extensive Investigation Activision Blizzard Internally Acknowledges Significant Risk of a Cause Finding and Attempts to Negotiate with DFEH; Following DFEH's Issuance of a Broad Subpoena DFEH Ignores the Company's Request to Meet and Confer; the Company Makes Another False and Misleading Legal Proceedings Statement

319. In its Answer to the DFEH Amended Complaint, Activision Blizzard admitted that its negotiations with the DFEH broke down in the spring of 2021.

320. In its Answer to the DFEH Amended Complaint, Activision Blizzard admitted that as part of negotiations with the DFEH about extending the parties tolling agreement, which was set to expire in July 2021, it began negotiating with the DFEH about the possibility that the DFEH might find "cause" for one or more of its claims. Activision Blizzard stated that: "The parties discussed and agreed that, if there was a 'cause' finding, the complexity of the issues warranted the use of a private mediator and that Mark Rudy, a private mediator, would be used in lieu of the DFEH panel of mediators. [Activision Blizzard] also proposed a pre-mediation meeting as the channel for DFEH to give notice of the claims on which it had found 'cause.' DFEH agreed that such a pre-mediation meeting would be helpful. The parties therefore agreed upon a pre-mediation meeting, and then a December 2021 mediation."

321. Accordingly, it is clear that Activision Blizzard believed that there was significant risk that the DFEH would find cause for one or more of its claims. Therefore, it would have been highly alarming to Activision Blizzard when, as the Company stated, in its Answer to the DFEH Amended Complaint, instead of engaging with Activision Blizzard about the scope of its claims, "on April 2, 2021, DFEH served a Subpoena Duces Tecum on Activision Blizzard, Inc., which contained 40 requests with numerous subparts. The requests reached far beyond the scope of the Director's Complaint, seeking broad categories of documents far

beyond those alleged employment practices noticed in the DFEH's Director's Complaint." On April 12, 2021, Activision Blizzard asked the DFEH to meet and confer, but the DFEH "did not respond to [Activision Blizzard's] request to meet and confer."

322. This dramatic breakdown of talks between Activision Blizzard and the DFEH indicated that there was a significant risk that the DFEH would file suit against Activision Blizzard.

323. The DFEH's decision to serve the broad subpoena did not bode well for Activision Blizzard given the *DFEH had already been investigating it for more than two years* and its Investigation was very extensive. The DFEH interviewed hundreds of victims and employee/contractor witnesses, taken 7 depositions, and received 18,000 pages of documents and 7 years of employment data.[10] Additionally, the EEOC conducted over 100 interviews of Activision Blizzard's current and former employees and third parties, sent an electronic survey to all of Activision Blizzard's employees, conducted "lengthy interviews" with 10 of Activision Blizzard's current and former managers and executives, and reviewed thousands of pages of Activision Blizzard's documents, including policies, trainings, complaints, investigations, and personnel records during its Investigation.[11]

324. During this time, Activision Blizzard continued to emphasize its commitment to diversity and inclusion to investors. In its 2021 Proxy Statement, filed with the SEC on April 30, 2021, Activision Blizzard said it was adding an environmental, social, and governance ("ESG") component to its executives'

---

[10] *See* Declaration of Janette Wipper in Support of Department of Fair Employment and Housing's Motion to Intervene, *EEOC vs. Activision Blizzard, Inc, et al.*, Case No. 2:21-cv-07682-DSF-JEM (C.D. Cal.), ECF No. 24-10.

[11] *See* Declaration of Ella Hushagen in Opposition to *Amicus* DFEH's Motion to Stay, *EEOC vs. Activision Blizzard, Inc, et al.*, Case No. 2:21-cv-07682-DSF-JEM (C.D. Cal.), ECF No. 62-9.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

annual cash bonus program. It stated that 20% of strategic objectives "will be based on measurable ESG initiatives (i.e., human capital management, corporate social responsibility, and sustainability goals*, which may include diversity, equity and inclusion metrics centered around the hiring/promotion of members of underrepresented communities, hiring of veterans and sustainability*)." (emphasis added).

325.   The DFEH served the above referenced Subpoena Duces Tecum more than a month before Activision Blizzard filed its Form 10-Q for the quarterly period ended March 31, 2021 on May 4, 2021 ("1Q 2021 10-Q"). Defendant Zerza signed the 1Q 2021 10-Q and it attached SOX Certifications signed by Defendants Kotick and Zerza. In the 1Q 2021 10-Q, Defendants continued to state that all investigations that Activision Blizzard were subject to were "routine," in "the ordinary course of business," "not significant," and not expected to have a "material adverse effect" despite the fact that the DFEH's decision to escalate its investigation by serving the April 2, 2021 Subpoena Duces Tecum strongly indicated it was dissatisfied with Activision Blizzard's cooperation and would likely file a public complaint.

**X.** **The Public Disclosure of the Investigations Leads to an Enormous Scandal that Damages Activision Blizzard's Reputation and Productivity, Leading to a Large Decline In The Company's Share Price.**

**1)**   **On July 20, 2021, the DFEH Publicly filed its Complaint Against Activision Blizzard, Revealing the Pervasive Misconduct at the Company, and Leading to Enormous Reputational Damage, Employee Walkouts, and the Decline of the Company's Share Price.**

326.   According to the DFEH Complaint, after the DFEH issued its finding of cause to Activision Blizzard on June 24, 2021, the DFEH and Activision Blizzard "attempted to resolve this matter without litigation. Prior to filing this civil action, the DFEH required all parties to participate in mandatory dispute

resolution in the department's internal dispute resolution division free of charge to the parties in an effort to resolve the dispute without litigation. Specifically, DFEH invited Defendants to participate in a mediation session with the department's internal dispute resolution division on July 1, 2, and 15, 2021, but the parties were unable to resolve the administrative complaints."

327.   By operation of a signed agreement between the DFEH and Defendants, the DFEH's deadline to file a civil action was July 21, 2021. The DFEH complied with this by filing the DFEH Complaint on July 20, 2021 in the Superior Court of the State of California in and for the County of Los Angeles.

328.   The DFEH brought causes of action for Employment Discrimination Because of Sex-Compensation; Employment Discrimination Because of Sex-Promotion; Employment Discrimination Because of Sex-Termination; Employment Discrimination Because of Sex-Constructive Discharge; Employment Discrimination Because of Sex–Harassment; Retaliation; Failure to Prevent Discrimination and Harassment; Unequal Pay; Waiver of Rights, Forums, or Procedures and Release of Claims. Each count asked the Superior Court to *enjoin* Activision Blizzard's illegal conduct.

329.   On July 21, 2021, the Company issued a statement, as reported by *Bloomberg Law*, denying the DFEH's allegations:

"We value diversity and strive to foster a workplace that offers inclusivity for everyone. There is no place in our company or industry, or any industry, for sexual misconduct or harassment of any kind," a spokesperson for Activision Blizzard said in a statement. "We take every allegation seriously and investigate all claims. ***In cases related to misconduct, action was taken to address the issue.***"

"***The DFEH includes distorted, and in many cases false, descriptions of Blizzard's past. We have been extremely cooperative with the DFEH throughout their investigation, including providing them with extensive data and ample documentation***, but they refused to inform us what issues they perceived," the statement continued.

"***The picture the DFEH paints is not the Blizzard workplace of today***," the company said.

(emphasis added).

330.   In the few days following the Company's denial, numerous current and former employees of the Company spoke up on Twitter and other social media about the pervasive sexual harassment and discrimination at the Company.

331.   On July 24, 2021, Jeff Hamilton, a Senior Game Designer at Blizzard who was working on World of Warcraft tweeted: "***I find Activision's corporate response wholly unacceptable.*** I don't stand by it, any of it. It is evil to usurp a victim's story into a rhetorical bludgeon, and it is abhorrent to reply to these accusations with anything other than a well-thought-out plan to correct these abuses." (emphasis added). He further tweeted: "***I can tell you, almost no work is being done on World of Warcraft right now while this obscenity plays out.*** And that benefits nobody - not the players, not the developers, not the shareholders." (emphasis added). Alex Klontzas, Senior Game Producer II – Systems Design on World of Warcraft then confirmed that the next update for World of Warcraft would "take longer to release."

332.   On July 26, 2021, more than 2,000 of Activision Blizzard's current and former employees signed and released an open letter stating that the Company's response to the lawsuit was "abhorrent and insulting":

To the leaders at Activision Blizzard,

***We, the undersigned, agree that the statements from Activision Blizzard, Inc. and their legal counsel regarding the DFEH lawsuit***, as well as the subsequent internal statement from Frances Townsend, ***are abhorrent and insulting to all that we believe our company should stand for.*** To put it clearly and unequivocally, our values as employees are not accurately reflected in the words and actions of our leadership.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

We believe these statements have damaged our ongoing quest for equality inside and outside of our industry. ***Categorizing the claims that have been made as "distorted, and in many cases false" creates a company atmosphere that disbelieves victims. It also casts doubt on our organizations' ability to hold abusers accountable for their actions and foster a safe environment for victims to come forward in the future.*** These statements make it clear that our leadership is not putting our values first. Immediate corrections are needed from the highest level of our organization.

Our company executives have claimed that actions will be taken to protect us, but in the face of legal action — and the troubling official responses that followed — we no longer trust that our leaders will place employee safety above their own interests. ***To claim this is a "truly meritless and irresponsible lawsuit," while seeing so many current and former employees speak out about their own experiences regarding harassment and abuse, is simply unacceptable.***

We call for official statements that recognize the seriousness of these allegations and demonstrate compassion for victims of harassment and assault. We call on Frances Townsend to stand by her word to step down as Executive Sponsor of the ABK Employee Women's Network as a result of the damaging nature of her statement. We call on the executive leadership team to work with us on new and meaningful efforts that ensure employees — as well as our community — have a safe place to speak out and come forward.

We stand with all our friends, teammates, and colleagues, as well as the members of our dedicated community, who have experienced mistreatment or harassment of any kind. We will not be silenced, we will not stand aside, and we will not give up until the company we love is a workplace we can all feel proud to be a part of again. We will be the change.

(emphasis added.)

