Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY CHENG, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>ACTIVISION BLIZZARD, INC., ROBERT A. KOTICK, DENNIS DURKIN, ARMIN ZERZA, and BRIAN KELLY,<br><br>     Defendants. | Case No. 2:21-cv-06240-PA-JEM<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>JUDGE:   Hon. Percy Anderson<br>HEARING: January 9, 2023<br>TIME:     1:30 p.m.<br>CTRM:    9A |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND AND SUMMARY OF NEW ALLEGATIONS .......2

    A.   Defendants' Misstatements About the Investigations. ...........................2

    B.   The Court's Order on the SAC. ...........................................................3

    C.   The TAC's Allegations. .......................................................................3

    D.   The Investigations Become Public, Causing Chaos at Activision. .........7

ARGUMENT .......................................................................................................9

I.    THE TAC ALLEGES ACTIONABLE MISSTATEMENTS.......................9

    A.   The Statements That the Investigations Were "Routine" and in the "Ordinary Course of Business" Were Not Opinion Statements............10

    B.   Defendants' Fact Statements That the Investigations Were "Routine" and in the "Ordinary Course of Business" Were Misleading.......................................................................................11

    C.   Defendants' Opinion Statements Were Misleading. ............................17

II.    THE TAC ALLEGES SCIENTER. ..............................................................18

    A.   Defendants Made Misstatements Knowingly or Recklessly. ................18

    B.   The TAC's Motive Allegations Support the Inference of Scienter.......23

    C.   The TAC Alleges Corporate Scienter....................................................23

III.    THE TAC ALLEGES LOSS CAUSATION...................................................24

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ansell v. Laikin*,
 2011 WL 3274019 (C.D. Cal. Aug. 1, 2011)........................................................24

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ...............................................................................10

*Bond v. Clover Health Invs., Corp.*,
 587 F. Supp. 3d 641 (M.D. Tenn. 2022)..............................................................12

*Brown v. Ambow Educ. Holding Ltd.*,
 2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ..........................................................25

*Camp v. Qualcomm Inc.*,
 2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ......................................................21

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
 433 F. Supp. 3d 515 (S.D.N.Y. 2020) ..................................................................24

*Erickson v. Corinthian Colleges, Inc.*,
 2015 WL 12732435 (C.D. Cal. Apr. 22, 2015) ....................................................24

*Habelt v. iRhythm Techs., Inc.*,
 2022 WL 971580 (N.D. Cal. Mar. 31, 2022).......................................................16

*Hollinger v. Titan Cap. Corp.*,
 914 F.2d 1564 (9th Cir. 1990) ..............................................................................23

*In re Alphabet, Inc. Sec. Litig.*,
 1 F.4th 687 (9th Cir. 2021) ...................................................................................22

*In re Am. Apparel, Inc. S'holder Litig.*,
 855 F. Supp. 2d 1043 (C.D. Cal. 2012) ................................................................22

*In re Amgen Inc. Sec. Litig.*,
 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)......................................................24

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD TAC                    2:21-cv-06240-PA-JEM

*In re Facebook, Inc. Sec. Litig.*,
  2021 WL 6000058 (N.D. Cal. Dec. 20, 2021)........................................................21

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 1549485 (N.D. Cal. May 1, 2017).........................................................21

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................................24

*In re Herbalife, Ltd.*,
  2015 WL 7566616 (C.D. Cal. Nov. 23, 2015) .....................................................18

*In re Lions Gate Ent. Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) .....................................................................11

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................................23

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) ...............................................................................25

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022)* ...............................................................11

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ..............................................................................23

*In re Skechers USA, Inc. Sec. Litig.*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020) .................................................................11

*In re VeriFone Holdings, Inc.*,
  704 F.3d 694 (9th Cir. 2012) ..............................................................................22

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  2017 WL 66281 (N.D. Cal. Jan. 4, 2017).............................................................24

*Inchen Huang v. Higgins,*
  443 F. Supp. 3d 1031 (N.D. Cal. 2020)...............................................................16

*Jui-Yang Hong v. Extreme Networks, Inc.*,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017).......................................................21

- iii -

*Jun Zhang v. LifeVantage Corp.*,
    2017 WL 2599883 (D. Utah June 15, 2017)..........................................................20

*Kang v. PayPal Holdings, Inc.*,
    2022 WL 3155241 (N.D. Cal. Aug. 8, 2022) ........................................................16

*Karinski v. Stamps.com, Inc.*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ...................................................21, 24

*Korzen v. Tetra Tech Inc.*,
    2014 WL 12603209 (C.D. Cal. Jan. 17, 2014) ......................................................21

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
    2018 WL 1230570 (C.D. Cal. Jan. 8, 2018) ..........................................................17

*Mandalevy v. Bofi Holding, Inc.*,
    2021 WL 794275 (S.D. Cal. Mar. 2, 2021) ...........................................................23

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    164 F.Supp.3d 568 (S.D.N.Y. 2016) ..............................................................10, 17

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...............................................................................25

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) .................................................................................24

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) .............................................................18, 22

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ........................................................................9, 18, 23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..........................................................................10, 11, 17

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ...............................................................................21

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ...................................................................................9

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD TAC                    2:21-cv-06240-PA-JEM

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ...............................................................................18

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ......................................................21

*Rok v. Identiv, Inc.*,
   2016 WL 4205684 (N.D. Cal. Aug. 10, 2016) ......................................................25

*Sakkal v. Anaplan Inc.*,
   557 F. Supp. 3d 988 (N.D. Cal. 2021) ..................................................................21

*Sanders v. Realreal, Inc.*,
   2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ......................................................21

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ................................................................................20

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ...........................................................11, 12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)..........................................................................................18, 23

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ......................................................17

*Veal v. Lendingclub Corp.*,
   2020 WL 3128909 (N.D. Cal. June 12, 2020).......................................................21

*Waterford Twp. Police v. Mattel, Inc.*,
   321 F. Supp. 3d 1133 (C.D. Cal. 2018) ................................................................21

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ..............................................................................25

*Xiaojiao Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019).................................................................16

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD TAC                    2:21-cv-06240-PA-JEM

**INTRODUCTION**

Activision Blizzard, Inc. ("Activision" or the "Company") is one the largest developers and publishers of video games, and operates competitive video game playing leagues. ¶67.[1] Defendants[2] misled investors during the Class Period[3] by repeatedly representing that any existing undisclosed investigations of the Company were "routine," in the "ordinary course of business," "not significant," and that they did not "expect them to have a material adverse effect" despite failing to disclose investigations by U.S. Equal Employment Opportunity Commission (the "EEOC") and California Department of Fair Employment and Housing (the "DFEH") into systemic sexual harassment and discrimination at Activision (the "Investigations").

The Court dismissed the Second Amended Complaint ("SAC"), finding that it was not sufficient under the PSLRA because it grouped the Defendants' statements and set forth the exact same reasons why each was misleading.