333.   On July 27, 2021, Activision Blizzard employees planned a walkout and work stoppage to support the petition against the Company, to be held on July

86

28, 2021.

334.   In a report published on July 27, 2021, *Bloomberg Intelligence* analysts Matthew Kanterman and Nathan Naidu sounded the alarm on the "***brain-drain threat***" facing Activision Blizzard as a result of the revelations contained in the DFEH lawsuit. "***The increasing threat of an exodus of key talent from Activision Blizzard in the wake of a sexual discrimination lawsuit from the state of California could inhibit the company's ability to deliver on a promising pipeline of new games on time and at the necessary quality***, including Diablo IV, Overwatch 2 and several mobile games, **_hurting their sales potential_**. *In the near term, work stoppages and an employee strike could delay key content updates, hurting live services revenue*." (emphasis added).

335.   Since it was now clear that Activision Blizzard's denial of the DFEH's allegations rang hollow and the risk to the Company's reputation and employee unrest had begun to materialize, the price of Activision Blizzard's stock fell $6.09/share, or 6.75%, to close at $84.05/share, on July 27, 2021.

336.   Later on July 27, 2021, Defendant Kotick issued a letter to all employees apologizing for the Company's "tone deaf" response to the DFEH lawsuit and promising to fire any managers and leaders across the Company who impeded the integrity of the Company's processes for evaluating harassment and discrimination claims:

> This has been a difficult and upsetting week.
>
> I want to recognize and thank all those who have come forward in the past and in recent days. I so appreciate your courage. Every voice matters - and we will do a better job of listening now, and in the future.
>
> ***Our initial responses to the issues we face together, and to your concerns, were, quite frankly, tone deaf.***

87

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

It is imperative that we acknowledge all perspectives and experiences and respect the feelings of those who have been mistreated in any way. I am sorry that we did not provide the right empathy and understanding....

We are taking swift action to be the compassionate, caring company you came to work for and to ensure a safe environment. There is no place anywhere at our Company for discrimination, harassment, or unequal treatment of any kind.

We will do everything possible to make sure that together, we improve and build the kind of inclusive workplace that is essential to foster creativity and inspiration.

***I have asked the law firm WilmerHale to conduct a review of our policies and procedures*** to ensure that we have and maintain best practices to promote a respectful and inclusive workplace. This work will begin immediately. The WilmerHale team will be led by Stephanie Avakian, who is a member of the management team at WilmerHale and was most recently the Director of the United States Securities and Exchange Commission's Division of Enforcement.

We encourage anyone with an experience you believe violates our policies or in any way made you uncomfortable in the workplace to use any of our many existing channels for reporting or to reach out to Stephanie....Of course, NO retaliation will be tolerated.

We are committed to long-lasting change. Effective immediately, we will be taking the following actions:

1. Employee Support. We will continue to investigate each and every claim and will not hesitate to take decisive action. To strengthen our capabilities in this area we are adding additional senior staff and other resources to both the Compliance team and the Employee Relations team.

2. Listening Sessions. We know many of you have inspired ideas on how to improve our culture. We will be creating safe spaces, moderated by third parties, for you to speak out and share areas for improvement.

88

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3. ***Personnel Changes. We are immediately evaluating managers and leaders across the Company. Anyone found to have impeded the integrity of our processes for evaluating claims and imposing appropriate consequences will be terminated.***

4. Hiring Practices. Earlier this year I sent an email requiring all hiring managers to ensure they have diverse candidate slates for all open positions. We will be adding compliance resources to ensure that our hiring managers are in fact adhering to this directive.

5. In-game Changes. We have heard the input from employee and player communities that some of our in-game content is inappropriate. We are removing that content.

Your well-being remains my priority and I will spare no company resource ensuring that our company has the most welcoming, comfortable, and safe culture possible. You have my unwavering commitment that we will improve our company together, and we will be the most inspiring, inclusive entertainment company in the world.

Yours sincerely,

Bobby

337.    Despite Defendant Kotick's letter, hundreds of Activision Blizzard employees walked off the job as planned on Wednesday July 28, 2021 to protest the working conditions recently highlighted in the DFEH lawsuit and the Company's response to it.

338.    As discussed in Paragraphs 142 to 145, *Kotaku.com* also released its report that included the "Cosby Suite" photo on July 28, 2021, tying numerous high-profile Blizzard personnel to shockingly inappropriate behavior and lending further credence to the account of Activision Blizzard's toxic workplace environment detailed by the DFEH.

339.   In a report published on July 28, 2021, *Bloomberg Intelligence* analysts Kanterman and Naidu reiterated how much damage the DFEH lawsuit had done to Activision Blizzard:

**Brain Drain Risks Growth**

Activision's Post-Lawsuit Brain Drain Threatens Long-Term Growth

***The growing likelihood that Activision Blizzard may lose key talent over fallout from a workplace culture lawsuit could deliver a stinging blow to its execution prowess***, putting its long-term content pipeline at risk and dragging sales below expectations. ***Work stoppages on key products such as World of Warcraft pose a near-term risk to revenue.***

2. Key Talent Could Walk as Accusations Fly

***The specter of talent flight at Activision Blizzard, spawned by a discrimination lawsuit alleging workplace impropriety, could compromise the company's ability to execute on its pipeline of new games.*** Key Blizzard games in development, including Diablo IV, Overwatch 2 and mobile titles could be at risk if the talent exodus escalates….

3. Near-Term Product Delays Could Hit Sales

Employee work stoppages and a planned strike threaten a near-term blow to Activision's sales, even if management can rectify cultural flaws documented in a California lawsuit. ***Development teams, including for key titles such as World of Warcraft, have halted work since the lawsuit was filed on grounds the company's response was lacking, which may signal delays to key content updates.*** Sales from these games are driven by new content releases, suggesting a near-term revenue hit if content delays spread to a broader array of titles.

(emphasis in first line in original; other emphasis added).

2)     **Defendants Admitted That the Investigations Were Material, Not Routine and Significant by Stating in its Public Filings Two Weeks After the DFEH Complaint Was Filed That its Business Could be Adversely Impacted.**

340.    In its 10-Q for the quarterly period ended June 30, 2021 ("2Q 2021 10-Q"), filed on August 3, 2021, the Company stated that "in July 2021 the State of California filed a complaint against the Company alleging violations of the California Fair Employment and Housing Act and the California Equal Pay Act. The complaint was recently filed, and we are taking actions to address the concerns of employees and other key stakeholders and the adverse consequences to our business. *If we experience prolonged periods of adverse publicity, significantly reduced productivity or other negative consequences relating to this matter, our business likely would be adversely impacted.* We are carefully monitoring all aspects of our business for any such impacts." (emphasis added).

341. Defendants' admission that reputational harm from the DFEH Complaint could materially impact the Company shows that the DFEH and EEOC Investigations were never routine and were significant. Given that the Investigations were into systemic misconduct and given the pervasive misconduct at Activision Blizzard of which Defendants were aware, it was always highly likely the Investigations would lead to public revelations of sexual harassment and reputational harm. Therefore, by admitting that such reputational harm would likely adversely affect Activision Blizzard's business, Defendants admitted that the Investigations were likely to have an adverse impact on the Company's business.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3

**3)    The Fallout From the DFEH Lawsuit Continues, Including the Resignations of Blizzard's President and Head of Human Resources and the Firing of the Director of Diablo IV.**

4
5
6
7
8
9
10
11

342.   On August 3, 2021 and August 4, 2021, respectively, Blizzard's President J. Allen Brack and  Senior VP of HR Jesse Meschuk resigned from the Company. Brack was replaced with two co-heads, Jennifer Oneal and Mike Ybarra. Oneal was a long-time employee of Activision Blizzard and studio head of Vicarious Visions  (a wholly owned subsidiary of Activision) until transitioning to Executive Vice President of Development at Blizzard in January 2021 when the Company folded that studio into Blizzard. She was the first woman ever to lead one of the Company's business units.

12
13
14
15
16
17
18
19
20
21

343.   Following President Brack's resignation, on August 3, 2021 *Bloomberg Intelligence* analysts Kanterman and Naidu stated in a report that President Brack's departure "***is just the first step of many Activision Blizzard must take to rectify its endemic culture problems*** and avoid a massive talent drain that could inhibit long-term growth. If the situation endures, the risk of losing key game developers jeopardizes Activision's ability to bring new games to market and update existing titles…" (emphasis added). The report further emphasized the importance of upcoming Diablo and Overwatch releases: "Upcoming new releases from the Diablo and Overwatch franchises are big growth opportunities, but recent culture issues could lead to a talent exodus and hurt their development."

22
23
24
25
26
27

344.   On August 4, 2021, Cowen analysts Doug Creutz and Stephen Glagoia released on report on Activision Blizzard entitled "A Very Mixed Bag in Q2; Blizzard Situation Remains Overly Dynamic." In a section of the report entitled "**Defenestrations Begin At Blizzard**," the analysts observed that while they agreed with the need for Brack and Meschuk to step down "***it's fair to ask why they* [sic]** *only happened today, rather than two weeks ago when the DFEH*

28

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*investigation became public, <u>or two years ago when the company first learned of the DFEH investigation.</u>*" (emphasis added).

345.   On August 6, 2021, Kellogg's pulled out as sponsor of Overwatch League and Coca-Cola and State Farm paused their advertising through Activision Blizzard's Esports platforms.

346.   On August 11, 2021, *Kotaku.com* and Activision Blizzard confirmed that Director of Diablo IV, Luis Barriga, the Lead Game Designer for Diablo IV, Jesse McCree, and World of Warcraft Designer, Jonathon LeCraft, were fired. McCree and LeCraft were, along with others, featured in the "Cosby Suite" photo previously published by *Kotaku.com*.

**4)    The DFEH Amends Its Complaint to Add Claims that Activision Blizzard Obstructed its Investigation.**

347.   On August 23, 2021, the DFEH amended its lawsuit to add allegations that Activision Blizzard obstructed the DFEH's Investigation and retaliated against employees for assisting the DFEH's Investigation and added a claim that the Company failed to maintain and produce records.