The Plaintiffs amended the TAC so that it now clearly pleads why each of Defendants' statements was false when made. Additionally, it pleads new facts showing falsity, including: (1) that the risk of public revelations of sexual harassment was clear given that the market value of Wynn Resorts Ltd. dropped by $2.1 billion on January 26, 2018 after the pattern of sexual misconduct by the Company's CEO became public; (2) according to a CW who worked in Activision Human Resources ("HR"), right after the Investigations began, Activision's attorneys told her about the

---

[1] All paragraph references are to the Third Amended Complaint ("TAC", ECF No. 90) and this Opposition adopts the definitions from the TAC unless otherwise specified.

[2] Defendants are Activision, Robert Kotick ("Kotick"), Activision's CEO and a director since 1991; Dennis Durkin ("Durkin") Activision's CFO from March 2012 to May 2017 and January 2019 to April 2021 and Chief Corporate Officer in between; Armin Zerza ("Zerza"), Activision's CFO from April 2021 to present and COO of Blizzard from October 2017 to April 2021 and CFO of Blizzard from August 2015 to September 2017; Brian Kelly ("Kelly"), Activision's Chairman of the Board since 2013, Co-Chairman of the Board from October 1998 to 2013, and director since 1995. ¶¶57-60.

[3] The Class Period in the case is November 8, 2018 to November 16, 2021. ¶1

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD TAC                    2:21-cv-06240-PA-JEM

Investigations and made an "urgent" request for "huge" data sets on the Company's employees dating back many years; (3) Activision went to the trouble and expense of setting up a parallel internal investigation in 2018, so that the Company could use it to obstruct the Investigations by claiming that sexual harassment complaints were privileged; (4) on January 21, 2020, *The Los Angeles Times*, reported that the DFEH had moved to intervene to prevent the $10 million dollar settlement of sexual harassment and discrimination suit by the female employees of Riot Games, a local competitor of Activision's, against that company — the DFEH intervened because it believed that Riot's female employees could be entitled to up to $400 million; (5) three new CWs stated that Activision continued to dramatically overhaul its HR department, in June 2020, when it created the Employee Relations Team to handle all investigations of internal complaints — something that HR had previously handled; and (6) in early 2021, Activision specifically proposed a pre-mediation meeting with the DFEH where the DFEH would give notice of what claims it had found cause for.

The TAC newly alleges that Defendant CEO Kotick made the misstatements with scienter because a new CW stated that when Activision Chief People Officer Claudine Naughton made significant changes to HR due to the Investigations, she did so under Kotick's direction. Additionally, two new CWs stated that Kotick's approval was required to fire anyone at the level of Senior Vice President and up and that Kotick had to know about the ongoing sexual harassment at Activision.

Finally, Defendants' argument that the TAC does not plead loss causation is meritless. Questions of loss causation are typically not resolved at the pleading stage and a complaint need only show a causal connection between the fraud and the loss.

**FACTUAL BACKGROUND AND SUMMARY OF NEW ALLEGATIONS**

**A. Defendants' Misstatements About the Investigations.**

The DFEH began requesting information from Activision in 2017. ¶¶114-115. The EEOC and DFEH began the Investigations, which concerned systemic sexual

harassment, discrimination, and retaliation at Activision by Commissioner's charge on September 26, 2018 and Director's Complaint on October 12, 2018, respectively. ¶¶112-117. Defendants did not disclose either Investigation and instead misled investors for more than two years by stating in Activision's 10-Ks and 10-Qs from November 8, 2018 through May 4, 2021 that all undisclosed investigations were "routine," in "the ordinary course of business," "not significant," and that they did not "expect them to have a material adverse effect." ¶¶390-426.

**B. The Court's Order on the SAC.**

On August 30, 2022, the Court granted Defendants' Motion to Dismiss the SAC with leave to amend. ECF No. 87. The Court held that "Plaintiffs' pleading strategy – grouping the SEC filings and setting forth the same exact reasons as to why each of the alleged misstatements are false or misleading – is insufficient under the PSLRA." *Id.* at 9. The Court further held that the TAC's scienter allegations were insufficient since they arose largely from the same allegations as falsity. *Id.* at 13.

**C. The TAC's Allegations.**

Plaintiffs amended the TAC so that it now clearly pleads why each of the "legal proceeding" statements were false when made. At the beginning of the Class Period (the November 8, 2018 legal proceeding statements), it was clear that: (1) there was pervasive sexual harassment at Activision and that the DFEH and EEOC's inevitable discovery of it would render the Investigations non-routine and significant (¶¶118-242); (2) the #MeToo movement made it extremely unlikely that the Investigations would be routine (¶¶243-247); (3) the Investigations were initiated by EEOC Commissioner Charge and DFEH Director's Complaint, which those government agencies rarely use and reserve for serious systemic misconduct (¶¶248-254); and (4) Activision's management informed the board of directors about the Investigations, which would not be true of a routine matter at a large company. (¶¶267-268).

Also, by the time Defendants issued the November 8, 2018 statements, the Investigations had caused the Company: (1) to fire key senior employees Ben Kilgore

and Tyler Rosen (¶¶215-226, 270-274); (2) to alter its HR practices by instituting formal procedures for internal complaints for the first time and holding regular meetings between company-wide HR and the legal department (¶¶255-261); and (3) to open a parallel internal investigation to obstruct the Investigations (¶¶262-266).

In the TAC, two new CWs, CW10 and CW11, who both worked in HR, alleged that Kotick's approval was required to terminate anyone at the level of Senior Vice President and up and that Kotick had to know about the ongoing sexual harassment at Activision because of that requirement. ¶¶220-222. This further corroborates that Kotick personally approved Kilgore's firing in August 2018, right before the formal initiation of the Investigations. ¶¶218-219. Additionally, a new CW, CW13, who worked in Blizzard HR from December 2013 to August 2018, including as a HR Business Partner, said her supervisor told her in the first half of 2018 that Kilgore was "untouchable". ¶225. That Kilgore was fired later that year shows that the impending Investigations caused a major shift at Activision. CW13 also said that it was standard practice to protect harassers that were valuable to the Company. *Id.* Kotick also received an email in July 2018 from a lawyer threatening a lawsuit from a former employee at Sledgehammer Games, an Activision-owned studio, stating that her client had been raped. ¶¶238-239. Thus, Kotick was sufficiently apprised of sexual harassment at Activision right before the Investigations started in fall of 2018.

The TAC also includes new allegations showing that the Investigations were a risk to Activision: 1) a study from PwC found that, for the first time, in 2018, more CEOs left companies because of unethical behavior, including sexual misconduct or ethical lapses than poor financial performance (¶244); and 2) the market value of Wynn Resorts Ltd. dropped by $2.1 billion on January 26, 2018 after *The Wall Street Journal* ("*WSJ*") published an article citing a pattern of sexual misconduct by the company's CEO Steve Wynn. (¶245).