348.   The Company obstructed the DFEH by claiming that receipt of or investigation of discrimination and harassment complaints was privileged:

> DFEH requested documents related to employee complaints, communications and records about harassment or discrimination by Defendants. Defendants refused to produce relevant evidence to DFEH, claiming that the company's "*receipt [of complaints] or investigation of discrimination or harassment complaints is privileged,*" and they thereby suppressed evidence and interfered with a government investigation seeking relief for employees who suffered unlawful conduct. In one instance, Defendants' counsel stated: "*[a]s a threshold issue, we note that [the investigator] is an attorney …; her work related to receipt or investigations of discrimination or harassment complaints is privileged.*" Throughout the DFEH two-year investigation, Defendants have taken several adverse actions in response to employee complaints and assistance with the DFEH,

93

including repeatedly cloaking the '***receipt or investigation***' of
employee discrimination and harassment complaints in attorney-client
'privilege,' then withholding and suppressing evidence from the
governmental department charged with investigating and remedying
such complaints, and ultimately interfering with DFEH's statutory
duties to prosecute workplace discrimination and harassment
violations on behalf of employees and contingent or temporary
workers.

(emphasis in original).

349.   The DFEH further alleged that the Company retained WilmerHale to
conduct a confidential investigation for the purpose of interfering with the
DFEH's investigation:

In response to the filing of this suit, Defendants again took similar
actions. Defendants retained a law firm to conduct an attorney-led
'confidential' investigation of unlawful practices raised in employees'
complaints and assistance with the government enforcement action.
Within a week of filing the action and immediately following
employees' public assistance, Defendants issued a public statement
that announced it retained the law firm WilmerHale "…to conduct a
review of [its] policies and procedures" in the workplace. Defendants
publicly stated that: "This work will begin immediately… We
encourage anyone with an experience you believe violates our policies
or in any way made you uncomfortable in the workplace to use any of
our many existing channels for reporting or to reach out to [an
attorney who formerly worked at the United States Securities and
Exchange Commission]. ***[The attorney] team at WilmerHale will be
available to speak with you on a confidential basis.... Your outreach
will be kept confidential***." And, as previously stated by Defendants'
counsel, when ***the investigator is "an attorney…; her work related to
receipt or investigations of discrimination or harassment complaints
is privileged***" and then withheld from the government department
charged with investigating and remedying the complaints. This
directly interferes with DFEH's statutory mandate to investigate,
prosecute, and remedy workplace discrimination and harassment
violations on behalf of employees and contingent or temporary
workers who engaged in, or were perceived to be engaged in,
protective activity.

94

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(emphasis in original).

350.   Activision Blizzard also tried to solicit waivers of employee rights without informing employees of the DFEH's pending government enforcement action: "Also, in response to employees' protected activity, Defendants have also taken adverse actions aimed at curtailing employee rights in this government enforcement action such as soliciting waivers of employee rights and obtaining repressive, if not punitive, secret settlements of sexual harassment claims, non-disclosure agreements, and non-disparagement agreements with severe penalties against employees. *Without any notice of the pending government enforcement action under the California Fair Employment and Housing Act and the California Labor Code*." (emphasis in original).

351.   Such waivers and releases violate California law: "Defendants' waivers and releases that overtly interfere with the DFEH's statutory mandate to investigate and remedy discrimination by imposing conditions to and constraints against their employees' ability to notify DFEH of 'information about unlawful conduct in the workplace' is 'contrary to public policy and shall be unenforceable,' as set forth in Government Code sections 12964.5 and 12953."

352.   DFEH further alleged that Activision Blizzard **shredded documents in violation of a document retention notice sent by DFEH**: "DFEH is also informed and aware that documents and records have not been maintained as required by law or by the DFEH's Document Retention Notice, including but not limited to documents related to investigations and complaints were shredded by human resource personnel and emails are deleted thirty (30) days after an employee's separation."

353.   The Amended DFEH Complaint also added contingent and temporary workers to the class of affected workers.

95

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**5)   The SEC Opens an Investigation into Sexual Harassment and Workplace Discrimination at Activision Blizzard and Subpoenas Defendant Kotick; Blizzard's Chief Legal Officer and Executive Producer of Overwatch Leave the Company.**

354.   On September 20, 2021, the *Wall Street Journal* reported that the SEC had opened an investigation into Activision Blizzard and subpoenaed Defendant Kotick:

> Federal securities regulators have launched a wide-ranging investigation into Activision Blizzard Inc., including how the videogame-publishing giant handled employees' allegations of sexual misconduct and workplace discrimination, according to people familiar with the investigation and documents viewed by The Wall Street Journal.
>
> The Securities and Exchange Commission has subpoenaed Activision, known for its Call of Duty, World of Warcraft and Candy Crush franchises, and several of its senior executives, including longtime Chief Executive Bobby Kotick, according to the people and documents.
>
> The agency is asking for documents including minutes from Activision board meetings since 2019, personnel files of six former employees and separation agreements the company has reached this year with staffers, records show. The SEC is asking for Mr. Kotick's communications with other senior executives regarding complaints of sexual harassment or discrimination by Activision employees or contractors, the documents show.

355.   Immediately following the news of the SEC Investigation, *Bloomberg Intelligence* analysts Kanterman and Naidu warned that the Investigation could compromise the Company's ability to execute new games, including Diablo IV and Overwatch 2: "A U.S. Securities and Exchange Commission investigation into disclosures regarding workplace issues at

96

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Activision Blizzard, first reported in The Wall Street Journal, ***could compromise the company's ability to execute new games -- including Diablo IV, Overwatch 2 and mobile titles -- and meet consensus' estimated double-digit 2022 sales growth***. Development works including those for World of Warcraft had to stop in the wake of a California state lawsuit and employee defections." (emphasis added).

356.   On September 20 and 21, 2021, following the reporting of the SEC Investigation, the price of Activision Blizzard's stock dropped from $79.56 to $73.03/share or more than 8%.

357.   The Company confirmed the SEC's investigation in its Form 10-K for the fiscal year ended December 31, 2021, which it filed with the SEC on February 25, 2022 (the "2021 10-K"). The 2021 10-K stated that "[t]he Company is cooperating with an investigation by the U.S. Securities and Exchange Commission (the "SEC") regarding disclosures on employment matters and related issues including responding to subpoenas from the SEC. The SEC has also issued subpoenas to a number of current and former executives and other employees in connection with this matter."

358.   Also on September 20, 2021, Blizzard's Chief Legal Officer, Claire Hart, announced that September 17, 2021 had been her last day.

359.   On September 21, 2021, *Bloomberg* reported that Overwatch Executive Producer Chacko Sonny was leaving Activision Blizzard at the end of the week.

**6)   On September 27, 2021, the EEOC Files a Sexual Harassment, Sex Discrimination, and Retaliation Complaint under Title VII Against Activision Blizzard, and the Company Enters Into a Consent Decree as a Condition of Settlement.**

360.   After the EEOC issued to Defendants a Letter of Determination finding reasonable cause on its claims, "[a]s required by statute, the Commission

97

invited Defendants to engage in conciliation efforts to endeavor to eliminate the discriminatory practices and provide appropriate relief. The conciliation process is statutorily required for the EEOC to address the findings made in the Letter of Determination. The Commission engaged in extensive conciliation discussions with Defendants, but the Commission was unable to secure through informal methods an acceptable conciliation agreement."

361.   Accordingly, the EEOC filed the EEOC Complaint on September 27, 2021. As detailed above, the EEOC, like the DFEH, found that Activision Blizzard's employees were subject to sexual harassment and discrimination, that Defendants knew about it but did not prevent it, and that employees who complained were retaliated against.

362.   The EEOC asked for, *inter alia*, "a permanent injunction enjoining Defendant, their officers, successors, agents, servants, employees, attorneys, assigns, and all persons in active concert or participation with each of them, from engaging in sexual harassment, retaliation, and any other employment practices which discriminate based on sex, including pregnancy."

363.   Simultaneously with the filing of the EEOC Complaint, the EEOC announced that Activision Blizzard had entered into an onerous Consent Decree, which had a duration of 3 years and also included a $18 million monetary settlement.

364.   The Consent Decree required that within 30 days of its effective date, "Defendants will retain a third party EEO Consultant, approved by the EEOC, with demonstrated experience in the areas of preventing and combating gender discrimination, harassment, and related retaliation. The EEO Consultant shall have access to documents and employees and shall review Defendants' compliance with the provisions of this Decree."

365.   The Consent Decree also required Defendants to "hire or designate an Internal Equal Employment Opportunity Coordinator…to ensure Defendants'

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

compliance with this Decree."

366.   Activision Blizzard will also be subject to annual audits: "On an annual basis throughout the duration of this Decree, the EEO Consultant shall conduct unannounced audits of current employees, that can occur in person, to assess whether sexual harassment, pregnancy discrimination and/or related retaliation issues are properly being addressed, whether the mechanisms implemented pursuant to this Decree are effective, whether the trainings are effective, and to identify areas to improve."

367.   In a report they released on September 27, 2021, *Bloomberg Intelligence* analysts Kanterman and Naidu stated that Activision Blizzard's settlement with the EEOC "Doesn't Alleviate Talent Risk": "Activision Blizzard's $18 million settlement with the U.S. Equal Employment Opportunity Commission ***doesn't alleviate the likelihood of significant brain drain, with staff defections likely to persist in the wake of workplace culture allegations, jeopardizing the timing and quality of its new-game pipeline and putting sales expectations at risk.*** Activision still faces a lawsuit from California's Department of Fair Employment and Housing and an investigation from the SEC." (emphasis added).

368.   Judge Fischer of the U.S. District Court for the Central District of California entered the final version of the Consent Decree on March 29, 2022.

**7)   Due to the Ongoing Scandal, Activision Blizzard Fires 20 Employees; Cancels its Yearly Showcase; Institutes a "New Zero-Tolerance Harassment Policy"; Waives Required Arbitration of Sexual Harassment and Discrimination Claims; and Defendant Kotick Cuts his Own Base Salary to $62,500.**

369.   On October 19, 2021, the Financial Times reported that Activision Blizzard "has fired 20 employees in an attempt to clean up its culture following allegations of widespread gender-based discrimination and harassment" and "has also reprimanded 20 individuals and will expand its ethics and compliance team."