The TAC further includes new CW allegations about the HR changes in the fall of 2018, right after the Investigations began. CW14, who was a Lead HR Program

Manager, said that immediately after the Investigations started, Activision's attorneys told her about them and made an "urgent" request for "huge" data sets on the Company's employees dating back years. ¶¶260-261. CW14 was confident that the higher-ups were worried about the Investigations. ¶261. The TAC also specifically alleges for the first time that Activision went to the trouble and expense of setting up a parallel internal investigation in 2018 as a ruse to obstruct the Investigations so that it could claim that sexual harassment complaints were privileged. ¶¶264-266.

The TAC also alleges that the Investigations and Activision's reaction to them intensified during the Class Period.

*By the February 28, 2019 and May 2, 2019 Statements*. Pervasive harassment continued at Activision, including with multiple employees telling new Blizzard President J. Brack about widespread harassment. ¶¶278-287; 290-291.

*By the August 8, 2019 and November 7, 2019 Statements*. In August 2019, Activision changed the reporting structure of HR, so that it reported directly to the Company's corporate office. ¶294. A spokeswoman for Activision admitted to *WSJ* that it made this change because the prior setup "'occasionally allowed some employees to conduct themselves in truly regrettable ways.'" *Id*. Given CW12's statements that changes in the complaint investigation process right after the Investigation began were due to the EEOC Investigation (¶¶255-258) and Activision's EEOC Consent Decree said that "Defendants represent that they have reorganized and reconstituted the Human Resources functions enterprise wide," it is clear that this huge structural change was due to the Investigations. ¶294.

*By the February 27, 2020 and May 5, 2020 Statements*. The TAC alleges for the first time that, on January 21, 2020, *The Los Angeles Times* reported that the DFEH moved to intervene to stop a $10 million settlement of a private class action for sexual harassment and discrimination that female employees of Riot Games filed against that company. ¶297. Riot Games is a Los Angeles based video game company like Activision and a direct competitor. *Id*. The DFEH intervened because it believed

that Riot's female employees could be entitled to up to $400 million. *Id.* Additionally, in 2019 Kotick was directly involved in an internal investigation of sexual harassment by the co-head of Activision's Treyarch studio. ¶296.

*By the August 4, 2020 and October 29, 2020 Statements.* On May 28, 2020, despite the fact that, according to CW15, he was working on a proprietary game for Activision and shelving that game cost Activision millions of dollars, Activision fired Alex Afrasiabi, the Senior Creative Director of Blizzard's most popular game, *World of Warcraft*. ¶¶301-303 Both CW15 and CW12 believed that the Investigations were the only possible explanation for Afrasiabi's firing given that his sexual harassment of women had been tolerated for years before he was abruptly fired. ¶¶302-305.

The TAC pleads for the first time that, according to three new CWs (CWs 10, 11, and 16), Activision made another significant structural change to HR, in June 2020, due to the Investigations. CW16, who served as Associate Director, Development Services in HR at Blizzard from June 2020 to February 2022, stated that, in June 2020, the Investigations caused Activision to create the Employee Relations Team, which took over all the internal investigations for the entire Company. ¶307. CW16 said there had not been standardized internal investigation procedures previously and that the newly created team took a "massive caseload" of internal investigations away from his HR team. ¶¶307-308. CW10, who, *inter alia*, served as Vice President of HR for Activision Publishing from February 2019 to December 2020 and reported to Activision Chief People Officer Naughton (who reported directly to Kotick), said that Naughton "began decimating HR in order to begin building up the company's employee relations team." ¶309. She further stated that she believes most of what Naughton did was at Kotick's direction. ¶310. Finally, CW11, who was a HR Partner at Blizzard, confirmed that the Employee Relations Team represented a dramatic change because there was no standardization of investigations of HR complaints previously. ¶311 CW11 said she did not even receive any training on how to conduct an investigation until late 2020. *Id.*

MEM. OF PTS. AND AUTH. IN OPP. TO MTD TAC                    2:21-cv-06240-PA-JEM

*By the February 23, 2021 Statements*. In 2020, 30 female employees working in Activision's Esports division wrote an email, which Kotick was aware of, to their unit's leaders saying that female employees had been subject to unwanted touching, demeaning comments, and exclusion from important meetings. ¶317.

*By the May 4, 2021 Statements.* The TAC alleges for the first time that after over two years of investigation, Activision internally acknowledged significant risk of a cause finding. Activision's Answer to the DFEH Amended Complaint admits that, in early 2021, as part of negotiations with the DFEH about extending the parties' tolling agreement, which was set to expire in July 2021, Activision "proposed a pre-mediation meeting as the channel for DFEH to give notice of the claims on which it had found 'cause.'" ¶320, Ex. 2 ¶178. Activision would not have proposed this absent a belief that there was a high chance that the DFEH would find cause. Activision further admitted in its Answer to the DFEH Amended Complaint, "on April 2, 2021, DFEH served a Subpoena Duces Tecum [Activision]…seeking broad categories of documents far beyond those alleged employment practices noticed in the DFEH's Director's Complaint." ¶321. On April 12, 2021, Activision asked the DFEH to meet and confer, but the DFEH "did not respond to [Activision] request." *Id.* Since Activision believed that there was significant risk that the DFEH would find cause for one or more of its claims, the dramatic breakdown in negotiations with the DFEH *more than two years after DFEH started investigating* indicates that Activision believed there was a significant risk that the DFEH would file suit against it.

**D. The Investigations Become Public, Causing Chaos at Activision.**

On July 20, 2021, DFEH publicly filed its Complaint (the "DFEH Complaint") alleging, *inter alia*, that Activision had illegally allowed sexual harassment, discrimination, and retaliation and revealing the existence of its investigation. ¶¶327-328. The next day, in an attempt to blunt reaction to the DFEH Complaint, the Company issued an angry denial, stating that the DFEH included "distorted" and "false descriptions of Blizzard's past" and that the Company had been "extremely

cooperative" with the DFEH's investigation. ¶329. This denial caused explosive anger across social media — current and former Activision employees shared their stories of abuse and more than 2,000 of the Company's employees signed an open letter calling its response to the DFEH Complaint "abhorrent and insulting" and planned a walkout. ¶¶330-333. When it became clear that the Company's denial rang hallow, the Company's stock fell 6.75% to close at $84.05 on July 27, 2021. ¶335. *Bloomberg Intelligence* attributed the stock drop to "[t]he increasing threat of an exodus of key talent from Activision in the wake of [the DFEH suit]." ¶334.

With his workforce in revolt, Kotick was forced to apologize, but hundreds of employees still walked out in protest. ¶¶336-337. The fallout continued with the resignation of Blizzard President Brack in early August. ¶342. The Game Director of upcoming game, Diablo IV, was fired soon thereafter and, in September, the Executive Producer of the game Overwatch left, both due to the scandal. ¶¶346, 359.