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Activision Blizzard's Chief Compliance Officer, Frances Townsend, said that the 20 people fired had "patterns" of misconduct. Townsend also admitted that the Company's investigation of itself "found misconduct across several parts of the business."

370.   On October 26, 2021, Blizzard announced that it was canceling BlizzCon. In an article by Michael Tobin entitled "Activision's Blizzard Cancels Conference Amid Misconduct Scandal" from that same date, *Bloomberg* describes "BlizzCon as one of the biggest events on the video game industry calendar. In years past, it has drawn more than 20,000 people to Southern California and serves as a venue to unveil new games from Activision's Blizzard Entertainment unit."

371.   As part of the Company's continued effort to placate its employees, Defendant Kotick announced on October 28, 2021, in yet another letter, that the Company was launching a "***new*** zero-tolerance harassment policy company-wide" (bold and italics added; underlining in original). Kotick also stated that "[f]or any Activision Blizzard employee who chooses not to arbitrate an individual claim of sexual harassment, unlawful discrimination, or related retaliation arising in the future, the company will waive any obligation to do so."

372.   In his letter issued October 28, 2021, Defendant Kotick also stated that he had asked Activision Blizzard's Board of Directors "to reduce my total compensation until the Board has determined that we have achieved the transformational gender-related goals and other commitments described above." He specifically "asked the Board to reduce [his] pay to the lowest amount California law will allow for people earning a salary, which this year is $62,500" and that he not be granted any bonuses and equity during this time.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

**8)    Activision Blizzard Admits That Leadership Changes to Their
Diablo and Overwatch Franchises, Forced by the Ongoing Sexual
Harassment Scandal, Would Cause the Latest Installments of Those
Games to be Delayed and that Jennifer Oneal was Departing from
her Position as Co-leader of Blizzard, Leading to a Huge Drop in the
Company's Stock.**

7

8

373.   On November 2, 2021 Activision Blizzard held its Earnings Call for
the Third Quarter of 2021 (the "Q3 2021 Earnings Call").

9

10

11

12

13

14

374.    During the Q3 2021 Earnings Call, Daniel Alegre, the Company's
President and Chief Operating Officer ("COO") admitted that because the
Company had "taken actions that resulted in the departure of a number of
individuals across the company," resulting in new leadership for the Overwatch
and Diablo franchises, the Company was pushing back the launch date for
Overwatch 2 and Diablo IV:

15

16

17

18

19

20

21

As we grow our teams with new hires, we are keenly aware of the
importance and responsibility we have to ensure a safe working
environment for our people. This is our number one priority.
Specifically, ***in recent months, we have taken actions that resulted in
the departure of a number of individuals across the company.***
Additionally, we have seen increased competition in the market for
our talent and higher voluntary turnover that has partly offset our
success in hiring.

22

23

24

25

26

***As we have worked with new leadership in Blizzard and within the
franchises themselves, particularly in certain key creative roles, it's
become apparent that some of the Blizzard content planned for next
year will benefit from more development time to reach its full
potential.*** While we are still planning to deliver a substantial amount
of content from Blizzard next year, ***we are now planning for a later
launch for Overwatch 2 and Diablo IV than originally envisaged.***

27

28

***These are two of the most eagerly anticipated titles in the industry,***

101

and our teams have made great strides towards completion in recent quarters. But we believe giving the team some extra time to complete production and continue growing their creative resources to support the titles after launch will ensure that these releases delight and engage their communities for many years into the future.

*These decisions will push out the financial uplift that we had expected to see next year*, but we are confident that this is the right course of action for our people, our players, and the long-term success of our franchise.

(emphasis added).

375.    Activision Blizzard's CFO, Defendant Zerza, stated later on the Q3 2021 Earnings Call that due to the delays, "[w]e are therefore currently not planning for material contributions from Overwatch 2 or Diablo IV in 2022."

376.    During the question and answer period of the Q3 2021 Earnings Call, analyst Mike Hickey from The Benchmark Co. LLC asked for more color "on the reason for the slip in Overwatch 2 and Diablo IV." Blizzard Co-Leader Mike Ybarra responded by confirming that the "slip" was due to the leadership changes on each game:

Looking at our upcoming releases across all of our teams here at Blizzard, we have a deep bench of veteran development talent, and *we have new leadership on both Overwatch 2 and Diablo IV.* Both are seasoned Blizzard developers with over 30 years' experience at the company between them. The teams have made great progress and passed important milestones recently, and we expect these to be fantastic releases. *But there's obviously been a change in leadership.* We looked at what was left in the final phases of production with fresh eyes, and we saw that allowing the teams more time would enable both great experiences at launch and also help ensure that everything will be in place to engage the communities for many years to come.

(emphasis added)

377.    During the Q3 2021 Earnings Call, Alegre also announced that

102

Jennifer Oneal was departing from her position as co-leader of Blizzard at the end of the year.

378.  Analysts believed that the delays of Overwatch 2 and Diablo IV were a disaster for the Company and that the delays had been caused by the fallout from the sexual harassment and discrimination allegations against the Company.

379.  Following the Q3 2021 Earnings Call, on November 2, 2021, *Bloomberg Intelligence* analysts Kanterman and Amine Bensaid issued a report entitled "***Culture Turmoil May Slow Activision's 4Q Sales: Earnings Outlook***." It stated that "Activision Blizzard's decision to delay the launches of Overwatch 2 and Diablo IV may be due to the internal culture turmoil the company is experiencing, and we think it may mean more revenue volatility in 4Q, with the potential for a decline in 2022."

380.  On November 3, 2021, BMO Capital Markets analyst Gerrick L. Johnson issued a report entitled "3Q Results OK, but Game Delays Send Shares Lower." The report stated that the game delays were the realization of the "***worst fears regarding the workplace issues at Blizzard***":

> ***The biggest surprise out of the quarter was the news that Overwatch 2 and Diablo IV would not meaningfully contribute to 2022, which was not what investors wanted to hear*** given already heightened concern around game delays in the sector…
>
> ***When the state of California sued the company for sexual harassment and discrimination and these issues came to light, one of the biggest risks we identified was the potential loss of personnel, especially with a lot of growth in the industry and heightened demand for talent. We think our worst fears regarding the workplace issues at Blizzard are being realized.*** It was clear to us, based on management comments, that the company was lacking the human resources needed, not so much to launch a finished game, but also talent needed to support the game after launch with continued in game content drops and live services. ***In retrospect, after the departures of Overwatch 2's executive producer, Chacko Sonny, and***

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3

*its Director, Jeff Kaplan, as well as Diablo 4's Director, Luis Barriga, and Lead Designer, Jesse McCree, these delays are not that big of a surprise.*

(emphasis added).

4
5
6
7
8
9
10
11
12

381.   Also on November 3, 2021, Jefferies issued an analyst report on Activision Blizzard entitled "**Scenario #13, The One We Didn't Want**." (emphasis in original). It stated that the key take away was "**ATVI reported an in-line 3Q and an expected in-line 4Q guide. What came next on the call/slide deck (not the press release) was largely dreadful. First, Overwatch 2 and Diablo IV are delayed. Second, recent promote & diversity champion Jen O'Neal is stepping down from Blizzard leadership after three months. Third, the delays seem related to internal issues, not just 'need more time to make them great'. We think investors' confidence is shaken.**" (emphasis in original).

13
14
15
16

382.   On November 3, 2021, after Blizzard announced that Overwatch 2 and Diablo IV were delayed due to a change in leadership in both games, the price of Activision Blizzard shares traded at unusually high volumes and plunged $10.92, or more than 14%, to $66.75/share.

17
18
19
20
21
22
23
24

**9)   The November 16 *Wall Street Journal* Article is Published Revealing That Defendant Kotick Knew About Sexual-Misconduct Allegations at Activision Blizzard for Years, the Company had Received More Than 500 Harassment and Discrimination Reports From Current and Former Employees Since the DFEH Complaint was Filed, and That Jennifer Oneal Sent an Internal Email Saying She Was "Tokenized, Marginalized, and Discriminated Against" Prior to Her Resignation.**

25
26
27
28

383.   As described in Paragraphs 219, 237-242, and 296, the November 16 *Wall Street Journal* Article showed that Defendant Kotick had been aware of sexual misconduct allegations at Blizzard and at other Activision Blizzard studios for years and had engaged in misconduct himself.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

384.   The November 16 *Wall Street Journal* Article also revealed that since the DFEH filed suit on July 20, 2021, Activision Blizzard had received more than 500 reports from current and former employees alleging harassment, sexual assault, bullying, pay disparities and other issues. This number of reports is remarkable given that only 20% of Activision Blizzard's 9,500 employees are women.

385.   Another revelation in the November 16 *Wall Street Journal* Article was that in September 2021, only a month after she was appointed Blizzard's co-head, Jennifer Oneal "sent an email to a member of Activision's legal team in which she professed a lack of faith in the ability of Activision's leadership to turn the culture around, saying 'it was clear that the company would never prioritize our people the right way.'" Oneal further stated in the email that she had been sexually harassed earlier in her career at Activision Blizzard, that she was paid less than her male counterpart (Mike Ybarra) at the helm of Blizzard, and wanted to discuss her resignation. Oneal, who is Asian-American and gay, wrote: "I have been tokenized, marginalized, and discriminated against…". Oneal also described a party for an Activision development studio she attended with Defendant Kotick around 2007 in which scantily clad women danced on stripper poles. The *Wall Street Journal* further reported that at the same party, a DJ encouraged female attendees to drink more so the men would have a better time, according to another person who was present.

386.    When the November 16, 2021 *Wall Street Journal* Article was published at 10:59 a.m. Activision's share price began dropping from the day's high of $72.13/share. Then at about 2:30 p.m., *Bloomberg* reported that Activision Blizzard employees had planned a walkout protest to force the resignation of Kotick.  Kotick, being the CEO, was an integral part of the Company and his possible departure created uncertainty and fear among investors. This adverse news caused Activision Blizzard's share price to decline $5.99/share from its high

of $72.13/share that day or 8.3% to close at $66.14/share.