On September 20, 2021, *WSJ* reported that the SEC had opened an investigation into sexual misconduct at Activision and subpoenaed Kotick. ¶354. A *Bloomberg Intelligence* report issued that day stated that this could compromise Activision's ability to execute new games, including Diablo IV and Overwatch 2. ¶355. On September 20 and 21, 2021, the Company's stock dropped more than 8% to $73.03. ¶356. On September 27, 2021, the EEOC filed suit against the Company in federal court. Activision settled with the EEOC, agreeing to an onerous three-year consent decree ("EEOC Consent Decree") and an $18 million penalty. ¶¶360-368.

During its November 2, 2021 earnings call, Activision admitted that the departures of Overwatch and Diablo's leadership, which were caused by the fallout from the Investigations, would cause the next installments of, and consequently revenues tied to, those games to be delayed. ¶¶373-376. The Company's stock then went into free fall, dropping 14% to $66.75. ¶382. Contemporaneous analyst reports confirmed that this drop was due to the game delays, tracing them directly back to the scandal the Investigations caused. ¶¶378-381. On November 16, 2021, *WSJ*

published its report that Kotick knew about sexual misconduct for years. ¶383. The Company's stock declined 8.3% from its daily high to close at $66.14. ¶386.

## ARGUMENT

On a Rule 12(b)(6) motion, "[a]ll allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff" and "[a] complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts...that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003) ("*America West*").

## I.   THE TAC ALLEGES ACTIONABLE MISSTATEMENTS.

"A statement or omission is misleading…if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011).

Each Activision 10-K and 10-Q filed between November 2018 and May 2021 made similar misstatements. For example, in its 2018 and 2019 10-Ks, Activision enumerated certain legal proceedings followed by the blanket statements:

> "***In addition, we are party to routine claims, suits, investigations…and other proceedings arising in the ordinary course of business***, including with respect to…***employment matters***…. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business***…."

¶¶397, 409 (emphasis added).[4] These paragraphs falsely represented that: (i) all claims and investigations not listed were "routine" and "ordinary course," (ii) all such "routine" claims are "not significant," and (iii) management does not expect any of the "routine" claims will have a material adverse effect on the Company. Defendants

---

[4] The 2nd Quarter 2019 10-Q is functionally the same. ¶403. The 2020 10-K and other 10-Qs each have similar language starting from "we are party to routine…." ¶¶391, 400, 406, 412, 415, 418, 422, 425.

stated explicitly that this applied to all investigations about "employment matters."

Defendants were not required to, but once Defendants spoke about the investigations Activision was subject to, they were bound to do so in a way that was not misleading. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (general statement about work backlog required disclosure that some of the backlog was subject to stop work orders); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F.Supp.3d 568, 574-575, 584 (S.D.N.Y. 2016) ("*Och-Ziff*") (by stating that "the Company is currently not subject to any pending…proceedings…expected to have a material impact…," "Och-Ziff opted to speak on the subject of investigations").

## A. The Statements That the Investigations Were "Routine" and in the "Ordinary Course of Business" Were Not Opinion Statements.

Defendants assert the sentence "we are party to routine claims, suits investigations…and other proceedings arising in the ordinary course of business, including with respect to…employment matters" is an opinion, but it contains no language modifying "routine" or "ordinary course of business" indicating they are opinions. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (opinions are prefaced with modifiers like "I believe" or "I think," such as "I think the coffee is hot"). Defendants base this on the fact that *the next sentence* is an opinion statement, asserting the context makes the first sentence an opinion. Defendants' Motion to Dismiss TAC ("Mot.") at 16-18. The context demonstrates the opposite, however. When addressing whether the statement was forward-looking in its Order on the FAC, the Court stated that the "routine" statement is "a statement of ***present fact***" (emphasis added). ECF No. 75 at 13. That affirmative statement of present fact is followed by a sentence that is clearly demarcated as an opinion since it starts with "In the opinion of…." Defendants could have, but did not, indicate that "routine" and "ordinary course" were likewise opinions.

Defendants' argument is further undermined by the fact that courts treat even "embedded statements of fact" within an opinion as factual statements. *See*

*Omnicare*, 575 U.S. at 185 (explaining that "we use a patented technology to which our competitors do not have access" would be a statement of fact even if prefaced by "I believe our TVs have the highest resolution available because…"); *In re QuantumScape Sec. Class Action Litig.,* 580 F. Supp. 3d 714, 739-740 (N.D. Cal. 2022*)* (holding that facts contained in statements that started with "we believe" were actionable). Accordingly, even if Defendants had said that in the opinion of management, the investigations were not significant and did not expect them to have a material adverse effect *because* they were routine, the "routine" portion of the statement would be an embedded statement of present fact. Here, Defendants clearly separated fact and opinion, making this a much easier case.[5]

### B. Defendants' Fact Statements That the Investigations Were "Routine" and in the "Ordinary Course of Business" Were Misleading.

The definition of "routine" is "of a commonplace or repetitious character" and the definition of "ordinary" is "of a kind to be expected in the normal order of events."[6] Defendants' falsity arguments are an exercise in trying to avoid this language in their statements. They try to alter the relevant inquiry — whether the Investigations were "routine" — to whether the regulatory outcome was certain. This is, however, contrary to law. For example, in *SEB Inv. Mgmt. AB v. Align Tech., Inc.,* 485 F. Supp. 3d 1113, 1131 (N.D. Cal. 2020), the court held that the statement "there's not a momentum piece or anything that we're adjusting the business around right now" was false because plaintiff alleged that defendants had been adjusting the business by implementing a new $200 discount to combat competition. Defendants disputed whether the discount was an actual "adjustment" because the use of

---

[5] Defendants' cases are distinguishable. *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15-16 (S.D.N.Y. 2016) (court did not address whether portion of disclosure was not an opinion and noted that portion that could have potentially been construed as a present fact was accurate; statement did not use term "routine"); *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (off the cuff statement during earnings call was in response to question of what defendant's "expectation" was).

[6] *See* https://www.merriam-webster.com/dictionary/routine and https://www.merriam-webster.com/dictionary/ordinary.

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD TAC                    2:21-cv-06240-PA-JEM

promotions was a regular part of Align's marketing tools, but the court held that the statement was misleading because "the Court may not resolve any disputes about the actual meaning of the statement in this procedural posture." *Id.* at 1132. The court further held that the argument that the promotion was not significant enough to be an "adjustment" concerned materiality and was not proper on a motion to dismiss. *Id.*

*Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 660, 673 (M.D. Tenn. 2022), addressed the precise question of what is required to plead that an investigation is not routine. It held that statements that a company was "subject to routine, regular and special investigations" were misleading because the plaintiff plausibly pled that a DOJ kickback investigation "***was not, in context, simply a run-of-the-mill matter*** that investors had no reason to expect disclosure about." *Id.* (emphasis added). That court noted that "the plaintiffs have alleged that the investigation was well-founded, broad in scope, and likely to uncover wrongdoing" *Id.* at 673. It further held that the defendants would have "ample opportunity to argue that that characterization was false," but it was "required, at this stage, to accept the plaintiffs' particularized, well-pleaded allegations as true for the purposes of the motion to dismiss." *Id.*

Defendants encourage the Court to consider each of the TAC's allegations in isolation, but to properly determine whether a statement is misleading — whether it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists — it is necessary to consider the allegations in their totality. Here, when the allegations are considered together and in context, it is clear that the TAC pleads that the Investigations were not "common place" or "run-of-the-mill" at the beginning of the Class Period and that the Investigations grew more intense and threatening as the Class Period wore on.