**10)   The SEC Widens its Investigation of Activision Blizzard and the DFEH Subpoenas the Police Departments in the Los Angeles Area for Records About Defendant Kotick and 18 Other Current and Former Activision Employees.**

387.   On February 17, 2022, *The Wall Street Journal* published a report entitled "Regulators Widen Activision Blizzard Probes Over Workplace Issues: SEC subpoenas more current and former executives: California agency seeks additional information on CEO Bobby Kotick and board's handling of workplace misconduct allegations" by Kirsten Grind.

388.   *The Wall Street Journal* reported that the SEC widened its investigation into Activision Blizzard by serving a subpoena dated January 18, 2022 which requested records and communications from a much longer list of current and former Activision Blizzard executives than it had previously sought. The subpoena also requested records dating back to 2016, which was a much longer timeframe than the SEC had previously requested.

389.   The *Wall Street Journal* further reported that shortly thereafter, the DFEH issued subpoenas to police departments in the Los Angeles area for records about Defendant Kotick and 18 other current and former Activision Blizzard employees.

## FALSE AND MATERIALLY MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

**A. Activision Blizzard's SEC Filings Repeatedly Misstated That The Company Was Only "party to routine…investigations" that arose in the "ordinary course of business" and were "not significant" or expected to have "a material adverse effect."**

390.   On November 8, 2018, Activision Blizzard filed its 3Q 2018 10-Q with the SEC. Attached to the 3Q 2018 10-Q was a SOX Certification signed by

106

Defendant Kotick. The Company's consolidated financial statements form part of the 3Q 2018 10-Q and the 3Q 2018 10-Q states that the Company prepared them in accordance with Generally Accepted Accounting Principles ("GAAP").

391.    The 3Q 2018 10-Q stated under the heading "Legal Proceedings" in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

> *We are party to routine* claims, suits, *investigations*, audits, and other proceedings *arising from the ordinary course of business*, including with respect to intellectual property rights, contractual claims, *labor and employment matters*, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, *such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business*, financial condition, results of operations, or liquidity.

(emphasis added).

392.    The foregoing statements in Activision Blizzard's 3Q 2018 10-Q were false and materially misleading when made and omitted to state material facts necessary to make the statements not misleading because:  (1) the pervasive sexual harassment and discrimination at Activision Blizzard and the inevitable fact that the EEOC and DFEH would discover it rendered the Investigations non-routine, highly significant, and certain to have a material adverse effect on the Company at all relevant times (Paragraphs 118-242); (2) the #MeToo Movement made it extremely unlikely that the Company would be able to handle the Investigations as a routine matter and predictable that the Investigations would lead to a significant number of firings and reputational damage at all relevant times (Paragraphs 243-247); (3) the Investigations were initiated with an EEOC Commissioner Charge and DFEH Director's Complaint, which those government agencies rarely use and reserve for serious systemic misconduct (Paragraphs 248-254); (4) Activision Blizzard's management informed the board of directors about

107

the Investigations at all relevant times, which would not be true of a routine or not
significant matter at a large company such as Activision Blizzard (Paragraphs
267-268). Further, by this time, the Investigations: (1) prompted the Company to
fire key senior employees Ben Kilgore and Tyler Rosen (Paragraphs 215-226,
270-274); (2)  caused the Company to alter its Human Resources practices —
(*e.g.*, by instituting formal procedures for sexual harassment complaints for the
first time and holding regular meetings between company-wide Human Resources
and the legal department) (Paragraphs 255-261); and (3) caused  the Company to
open a parallel internal investigation (Paragraphs 262-266); actions which the
Company would not have taken had the Investigations been "routine" "not
significant " and not expected to have a "material adverse effect" on Activision
Blizzard's business.

393.   The statement of present fact that any undisclosed investigations of
Activision Blizzard were "routine" and arose in "the ordinary course of business"
is misleading because that did not correctly describe the EEOC and DFEH
Investigations for the reasons listed in Paragraph 392.

394.    The statements that any undisclosed investigations of Activision
Blizzard were "not significant" or expected to have a "material adverse effect" on
Activision Blizzard's business had no basis because the omissions of the EEOC
and DFEH Investigations made those statements misleading to a reasonable
person. If the EEOC and DFEH Investigations had been disclosed, a reasonable
investor would have understood that Activision Blizzard, contrary to its
statements, was subject to investigations that were significant and/or expected to
have a material adverse effect on the Company's business for the reasons listed in
Paragraph 392.

395.   Additionally, for the reasons stated in Paragraph 392 the entire legal
"legal proceedings" disclosure is false and misleading in context.

396.   On February 28, 2019, Activision Blizzard filed its 2018 10-K with

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2018 10-K were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2018 10-K and the 2018 10-K states that the Company prepared them in conformity with GAAP.

397.  The 2018 10-K stated the following under the heading "legal proceedings" under both Item 3 of Part I and in the notes to the Company's consolidated financial statements:

> In December 2018, we received a decision from the STA informing us of an audit assessment to a Swedish subsidiary of King for the 2016 tax year…

> In December 2017, we received a Notice of Reassessment from the FTA related to transfer pricing for intercompany transactions involving one of our French subsidiaries for the 2011 through 2013 tax years….

> ***In addition, we are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising in the ordinary course of business***, including with respect to intellectual property, competition and antitrust matters, regulatory matters, tax matters, privacy matters, ***labor and employment matters***, compliance matters, unclaimed property matters, liability and personal injury claims, product damage claims, collection matters, and/or commercial claims. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

398.  The foregoing statements in the 2018 10-K were false and misleading when made for the reasons stated in Paragraphs 392-395. They were also false and misleading when made for the additional reasons that: (1) in early 2019, multiple employees informed Blizzard President Brack of pervasive harassment and discrimination at Blizzard (Paragraphs 278-283); (2) on December 17, 2018, Doe

provided information about her harassment in Blizzard's Technology Department to an outside investigator hired by Activision Blizzard (Paragraph 285); (3) in February 2019, CW3 was laid off due to her reports of sexual harassment to Human Resources and she wrote an email to Individual B, a Senior Manager in the HR Department, about it. (Paragraph 286)

399.   On May 2, 2019, Activision Blizzard filed its 1Q 2019 10-Q with the SEC that was signed by Defendant Durkin. Attached to the 1Q 2019 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 1Q 2019 10-Q and the 1Q 2019 10-Q states that the Company prepared them in accordance with GAAP.

400.   The 1Q 2019 10-Q stated under the heading "legal proceedings" in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

> **We are party to routine** claims, suits, **investigations**, audits, and other proceedings **arising from the ordinary course of business**, including with respect to intellectual property rights, contractual claims, **labor and employment matters**, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, **such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business**, financial condition, results of operations, or liquidity.

(emphasis added).

401.   The foregoing statements in the 1Q 2019 10-Q were false and misleading when made for the reasons stated in Paragraphs 392-395, and 398. They were also false and misleading when made for the additional reasons that: (1) on March 14, 2019, Doe complained to Blizzard President Brack in writing about the sexual harassment and retaliation she had suffered in Blizzard's Technology Department (Paragraph 290) and (2) between February and April 2019 CW6 met with Senior VP of Human Resources Jesse Meschuk and Blizzard

Chief Legal Officer and Senior Vice President Claire Hart about sexual harassment and discrimination at the Company. (Paragraph 291).

402.   On August 8, 2019, Activision Blizzard filed its 2Q 2019 10-Q with the SEC that was signed by Defendant Durkin. Attached to the 2Q 2019 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2Q 2019 10-Q and the 2Q 2019 10-Q states that the Company prepared them in accordance with GAAP.

403.   The 2Q 2019 10-Q stated under the heading "Legal Proceedings" in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

> In December 2018, we received a decision from the STA informing us of an audit assessment of a Swedish subsidiary of King for the 2016 tax year….
>
> ***In addition, we are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, ***labor and employment matters***, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

404.   The foregoing statements in the 2Q 2019 10-Q were false and misleading when made for the reasons stated in Paragraphs 392-395, 398, 401. They were also false and misleading when made for the additional reason that in August 2019, Activision Blizzard changed the reporting structure of Human Resources so that it reported directly to the Company's corporate office. The

111

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Company made this change because the prior setup "occasionally allowed some employees to conduct themselves in truly regrettable ways." (Paragraph 294).

405.   On November 7, 2019, Activision Blizzard filed its 3Q 2019 10-Q with the SEC that was signed by Defendant Durkin. Attached to the 3Q 2019 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 3Q 2019 10-Q and the 3Q 2019 10-Q states that the Company prepared them in accordance with GAAP.

406.   The 3Q 2019 10-Q stated in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

> ***We are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, ***labor and employment matters***, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant, and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added)

407.   The foregoing statements in the 3Q 2019 10-Q were false and misleading when made for the reasons stated in Paragraphs 392-395, 398, 401, and 404.

408.   On February 27, 2020, Activision Blizzard filed its 2019 10-K with the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2019 10-K were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2019 10-K and the 2019 10-K states that the Company prepared them in conformity with GAAP.

409.   The 2019 10-K stated the following under the heading "legal proceedings" under both Item 3 of Part I and in the notes to the Company's

consolidated financial statements:

In December 2017, we received a Notice of Reassessment from the French Tax Authority (the "FTA") related to transfer pricing for intercompany transactions involving one of our French subsidiaries for the 2011 through 2013 tax years….

***In addition, we are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising in the ordinary course of business***, including with respect to intellectual property, competition and antitrust matters, regulatory matters, tax matters, privacy matters, ***labor and employment matters***, compliance matters, unclaimed property matters, liability and personal injury claims, product damage claims, collection matters, and/or commercial claims. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

410.   The foregoing statements in the 2019 10-K were false and misleading when made for the reasons stated in Paragraphs 392-395, 398, 401, and 404. They also were false and misleading when made for the additional reasons that: (1) in 2019, Defendant Kotick was directly involved in the internal investigation of the co-head of Activision Blizzard's Treyarch studio for sexual harassment (Paragraph 296) and (2) on January 21, 2020, *The Los Angeles Times* reported that the DFEH had intervened in a class action suit against Riot games, arguing that the agreed settlement of $10 million was too low because the women could be entitled to as much as $400 million (Paragraph 297).