As an initial matter, leading up to the initiation of the Investigations in fall of 2018, pervasive misconduct took place at the Activision. Multiple sources corroborate this, *e.g.,* complaints from the DFEH and EEOC, extensive investigations by *WSJ*, *The Washington Post,* and *Bloomberg*, and numerous CWs. ¶¶118-242. This

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD TAC                              2:21-cv-06240-PA-JEM

included two major incidents that Kotick was directly involved in — the Company's sudden firing of Kilgore for sexual misconduct in August 2018 (¶¶215-225) and the July 2018 email that Kotick received about rape at Activision-owned Sledgehammer games (¶¶238-239). Also, Michael Morhaime, who was Blizzard President until October 2018, had detailed knowledge of harassment. ¶¶191-196. Thus, it was objectively true that a sexual harassment investigation would uncover significant misconduct at the Company. The risk of public revelations about sexual harassment was clear since the #MeToo Movement had led to the firing of numerous high-profile men starting in 2017 and continuing through 2018. ¶243. The number of firings was so dramatic that PwC found that the number of CEOs who left due to unethical behavior eclipsed the number who lost their jobs for poor performance in 2018. ¶244. The risk to a company's stock price was not hypothetical — the market value of Wynn Resorts Ltd. dropped by $2.1 billion after *WSJ* published an article in January 2018 citing a pattern of sexual misconduct by CEO Steve Wynn. ¶245.

Given these circumstances, it was perilous to Activision when the EEOC and DFEH opened their Investigations a few weeks apart in fall 2018. Furthermore, the Investigations were rare, non-routine mechanisms reserved for accusations of serious, systemic misconduct. ¶¶250-254. The EEOC only filed 11 Commissioner's charges in the entire United States in 2018, which decreased to 9 in 2019 and 3 in both 2020 and 2021. ¶252. The DFEH only filed 3 Director's Complaints in 2020 and 4 in 2019, and the Activision investigation was only one of 10 ongoing. ¶254.[7]

Furthermore, that the Investigations were not routine is based on even more than the strong circumstantial evidence of the type of investigation, the pervasive harassment at the Company, and the prominence of the #MeToo movement. ***There is also ample evidence that the Company treated the Investigations as non-routine.*** *First*, the TAC alleges that based on the statements of CW12 (who held multiple high-

_____

[7]As noted in Defendants' Opposition to the Motion to Dismiss the SAC, Defendants' Ex. F (previously, Ex. H) is referring to complaints of individuals, not Director's Complaints.

- 13 -

level positions in Activision HR between 2015 and 2020, including HR Business Partner, in fall of 2018), shortly after the Investigations began, all of Activision's HR Business Partners companywide began, for the first time, having regular meetings with the Company's legal team where the Company's executives told them to start documenting all sexual harassment and other internal complaints. ¶¶255, 258. Prior to that, Activision HR did not have a formal process for investigating complaints and there was no consistent documentation of them. ¶258. The Company's executives specifically told CW12 and other HR Business Partners that the EEOC Investigation caused these changes. *Id.* New CW, CW14, who was a Lead HR Program Manager, also confirmed an immediate response — shortly after the Investigations started, Activision attorneys told her about the Investigations and made an "urgent" request for a "huge" data set on employees specifically in response to the Investigations. ¶260-261. *Second*, shortly after the Investigations began, Activision set up a parallel investigation and used it to obstruct the DFEH's Investigation — this was an expensive defensive maneuver that is certainly not routine. ¶¶262-266. *Third*, Activision management informed the Board about the Investigations. ¶267. Activision, a large company with 9,500 employees, would not inform its board of "routine" legal matters. ¶¶268, 384. *Fourth*, the Investigations caused Activision to abruptly fire Kilgore, Blizzard's CTO, and Rosen, Senior Manager of Global Business Strategy & Operations, in August 2018 and October 2018, respectively, after the Company had protected them for years. ¶¶215-226; 270-272.

Defendants segregate the TAC's allegations in their Motion in a conscious attempt to ignore and obscure the fact the Investigations and Activision's reaction to them escalated in intensity as the Class Period wore on. As detailed in the TAC and herein, while the Investigations intensified and Activision's actions in response thereto grew in significance, Defendants' misstatements and omissions concerning the Investigations remained static.

Harassment continued to be so pervasive that in early 2019, shortly after Brack

took over as Blizzard President, he was directly informed multiple times by employees of the ongoing harassment and discrimination. ¶¶278-287; 290-292.

Then, in August 2019, Activision continued to dramatically restructure HR so that it reported directly to the Company's corporate office, which Activision admitted to *WSJ* was due to the inability to stop sexual harassment. ¶294. That was, however, not the end of the restructuring, as described by three new CWs (CW16, CW10, and CW11). Activision completely restructured how they conducted internal investigations in June 2020, establishing the Employee Relations Team to handle all the internal investigation of complaints for the entire company — previously there had not been a standard procedure. ¶¶307-311. Although Defendants conveniently claim the contrary now, Activision admitted in the EEOC Consent Decree that the changes to HR had been enormous, stating that "Defendants represent that they have reorganized and reconstituted the Human Resources functions enterprise wide." ¶294. Thus, by June 2020 at the latest, the Investigations were non-routine.

Furthermore, as the TAC alleges for the first time, while Activision was making these changes to HR, on January 21, 2020, that the DFEH Investigation was not routine was made deafeningly clear by the DFEH's intervention into the $10 million settlement of a class action lawsuit against Riot Games and its statement that Riot's female employees could be owed $400 million. ¶297. This showed the specific threat the DFEH Investigation posed to the Company. Afrasiabi was also suddenly fired on May 28, 2020 and harassment was still so pervasive in 2020 that 30 employees in Activision's Esports division wrote an email to unit leaders that they were subject to unwanted touching and demeaning comments. ¶¶301-306, 317.

Finally, in early 2021, the DFEH Investigation became even farther removed from anything that could possibly be described as "routine" when Activision, became so worried about a DFEH cause finding that it proposed a pre-mediation meeting where DFEH could give notice of the claims on which it found cause. ¶320. Furthermore, the complete breakdown of talks between Activision and DFEH in

April 2021 that was punctuated by the DFEH surprising Activision with a broad subpoena and then refusing to negotiate about its scope further supports this. ¶321.