411.   On May 5, 2020, Activision Blizzard filed its 1Q 2020 10-Q with the SEC that was signed by Defendant Durkin. Attached to the 1Q 2020 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 1Q 2020 10-Q and the 1Q 2020

113

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

10-Q states that the Company prepared them in accordance with GAAP.

412.   The 1Q 2020 10-Q stated under the heading "Legal Proceedings" in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

> ***We are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, ***labor and employment matters***, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant, and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

413.   The foregoing statements in the 1Q 2020 10-Q were false and misleading when made for the reasons stated in Paragraphs 392-395, 398, 401, 404, and 410.

414.   On August 4, 2020, Activision Blizzard its 2Q 2020 10-Q with the SEC that was signed by Defendant Durkin. Attached to the 2Q 2020 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2Q 2020 10-Q and the 2Q 2020 10-Q states that the Company prepared them in accordance with GAAP.

415.   The 2Q 2020 10-Q stated under the heading "Legal Proceedings" in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

> ***We are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, ***labor and employment matters***, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such***

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*routine claims and lawsuits are not significant, and we do not expect them to have a material adverse effect on our business*, financial condition, results of operations, or liquidity.

(emphasis added)

416. The foregoing statements in the 2Q 2020 10-Q were false and misleading when made for the reasons stated in Paragraphs 392-395, 398, 401, 404, and 410. They also were false and misleading when made for the additional reasons that: (1) on May 28, 2020, the Company suddenly fired Alex Afrasiabi and discontinued the propriety game he was working on despite having already spent millions of dollars on it  (Paragraphs 301-306); and (2) in June 2020, the Company completely revamped and standardized its internal complaint investigation process by removing the investigations from the purview of Human Resources and establishing the Employee Relations Team to handle them (Paragraphs 307-311).

417. On October 29, 2020, Activision Blizzard filed its 3Q 2020 10-Q with the SEC that was signed by Defendant Durkin. Attached to the 3Q 2020 10-Q were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 3Q 2020 10-Q and the 3Q 2020 10-Q states that the Company prepared them in accordance with GAAP.

418. The 3Q 2020 10-Q stated under the heading "Legal Proceedings"  in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

*We are party to routine* claims, suits, *investigations*, audits, and other proceedings *arising from the ordinary course of business*, including with respect to intellectual property rights, contractual claims, *labor and employment matters*, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, *such routine claims and lawsuits are not significant, and we do not expect them to have a material adverse effect on our business*, financial

115

condition, results of operations, or liquidity.

(emphasis added).

419.   The foregoing statements in the 3Q 2019 10-Q were false and misleading when made for the reasons stated in Paragraphs 392-395, 398, 401, 404, 410, and 416.

420.   On February 23, 2021, Activision Blizzard filed its 2020 10-K with the SEC that was signed by Defendants Kotick, Durkin, and Kelly. Attached to the 2020 10-K were SOX Certifications signed by Defendants Kotick and Durkin. The Company's consolidated financial statements form part of the 2020 10-K and the 2020 10-K states that the Company prepared them in conformity with GAAP.

421.   The 2020 10-K stated in Part I:

**Item 3.   LEGAL PROCEEDINGS**

> Refer to Note 22 of the notes to the consolidated financial statements included in Item 8 of this Annual Report on Form 10-K for disclosures regarding our legal proceedings.

(Emphasis in title in original; other emphasis added.)

422.   The 2020 10-K further stated in the notes to the Company's consolidated financial statements:

> **Legal Proceedings**
>
> **We are party to routine** claims, suits, **investigations**, audits, and other proceedings **arising in the ordinary course of business**, including with respect to intellectual property, competition and antitrust matters, regulatory matters, tax matters, privacy matters, **labor and employment matters**, compliance matters, unclaimed property matters, liability and personal injury claims, product damage claims, collection matters, and/or commercial claims. In the opinion of management, after consultation with legal counsel, **such routine claims and lawsuits are not significant and we do not expect them to**

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

***have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

423.   The foregoing statements in the 2020 10-K were false and misleading when made for the reasons stated in Paragraphs 392-395, 398, 401, 404, 410, and 416. They also were false and misleading when made for the additional reason that in 2020, 30 female employees working in Activision Blizzard's Esports division collectively wrote to their unit's leaders about the extensive sexual harassment and discrimination they suffered at the Company;  Defendant Kotick was aware of this email (Paragraph 317).

424.   On May 4, 2021, Activision Blizzard filed its 1Q 2021 10-Q with the SEC that was signed by Defendant Zerza. Attached to the 1Q 2021 10-Q were SOX Certifications signed by Defendants Kotick and Zerza. The Company's consolidated financial statements form part of the 1Q 2021 10-Q and the 1Q 2021 10-Q states that the Company prepared them in accordance with GAAP.

425.   The 1Q 2021 10-Q stated under the heading "Legal Proceedings" in both the notes to the Company's consolidated financial statements and under Item 1 of Part II:

> ***We are party to routine*** claims, suits, ***investigations***, audits, and other proceedings ***arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, ***labor and employment matters***, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant, and we do not expect them to have a material adverse effect on our business***, financial condition, results of operations, or liquidity.

(emphasis added).

426.   The foregoing statements in the 1Q 2021 10-Q were false and misleading when made for the reasons stated in Paragraphs 392-395, 398, 401,

404, 410, 416, and 423. They also were false and misleading when made for the additional reason that it was clear the Company's negotiations with the DFEH had broken down when, after over two years of extensive investigation into the Company the DFEH served a broad subpoena on Activision Blizzard on April 2, 2021 and refused to meet and confer about it. This breakdown indicated there was a significant risk that the DFEH would file suit against Activision. (Paragraphs 319-325).

## LOSS CAUSATION

427.   On July 27, 2021, it became clear that Activision Blizzard's denial of the DFEH's allegations was false after, *inter alia*, numerous employees spoke up about pervasive sexual harassment and discrimination at the Company, signed an open letter denouncing the denial, and threatened to walk out (*see* Paragraphs 326-335) and the risk of employee unrest, loss of productivity and large scale resignations and terminations had materialized, the price of Activision Blizzard shares traded at unusually high volumes and fell $6.09, or over 6.75%, to close at $84.05/share.

428.   On September 20 and 21, 2021, the price of Activision Blizzard shares fell $6.53, or more than 8%, to close at $73.03/share after *The Wall Street Journal* reported that the SEC had opened an investigation.

429.   On November 2, 2021, after the close of the market, Blizzard announced that Overwatch 2 and Diablo IV were delayed due to the termination of "a number of individuals across the company" and "higher voluntary turnover" as a result of the unfolding scandal, which was the materialization of the risk of the DFEH and EEOC Investigations. On November 3, 2021, the price of Activision Blizzard shares traded at unusually high volumes and fell $10.92, or more than 14%, to $66.75/share.

430.   In the morning on November 16, 2021 at 10:59 a.m., the *Wall Street Journal* published an article detailing how Defendant Kotick had not only known

118

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

of the endemic sexual harassment, retaliation and discrimination problems at Activision Blizzard for years, but that Kotick was also one of the culprits guilty of such misconduct. Within minutes of *The Wall Street Journal* article's publication, Activision Blizzard's share price began dropping from the day's high of $72.13/share. Then at about 2:30 p.m. *Bloomberg* reported that Activision Blizzard employees had planned a walkout protest to force the resignation of Kotick.  Kotick, being the CEO, was an integral part of the Company and his possible departure created uncertainty and fear among investors. This double shot of adverse news caused Activision Blizzard's share price to decline $5.99/share from its high of $72.13/share that day or 8.3% to close at $66.14/share.

431.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

**A. The Defendants Acted Knowingly or Recklessly.**

**1)    Defendant Kotick Acted Knowingly or Recklessly.**

a.  Kotick was Aware of Pervasive Harassment and Discrimination.

432.  Defendant Kotick was aware of the pervasive sexual harassment and discrimination at Activision Blizzard. Defendant Kotick's knowledge of the pervasive sexual harassment and discrimination at Activision Blizzard even prior to the commencement of the Investigations is evidenced by the following facts, among others: (1) Defendant Kotick personally approved Kilgore's firing and therefore knew of the circumstances precipitating his firing; Kotick was also personally involved in the hiring and firing of high-level Activision Blizzard employees (Paragraphs 218-222); (2) *The Wall Street Journal's* review of internal documents and interviews with people familiar with the matter concluded that Defendant Kotick "knew about allegations of misconduct in many parts of the Company" (Paragraph 237); (3) Defendant Kotick received the July 2018 email

119

concerning the rape at Sledgehammer Games (Paragraphs 238-239); (4) Blizzard President Michael Morhaime who reported directly to Kotick had detailed knowledge of the harassment and discrimination and would have reported the same to Defendant Kotick (Paragraphs 191-196); and (5) Defendant Kotick himself personally mistreated women (Paragraphs 240-242).

433.   During the course of the Investigations Kotick gained further additional knowledge of the pervasive misconduct because: (1) like Morhaime, new Blizzard President Brack who reported directly to Kotick had detailed knowledge of the harassment and discrimination and would have reported the same to Defendant Kotick (Paragraphs 278-283, 290); (2) Kotick was aware that Human Resources was restructured such that it reported directly to the Company's corporate office given that  the prior setup "occasionally allowed some employees to conduct themselves in truly regrettable ways" in August 2019 (Paragraph 294); (3) Kotick was personally  involved in the internal investigation concerning Treyarch co-head's sexual harassment  in 2019 (Paragraph 296); (4) Kotick was aware of the 2020 email from 30 women in esports concerning harassment and discrimination (Paragraph 317).

434.   Additionally, *The Wall Street Journal* found that since the DFEH publicly filed its case, Defendant Kotick misled Activision Blizzard's directors and other executives concerning how much he knew about the endemic sexual harassment at his company (Paragraph 237), demonstrating that Defendant Kotick has engaged in a pattern of intentionally  misrepresenting the sexual harassment and misconduct at Activision Blizzard.