The cases Defendants rely on underscore why the facts above, taken together, render Defendants' statements misleading. The cases that Defendants cite for the proposition that Plaintiff must show that the regulatory outcome was certain do not support their position. Mot. at 11. In *Habelt v. iRhythm Techs., Inc.*, 2022 WL 971580, at *8, *16-*17 (N.D. Cal. Mar. 31, 2022), falsity hinged on whether the "regulatory outcome was knowable and absolutely certain" *because it concerned a regulatory proceeding that was already public*. *Kang v. PayPal Holdings, Inc.*, 2022 WL 3155241, at *9 (N.D. Cal. Aug. 8, 2022) simply held "a statement about compliance is not made misleading just because a later regulatory inquiry occurs." Neither of these cases apply to a specific representation that all undisclosed investigations were routine. Defendants also cite cases for the proposition that Plaintiffs' CW allegations about the significant HR changes were not "indicative of falsity," (Mot. at 12), but they only stand for the uncontroversial proposition that what the CW alleges must actually show the statements are false. *See Inchen Huang v. Higgins,* 443 F. Supp. 3d 1031, 1046 (N.D. Cal. 2020) (CWs did not show falsity, because their statements did not indicate that widespread off-label marketing took place, which is what the plaintiff needed to establish); *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276-1277 (N.D. Cal. 2019) (both statements and reasons they were false were too general). Here the CWs specially stated the Investigations caused huge changes to HR, rendering in the Investigations non-routine. ¶¶258, 307.[8]

---

[8] Lastly, the cases Defendants cite for argument that the belief of CWs that Kilgore, Rosen, and Afrasiabi were fired due to the Investigations is irrelevant (Mot. at 13-14) are distinguishable. In those cases, the witnesses' positions were not described with particularity and/or they had no reason for their beliefs. Here each witness's position is described and each had specific information supporting their beliefs: (1) CW13 had specific knowledge from her supervisor in HR that Kilgore had been considered untouchable before he was fired (¶¶224-225); (2) CW15 had personal knowledge that Afrasiabi was in the midst of developing a game that the Company had spent millions of dollars on when he was abruptly fired and it was cancelled (¶302-303); and (3) CW12, as someone who was high up in HR, was in a position to know how surprising each firing was (¶¶223, 272, 304).

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD TAC                    2:21-cv-06240-PA-JEM

## C. Defendants' Opinion Statements Were Misleading.

Defendants' statements that "[i]n the opinion of management… such routine claims are not significant and we do not expect them to have a material adverse effect on our business…" are two separate misleading statements joined by "and." Thus, the Court should evaluate each separately. Opinions are actionable where a plaintiff identifies "particular (and material) facts going to the basis for the…opinion…whose omission makes the opinion…at issue misleading to a reasonable person reading [it] fairly and in context." *Omnicare,* 575 U.S. at 194; *see also Todd v. STAAR Surgical Co.,* 2016 WL 6699284, at *8-*9 (C.D. Cal. Apr. 12, 2016) (opinion that "[STAAR] believes it is substantially in compliance with the FDA's [regulations]" was misleading due to failure to disclose FDA violations).[9] Here, Defendants' omission of the Investigations made their statements that all undisclosed investigations were "not significant" or expected to have a "material adverse effect" misleading. *See Och-Ziff,* 164 F.Supp.3d at 584 (opinion misleading because "Plaintiffs have plausibly alleged…projections about the likely impact of regulatory proceedings were based on omitted facts that, if disclosed, would have conflicted with what a reasonable investor would have taken from…[the] statements themselves").

Notably, this case is even stronger than *Och Ziff* because Defendants also stated that all undisclosed investigations were "not significant." "Significant" is defined as "having or likely to have influence or effect."[10] For the reasons stated in the previous section, omitting the Investigations rendered the opinion that any existing "investigations" were "not significant" misleading. Additionally, the opinion "we do not expect [any Investigations] to have a material adverse effect on our business" was also false and misleading. In particular, the serious risk of a material adverse effect

---

[9] In *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2018 WL 1230570, at *4 (C.D. Cal. Jan. 8, 2018), this Court held an opinion  non-actionable because plaintiffs did not "identify facts going to the basis of the [opinion] that rendered it misleading to a reasonable person." Here the undisclosed fact was that the Investigations were occurring.

[10] https://www.merriam-webster.com/dictionary/significant

on Activision was evident by January 21, 2020, when the DFEH intervened in the $10 million settlement of the Riot Games class action and stated that its female employees should get *40 times that amount of money*. ¶297. The potential of the DFEH's Investigation to have a material adverse effect became even more profound when Activision, in early 2021, (1) became so worried about a DFEH finding of cause that it proposed a pre-mediation meeting for the purpose of the DFEH giving notice of cause and (2) talks with DFEH collapsed to the point that DFEH served a broad subpoena on Activision and refused to negotiate about it. ¶¶320-323. Finally, even if Activision's entire legal proceeding disclosures were opinions, including the "routine" and in the "ordinary course of business" portion, as Defendants erroneously argue, they would still be actionable for the reasons articulated in this section.[11]

## II. THE TAC ALLEGES SCIENTER.

When considering scienter, a court must "accept all factual allegations in the complaint as true" and "consider the complaint in its entirety." *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014). Scienter may be pled by alleging "knowledge of the falsity as well as 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (quoting *America West*, 320 F.3d at 937). If the inference of fraud is at least *equally* as likely as any non-culpable explanation, scienter is pled. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

### A. Defendants Made Misstatements Knowingly or Recklessly.

Kotick certified every misstatement as not misleading pursuant to Sarbanes Oxley ("SOX"). Defendants admit that Kotick was aware of the Investigations, but argue that the TAC does not establish that that he knew that they were non-routine or would have a material adverse effect. Mot. at 20. But the evidence that Kotick knew or should have known the statements were misleading is overwhelming. ¶¶432-441.

---

[11] *In re Herbalife, Ltd.*, 2015 WL 7566616, at *2 (C.D. Cal. Nov. 23, 2015) is distinguishable — the market was already aware of what made the statements misleading, the stock was climbing less than a week after disclosure and rose over the next two weeks, and plaintiff bought shares post corrective disclosure. Here, the stock dropped from $91.51 before the DFEH filed its complaint to $66.14 at the end of the Class Period.

MEM. OF PTS. AND AUTH. IN OPP. TO MTD TAC                    2:21-cv-06240-PA-JEM

Leading up to the opening of the Investigations, Kotick was aware of pervasive harassment at Activision. Kotick received the July 2018 email concerning rape at Sledgehammer Games (¶¶238-239) and personally approved Kilgore's firing and, therefore, knew of the circumstances precipitating it (¶219). Kotick's involvement in Kilgore's firing for sexual harassment was not atypical — the *WSJ* found: "Kotick approves high-profile hiring decisions and the exit and pay packages of star developers, and he is typically aware of any major problems in each of Activision's 12 development studios and three major business units." ¶218. Also, CW10 and CW11 (both new in the TAC), who both worked in Activision HR, stated that Kotick had to approve the termination of anyone at the level of Senior VP and above and, therefore, Kotick was aware of the harassment precipitating the terminations of Kilgore and others. ¶¶220-222. *WSJ* confirmed this, finding as part of an extensive investigation based on "memos, emails and regulatory requests, and interviews with former employees and others familiar with the company" that Kotick was aware of "allegations of employee misconduct in many parts of the company." ¶237. Additionally, Blizzard President Morhaime, Kotick's direct report, had detailed knowledge of the harassment and would have reported it to Kotick. ¶¶191-196, 432.