435.   Finally, the pervasive sexual harassment at Activision Blizzard and the inevitable fact that EEOC and the DFEH would discover it rendered the Investigations (of which Kotick was aware) non-routine, highly significant, and almost certain to have a material adverse effect on the Company. Accordingly, since Kotick knew or should have known of the pervasive misconduct, his

120

statements about the nature of the Investigations were, at minimum, reckless.

          b.    Kotick was Aware of the Investigations and That the Board Had Been Informed About Them

436.   The November 16 *Wall Street Journal* Article stated that Defendant Kotick was aware of the DFEH and EEOC Investigations. Additionally, Activision's Board was informed about the Investigations and Kotick is a member of the Board. Furthermore, CW4 told Plaintiffs' investigator that the DFEH and EEOC Investigations were common knowledge at the Company as far back as 2018 and that employees discussed the Investigations on the Company's internal Slack channels.

437.   Given that: (1) Kotick was aware of the Investigations, (2) the Investigations were very rare investigations into systemic misconduct initiated by an EEOC Commissioner's Charge and DFEH Director's Complaint (*see* Paragraphs 248-254), (3) the Investigations were important enough to inform Activision's board of directors of (*see* Paragraphs 267-268), and (4) given the extensiveness of each Investigation and the breakdown of Activision Blizzard's negotiations with the DFEH (*see* Paragraphs 319-325), Kotick was, at minimum, reckless in making his statements about the investigations that Activision Blizzard was subject to.

          c.    Kotick was Aware of Significant Changes to the Company's Human Resources Procedures and the Firing of Senior Employees Due to the Investigations.

438.   Almost as soon as the Investigations formally began, the Company made significant changes to how its Human Resources department operated. — Human Resources company-wide began having regular meetings with the Legal Department; executives told Human Resources that they must introduce a formal complaint process specifically because of the EEOC Investigation (*see* Paragraphs 255-258). Further, CW12 was certain that Defendant Kotick would be aware of

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

changes to Human Resources because of his one-on-one meetings with Chief People Officer Naughton. (*see* Paragraphs 259). The Company also took the significant step of conducting an internal investigation of its human resources' policies and procedures that was parallel to the DFEH and EEOC's Investigation in 2018 and claimed  that made its receipt of complaints was privileged (*see* Paragraphs 262-266). Then in August 2019, Activision Blizzard changed the reporting structure of Human Resources such that it reported directly to the corporate office. The Company admitted that this change was due to the inability to stop sexual harassment (*see* Paragraphs 294). Finally, in June 2020, Activision Blizzard completely revamped how it handled the internal investigation of complaints by establishing the Employee Relations Team to handle them throughout the Company and took  away its Human Resources department's jurisdiction over employee complaints. (*see* Paragraphs 307-311). According to CW10, Naughton made these changes at Kotick's direction. (Paragraph 310).

439.   Furthermore, as discussed in Paragraphs 215 to 226, 270 to 274, and 301 to 306, the Investigations caused the firing of senior Blizzard leaders Kilgore, Rosen and Afrasiabi long before they became public. Their firings were shocking given these individuals' value to the Company and their long history of engaging in illegal harassment. Defendant Kotick was, as a matter of course, involved in the hiring and firing of high-level employees and personally approved the firing of Kilgore.

440.   These major changes occurred contemporaneous Kotick's statements to investors assuring them that all Investigations Activision Blizzard was subject to were "routine," in the "ordinary course of business," "not significant," and not expected to have a "material adverse effect." Accordingly, Kotick was, at minimum, reckless when he made those statements.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

       d.   Defendant Kotick Signed SOX Certifications for Each Misstatement

441.   Each misstatement in this case was contained in an SEC filing with a SOX certificate signed by Defendant Kotick stating that it did not contain any untrue statement of material fact. Given Kotick's knowledge of and easy access to other information showing the falsity of the legal proceeding statements, Kotick was, at minimum, reckless in signing them.

**2)   Defendant Durkin Acted Knowingly or Recklessly.**

442.   As Activision Blizzard's CFO from January 2019 until April 2021 Defendant Durkin signed each 10-K and 10-Q and SOX Certification from February 28, 2019 through February 23, 2021. As CFO it was Defendant Durkin's job to review and assess the accuracy of the Company's statements concerning investigations because they were part of Activision Blizzard's financial statements. Accordingly, a minimal level of due diligence would have informed Durkin of the mechanism used to start the Investigations, that the Board had been informed about the Investigations, the repeated and significant structural changes to Human Resources, and the firing of key employees. Additionally, information about the pervasive sexual harassment and discrimination at the Company was easily accessible because Blizzard Presidents Brack and Morhaime and high-level people in Human Resources, including Jesse Meschuk, Senior Vice President and Global Head of Human Resources, were aware of it. Furthermore, the fact that the Company altered its reporting chain for human resources because by the Company's own admission the prior setup "occasionally allowed some employees to conduct themselves in truly regrettable ways," shows that the top executives of the Company were aware of the misconduct. Accordingly, Defendant Durkin was, at minimum, reckless when he signed the filings containing the misstatements and signed SOX certifications accompanying them.

123

### 3)   Defendant Zerza Acted Knowingly or Recklessly.

443.    Defendant Zerza knew about the pervasive harassment at Blizzard since he served as Chief Operating Officer of Blizzard from October 2017 to April 2021, and CFO of Blizzard from August 2015 to September 2017. According to Confidential Witness 17 ("CW17"), who served as Vice President of Business Development & Media at Activision Blizzard from 2016 to June 2020, Zerza worked closely with Brack and Morhaime, and Meschuk would have taken direction and sought approval from Zerza. Accordingly, CW17 said that Zerza "had to know what was going on." Furthermore, as a high-level official of Blizzard he certainly would have known about the firings of Kilgore, Rosen and Afrasiabi and the reason for their firings.

444.   Accordingly, when Zerza became CFO of the Company in April 2021, he would have been aware of the peril the Investigations posed to Activision Blizzard. Additionally, as CFO it was Defendant Zerza's job to review the statements concerning investigations contained in the 1Q 2021 10-Q because they were part of Activision Blizzard's financial statements. Given the red flags Zerza was aware of from Blizzard and his role approving the statements as CFO, with even a minimal level of due diligence Zerza could have easily accessed information about the mechanism used to start the Investigations, the repeated and significant changes to Human Resources, the pervasive sexual harassment and discrimination at the Company, and the progress of the Investigations, including the DFEH's combativeness with the Company and its issuance of a broad subpoena. Accordingly, Defendant Zerza was, at minimum, reckless when he signed the 1Q 2021 10-Q and signed an accompanying SOX certification.

### 4)   Defendant Kelly Acted Knowingly or Recklessly.

445. The November 16 *Wall Street Journal* Article stated that the Company's Board of Directors sent *The Wall Street Journal* a statement that said it had been "informed at all times with respect to the status of regulatory matters,"

124

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

referring to the DFEH and EEOC Investigations. Accordingly, Defendant Kelly, Chairman of Activision Blizzard's Board was informed about the nature of Investigations and the Company's decision take numerous non-routine measures, including the repeated restructuring of Human Resources and the firing of important employees in reaction to them. Accordingly, Defendant Kelly was, at minimum, reckless when he signed the 2018, 2019, and 2020 10-Ks.

**5) Defendants' Obstruction of the DFEH's Investigation Supports a Strong Inference of Scienter.**

446. As detailed in Paragraphs 347 to 352, the DFEH amended its complaint to add allegations that Activision Blizzard intentionally obstructed its investigation by: 1) claiming employee complaints were subject to attorney-client privilege; 2) retaining WilmerHale to conduct a confidential investigation that interfered with the DFEH investigation; 3) soliciting waivers of employee rights without providing any notice of the DFEH investigation; and 4) ***shredding documents*** in violation of a document retention notice sent by DFEH. Defendants' all-out effort to obstruct the DFEH investigation shows that they were aware that it was a serious threat to Activision Blizzard.

**6) Given the #MeToo Movement and Activision Blizzard's Lip Service to Diversity, Equity, and Inclusion, Defendants Cannot Reasonably Argue that They Did Not or Should Not Have Realized the Importance of the DFEH and EEOC Investigations.**

447. As the *New York Times* documented, more than 201 powerful men lost their jobs from October 2017 to October 2018 based on sexual harassment allegations levelled against them. Multiple other sources demonstrated the power of the #MeToo movement and the repercussions harassment allegations could have for companies (*see* Paragraphs 243-247). The EEOC and DFEH Investigations, which commenced in September and October of 2018, respectively, commenced in the wake of the above-referenced firings.

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

448.   Additionally, on January 21, 2020, *The Los Angeles Times* reported that the DFEH had intervened in a class action suit against Riot games, arguing that the agreed settlement of $10 million was too low because the victims could be entitled to as much as $400 million. (Paragraph 297). This showed the DFEH's aggressive stance concerning misconduct involving sexual harassment and discrimination

449.   Additionally, as described in Paragraphs 246, 292, 299, and 324 the Company repeatedly stated that its reputation as a good place to work and its commitment to diversity and inclusion were important to its success..

450.   In light of the #MeToo Movement and Activision Blizzard's efforts to portray itself as a workplace committed to diversity, equity, and inclusion, the Defendants would have realized or were reckless in failing to realize that the EEOC and DFEH Investigations and the ongoing misconduct were likely to seriously harm the Company's reputation. This is especially true given that Defendants were aware that, ***in reality, sexual harassment and discrimination were endemic at the Company***.

**7)   Defendants Admitted that the Investigations Were Material and Not "Routine" by Stating in the Company's 2Q 2021 10-Q, Filed on August 3, 2021, That its Business Could be Adversely Impacted.**

451.   After the DFEH publicly filed its Complaint on July 20, 2021, Defendants disclosed it in Activision Blizzard's 2Q 2021 10-Q, filed on August 3, 2021, stating "in July 2021 the State of California filed a complaint against the Company alleging violations of the California Fair Employment and Housing Act and the California Equal Pay Act. The complaint was recently filed, and we are taking actions to address the concerns of employees and other key stakeholders and the adverse consequences to our business. ***If we experience prolonged periods of adverse publicity, significantly reduced productivity or other negative consequences relating to this matter, our business likely would be adversely***

126

*impacted. We are carefully monitoring all aspects of our business for any such impacts*." (emphasis added). By stating this, Defendants admitted that the reputational harm from the DFEH Complaint could seriously harm Activision Blizzard's business. Given the pervasive misconduct at Activision Blizzard of which Defendants were aware since the outset of the Investigations, at all relevant times it was likely that likelihood the Investigations would lead to reputation-damaging revelations about sexual harassment at Activision Blizzard coming out. Therefore, the statement in 2Q 2021 10-Q was an admission that the Investigations were not routine, were significant, and likely to have a material effect on the Company.