When the Investigations began, but before the first misstatement (November 8, 2018), Activision's board of directors, which Kotick is on, was informed of the Investigations (¶¶267-268), accordingly Kotick would have been aware of rarely used mechanisms the government agencies used to commence them (¶¶248-254). Additionally, CW12 stated that Kotick knew, because of his regular one-on-one meetings with Chief People Officer, Naughton (who reported directly to him), that the EEOC Investigation caused (1) HR to have regular meetings with the legal department for the first time and (2) executives to give a mandate to HR to start documenting all complaints and instituting a formal process for investigating them. ¶¶255-259. Accordingly, Kotick would have also been aware of the internal investigation that the Company instituted contemporaneously in 2018 which is used

as a ruse to conjure a claim of privilege over the harassment complaints ¶¶262-266.

As Kotick continued to sign SOX Certifications attesting to the accuracy of the Class Period misstatements, his knowledge of the magnitude of the Investigations deepened. Due to his one-on-one meetings with Naughton and the degree of change, Kotick would have been aware that, in August 2019, Activision changed the structure of HR so that it reported directly to the corporate office due to the inability to stop sexual harassment. ¶294. Also, as pled for the first time in the TAC, CW10 stated that Kotick directed most of what Naughton did, including when, because of the Investigations, in June 2020, she established the Employee Relations Team, which took all internal complaint investigations away from HR. ¶¶307-311. Additionally: (1) in early 2019, new Blizzard President Brack who reported to Kotick had detailed knowledge of the harassment and discrimination (¶¶278-283, 290, 433); (2) Kotick was personally involved in the internal investigation concerning Treyarch co-head's sexual harassment in 2019 (¶296); and (3) Kotick was aware of the 2020 email from 30 women in esports concerning harassment and discrimination at Activision (¶317). Furthermore, as all this was happening, Kotick certainly would have known that the DFEH had intervened in the class action lawsuit against direct competitor Riot Games and stated its female employees were owed as much as $400 million. ¶297.[12]

That Activision dramatically changed its HR procedures because of the Investigations is strongly indicative of scienter. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016) (that company made internal effort to respond to the FDA, while failing to disclose the FDA's concerns contributed to scienter). Defendants contend that "the TAC offers no facts tying [the HR changes] to the regulatory investigations." Mot at 20. Not so. As described above, (1) Activision's executives told CW12 that the 2018 HR changes were due to the EEOC Investigation

_____

[12] *Jun Zhang v. LifeVantage Corp.*, 2017 WL 2599883, at *6 (D. Utah June 15, 2017), is easily distinguishable because it concerned allegations that defendants were on notice of fraud simply because the defendant company was a multi-level marketing company. *Here Defendants knew that the DFEH was investigating Activision.*

MEM. OF PTS. AND AUTH. IN OPP. TO MTD TAC      2:21-cv-06240-PA-JEM

(¶258); (2) CW10 stated the creation of the Employee Relations Team was due to the Investigations (¶307); and (3) the EEOC Consent Decree states that "Defendants represent that they have reorganized and reconstituted the [HR] functions enterprise wide" (¶294). Defendants' cases are also distinguishable. *See Camp v. Qualcomm Inc.*, 2020 WL 1157192, at *6 (S.D. Cal. Mar. 10, 2020) (no reason to believe that Defendants believed their statements were misleading because Defendants *disclosed* the exact risk that plaintiffs claimed they concealed); *Veal v. Lendingclub Corp.* 2020 WL 3128909, at *7, *14 (N.D. Cal. June 12, 2020) (primarily concerned whether defendants were aware of focus of *already disclosed* FTC investigation).

Defendants assert that the CWs' allegations as to Kotick are not indicative of scienter since they did not have direct contact with him. First, a CW need not have direct contact with a defendant. *See, e.g., Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10–*11 (N.D. Cal. Apr. 28, 2020) (CW allegations sufficient despite lack of direct contact with the defendants); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020) (CW allegations contributed to scienter despite not having direct contact with defendants). Second, the CW allegations are very specific: CW12 stated that Kotick was aware of HR changes due to his one-on-one's with Naughton, and CW10 stated that Naughton made changes at Kotick's direction. ¶¶259, 310. Courts have held that similar allegations support scienter. *See In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *6-*7 (N.D. Cal. May 1, 2017) (scienter pled based on access to information and CW allegations about what would have been disclosed to defendants). In contrast, Defendants' cases are distinguishable.[13]

---

[13] *See Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *15 (N.D. Cal. Mar. 31, 2021) (vague allegations that because CWs saw defendant visiting company facilities, he must have known how authentication process worked); *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108–09 (9th Cir. 2021) (scienter allegations were entirely based on defendants' role at the Company); *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021) (CW allegations were not anchored in time); *In re Facebook, Inc. Sec. Litig.*, 2021 WL 6000058, at *6 (N.D. Cal. Dec. 20, 2021) (no connection at all between defendants and misstatements); *Korzen v. Tetra Tech Inc.*, 2014 WL 12603209, at *3 (C.D. Cal. Jan. 17, 2014) (no CW statements implicating defendants or accounting policies at issue); *Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *20 (N.D. Cal. Apr. 27, 2017) (no clear allegation that defendants knew that integration was not on track); *Waterford Twp.*

- 21 -

MEM. OF PTS. AND AUTH. IN OPP. TO MTD TAC                    2:21-cv-06240-PA-JEM

Even if the above facts were not sufficient to show Kotick's knowledge, he was, at minimum, reckless since he could have easily found out more information about the nature and progress of the Investigations. *See Mulderrig,* 492 F. Supp. 3d at 1013, 1026-1027 ("It is not necessary…to establish a strong inference that defendants actually knew contradicting facts since '[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct….'" (quoting *In re VeriFone Holdings, Inc.*, 704 F.3d 694, 708 (9th Cir. 2012)); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (should consider "executive's access to the information").

The TAC also pleads scienter for the other Defendants. Durkin and Kelly signed filings that covered most of the Class Period — Durkin signed every filing and SOX certificate from February 28, 2019 through February 23, 2021 and Kelly signed 10-Ks on February 28, 2019, February 27, 2020, February 23, 2021. The only significant event that occurred after all the statements they signed was the broad DFEH subpoena. Zerza signed and SOX certified the last, May 4, 2021, statements.

Durkin and Zerza served as Activision's CFO during the Class Period. ¶¶58-59. Accordingly, it was their job to assess the misstatements' accuracy, since they were part of Activision's financial statements. ¶¶442, 444. Given the major changes to HR, the high-profile firings, the easy accessibility of information about the nature, scope, and progress of the Investigation, and the pervasive sexual harassment at Activision, Durkin, and Zerza were reckless in executing SOX certificates. *Id.* Additionally, Zerza held high-level positions at Blizzard from August 2015 to April 2021, and CW17 had personal knowledge that Zerza worked closely with Brack, Morhaime, and Blizzard HR and, therefore, would have known about the harassment. ¶443. Additionally, Kelly was aware of the nature of the Investigations and their progress and effects since he was Chairman of Activision's Board of Directors. ¶445.

---

*Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1154 (C.D. Cal. 2018) (none of the CWs had personal knowledge of the inventory levels at issue); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1079 (C.D. Cal. 2012) (complaint vaguely alleged that defendant knew about immigration status of employees because he spent time at the factory).

MEM. OF PTS. AND AUTH. IN OPP. TO MTD TAC                    2:21-cv-06240-PA-JEM

**B. The TAC's Motive Allegations Support the Inference of Scienter.**

Although a motive standing alone is not sufficient, it can meaningfully contribute to scienter. *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference").[14] Plaintiffs allege that Kotick was motivated to keep Activision's stock price above $79.96 for 90 days so he could get a $150 million bonus. ¶¶452-455. Courts in the Ninth Circuit have held allegations that a defendant had a strong incentive to keep the stock price up supports scienter. *See Am. West*, 320 F.3d at 944 (the desire to receive stock options were "particularized allegations" of motive even though the only connection between the options and the statements was that the options were based on financial performance); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011) (need to keep stock price above a specific amount to maintain access to capital "buttresse[d] a finding of scienter"); *Mandalevy v. Bofi Holding, Inc.*, 2021 WL 794275, at *5 (S.D. Cal. Mar. 2, 2021) (scienter supported because "Defendants' false statement would ward off a drop in stock prices and prevent the investigation from affecting BofI's value"). The Defendants complain that the TAC does not allege Kotick sold stock, but neither did the defendants in *Am. West*, 320 F.3d at 944.

**C. The TAC Alleges Corporate Scienter.**

The scienter of each Individual Defendant is imputed to Activision. The Court should also impute scienter from Blizzard President Brack, who was aware of the culture of harassment and headed one of Activision's three segments under *respondeat superior*. ¶¶278-283, 290-291, 470. *See Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1576–77 (9th Cir. 1990).

A plaintiff can plead corporate scienter without alleging that a particular person had scienter in "circumstances in which a company's public statements [a]re so important and so dramatically false that they [ ] create a strong inference that at least

---

[14] *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012), unremarkably held that corporate objectives are not by themselves "sufficient to allege scienter."

MEM. OF PTS. AND AUTH. IN OPP. TO  MTD TAC                    2:21-cv-06240-PA-JEM

some corporate officials knew of the falsity…." *Erickson v. Corinthian Colleges, Inc.*, 2015 WL 12732435, at *10 (C.D. Cal. Apr. 22, 2015) (internal quotation marks omitted); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 66281, at *14-*15 (N.D. Cal. Jan. 4, 2017). The misstatements fit into this category. Because they were part of Activision's financial statements and made repeatedly, they were closely vetted. Since, as described above, the Investigations were far from routine, at least some corporate officer must have been aware of their falsity. The Company's obstruction of the DFEH Investigation, *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 548 (S.D.N.Y. 2020), and false denial of the DFEH's allegations, *see Karinski*, 2020 WL 281716, at *16, also supports corporate scienter. ¶¶347-352; 466-468.

### III.   THE TAC ALLEGES LOSS CAUSATION.

"Questions of loss causation are typically not to be resolved at the pleading stage." *Ansell v. Laikin*, 2011 WL 3274019, at *4 (C.D. Cal. Aug. 1, 2011). Ninth Circuit authority contradicts Defendants' assertion that the brief gap from July 20, 2021, when the DFEH filed its public complaint and the first large stock drop on July 27, 2021, defeats loss causation. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1053, 1057-1058 (9th Cir. 2008) (finding loss causation despite almost three month lag between corrective disclosure and stock drop). Defendants misleadingly cite *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-754 (9th Cir. 2018). There, the Ninth Circuit explained that "[t]o prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss" and "[r]evelation of fraud…is simply one of the 'infinite variet[ies]' of causation theories a plaintiff might allege to satisfy proximate cause." "That a stock price drop comes immediately after the revelation of fraud can help to rule out alternative causes….***But that sequence is not a condition of loss causation***." *Id.* at 754 (emphasis added); *see also In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *20-*21 (C.D. Cal. Aug. 4, 2014) (loss causation established by "alleging that…misrepresentations concealed a

risk that materialized and played some part in diminishing the value of the security.").

There is a clear causal connection for each stock drop. Defendants did not disclose the Investigations, concealing a risk. After the DFEH filed its complaint, Activision strongly denied the allegations, delaying the reaction. ¶329. The DFEH Complaint directly caused the employee unrest that undermined Activision's efforts to minimize the suit, caused the drop on July 27, 2021. ¶¶330-335, 427. The stock next dropped on September 20 and 21, 2021, when the SEC opened an investigation into harassment and discrimination at Activision — the publicity from the DFEH Complaint was the but-for cause of the SEC Investigation. ¶¶354-356, 428. Activision stock next dropped 14% on November 3, 2021 because of delays of the latest installments of its Diablo and Overwatch franchises. Activision admitted in its third quarter 2021 earnings call that leadership changes to those games, which were caused by the disclosure of the Investigations, led to the delay. ¶¶373-382, 429. Finally, Activision's stock dropped again on November 16, 2021 after a *WSJ* investigation precipitated by the disclosure of the Investigations revealed that Kotick had long known about misconduct at Activision. ¶¶383-386, 430.

The cases that Defendants cite are inapplicable. Several of them concern instances where none of the alleged corrective disclosures revealed the alleged fraud, whereas the issue here was a delay in the stock drop.[15] There was no loss causation in *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021), because the stock rebounded quickly, but here the stock price dropped from $91.51 before the DFEH filed its complaint to $66.14 at the end of the Class Period.[16]

## CONCLUSION

Defendants' Motion should be denied.

---

[15] *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008); *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *7 (C.D. Cal. Feb. 6, 2014).

[16] *Rok v. Identiv, Inc.*, 2016 WL 4205684, at *3-*4 (N.D. Cal. Aug. 10, 2016) only held that the announcement of an internal investigation is not by itself sufficient for loss causation.

MEM. OF PTS. AND AUTH. IN OPP. TO MTD TAC                    2:21-cv-06240-PA-JEM

DATED: December  1, 2022

**THE ROSEN LAW FIRM, P.A.**

By: _Laurence M. Rosen_
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Brian B. Alexander, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: balexander@rosenlegal.com

_Lead Counsel for Plaintiffs_