**B. The Individual Defendants Were Motivated to Make the Misstatements.**

**1)  Defendant Kotick Was Motivated to Make Misstatements by Shareholder Value Creation Incentives in His Employment Agreement.**

452.  On June 7, 2021, the CtW Investment Group ("Ctw"), which works with union-sponsored pension funds to enhance long-term stockholder value, issued a letter to Activision Blizzard Shareholders criticizing Defendant Kotick's compensation and encouraging shareholders to vote against the nonbinding "Say-on-Pay" resolution concerning Defendant Kotick's compensation and re-election of the chair of Activision Blizzard's compensation committee, Robert Morgado.

453.  Ctw explained that under the Shareholder Value Creation Incentive in Defendant Kotick's employment agreement, "if the [Company's] stock price closes at or above $79.96 for at least 90 consecutive trading days, all outstanding equity awards granted under the agreement from October 2016 all the way through December 2021 would accelerate vesting at the maximum payout level."

454.  That stock price condition was not met until the first half of 2021 and triggered a total pay package of almost $155 million for Defendant Kotick for the year 2020, including almost $150 million in stock awards. This dwarfed

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendant Kotick's already substantial pay packages of approximately $30 million for each of the previous four years.

455.   Defendant Kotick only received this massive bonus due to the aforementioned false and misleading statements that inflated Activision Blizzard's share price.

**2)   Defendants Sold Millions of Dollars in Activision Blizzard Stock in 2020 and 2021, Before the DFEH and EEOC Filed their Public Complaints.**

456.   On May 14, 15, and 18, 2020, Defendant Kelly, the Chairman of Activision Blizzard's Board, sold $27,271,372.50 of Activision Blizzard common stock. Defendant Kelly sold 250,000 shares for proceeds of $18,105,250 on May 14, 2020. On May 15, he sold 75,000 shares of for $5,502,202.50. Then, on May 18, 2020, Defendant Kelly sold 50,000 shares for $3,663,920.

457.   On November 2, 3, and 4, 2020, Defendant Kelly sold another $28,913,822.50 in Activision Blizzard shares. Defendant Kelly sold 200,000 shares for proceeds of $15,329,980 on November 2, 2020. On November 3, 2020 he sold 100,000 shares for $7,665,240. Then, on November 4, 2020, Defendant Kelly sold 75,000 shares for $5,918,602.50.

458.   In total, Defendant Kelly sold ***more than $56 million in Activision Blizzard Shares in 2020***.

459.   On August 27, 2020, while still serving as Activision Blizzard's CFO, Defendant Durkin sold 50,000 shares of Activision Blizzard common stock for proceeds of $4,175,500.

460.   On May 11, 2021, while serving as Activision Blizzard's CFO, Defendant Zerza sold 23,723 shares of Activision Blizzard stock for proceeds of $2,250,263.64.

461.   On March 15, 2021, Activision Blizzard's longtime Chief Legal Officer Christopher Walther sold 45,030 Activision Blizzard shares for

128

proceedings of $4,141,859.40. Walther then retired on June 14, 2021, shortly before the DFEH filed its Complaint.

462.   Activision Blizzard's President and Chief Operating Officer Daniel Alegre sold 18,500 Activision Blizzard shares for proceeds of $1,771,190 on February 24, 2021 and 21,722 Activision Blizzard shares for proceeds of $2,034,916.96 on May 14, 2021, for a total of $3,806,106.96.

463.   Finally, Activision Blizzard directors Robert Morgado and Casey Wasserman also sold significant amounts of stock in 2020. On February 12, 2020, Morgado sold 32,000 Activision shares for proceeds of $1,991,561.60. On August 31, 2020, Wasserman sold 10,000 Activision Blizzard shares for $807,500.

464.   Defendants were motivated to make misstatements and omissions about the DFEH and EEOC Investigations and the endemic harassment and discrimination so that they could sell shares of the Company's common stock at inflated prices.

**C.** **The Individual Defendants Acted Intentionally or Recklessly When They Approved and Failed to Correct the Aforementioned Misstatements.**

465.   Each of the Individual Defendants was provided with copies of the aforementioned SEC filings that contained the misleading statements alleged herein before their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. They were at minimum reckless when they signed and/or authorized the issuance of those public filing and other public statements and signed SOX Certifications.

**D.** **There is a Strong Inference That Activision Blizzard Acted with Scienter.**

466.   Activision Blizzard's July 21, 2021, denial of the allegations in the DFEH complaint was a false exculpatory statement evidencing its scienter.

467.   In response to public disclosure of the DFEH Complaint, on July 21, 2021, the Company issued a press release denying the allegations of the complaint stating in part:

129

The DFEH includes distorted, and in many cases false, descriptions of Blizzard's past. We have been extremely cooperative with the DFEH throughout their investigation, including providing them with extensive data and ample documentation, … .

468.   This denial was a false exculpatory statement and evidences consciousness of guilt that is strong evidence of scienter.

469.   Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Activision Blizzard, including each high-ranking officer or director, is imputable to the Company. The knowledge of each of these individuals should therefore be imputed to Activision Blizzard for the purposes of assessing corporate scienter.

470.   Even aside from the scienter of the Individual Defendants and other senior managers, the facts alleged herein raise a strong inference of corporate scienter as to Activision Blizzard as an entity. Corporate scienter may be alleged independent of individual defendants where others high-level employees are aware that a statement was false or misleading. Among others, since Brack and Morhaime were both aware of the EEOC and DFEH Investigations and pervasive misconduct at Blizzard and, as Presidents of one of the Company's three units, their knowledge is imputed to the Company.

## NO SAFE HARBOR

471.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.

472.   *First*, the statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

473.   *Second*, the safe harbor does not to apply statements "included in a financial statement prepared in accordance with [GAAP]." 15 U.S.C § 78u-

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

5(b)(2)(A). Since all of the misstatements in this Complaint appear in the Company's consolidated financial statements, which were prepared according to GAAP, the safe harbor does not apply to any of them.

474. *Third*, to the extent that the statements can be characterized as forward-looking, only the second clause of the second sentence of each statement was forward-looking ("we do not expect them to have a material adverse effect"), and that does not render the rest of each statement forward-looking. Accordingly, the statements "we are party to routine…investigations…arising from the ordinary course of business…" and "[i]n the opinion of management, after consultation with legal counsel, such routine claims and lawsuits are not significant" are not forward looking.

475. *Fourth*, to the extent certain of the statements alleged to be false and misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made.

476. *Fifth*, to the extent certain of the statements alleged to be false and misleading may be characterized as forward looking, they were not accompanied by meaningful cautionary language. The language "[w]e may be involved in legal proceedings that have a negative impact on our business" that appeared in the risk disclosures in the Company's public filings during the Class Period is not close to sufficient. Since that risk disclosure would apply to virtually any public company, it does not affect the reasonableness of reliance and materiality of the misstatements at issue in the case, and, therefore, does not qualify as meaningful cautionary language. Additionally, the risk disclosures are themselves misleading and exacerbate the misleading nature of the Defendants' misstatements about the Investigations that Activision Blizzard was subject to because they represent as hypothetical risks actual events that had already transpired.

477. *Sixth*, to the extent certain of the statements alleged to be false and misleading may be characterized as forward looking the speaker had actual

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Activision Blizzard who knew that the statement was false when made (*see* Paragraphs 432-445).

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

478.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Activision Blizzard securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of Activision Blizzard, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

479.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Activision Blizzard securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

480.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

481.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

482.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of

132

the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Activision Blizzard;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Activision Blizzard to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Activision Blizzard securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

483.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

484.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Activision Blizzard's shares met the requirements for listing, and

133

were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, Activision Blizzard filed periodic public reports;

- Activision Blizzard regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Activision Blizzard's securities were liquid and traded with sufficient volume during the Class Period; and

- Activision Blizzard was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

485.   Based on the foregoing, the market for Activision Blizzard securities promptly digested current information regarding Activision Blizzard from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

486.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

487.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

488.   This Count is asserted against Defendants based upon Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

489.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

490.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Activision Blizzard securities during the Class Period.

491.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Activision Blizzard were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Activision Blizzard, their control over, and/or receipt and/or modification of Activision Blizzard's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Activision Blizzard, participated

135

in the fraudulent scheme alleged herein.

492.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Activision Blizzard personnel to members of the investing public, including Plaintiff and the Class.

493.   As a result of the foregoing, the market price of Activision Blizzard securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Activision Blizzard securities during the Class Period in purchasing Activision Blizzard securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

494.   Had Plaintiffs and the other members of the Class been aware that the market price of Activision Blizzard securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Activision Blizzard securities at the artificially inflated prices that they did, or at all.

495.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

496.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Activision Blizzard securities during

the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

497.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

498.   During the Class Period, the Individual Defendants participated in the operation and management of Activision Blizzard, and conducted and participated, directly and indirectly, in the conduct of Activision Blizzard's business affairs. Because of their senior positions, they knew the adverse non-public information about Activision Blizzard's misstatement of revenue and profit and false financial statements.

499.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Activision Blizzard's financial condition and results of operations, and to correct promptly any public statements issued by Activision Blizzard which had become materially false or misleading.

500.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Activision Blizzard disseminated in the marketplace during the Class Period concerning Activision Blizzard's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Activision Blizzard to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Activision Blizzard within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Activision Blizzard securities.

501.   By reason of the above conduct, the Individual Defendants are liable

137

pursuant to Section 20(a) of the Exchange Act for the violations committed by Activision Blizzard.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)  declaring this action to be a proper class action, designating Plaintiff Jeff Ross as Lead Plaintiff and certifying him as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)  awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)  awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 29, 2022

**THE ROSEN LAW FIRM, P.A.**

/s/*Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684

138

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email: lrosen@rosenlegal.com

Brian B. Alexander, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: balexander@rosenlegal.com

*Lead Counsel for Plaintiffs*

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS